## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| JOHN DOE, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **CIVIL ACTION NO. 5:04-CV-0173-3(DF)** |
| ) | |
| GEORGIA DEPARTMENT OF ) | |
| CORRECTIONS, et al., ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## BRIEF IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT

Plaintiff John Doe respectfully submits this brief in response to Defendant's motion for summary judgment.

## INTRODUCTION

This claim and two related claims arise from a series of homosexual assaults by Frank Scott State Prison (hereafter "Frank Scott") guard Nicholas Tuft during the summer of 2002. Plaintiff John Doe was victim one, Charles Doe was victim two, and James Doe was victim three. Before addressing the facts and Defendants' legal arguments, several general observations are appropriate.

First, the briefs of all Plaintiffs are identical. Although Defendants' briefs vary slightly from case to case, the facts of each case are related and interdependent and the legal arguments are essentially the same. To the extent that a particular Plaintiff's claim differs from the claim of another Plaintiff that is discussed herein.

Second, the homosexual assaults at Frank Scott during the summer of 2002 and the subsequent convictions of Nicholas Tuft are, according to testimony,

unprecedented in the history of the Department of Corrections.  Yet, remarkably, the key players recall none of the facts and circumstances surrounding the assaults.  Indeed, some of these players, notwithstanding their deep involvement in events, claim they can recall absolutely nothing about Plaintiffs, Tuft, or anything at all related to the assaults.  Plaintiffs have their suspicions about this inability to recall the dramatic events of the summer of 2002.  The pertinent point for now, however, is that because of the Defendants' and other defense witnesses' amnesia, the accounts of the Plaintiffs and their witnesses are largely undisputed.

Third, Defendants are totally wrong when they say in their brief that, although there was some initial difficulty in finding key documents, those documents have now been found, and that Plaintiffs' concerns of cover up and destruction of evidence are unfounded.  In fact, most of the key documents from Frank Scott cannot be located.  A critical disciplinary report, mental and physical health records, segregation assignment memoranda, logbooks, and, perhaps most importantly, minutes of key meetings at Frank Scott that would shed much light on the events of the summer of 2002 are mysteriously absent.  Fortunately, copies of some documents were retained by Plaintiffs and copies of other documents were maintained at other facilities.  Still, as will occasionally be noted herein, many key documents and the originals of other key documents are missing.  Defendants concede that this is a strange situation.  For example, one Defendant concedes that it is "very unusual" and he knows of no possible explanation for why such documents cannot be located.  Knight Dep., pp. 13, 45.  Plaintiffs note that the Eleventh Circuit recently made clear that severe sanctions are appropriate

2

remedies for spoliation of evidence. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939 (11th Cir. 2005).

## COMMON STATEMENT OF FACTS

### A. *CASON v. SECKINGER*.

The landmark case of *Cason v. Seckinger*, Civil Action No. 5:84-CV-313-1 (M.D.Ga.) provides the backdrop for the Plaintiffs' claims. During nearly two decades of litigation, the plaintiffs in *Cason* challenged a broad spectrum of unconstitutional conduct by the Georgia Department of Corrections (sometimes referred to as the "Department") and Department employees. Many of the allegations involved sexual misconduct by Department employees. The case was largely resolved by the entry of consent orders intended to remedy the constitutional deficiencies. See, *Cason v. Seckinger*, 231 F.3d 777 (11th Cir. 2000).

It was the intent of this Court in *Cason* to ensure that these deficiencies were "resolved in a manner to guarantee continued and continuing compliance with the Constitution." *Cason*, April 8, 1999 Order Terminating Proceedings, p. 6. Thus, this Court's orders and injunctions made it possible for the Department of Corrections to establish that "it is in compliance with the Constitution."[1]

---

[1] Ironically, the central dispute in the later years of *Cason* was whether the Court's orders and injunctions should remain in effect. As the Department argued that the orders should be terminated, Judge Hicks was "hard pressed to understand why the Department of Corrections is seemingly so opposed to continuing the SOPs it agreed to over the past several years." Noting that "much of what has been accomplished in this lawsuit came about after allegations were made of sexual harassment and sexual abuse, Judge Hicks wondered whether the Department intended "to go back to a time when it had no policy regarding sexual harassment and sexual abuse?" *Id.* at p. 7. Although Judge Hicks decided to keep the orders and injunctions in place, the Eleventh Circuit took a different view and, the *Cason* litigation ended in February 2002. Tuft's sexual assaults occurred during the summer of 2002.

Several Standard Operating Procedures ("SOPs") emanating from *Cason* are relevant to this litigation. One concern of *Cason* was that claims of sexual misconduct be properly investigated by personnel specially trained to conduct such investigations. The unit conducting these investigations is now known as the Special Investigations Unit and its investigators are specially trained to investigate allegations of staff sexual misconduct. Roulain Dep., pp. 9-10. Jan Roulain is currently Chief Investigator for Internal Investigations, and previously was the Manager of the Special Investigations Unit. Ms. Roulain acknowledges that, in terms of investigations of sexual misconduct and the training of investigators, it makes no difference whether the victim is male or female; investigations must be conducted properly and they must be conducted by somebody who has been specially trained to investigate such claims. *Id*. at p. 20. In sexual assault investigations, the investigator must always ensure that the alleged victim has received an appropriate mental health evaluation. *Id*. at p. 27.

Although it was not until October 2003 that the specially trained investigators of the Special Investigations Unit took responsibility for investigating sexual misconduct involving male inmates (*Id*. at p. 21), nevertheless, the Department did have in place in 2002 a *Cason*-based policy regarding "Investigations of Allegations of Sexual Contact, Harassment in Institutions or Centers Involving Sentenced Males." Plaintiffs' Ex. 5. This SOP acknowledges the Department "policy. . .that all allegations of sexual contact, sexual abuse, and sexual harassment involving sentenced males . . .will be reported, fully investigated and otherwise be treated in a confidential and serious manner. Staff conduct and attitude towards such

4

allegations will be professional, unbiased and staff members will cooperate with the investigation into all allegations.  It is the policy of the GDC to ensure that investigations are conducted in such a manner to avoid **threats, intimidations or future misconduct**."  *Id*.  (Emphasis added.)

The SOPs' definitions make clear that any allegation of even "unwelcome sexual advances" or "verbal. . .conduct of a sexual nature" falls within the scope of the SOPs.  Pursuant to the SOPs, once any Department employee hears even so much as a rumor or "inmate talk" of a sexual nature, then that employee must immediately inform the warden and/or the duty officer.  The SOPs go to great length to ensure that the physical and emotional well being of the alleged victim is accorded paramount consideration.  Among many other things, the warden must "ensure that mental health and medical assistance are immediately made available for the victim. . ."  *Id*.  This latter consideration, protecting the physical and emotional health of the victim, is embodied in separate SOPs that provide much more specific mandates for ensuring that the victim promptly receives appropriate mental and physical evaluations and treatment.  Plaintiffs' Ex. 6 and 7.

In short, as a result of this Court's orders in *Cason v. Seckinger*, the Department of Corrections was forced to implement policies and procedures that provided protection for the constitutional rights of alleged victims of sexual misconduct by guards.  All Department employees, including Defendants, receive intensive training in the requirements of the *Cason* SOPs.

**B.   NICHOLAS TUFT'S COMMON MODUS OPERANDA.**

As noted, Nicholas Tuft has pled guilty to sexually assaulting the Plaintiffs.

5

In all his known assaults, Tuft used basically the same modus operandi.  First,
using the Department's website, Tuft would research his victims.  Tuft Dep., p. 95.
Second, he would confront his victim in a more or less secluded spot.  Brandishing
his radio, he would demand that the inmate succumb to his advances, informing the
inmate that if he resisted, he would announce over the radio that he was being
assaulted by an inmate.  Because of his research, Tuft could accentuate his threat
by noting the impact a charge of assault would have on an inmate's sentence.
Charles Doe Dep., pp. 70-71.

      **C.**      **DEPARTMENT OF CORRECTION EMPLOYEES LEARN OF
ALLEGATIONS OF SEXUAL MISCONDUCT BY NICHOLAS TUFT.**

      John Doe was Tuft's first known victim.  After several assaults, John Doe, on
July 10, 2002, fought back and Tuft, as promised, claimed that John Doe had
assaulted him.  Tuft reported John Doe's alleged assault of an officer to Dennis
Knight, who immediately conducted an investigation.[2]  According to Knight's report,
when he interviewed John Doe, John Doe informed him that Tuft wanted John Doe
to engage in oral sex and that "he is always asking me to kiss on me."[3]  Plaintiffs'
Ex. 41.

      Notwithstanding the position taken by Defendants in their briefs, the
Defendants, in their deposition testimony, all acknowledged the tremendous
significance of this initial, relatively tame, revelation of Tuft's assaults.  Knight

---

[2] As noted, many documents from Frank Scott have not been produced and most of these
documents were generated when John Doe's allegations first surfaced.  Knight's July 10
investigation was not produced until late in discovery.

[3] Actually, John Doe told Knight that Tuft had forced him to allow Tuft to perform oral sex on John
Doe and vice versa.  John Doe Dep., pp. 113-114.  At this juncture, however, Plaintiffs will reference
only what Knight documented in his report.

acknowledged that this allegation constituted a very serious incident and that he would have immediately let his Supervisor Dennis Holsey and Duty Officer Thomas McElheney know about John Doe's allegations.  The reason he would have informed Holsey and McElheney was that the matter had to be reported to the Warden.  Knight Dep., pp. 36-38.  Knight further acknowledged that when an inmate makes such an allegation, you have to assume that it is true and that the Warden must be informed because, among other things, the guard should be moved to an area where he would not have the kind of contact with inmates that would allow him to again assault an inmate.  *Id*. at p. 44.  Because of the seriousness of the matter, there is "no doubt" in Knight's mind that by the end of the day on July 10, 2002, he had informed both Holsey and McElheney about Tuft's alleged sexual misconduct.  *Id*. at p. 40.

When Supervisor Holsey reviewed John Doe's July 10 statement at his deposition, he agreed that the statement raised a "serious allegation" and that he would have immediately notified McElheney.  Holsey Dep., p. 34.  Because the allegation involved improper sexual conduct, he understands, from his *Cason* training, that action had to be taken.  *Id*. at pp. 34-35.

Similarly, McElheney, after reviewing John Doe's July 10 statement, admits that he would have immediately reported the matter to Warden Scroggy because it clearly involved sexual contact between a guard and a prisoner, a criminal offense. The SOP requires such immediate notification and there is no doubt in his mind that he notified Scroggy.  McElheney Dep., p. 33.

7

Like most Department of Corrections employees who were deposed, Knight, Holsey, and McElheney all claimed that they had never heard of a guard sexually mistreating an inmate and that they certainly would remember if they heard of such conduct. Knight Dep., p. 18; Holsey Dep., p. 33; McElheney Dep., p. 28. Indeed, as a practical matter, it would seem highly unlikely that any employee would not remember that a fellow employee had pled guilty to serial sexual assaults while on the job. However, and again like most other Department employees, Knight, Holsey, and McElheney, even when confronted with the July 10 documentation, deny any recollection of John Doe's allegations. Knight Dep., p. 40; Holsey Dep., pp. 29-32; McElheney Dep., p. 36. McElheney, perhaps because he has advanced in the Department hierarchy, felt it necessary to say "with certainty that for whatever reason [he was] never told about [John Doe's] allegations on July 10." McElheney Dep., p. 36.

Instead of according John Doe the dignity and respect called for by Department SOPs, Defendants, on July 10, threw John Doe in the "hole."[4] The impact of Defendants' conduct on John Doe is discussed in more detail below.

The next morning, John Doe's allegations should have been, and apparently were, discussed at a "Management Meeting," at which McElheney was present, and minutes were prepared of this meeting.[5] Jones II, pp. 40, 42-44, 52-53.

---

[4] That, too, should have resulted in the generation of many documents, including crucially important medical and mental health documentation. None of these documents have been produced.

[5] None of these documents have been produced.

At that point, Aubrey Jones and Gene Scroggy became involved. Jones, at the time, was Deputy Warden for Security and Scroggy, at the time, was Warden. Jones has been deposed twice; his second deposition was primarily a largely unsuccessful attempt to learn the whereabouts of the missing documents. Although little was learned about the missing documents, Jones' two depositions help explain what happened, and what did not happen, on July 11, 2002.

In his first deposition, Jones, like Knight, Holsey, and McElheney, denied any knowledge of the events of July 10, notwithstanding the fact, as will be discussed, that he personally investigated those allegations the afternoon of July 11.[6] Specifically, in his first deposition, he claimed he did not know who John Doe was, did not remember any involvement in the investigation of the allegations, did not take any statements, did not interview any inmates, and did not interview Tuft. Jones Dep. I, pp. 25-26. Indeed, Jones denied ever hearing of an allegation by an inmate that a guard forced an inmate to have sex or perform some sexual act, a preposterous claim in view of Jones' extensive involvement in the assaults on all three Plaintiffs. *Id*. at p. 40.

After claiming lack of knowledge of John Doe's allegations (and thus any responsibility for the handling of those allegations), Jones was most emphatic and expansive about what **should** have been done when the July 10 allegations surfaced. First, he noted, it is a felony offense for a guard to have any sexual

---

[6] It is pertinent to note that at the time of Jones' first deposition, Plaintiffs had even less documentation then they do now. For example, Knight's July 10 investigation was not produced until after Jones' first deposition. Arguably, this may have been helpful to Plaintiffs. It can be inferred that Jones, safe in the knowledge that Plaintiffs counsel had little documentation, felt free to deny events in which it is now known he participated.

contact with an inmate. *Id*. at p. 27. Pursuant to the *Cason* SOPs, any employee who learns of any type of sexual contact between a guard and an inmate must immediately notify the warden or the duty officer. *Id*. at p. 37. With regard to the guard, Jones continued, it is the responsibility of the warden, when such an allegation surfaces, to remove the guard from contact with the inmate population. *Id*. at pp. 42-44, 57-58, 82-84. Consequently, Jones, in his first deposition, and when he was still claiming ignorance of Tuft's assaults, claimed great "surprise" when shown documentation that inmates were making complaints about Tuft's sexual assaults weeks after John Doe first raised his complaint. His surprise was based on the fact that Tuft was still in a position where he could continue his predatory assaults on inmates. Clearly, according to Jones during his first deposition, Scroggy should have transferred Tuft to a position where he could not have contact with inmates. *Id*. at pp. 78-85.[7]

At his second deposition, Jones took a somewhat different tact. First, consistent with his testimony at his first deposition, he had no recollection of Knight's investigation on July 10. Jones Dep. II, pp. 37-38. Remarkably, however, given his claimed lack of knowledge of Tuft's dramatic assaults during the summer of 2002, he claimed to recall McElheney giving a report about the John Doe incident during the Management Meeting on July 11, the minutes of which, again, cannot be found. *Id*. at pp. 39-40. However, he claims that McElheney only reported the relatively minor incident of John Doe pushing Tuft; he claims McElheney never

---

[7] As will be shown, it was Jones who transferred Tuft to a position where he could continue his assaults. According to Tuft, Jones wanted Tuft to be in a position where he would be "comfortable" after John Doe's allegations.

made any mention of the much more serious allegation of Tuft's sexual misconduct. *Id*. at p. 39. Jones claims that McElheney should have reported all the events to him. *Id*. at p. 46.

After claiming ignorance of John Doe's allegations and denying any involvement in any investigation of those allegations, Jones was confronted with a July 12, 2002 memorandum from him to Scroggy. As it turned out, Scroggy, presumably based upon Knight's investigation and McElheney's report, had instructed Jones to investigate John Doe's allegations. Plaintiffs' Exhibits 8, 9, 10, and 11.

Before discussing Jones' July 11 investigation, it is appropriate to address Scroggy's involvement. First, Scroggy, like Knight, Holsey, McElheney, and Jones, initially professed to have no knowledge or recollection of sexual assaults by guards against inmates at Frank Scott. Scroggy Dep., p. 15. The only thing that he recalled about John Doe was that he was a "cutter," (referring to John Doe's suicide or self-mutilation attempts). *Id*. at p. 47. He claimed that while he was Warden at Frank Scott, there were no allegations that a male guard had sexually assaulted an inmate. *Id*. More specifically, he claimed to be totally unaware that there were three victims of Tuft's sexual assaults. *Id*. at p. 71. In short, Warden Scroggy denied knowledge that one of his guards had committed serial sexual assaults while under his command and claimed not to know that he had pled guilty to sexually assaulting inmates.[8]

---

[8] Plaintiffs could cite numerous documents either from Scroggy or otherwise bearing Scroggy's signature to demonstrate that this testimony is false. For example, he signed off on Knight's July 10

Just as Jones, having testified that he had no involvement in John Doe's allegations, gave strong testimony about what should have been done in response to those allegations, Scroggy, having testified he was not involved, proceeded to give illuminating testimony on what the *Cason* SOPs required in response to such an allegation.

First, he claimed that the applicable SOPs precluded him from investigating the allegations. *Id*. at 24. He would not confront the guard "because inmates make allegations against officers constantly. . . ." *Id*. at p. 25. Instead, nothing would be done until the allegation is "confirmed by Internal Affairs." *Id*. The inmate making the allegation should remain in the "main population." *Id*. at p. 27. Indeed, he would not allow the inmate to "manipulate the system" until there is "some meat to the allegation." *Id*. at pp. 28-29. **Specifically, he would not refer an alleged victim to mental health until it had been confirmed that his allegation had merit.** *Id*. at p. 37.

After reviewing documents showing that he was informed of and actually became involved in John Doe's allegations against Tuft, Scroggy testified that he still would not consider moving Tuft away from the inmate population because what John Doe had said was "just an allegation." *Id*. at pp. 49-50. When asked specifically if he would have had any concern that Tuft might sexually assault other inmates, he again replied that John Doe's allegations had not been proven. *Id*. at p. 65. Instead, his number one concern would be the reputation of the guard and he would just "leave [the guard] on the dorm. There's no need to move him." *Id*. at

---

investigation on July 11 (Plaintiffs' Exhibit 41), and he sent a memorandum about John Doe's allegations of sexual assault to the Regional Director on July 12. Plaintiffs' Ex. 14.

p. 66. When confronted with Jones' testimony that Scroggy should have immediately moved Tuft away from the inmate population, Scroggy responded that Jones could have done the same thing. *Id.* at p. 86. Moreover, he "totally disagree[d]" with Jones' testimony that it was the warden's responsibility to refer the inmate for a mental health evaluation. *Id.* at p. 88.

At that point in his deposition, Scroggy was shown the applicable *Cason* SOPs. He then broke down and admitted the obvious: the *Cason* SOPs required him to ensure that mental health and medical assistance were immediately made available to the alleged victim. *Id.* at p. 93. He admitted that he violated the SOPs. *Id.* at p. 94. Then Scroggy made a remarkable confession: "No, I did not notify mental health. I did not feel there was any merit to his accusation." *Id.* at p. 99. Notwithstanding his earlier sworn testimony that he lacked any knowledge of Tuft's sexual assaults at Frank Scott, he claimed that John Doe was using his allegations to "circumvent the DR that he was allegedly going to receive." *Id.*[9]

It is now known that Scroggy, presumably after McElheney reported John Doe's allegations of sexual abuse at the July 11 Management Meeting, ordered Jones to investigate. Jones, notwithstanding Department SOPs regarding the conduct of investigations of sexual misconduct, brought John Doe and Tuft together in the presence of Captain Carl Evans and Secretary Kerry Downing and perhaps

---

[9] Mike Avant, a former mental health counselor at Frank Scott, shed some light on Scroggy's refusal to refer John Doe for a mental health evaluation. Avant confirmed that the *Cason* SOPs required immediate notification to mental health authorities. The rationale behind the policy is that it is critically important that alleged inmate victims of guard sexual abuse receive appropriate mental health counseling, care, and attention. Avant Dep., pp. 11-12. The policy recognizes the "potentially traumatic and dramatic consequences of a sexual assault." *Id.* at p. 12. With regard to Scroggy, Avant testified that Scroggy "despised mental health" and "put up so many barriers between us and our job." *Id.* at pp. 17-18.

others. Jones then took a statement from John Doe in which he further described Tuft's sexual assaults. He took a confirming statement from inmate Troy Lamar Scott who, although denying any firsthand knowledge of what had happened, testified that John Doe had reported to him that "starting two months" earlier, Tuft had asked John Doe for oral sex. Plaintiffs' Ex. 10. Jones also took a statement from Tuft in which he denied the allegations. Plaintiffs' Exhibit 11. In a July 12 memorandum to Scroggy, Jones summarized his investigation noting that John Doe had resisted Tuft's sexual assault but after "persistent advances," had succumbed. Plaintiffs' Exhibit 8. This memorandum "clearly describes. . .a felony under Georgia law." Stanelle Dep., p. 45.

Also on July 12, Scroggy transmitted Jones' investigation to the Regional Director's office and the documentation of John Doe's allegations was assigned to Internal Affairs Investigator Ray Stanelle. Before addressing that aspect of the case, it is appropriate to discuss the impact of Defendants' conduct, to that point, on John Doe.

### D. THE IMPACT OF DEFENDANTS' CONDUCT ON JOHN DOE.

An essential purpose of the *Cason* SOPs is to ensure that an alleged victim of sexual misconduct is treated in a manner that will minimize consequences of the assault. Investigations are to be conducted quickly and professionally by specially trained investigators, victims are to be treated with dignity and respect, and they must immediately receive mental health evaluations. Plaintiffs' expert, Dr. Donald Meck, confirmed the importance of these aspects of the *Cason* SOPs. Meck Dep., p. 52. If not treated properly, victims begin to blame themselves and the

consequences of their trauma are exacerbated. *Id*. at p. 53. While victims may experience an acute distress disorder, if treated properly, victims learn that their response is typical and they do not put undo responsibility or shame on themselves. *Id*. at p. 53. Delayed therapy is much less effective.

In John Doe's case, not only did he **never** receive a physical or mental health evaluation as an alleged victim of a sexual assault, he was treated with incredible callousness.

As discussed, Defendants placed John Doe in the "hole" when he "blew the whistle" on Tuft. The next day, Jones forced John Doe to give details of Tuft's assaults in the presence of Tuft, the Warden's secretary, and others. In an admitted breach of *Cason* SOPs, John Doe was not referred, immediately or otherwise, to a counselor specially trained to deal with sexual assault victims or, for that matter, any kind of counselor.

At about 6:00 p.m. on July 11, and while in the "hole," John Doe began slashing his forearms with a razorblade. Treadwell Aff., Ex. "A." Counselor Michael Avant was called to Frank Scott and he determined that John Doe needed to be placed in a Crisis Stabilization Unit (hereafter "CSU"). However, no one told Avant that John Doe was a possible victim of a sexual assault. At the CSU, John Doe made clear that he wanted out of Frank Scott. Treadwell Aff., Ex. "B."

On July 16, John Doe was transferred back to Frank Scott, where almost within minutes of his return, he was found in his cell with "blood all over himself and cell." Treadwell Aff., Ex. "C." Knight was one of the officers who transferred John Doe for treatment on July 16, 2002. Treadwell Aff., Ex. "C." Later, Knight

15

transported John Doe to a CSU in Valdosta. Treadwell Aff., Ex. "C." On July 20, John Doe was returned to Frank Scott where he again cut himself and pleaded "to get away from Scott." Treadwell Aff., Ex. "D." He reported to medical personnel that "others are out to get him due to security issues." *Id*. John Doe was then transferred to Central State Hospital.

Still, however, medical and mental health personnel were not informed of Tuft's assault, although they did document severe emotional disorders, including depression. For the balance of John Doe's incarceration, his medical records are replete with diagnoses of depression, dysthymic disorder, and repeated incidents of self-injurious behavior ("I get depressed and I cut"). See Reponses to John Doe's Request for Admissions.

Mike Avant was a mental health counselor at Frank Scott who had received the *Cason*-required training to be a "specially trained counselor," meaning that he had received the training necessary for counselors to interact with alleged victims of sexual assault. Avant Dep., p. 9. As noted, although Mr. Avant had communications with John Doe, no one told him that John Doe was a victim or an alleged victim of sexual misconduct. Consequently, he never was able to bring his skills to bear with regard to John Doe. However, his testimony is helpful to an understanding of the issues faced by John Doe. With regard to the *Cason* SOPs' requirement that alleged victims of sexual assault receive immediate and appropriate mental health evaluations, Mr. Avant testified that this requirement recognizes the potentially traumatic and dramatic consequences of a sexual assault. Avant Dep., p. 11.

16

When asked if victims are sometimes reluctant to come forward, Mr. Avant responded, "absolutely. They are ashamed to admit that this has happened to them in a lot of cases." *Id*. at p. 12. Accordingly, the *Cason* SOPs are intended to ensure that potential victims are treated with the utmost respect and dignity and they get treatment they need as soon as possible. *Id*. Mr. Avant agrees that "if a potential victim were to make a complaint that he had been assaulted by a guard and then, instead of being referred for treatment, rather was thrown in the hole and punished, that potentially could have adverse consequences." *Id*. at pp. 12-13.

Dr. Meck confirms that John Doe suffers from severe Post Traumatic Stress Disorder. Meck Dep., p. 48. In addition, he noted that John Doe reported clinically meaningful levels of trauma specific to disassociation and suicidality. *Id*. at p. 49. John Doe needs, Dr. Meck concluded, extensive treatment. *Id*. at p. 50. See also Meck Aff.

### E.    THE INTERNAL AFFAIRS' INVESTIGATION "BEGINS."

Although Scroggy admittedly breached *Cason* SOPs with regard to his handling of John Doe's allegations, he did, on July 13, 2002, forward the "results" of Jones' July 11 investigation to the Regional Director. The file was forwarded to Internal Affairs for investigation. At the time, Johnny McCurry was Chief Investigator of the Internal Affairs Unit. McCurry Dep., p. 10. According to Defendants, McCurry received the file on July 19, 2002. Defendants' Statement of Facts as to Which There is No Dispute, Charles Doe, ¶ 10. Although McCurry professes not to know whether Stanelle had the training necessary to investigate a sexual assault (he did not), Investigator Ray Stanelle was assigned responsibility

17

for investigating Tuft's alleged assaults against John Doe.  McCurry Dep., pp. 14, 23.

Summarizing Stanelle's investigation through the period ending August 11, 2001 is simple.  He did nothing that can be gleaned from the record.  Specifically, he did nothing to ensure that John Doe had received an appropriate mental health evaluation, he did not interview John Doe, and he did not interview Tuft.  In a word, nothing happened.

### F.    TUFT'S ASSAULTS CONTINUE.

Rather than being reassigned to an area where he would not have isolated contact with inmates, Tuft was simply moved to another dormitory.  Defendants' assertion that Tuft's reassignment was "routine" is false.  According to Tuft, Jones asked Tuft, after John Doe's allegations came to light, if he felt "comfortable" returning to the same dormitory.  Jones then transferred him to A Hall, the dormitory housing Charles Doe and James Doe.  Tuft Dep., p. 39.[10]  Thus, Jones assigned Tuft to another dorm where, while more comfortable, he could continue his assaults.

For several days following Tuft's transfer to A Hall, there appears to have been a lull.  The minutes of one meeting during that time period, however, provide a tantalizing glimpse of what may have been going on.  At a Warden's Monthly Department Head Meeting, Scroggy "reminded staff there is **0 TOLERANCE** within the Georgia Department of Corrections for **sexual harassment**. . . .[T]here are

---

[10] Remember, it was Jones who adamantly maintained that Tuft should not have been moved to a position where he could have contact with the inmate population.  Jones I, pp. 42-44, 57-58, 82-84.

18

several cases pending surrounding sexual harassment.  He reminded staff to remain professional at all times."  Treadwell Aff., Ex. "E," p. 2.[11]

The lull ended four days later on July 29, 2002 when Tuft first assaulted Charles Doe.  Charles Doe immediately attempted to report the incident by sending a letter to Defendant Gloria Nicholson.  Plaintiffs' Ex. 12.  Charles Doe's letter made clear what Tuft was doing and what he intended to do.  Charles Doe's letter also revealed what Tuft had in mind for the future.  Tuft told Charles Doe to keep what had happened a secret, warning that if he did not, he would "end up like that guy [John Doe and] his boys would attempt to kill [Charles Doe] like they did [John Doe], but he would not fail."  *Id.*

The next day, Tuft assaulted James Doe and James Doe, like Charles Doe, immediately wrote for help.  James Doe sent his letter directly to Scroggy.

> I am pleading to you in this letter for your help and
> protection.  I have been sexually assaulted by one
> of your officers.  I do not know of any way to prove
> this to you.  I am afraid that this officer will
> continue to do things like this because he knows
> I don't have a defense against his by him being
> an officer.  . . .[During the assault], Tuft said "if
> you say s____, I'll call 10-10 and say you've just
> assaulted me."  Then, he laughed and walked
> out of the room.  Please, Warden, help me in

---

[11] Exhibit "E" is a good example of the type of detailed minutes that should be available with regard to the July 11, 2002 Management Meeting.

     this matter.  I am not a homosexual and do not

     participate in those type of acts.  I just want to do

     my time and go home.  I don't want a charge for

     assaulting an officer.

Plaintiffs' Exhibit 29.

     There was no response to these letters, and Tuft's assaults continued.
Consequently, on July 31, Charles Doe sent a letter to Jones explaining that he had
received no response to his July 29 letter to Nicholson.  Tuft, Charles Doe reported,
was even writing "notes and when I don't respond, he talks about f____ me up.  He
threatened to tell you all that I assaulted him and I'd get a life sentence because I
already have violent crimes.  Please call me to your office as soon as possible."
Plaintiffs' Exhibit 12.

     On August 1, James Doe wrote Scroggy and informed him that Tuft had
again sexually assaulted him, this time by forcing James Doe to perform oral sex on
him.  Plaintiffs' Exhibit 49.  In this letter, James Doe told Scroggy that Tuft told him
that he had "already pulled up your information on the internet.  You already got
one violent charge.  If I say you just assaulted me, you may never get out of prison."
*Id*.  Tuft again talked about John Doe:

     Do you know what happened to [John Doe]?  He

     was supposed to die.  If you don't do what I say,

     you will either die or never get out of prison.  Right

     now it's my word against yours and it will be mine

     that they'll believe.

Plaintiffs' Exhibit 49.  James Doe ended his letter with a plea:

> Please, Warden, protect me from this sick officer.
> He forced me to do something that is totally against
> my religion and belief as a man.  I am afraid because
> I know an officer's word is taken over an inmate's every
> time.  I don't know how to protect myself if he comes
> back in the dorm besides fighting him, but then I don't
> have a defense [against] him saying I assaulted him.
> Please help me.  I got to tell my parents, but I don't know
> how.

Plaintiffs' Exhibit 49.

On August 2, Charles Doe also wrote Scroggy.  He described two more assaults committed by Tuft since his previous letters.  Plaintiffs' Exhibit 13.  Still, nothing was done.  However, during the course of his assaults, Tuft had ejaculated on articles of Charles Doe's and James Doe's clothing.  They knew Tuft's semen would potentially provide evidence supporting their claims.  Having received no response from Frank Scott authorities, they both made arrangements to get word to the outside, specifically, their families.

On Sunday, August 11, 2002, Charles Doe told his grandmother about what happened and gave her the semen-stained clothing.  The next morning, Charles Doe's stepfather, Ronald James, went to Department of Corrections headquarters with the intent of meeting with James Doctor, the Department's Director of Facilities.  After some difficulty and through some machinations, the stepfather was

21

able to talk with Doctor.  When Doctor realized that the stepfather had the letters
and DNA evidence, he called in the "Deputy Commissioner for Internal Affairs"
(presumably Johnny McCurry) and a telephone call was placed to Scroggy.  James
Dep., p. 17.  Initially, James could overhear both ends of that telephone
conversation and he heard Scroggy admit that he had the letters about Tuft on his
desk.  *Id*.  Doctor instructed Scroggy to get Tuft out of Frank Scott immediately.  *Id*.
at p. 18.

As noted, Investigator Stanelle, up until that point, had done nothing.  That
changed on August 12.  On August 12, Stanelle received a telephone call from
Johnny McCurry telling him to "get down to Scott State Prison and find out what's
going on down there.  We've got some other charges."  Stanelle Dep., p. 55.

For several reasons, Stanelle claimed that he was absolutely "floored" by this
development.  First, if there were semen stained articles of clothing, then there
would be positive proof of Tuft's assaults.  Second, and this from an investigator
assigned to investigate sex crimes, he had "never run into a forced sex thing
before."  *Id*. at p. 56.  Third, he was floored that Tuft was still in a position from
which he could continue his assaults rather than having been administratively
reassigned away from inmates.  *Id*. at p. 57.

Finally spurred into action, Stanelle was at Frank Scott by no later than 2:45
p.m. on August 12 when he conducted an interview of Charles Doe.  Stanelle's
interview notes reveal that Charles Doe told him about both John Doe and James
Doe.  Plaintiffs' Ex. 48.  The tape of this interview reveals something else – Charles
Doe told Stanelle that Tuft had told him that John Doe's wrists had been cut in an

22

effort to silence him.[12]  Still, Stanelle did nothing to ensure that John Doe had
received an appropriate mental health evaluation and even though Charles Doe
had told him about a third victim, he did nothing about that either.

In the meantime, James Doe had also successfully gotten to his family
semen-stained clothing, and his father also went to the Department of Corrections
headquarters.  At 7:32 a.m. on Friday, August 16, Johnny McCurry facsimiled to
Stanelle information about Tuft's assaults on James Doe:

> This inmate is making the same allegations against
>
> Tuft.  Just interview him and see if he will take a
>
> polygraph.  Call me afterwards.

Plaintiffs' Ex. 21.  Stanelle interviewed James Doe beginning at 11:26 a.m. on
August 16, and later that day, he and Jones finally confronted Tuft.

Before discussing that confrontation, it is appropriate to note that Stanelle's
deposition testimony is a study in contrast.  For example, he sat on the John Doe
investigation, but then talks about the urgency of the Charles Doe and James Doe
investigations.  In the latter situation, he was worried about other victims.  "I needed
to get Tuft out of the system is what I needed to do."  Stanelle Dep., p. 63.  When
asked why he was so worried about other inmates then but yet not worried about
other inmates when he got the John Doe case, Stanelle responded "I can't answer
that because I don't – it's not that I wouldn't have been worried about it.  It's not that
I wouldn't have been concerned about the case, it was a matter of what was going
on at that time, and I'm not sure what that is."  *Id.* at p. 64.  Similarly, while he

---

[12] At this deposition, Stanelle repeatedly denied knowing that John Doe had attempted suicide.
Stanelle Dep., pp. 39-40, 48-49, 132, 133.

contends he moved as quickly as possible "because an allegation of improper sexual contact between a guard and an inmate is very serious" (Stanelle Dep., p. 42), he claims he put the John Doe investigation on the backburner because the information available to him indicated that the sexual contact was consensual. *Id.* at p.141. He agrees that "one of the most important things to do is to ensure that [alleged victims] got mental health counseling" (Stanelle Dep., p. 77), but yet he never did anything to ensure that any of the victims got mental health counseling.

On August 16, and at long last, Stanelle confronted Tuft. Stanelle claims great credit for his and Jones' interrogation of Tuft. He very quickly was able to "put things in a posture" that forced Tuft's resignation on August 16. Stanelle Dep., p. 94. As a result of what he did on August 16, he continued, Tuft was not in a position where he could have further contact with inmates. *Id.* Again, however, Stanelle cannot explain why he did not act sooner to ensure that Tuft could not have contact with inmates.

With regard to Jones and despite his sworn testimony to the contrary, he played a very active role in the August 16 confrontation. Stanelle Dep., p. 90. On that Friday, Stanelle took Tuft to Jones because he needed Jones "to accept the resignation." *Id.* at p. 33. Stanelle "wanted an admission from Tuft, and [he] wheeled him pretty hard. . .it was pretty intense for him, let me tell you." *Id.* According to Stanelle, Jones told Tuft "when you resign, this isn't over; I want you to understand that this isn't over." *Id.* Jones was "fired up." *Id.* Again, Jones remembers nothing.

24

G.      IMPACT OF TUFT'S ASSAULT ON CHARLES DOE AND JAMES
        DOE.

As noted, Scroggy argued that he did not have to refer a victim of sexual

assault to mental health authorities until the allegations had been proven, a position

he has now understandably abandoned.  Moreover, if he truly believed that,

Charles Doe and James Doe should have been referred to mental health authorities

during the week of August 12 when the allegations were proven.  That did not

happen.

Instead, on August 22, 2002, James Doe's mother called Scroggy directly to

voice her concern about her son's mental health and asked that he be referred to

mental health counseling for evaluation.  After that, at least for Charles Doe and

James Doe, they were finally afforded the protection of *Cason* SOPs.  Treadwell

Aff., Ex. "E."  The treatment Charles Doe and James Doe received at that point

illustrates how they benefited from intervention and how John Doe could have

benefited from the *Cason* SOPs.

Even in the hand of a professional, it was difficult to get from James Doe the

complete story of Tuft's assaults.  "Inmate refuses to describe the alleged sex act.

Inmate appears traumatized as evidenced by his flat effect, his obvious

embarrassment, his unwillingness to discuss the incident and his anxiety about

reliving the experience verbally.  Inmate presented a very flat effect, states that he

is depressed everyday."  Treadwell Aff., Ex. "F."

25

Charles Doe was interviewed by a specially trained counselor on August 23, 2002.  Plaintiffs' Ex. 20, pp. 008-011.  The counselor found that Charles Doe was "depressed and needs to be in need of further MH evaluation."  *Id*. at p. 9.

## H.     NICHOLAS TUFT'S CONVICTIONS.

DNA testing confirmed that Tuft's semen was on the clothing of Charles Doe and James Doe.  (Defendants' Response to Request for Admissions.)  Tuft subsequently plead guilty to sexually assaulting the Plaintiffs.  Tuft Dep., p. 53.

## ARGUMENT AND CITATION OF AUTHORITY

### A.     STANDARD OF REVIEW.

Summary judgment will only be granted when "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the burden of demonstrating that no dispute as to any material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  In reviewing a motion for summary judgment, a court must review all the evidence in the record while "draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); see also *Maynard v. Williams*, 72 F. 3d 848, 851 (11th Cir. 1996).

The moving party always bears the burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine

26

issue of material fact" and that entitle it to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323. It is only when the moving party has met this burden that the nonmoving party has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**B.    EIGHTH AMENDMENT.**

The Eight Amendment prohibits the infliction of cruel and unusual punishment. See *U.S. Const. Amend. VIII*. It is well settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U. S. 825, 832 (1994), quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993). The Eighth Amendment imposes duties on prison officials, "who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, **and medical care, and must take reasonable measures to guarantee the safety of the inmates."** *Farmer*, 511 U.S. at 832 (internal quotation marks omitted), quoting *Hudson v. Palmer*, 484 U. S. 517, 526-527 (1984) (emphasis added). See *Helling*, supra, at 31-32; *Washington v. Harper*, 494 U.S. 210 (1990); and *Estelle v. Gamble*, 429 U.S. 97 (1976).

A prison official violates the Eighth Amendment when "a substantial risk of serious harm, of which the official is subjectively aware, exists and the official dose not respond reasonably to the risk." *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001)(en banc), quoting *Farmer*, 511 U.S. at 844 (internal quotation marks omitted). Said another way, "[t]he question under the Eighth Amendment is

whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health." *Farmer*, 511 U.S. at p. 843. Similarly, the Supreme Court has held that a prison official's "deliberate indifference to [the] serious medical needs of [a] prisoner [] constitutes the unnecessary and wanton infliction of pain. . .proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (1976).

To survive a motion for summary judgment on a Section 1983, Eighth Amendment claim, a plaintiff is "required to produce sufficient evidence of (1) a substantial risk of serious harm;  (2) the defendants' deliberate indifference to that risk; and  (3) causation."  *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003), quoting *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995).

In these three related cases before the Court there is incontrovertible evidence proving that these Plaintiffs were subjected to a substantial risk of serious harm by the Defendants, and as a result did in fact suffer serious injuries.[13] John Doe was denied medical and psychiatric evaluation and treatment for sexual assault after he reported Tuft's assaults against him on July 10, 2002. Plaintiffs' Ex. 41.  Instead of receiving the evaluation and treatment that he needed, John Doe was thrown in the "hole".  But for these Defendants' refusal to adhere to the *Cason* SOPs, John Doe would have received immediately much needed medical and mental health evaluation and treatment.  Dr. Meck confirms that John Doe suffers from severe Post Traumatic Stress Disorder and that the delay in evaluation and treatment was detrimental to John Doe. Meck Dep., pp. 48, 52-53.

---

[13] In their briefs the Defendants argue extensively the issue of "deliberate indifference," but do not contest the issues of "substantial risk of serious harm" and "causation".

Charles Doe and James Doe were subjected to a substantial risk of serious harm, and did in fact suffer serious harm, when, after having knowledge of the allegations of Tuft's sexual assault against John Doe, Defendants assigned Tuft to A Hall, the dormitory housing Charles Doe and James Doe.  Tuft Dep., p. 39.  Shortly after Tuft's reassignment to A Hall he sexually assaulted Charles Doe and James Doe.  Plaintiffs' Ex. 12 and Ex. 49.  If Tuft had not been reassigned to A Hall, but had been removed from having contact with inmates, Charles Doe and James Doe would not have been sexually assaulted by Tuft.  As a result of the sexual assaults committed by Tuft upon reassignment to A Hall by the Defendants, both suffered serious anxiety and depression and are in need of professional treatment.  Treadwell Aff., Ex. "F;" Plaintiffs' Ex. 20, p. 10; Charles Doe Dep., p. 154; and James Doe Dep., p. 94.

With more than sufficient evidence to prove "substantial risk of serious harm" and "causation", two prongs of what the Plaintiffs are required to show to defeat Defendants' motion for summary judgment are satisfied. The third prong, Defendants' "deliberate indifference" to the risk of serious harm, is the issue upon which determines the fate of Defendants' motion.[14] The facts that demonstrate the deliberate indifference of each of the Defendants to the substantial risk of serious harm that the Plaintiffs suffered will be discussed in detail below, but first a

---

[14] The Defendants have also asserted the defense of qualified immunity which will be responded to in a separate section of Plaintiffs' brief. Suffice to say that in view of the Eighth Amendment and the many prison condition and abuse cases decided pursuant to the Eighth Amendment, including the previously discussed landmark case of *Cason v. Seckinger* , denial of medical and psychiatric evaluation and treatment resulting from sexual assault and subjecting prisoners to sexual abuse by a prison guard who has been accused of sexually assaulting another prisoner, is conduct that violates clearly established statutory and constitutional rights of which every one of these Defendants would have known, and have admitted knowing.

discussion of what is meant by "deliberate indifference" in the context of Plaintiffs'
Section 1983 Eighth Amendment claims.

### C.     DELIBERATE INDIFFERENCE.

#### 1.     Claims of Serious Medical Need.

"To show that a prison official acted with deliberate indifference to serious
medical needs [such as in the case of John Doe], a plaintiff must satisfy both an
objective and subjective inquiry.  *Kelley v. Hicks*, 400 F3d 1282, 1284 (11th Cir.
2005).  "First, a plaintiff must set forth evidence of an objectively serious medical
need." *Id.*  "Second, a plaintiff must prove that the prison official acted with an
attitude of deliberate indifference to that need."  *Id.*  A serious medical need is
considered "one that has been diagnosed by a physician as mandating treatment or
one that is so obvious that even a lay person would easily recognize the necessity
for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003),
quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F3d. 1176, 1187 (11th Cir. 1994).

In the Eleventh Circuit it is well established that  "… psychiatric needs can
constitute serious medical needs and that the quality of psychiatric care one
receives can be so substantial a deviation from accepted standards as to evidence
deliberate indifference …".  *Steele v. Shah*, 87 F3d 1266, 1269 (11th Cir. 1996).   It
should be obvious, and indeed Defendants admit, that a person who is the victim of
a sexual assault has a serious medical need and the failure to provide medical and
mental health evaluation and treatment is such a substantial deviation from
accepted standards as to evidence deliberate indifference.

30

## 2.    Elements of Deliberate Indifference Standard.

The Supreme Court in *Farmer* has articulated the elements of "deliberate

indifference" as (1) an objective risk of serious harm and (2) a subjective deliberate

indifference to that risk with a state of mind "more blameworthy than negligence."

*Farmer*, 511 U.S. at pp. 835-36.  "Acting or failing to act with deliberate indifference

to a substantial risk of serious harm to a prisoner is the equivalent of recklessly

disregarding that risk."  *Id*. at p. 836.  The test for the subjective element of

deliberate indifference is a type of recklessness defined as a "[conscious] disregard

[for] a substantial risk of serious harm." *Id*. at p. 839.

Under the *Farmer* analysis, to satisfy the subjective test the prison official

"must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Id*. at

p. 837.  However, "an Eighth Amendment claimant need not show that a prison

official acted or failed to act believing that harm actually would befall an inmate; **it is**

**enough that the official acted or failed to act despite his knowledge of a**

**substantial risk of serious harm.**  *Id*. at p. 842 (emphasis added).

Establishing knowledge on the part of the actor need not be accomplished

soley by direct evidence; **a factfinder is permitted to infer from circumstantial**

**evidence that the actor actually drew the inference that the circumstances**

**posed a substantial risk of harm**.  *Id*. at p. 842.[15] It is possible to premise this

---

[15] *Farmer* provides this guidance to the trier of fact: "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, **including inference from circumstantial evidence**, and a **factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."** *Farmer*, 511 U.S. at p. 842.

inference on "the very fact that the risk was obvious." *Id.* Obviousness of the risk thus plays a role in the subjective test and the subjective test is then satisfied if the circumstances permit an inference that the actor "must have known" about the risk. *Id.* at pp. 842-43.

   **D.    THERE EXIST GENUINE ISSUES OF MATERIAL FACT AS TO EACH DEFENDANT'S LIABILITY PURSUANT TO 42 U.S.C. § 1983 FOR VIOLATING THE PLAINTIFFS' EIGHTH AMENDMENT RIGHT AGAINST "CRUEL AND UNUSUAL PUNISHMENT".**

   John Doe's case centers around each Defendant's deliberate indifference to a serious medical need. That serious medical need was medical and mental health evaluation and treatment after John Doe reported that he has been sexually assaulted by Tuft; an allegation that proved to be true.[16]

   For Charles Doe and James Doe, it was each Defendants deliberate indifference to the obvious danger that Tuft, a serial sexual predator, posed to inmates in general, and particularly inmates like Charles Doe and James Doe who were living on A Hall, the dormitory where Tuft was reassigned after John Doe reported that Tuft had sexually assaulted him. "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at p. 834, quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)

_____

[16] The Defendants argue in John Doe's case that his claim ". . .boils down to an allegation that some, or all, of Defendants failed to ensure that a specific mental health evaluation form was completed following. . ." John Doe's reporting to the Defendants that he had been sexually assaulted by Tuft. Defendants' John Doe brief, p. 17. Although completion of a mental health evaluation form and compliance with Department SOPs would have been a step in the right direction, and would have saved Charles Doe and James Doe from being Tuft's next victims, the undisputed facts in this case prove that the Defendants had a "sufficiently culpable state of mind"; which was one of "deliberate indifference" to the Plaintiffs' health and safety. See *Wilson v. Seiter*, 501 U.S. 294, 297, 302-03 (1991).

(internal quotation marks omitted). Charles Doe and James Doe also assert claims based on each Defendant's deliberate indifference to a serious medical need.

Like John Doe, the serious medical need being immediate medical and mental health evaluation and treatment after Defendants learn that Charles Doe and James Doe had been sexually assaulted by Tuft.

Defendants attempt to characterize the Plaintiffs' claims as being based solely on the fact that these Defendants failed to follow the *Cason* SOPs. Defendants cite *Taylor v. Threadgill* [reported as *Taylor v. Adams*, 221 F3d 1254 (11th Cir. 2000)] for the proposition that failure to follow standard operating procedures "does not, by itself, rise to the level of deliberate indifference." *Id.* at p. 1259.[17] The operative phrase here is **"does not, by itself"** rise to the level of deliberate indifference. The clear inference in *Taylor* is that a failure to follow SOPs can be evidence of deliberate indifference, just not the only evidence. It can be significant circumstantial evidence in proving that the Defendants actually drew the inference that the circumstances posed a substantial risk of harm for the Plaintiffs. See *Farmer, supra* at p. 842.

In the context of establishing deliberate indifference, any discussion of the weight given to a violation of a particular SOP will depend on the nature of the SOP and the harm resulting to Plaintiff when that SOP is ignored. In *Taylor*, the court is

---

[17] In *Taylor*, the decedent was attempting to flee the scene after being accused of shoplifting. He was apprehended after a chase and held on the ground until law enforcement officers arrived. After showing some signs of discomfort, including heavy breathing, several firemedics inquired as to whether the decedent needed or wanted treatment and he responded that he did not, and the firemedics left the scene. The decedent subsequently had a seizure and died. Firemedic regulations required that the vital signs of a seizing patient be taken and that paramedics be called. The court noted that not only did the decedent decline any treatment at the scene, but that it was unclear if he was even evidencing signs of seizing at the time of being observed by the firemedics.

dismissive of the plaintiff's claim that the firemedics violated their own regulation because the decedent declined any treatment at the scene and was not evidencing signs of seizing. On the other hand, if the *Cason* SOPs had not been consciously ignored, John Doe would have received immediate medical and mental health evaluation and treatment and Charles Doe and James Doe would have never been sexually assaulted by Tuft. The *Cason* SOPs are court mandated to address the history of constitutional deficiencies involving blatant sexual misconduct by prison guards and officials. They are not some mere regulation or protocol to be followed when a prison official feels like being kind. See *Cason*, April 8, 1999 Order Terminating Proceedings, p. 6.

The *Cason* SOPs were not followed in any shape, fashion or form. The Defendants have admitted that they were knowledgeable of *Cason* and its resulting SOPs and that they had intensive training in the requirements of the Cason SOPs. They can provide no explanation as to why these SOPs were ignored when John Doe reported that a prison guard had sexually assaulted him. And they provide no explanation as to why Tuft was allowed to have further contact with inmates after it was reported that he sexually assaulted John Doe.[18]

Each of these Defendants knew what was constitutionally required of them when John Doe reported the sexual assault by Tuft. Yet they did nothing to render aide themselves or to see that aide was rendered to John Doe. An Eighth Amendment claimant need only show "**that the [prison] official acted or failed to**

---

[18] It is not surprising that the Defendants have no explanation for why the Cason SOPs were ignored. These same Defendants claim not to recall any of the facts and circumstances surrounding the sexual assaults. They claim to have no recollection concerning their individual involvement in a matter that was unprecedented at Frank Scott. Jones Dep. II, pp. 32-33.

**act despite his knowledge of a substantial risk of serious harm**." *Farmer, supra* at p. 842 (emphasis added).

Likewise each of these Defendants knew what was constitutionally required of them when allegations of sexual assault were made against Tuft. When a prison guard is accused of sexual assault, the *Cason* SOPs and Department policy and procedure require immediate notification of the warden or the duty officer and removal of the guard from contact with the inmate population. Jones Dep. I, p. 37, pp. 42-44, 57-58, 82-84; Knight Dep., p. 44. If the guard is not removed from such contact, the serious risk of harm to the inmates becomes obvious, and the Supreme Court in *Farmer* tells us that obviousness of the risk plays a role in the subjective aspect of deliberate indifference and the subjective test is satisfied if the circumstances permit an inference that the actor "must have known" about the risk. *Id*. at pp. 842-43.

As to each individual Defendant, the following discussions will identify those genuine issues of material fact that evidence deliberate indifference to the known risk of serious harm that befell the Plaintiffs while incarcerated at Frank Scott Prison.

**1.      Defendant Scroggy.**

As warden of Frank Scott Prison during the summer of 2002, Defendant Scroggy played a very significant role in denying John Doe much needed medical and mental health evaluation and treatment. Although Scroggy initially denied knowledge that one of his guards committed serial sexual assaults while under his command, there are numerous documents in the record either from Scroggy or

otherwise bearing Scroggy's signature to demonstrate that this testimony is false. Scroggy Dep., p. 15, Plaintiffs' Ex. 14, Ex. 41.

Defendants would lead this Court to believe that Plaintiffs' entire case against Scroggy is based upon his "mere" failure to adhere to the *Cason* SOPs which Defendants quote in much detail in their briefs. Although Scroggy initially denied any knowledge about the facts and circumstances surrounding Tuft's sexual assault of John Doe, Charles Doe and James Doe, and even though he first claimed that the Cason SOPs precluded him from investigating or acting on such allegations (Scroggy Dep., p. 24); he did in the end, after being shown the applicable *Cason* SOPs, admit that he violated the SOPs when he did not insure that mental health and medical assistance were immediately made available to the victims. *Id*. at pp. 93-94.

What perhaps damns Scroggy most is that after his denial, under oath, of involvement in the aftermath of Tuft's sexual assaults on John Doe, his admission that he did not notify mental health because "I did not feel that there was any merit to his [John Doe] accusation." *Id*. at p. 99.

Defendants failed to address the significance of this admission by Scroggy. In fact, Defendants attempt to gloss over this critical admission by leading us to believe that John Doe, on July 10, 2002, was already on a mental health case load and therefore had mental health services available to him. This argument totally misses the point. The Cason SOPs require that the victim receive a mental health evaluation and treatment **for the sexual assault**. The Defendants had a duty to make sure this evaluation and treatment was afforded John Doe, as well as the

36

other Plaintiffs. Because of Scroggy's and the other Defendants' deliberate indifference John Doe was never referred to a counselor specially trained to deal with sexual assault victims as required by the SOPs.

Defendants are trying their best to convince this Court that the only issue before the Court is whether an alleged violation of the *Cason* SOPs constitutes deliberate indifference for purposes of a claim under the Eighth Amendment. See Defendants' John Doe Brief, p. 23. On the contrary, the issue of Scroggy's deliberate indifference for Eighth Amendment purposes requires the trier of fact to consider the totality of Scroggy's conduct based upon both direct evidence and circumstantial evidence and to apply the test articulated in *Farmer* for determining deliberate indifference.

To show that Scroggy acted with deliberate indifference to John Doe's serious medical needs, John Doe must put forth evidence of an objectively serious medical need and John Doe must prove that the prison official acted with an attitude of deliberate indifference to that need. *Kelley*, supra, 400 F.3d at 1284. The Defendants acknowledge that John Doe had an objectively serious medical need and Scroggy, by his own admission, consciously ignore that need.

Scroggy admits that he purposely did not notify mental health claiming that there was not any merit to John Doe's allegations against Tuft. How did he ever come to that conclusion? When Scroggy first became aware of the allegations, no investigation had been undertaken. Mike Avant, a former mental health counselor at Frank Scott, testified that Scroggy "despised mental health" and "put up so many barriers between us and our job." Avant Dep., pp. 17-18.

Once again, Defendants' contention that "there is no evidence that this particular inmate [John Doe] was intentionally deprived of access to a mental health evaluation as a form of punishment by Defendant Scroggy," is contrary to the evidence in the case. See Defendants' John Doe Brief, p. 24.

The evidence of Scroggy's deliberate indifference in the cases of Charles Doe and James Doe is just as stark. After Scroggy learned of the allegations of sexual assault made by John Doe against Tuft, he allowed Tuft to be reassigned to A Hall dormitory where Tuft sexually assaulted Charles Doe and James Doe. Aubrey Jones, Deputy Warden of Security, testified that under Department policy it is the responsibility of the warden to remove the guard from contact with the inmate population. Jones Dep. I, at pp. 42-44, pp. 57-58, pp. 82-84.

According to Jones, Scroggy should have transferred Tuft to a position where he could not have contact with inmates. *Id.* at pp. 75-85. The obvious reason for taking such action is to prevent the prison guard from being put in a position where he can continue his predatory assaults on inmates. Scroggy knew of the risk of serious harm but he recklessly disregarded that risk. "Knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, **including inference from circumstantial evidence**, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that **the risk was obvious**." *Farmer*, 511 US at p. 842 (emphasis added).

It really is an irony that Scroggy, presumably after Defendant McElheney reported John Doe's allegations of sexual abuse at the July 11 Management Meeting, ordered Jones to investigate; however, knowing the seriousness of the

38

allegations, Scroggy took no action to protect the inmates from Tuft until it could be determined whether the allegations made by John Doe were true. *Id.* at pp. 39-40.

Once again, you glean from the depositions of Scroggy and Jones that they both failed to act despite their knowledge of a substantial risk of serious harm. Serious harm that was obvious on its face. In sifting through the contradictions and falsehoods of Scroggy's testimony, his deliberate indifference, however subjective, shows through and reflects an obvious disdain for the inmates.

### 2.    Defendant Jones.

Like Warden Scroggy, Defendant Jones, as Deputy Warden for Security at Frank Scott during the summer of 2002, played a significant role in denying John Doe much needed medical and mental health evaluation and treatment. Jones denies any knowledge of the events of July 10, notwithstanding the fact, that he personally investigated those allegations the afternoon of July 11. In his first deposition, Jones claimed that he did not know who John Doe was and did not remember any involvement in the investigation. Jones Dep., I, pp. 25-26. Jones even denies ever hearing of an allegation by an inmate that the inmate was forced to have sex with a prison guard. *Id.* at p. 40.

However Jones was very clear about what should have been done when prison officials' learned of the sexual assault allegations on July 10. *Id.* at pp. 27, 37. He acknowledged that the *Cason* SOPs require that the alleged victim immediately receive medical and mental health assistance. *Id.* at p. 37. Further, Jones admits that the accused guard should be removed so as to prevent any further contact with the inmate population. *Id.* at pp. 42-44, pp. 57-58, pp. 82-84.

We now know that after McElheney reported John Doe's allegations of sexual abuse at the July 11 Management Meeting, Scroggy ordered Jones to investigate. Jones' investigation is froth with evidence of deliberate indifference towards the health and safety of Tuft's victims and potential victims. Jones, totally disregarding Cason SOPs regarding conduct of investigations of sexual misconduct, brought John Doe and Tuft together in the presence of Captain Evans, Secretary Kerri Downing and perhaps others. John Doe's Dep., at p. 109. He allowed the victim to be humiliated for no legitimate investigatory reason. Jones' investigation also revealed that another inmate, Troy Lamar Scott, told him that John Doe had confided in Scott that "starting two months" earlier, Tuft had asked John Doe for oral sex. Plaintiffs' Ex. 10.

Most damning to the Defendants' motion is a July 12 memorandum from Jones to Scroggy where Jones notes that John Doe had resisted Tuft's sexual assaults but after "persistent advances" had succumbed. Plaintiffs' Ex. 8. It is inconceivable that with the results of Jones' investigation Tuft would have been transferred to A Hall, the dormitory housing Charles Doe and James Doe. Tuft Dep., p. 39. Even more astonishing is the fact that it was Jones who ordered Tuft's reassignment. *Id*. Jones, it turns out, was concerned that, after John Doe's allegations came to light, Tuft would not feel "comfortable" returning to the same dormitory. *Id.*

"Prison officials must insure that inmates receive adequate medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 US at p. 832. The knowledge that Jones learned from his investigation of the

40

allegations made by John Doe, coupled with the fact that he purposely transferred Tuft to A Hall dormitory with the knowledge that such was clearly improper, evidences the type of recklessness which is defined in *Farmer* as a "[conscious] disregard [for] a substantial risk of serious harm." *Farmer*, *supra* at p. 839. To satisfy the subjective test for deliberate indifference, Jones and Scroggy had to be aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and they must also draw that inference. *Id*. at p. 837. *Farmer* does not require that a prison official, like Jones or Scroggy, acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. *Id*. at p. 842. Once again the direct evidence in this case as well as the circumstantial evidence proves that Jones and Scroggy drew the required inference that "the circumstances posed a substantial risk of harm". *Id*. at p. 842.

A common theme throughout Defendants' briefs is that alleged violations of *Cason* SOPs do not constitute "deliberate indifference" for purposes of a claim under the Eighth Amendment. Defendants' arguments are without merit. Jones' involvement and participation in the aftermath of the initial allegations of July 10 go way beyond any "mere" violation of the Cason SOPs. Jones' action, as well as his inaction, based upon the knowledge that he testifies he had, is the deliberate indifference that is prohibited by the Eighth Amendment.

Jones made no effort whatsoever to see that John Doe received proper medical and mental health evaluation and treatment after the July 10 report of sexual assault. Here is the Deputy Warden of Security, who has the authority to

41

transfer a prison guard accused of sexual assault to another dormitory, but makes no effort to provide necessary medical care to the victim.

Jones is just as culpable with respect to the injuries suffered by Charles Doe and James Doe. Just prior to transferring Tuft to A Hall Jones had sufficient information to believe now that Tuft would pose a serious risk of harm to inmates on A Hall. By his own admission, he made the decision to transfer Tuft knowing that such a transfer would be a violation of the Department's SOPs. Jones Dep. I, pp. 42-44, pp. 57-58, pp. 82-84.

### 3. Defendants Stanelle and McCurry.

In the summer of 2002, Ray Stanelle was an investigator with the Internal Investigations Division. Stanelle Dep., p. 8. Defendant McCurry was the chief investigator of the Internal Affairs Unit. McCurry Dep., p. 10. Defendant McCurry received the John Doe investigative file on July 19, 2002 and assigned the responsibility for investigating Tuft's alleged assaults to Defendant Stanelle. McCurry Dep., pp. 14, 23. Stanelle had no special training with respect to investigation of allegations of staff sexual misconduct. Stanelle Dep., pp. 12, 14. The Department had a Special Investigations Unit with investigators specially trained to investigate allegations of staff sexual misconduct (Roulain Dep., p. 9-10), Jan Roulain, currently chief investigator for Internal Affairs and previously manager of the Special Investigations Unit, testified that investigations of staff sexual misconduct must be conducted properly and they must be conducted by somebody who has been specially trained to investigate such claims. Roulain Dep., p. 20.

One of the first things an investigator is supposed to do in a sexual assault case is to ensure that the alleged victim has received the mandated mental health evaluation.  Roulain Dep., p. 27.  Neither Stanelle nor McCurry ever took any action to insure that Plaintiffs received mental health evaluations and treatment.  With regard to John Doe in particular, Stanelle and McCurry were provided documentation that, if true, demonstrated an objective serious medical need and yet they were deliberately indifferent to that need.  An Eighth Amendment claimant need only show "that the [prison] official acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Farmer, supra* at p. 842 (emphasis added).

Further, until August 12, when Charles Doe's stepfather, Ronald James, showed up at James Doctor's office with clear evidence of Tuft's sexual assaults, neither McCurry nor Stanelle took any meaningful action.  James Dep., p. 17, Stanelle Dep., p. 55.  Stanelle admitted that he put the John Doe investigation on the backburner.  Stanelle Dep., p. 141.  Even though he agrees that it is most important that the alleged victims get mental health assistance. *Id.* at p. 77.

Defendants' defense with respect to Stanelle's and McCurry's inaction is that the violation of an SOP does not equate to deliberate indifference.  It bears repeating that Stanelle and McCurry did not merely violate a SOP.  They ignored an obvious serious medical need. The absolute total disregard of the *Cason* SOPs by Stanelle, McCurry and the other Defendants reflects the complete and total disdain that they had for the Plaintiffs' health and safety.  If the *Cason* SOPs had been adhered to John Doe's injuries would have been minimized and the sexual assaults on Charles Doe and James Doe would never have occurred.  "Whether a prison

43

official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. *Farmer, supra*, 511 US at p. 842.

The extensiveness of any one particular actors involvement should not be the determining factor. While *Farmer* is the landmark case with respect to defining "deliberate indifference", the Eighth Amendment cases decided both before and after *Farmer* do not quantify the extent of involvement required for one to be liable for violating an individual's Eighth Amendment rights. That is a question for the trier of fact. Although Stanelle's and McCurry's involvement may not be as extensive as the involvement of Scroggy and Jones, they had ample opportunity to require medical and mental health evaluation and treatment for John Doe and to prevent the sexual assaults on Charles Doe and James Doe.

### 4. Defendants Knight, Holsey, Evans, McElheney and Nicholson[19]

Defendants Knight, Holsey, Evans, McElheney and Nicholson, adhering to the party line, claim to have no recollection of the sexual assaults by Tuft against the Plaintiffs, notwithstanding their documented involvement. Knight Dep., p. 19, Holsey Dep., pp. 16-17, 31, 38, Evans Dep., p. 24, McElheney Dep., pp. 21-22, and Nicholson Dep., pp. 9-10, 11, 28-29. None of these Defendants discharged their responsibilities to ensure that John Doe received medical and mental health assistance or to ensure that Tuft was not allowed to continue his assaults. Being on the front lines at Frank Scott Prison, each of these Defendants may have been in

---

[19] Defendant Gloria Nicholson, now known as Gloria Chester, was divorced in October of 2004, and at that time she took back her maiden name of "Chester". Nicholson Dep., p. 7.

the best positions to see that John Doe was afforded proper medical and mental health evaluation and treatment for psychological injuries that he suffered as a result of being sexually assaulted by Tuft.  Likewise, they were in a position to prevent Tuft from sexually assaulting Charles Doe and James Doe.  It was in part because of their deliberate indifference for the serious medical needs of John Doe and the serious risk of harm to Charles Doe and James Doe that these Plaintiffs suffered serious injury.

In reviewing the record in this case, this is what we know about the involvement of these five Defendants.  Knight was apparently the first prison official to be told about Tuft's sexual misconduct with John Doe.  Plaintiffs' Ex. 41.  Now he claims no knowledge of the assaults.  However, Knight testifies that because of the seriousness of the alleged incident, he would have immediately informed his Supervisor, Holsey and the Duty Officer, McElheney.  Knight Dep., pp. 36-38.  In his testimony Knight admits what must be the overriding consideration in these cases:  **When an inmate makes an allegation of sexual misconduct by prison staff, you have to assume that it is true and the warden must be informed and the guard in question moved to an area where he would not have contact with inmates.** Knight Dep., p. 44.

Holsey also acknowledged the seriousness of the allegations made by John Doe and is certain that he would have immediately notified McElheney.  Holsey Dep., p. 34.  Holsey also acknowledged that he knew, because of his *Cason* training, that immediate action had to be taken.  *Id*. at pp.34-35.  "An Eighth Amendment claimant need not show that a prison official acted or failed to act

45

believing that harm actually would befall an inmate; **it is enough that the official
acted or failed to act despite his knowledge of a substantial risk of serious
harm.** *Id.* at p. 842 (emphasis added).

Defendant McElheney testified that, after reviewing John Doe's July 10
statement, there is no doubt in his mind that he notified Scroggy. McElheney Dep.,
p. 33.

Notwithstanding their *Cason* training, the Defendants responded to John
Doe's July 10 revelations by throwing John Doe in the "hole". This action is
evidence of a blatant disregard by these Defendants of the *Cason* SOPs. When
faced with an objectively serious medical need, these Defendants, in effect,
punished John Doe. These Defendants knew that if the allegations were true, John
Doe had a serious medical need, which required immediate medical and mental
health evaluation and treatment. Knowing this, they chose not to render aid but
decided on punishment instead.[20]

Once again, we have significant evidence that these Defendants were
deliberately indifferent to John Doe's serious medical need. "When prison guards
ignore without explanation a prisoner's serious medical condition that is known or
obvious to them, the trier of fact may infer deliberate indifference." *Bozeman v.
Orum*, 422 R.3d 1265, 1273 (11th Cir. 2005); see also, *Harris v. Coweta County*, 21
F.3d 388, 393 (11th Cir. 1994).

---

[20] As events unfolded in the following days [discussed in detail above], none of the Defendants
stepped forward on behalf of John Doe. And when Jones transferred Tuft to A Hall, so he could be
"more comfortable", they still did nothing. Knight was among those prison guards that participated in
transferring John Doe for treatment on July 16 after he slashed his arms and was found in his cell
with "blood all over himself and cell". Treadwell Aff., Ex. C.

Captain Evans, in the summer of 2002, was the Chief of Security at Frank Scott. His duties included monitoring all procedures, in terms of security, inmate supervision and to "ensure that policies are followed as they are written." Evans Dep., at p. 6. Evans had firsthand knowledge of John Doe's allegations of Tuft's sexual assaults because he was present when Jones arranged to have John Doe and Tuft brought together so John Doe could repeat what he had already reported to Knight and others. John Doe's Dep., at p. 109.

One would assume that if your job responsibilities included enforcement of the Department's SOPs (Evans Dep., at p.6.) that Evans would have immediately taken required action once he heard John Doe's allegations that he had been sexually assaulted. He knew that if the allegations were true, John Doe had a serious medical need, which required immediate medical and mental health assistance. He did absolutely nothing to see that John Doe received the assistance that he so desperately needed.

Evans, like Jones and Scroggy, is just as culpable with respect to the injuries suffered by Charles Doe and James Doe. Prior to Tuft being transferred to A Hall Evans had sufficient information to believe that Tuft would pose a serious risk of harm to inmates on A Hall. As Chief of Security one of his job responsibilities was enforcement of the Department's SOPs, but upon learning of the allegations against Tuft, Evans did nothing to stop Tuft's transfer to A Hall knowing that such a transfer would be a violation of the Department's SOPs. "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed

47

a prisoner to a sufficiently substantial risk of serious damage to his future health."
*Farmer*, 511 U.S. at p. 843.

With respect to Defendant Nichoson, her deliberate indifference is obvious
on its face. On July 29, 2002, when Tuft first sexually assaulted Charles Doe,
Charles Doe immediately attempted to report the incident by sending a letter to
Defendant Nichoson. Plaintiffs' Ex. 12. Charles Doe's letter made it clear what Tuft
was doing and what he intended to do. Furthermore, his letter revealed what Tuft
had in mind for the future. *Id.* The next day, Tuft assaulted James Doe.

While Defendant Nichoson denies receiving the letter there is evidence that
would indicate otherwise. When Ronald James confronted James Doctor with the
DNA evidence on Charles Doe's clothing, Doctor placed a telephone call to
Scroggy. James Dep., p. 17. Initially, James could overhear both ends of that
telephone conversation and he heard Scroggy admit that he had the letters about
Tuft on his desk. *Id.* These facts and the testimony of Charles Doe that he placed
the letter in the prison mail, create a genuine issue of material fact as to Defendant
Nicholson's knowledge of Tuft's conduct on July 29, 2002 and thereafter.

### E.   DEFENDANTS ARE NOT ENTITLED TO AVAIL THEMSELVES OF THE DEFENSE OF QUALIFIED IMMUNITY IN THAT THE DEFENDANTS' ACTIONS VIOLATED CLEARLY ESTABLISHED STATUTORY AND CONSTITUTIONAL RIGHTS.

Defendants are not entitled to qualified immunity. Their claim that they did
not violate any clearly established constitutional right of the Plaintiffs is simply
contrary to the extensive record in these cases. Having discussed and examined in
detail that evidence, it is only necessary to say that in the summer of 2002, an

48

inmate's right under the Eight Amendment to have adequate recognition and treatment of an objectively serious medical need, and his right to be afforded reasonable measures to guarantee his safety were clearly established. A plaintiff, who seeks damages for violation of constitutional or statutory rights, may overcome an asserted defense of qualified immunity "… by showing that those rights were clearly established at the time of the conduct at issue." *Davis v. Scherer*, 468 U.S. 183, 197 (1984). When a defendant moves for summary judgment based on the doctrine of qualified immunity, the court must view the facts in the light most favorable to the plaintiff and determine whether those facts constitute a violation of a clearly established law. *Waldrop v. Evans*, 871 F.2d 1030 (11th Cir. 1989).

In *Anderson v. Creighton*, 483 U.S. 635 (1987) the Supreme Court explains what it means when a constitutional right is "clearly established": "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at p. 640. In essence these Defendants are claiming they did not understand that by denying John Doe medical and mental health evaluation and treatment, after he claimed to be a victim of sexual assault, that they were violating a constitutional right. Their position would be the same regarding the failure to protect other inmates, including Charles Doe and James Doe, from Tuft, after he was accused of having sexually assaulted John Doe.

In order to strip away the defense of qualified immunity, *Anderson* does not require the very action in question to have previously been held unlawful, but only that "in light of pre-existing law the unlawfulness must be apparent." *Id.* As noted, with *Cason* being the backdrop for the Plaintiffs' claims and its purpose being to

49

remedy constitutional deficiencies, the unlawfulness of the Defendants' actions against the Plaintiffs was most definitely apparent. [21] Where a party has sufficient pled facts to show a violation of an Eighth Amendment right, summary judgment as to qualified immunity should be denied. See generally, *Wallin v. Norman*, 317 F.3d 558 (6th Cir. 2003).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be **DENIED.**

This 6th day of  March, 2006.

/s/ Marc T. Treadwell
Marc T. Treadwell
Georgia Bar No. 716239

/s/ D. James Jordan
D. James Jordan
Georgia Bar No. 404465

ADAMS, JORDAN & TREADWELL, P.C.
Fickling & Co. Building
577 Mulberry Street, Suite 1250
P.O. Box 928
Macon, GA  31202-0928
(478) 743-2159

/s/ Clinton Alan Wheeler
Clinton Alan Wheeler
Georgia Bar No. 751248

C. Alan Wheeler, P.C.
637 Cherry Street
Macon, GA  31201-2623
(478) 742-7488

---

[21] Defendants acknowledge being fully aware of *Cason* and the *Cason* mandated SOPs.

50

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has this day served counsel of record for all

parties in the foregoing matter with a copy of this pleading via electronic filing with

the United States District Court for the Middle District of Georgia and addressed as

follows:

DRH@psstf.com
Mr. Deron R. Hicks
1043 Third Avenue
P.O. Box 1199
Columbus, GA  31902

This 6th day of March, 2006.

_/s/ Marc T. Treadwell_____
Marc T. Treadwell