```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF GEORGIA
 2                   MACON DIVISION
                 _____
 3
    THE UNITED STATES OF AMERICA,  :
 4                    PLAINTIFF  : CASE NO. 5:13-CR-32-MTT
    VS                           :
 5                               :        JUNE 9, 2014
                                 :
 6  JAMES HINTON, ET AL,         :     MACON, GEORGIA
                    DEFENDANTS. :
 7  _____
```

```
 8                        JURY TRIAL
                      VOLUME 1 OF 10
 9
            BEFORE THE HONORABLE MARC TREADWELL
10         UNITED STATES DISTRICT JUDGE, PRESIDING

11  APPEARANCES:
    FOR THE GOVERNMENT:        FORREST CHRISTIAN, AUSA
12                             TONA BOYD, AUSA
                               UNITED STATES DEPT OF JUSTICE
13                             950 PENNSYLVANIA AVE, NW
                               WASHINGTON, DC 20530
14  FOR THE DEFENDANTS:
    JAMES HINTON:              DAVID WOLFE
15                             101 MARIETTA ST. NW, STE 3325
                               ATLANTA, GA 30303
16  CHRISTOPHER HALL:          BRIAN JARRARD
                               230 THIRD STREET
17                             MACON, GA 31201
    RONALD LACH:               DEBRA GOMEZ
18                             P.O. BOX 13523
                               MACON, GA 31208
19  DELTON RUSHIN:             JOHN FOX
                               P. O. BOX 209
20                             MACON, GA 31202
    DERRICK WIMBUSH:           FRANKLIN HOGUE
21                             P. O. BOX 1795
                               MACON, GA 31202
22  TYLER GRIFFIN:             PAGE PATE
                               101 MARIETTA ST., STE 3300
23                             ATLANTA, GA 30303
    _____
24              TAMMY W. FLETCHER   USCR
                      P. O. BOX 539
25              MACON, GA 31202-0539
                     (478-752-3497)
```

1                    PRELIMINARY INSTRUCTIONS

2    BY THE COURT . . . . . . . . . . . . . . . . .   18

3                     OPENING STATEMENTS

4    BY MR. CHRISTIAN . . . . . . . . . . . . . . .   28

5    BY MR. JARRARD . . . . . . . . . . . . . . . .   47

6    BY MR. FOX . . . . . . . . . . . . . . . . . .   54

7    BY MR. WOLFE . . . . . . . . . . . . . . . . .   62

8    BY MR. HOGUE . . . . . . . . . . . . . . . . .   76

9    BY MR. PATE . . . . . . . . . . . . . . . . . .  84

10

11   JURORS EXCUSED . . . . . . . . . . . . . . . .   92

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S
 2   June 9, 2014
 3   (PRELIMINARY MATTERS OUTSIDE PRESENCE OF JURORS)
 4           THE COURT:   Anything to discuss before we bring
 5   the jury in?
 6           MR. CHRISTIAN:   Yes, Your Honor.  Mr. Jarrard,
 7   on behalf of his client, Defendant Christopher Hall, has
 8   provided the government with some demonstratives that he
 9   intends to use during opening.  May I pass them forward to
10   the Court?
11           THE COURT:   You may.
12           MR. CHRISTIAN:   Your Honor, the government
13   objects to the use of these demonstratives.  It appears
14   from the demonstratives that what Mr. Jarrard intends to
15   do is put up a photo of an uninjured inmate who attacked
16   an officer with a photo of an injured officer.
17           For example, Franklin Jones, an inmate, attacked
18   Officer Jason Davis in a dorm in a housing unit.
19           THE COURT:   Let me interrupt you.  You can't
20   put up evidence unless the other side agrees to it and if
21   they object to it it doesn't go up.
22           MR. CHRISTIAN:   Okay.  I understand they --
23           THE COURT:   Unless there's something I'm
24   missing here.
25           MR. CHRISTIAN:   No.  My concern was more of if
```

1  that's where the demonstratives are going that suggests to

2  me that's where the argument or the opening is going and I

3  have some concerns on that score.

4      MR. JARRARD:  Your Honor, are you saying -- I

5  mean, it's my position those are demonstrative evidence of

6  what I intend to cover in my opening statement.

7      THE COURT:  A picture of an inmate?  You say

8  it's not to be an exhibit?  It's demonstrative exhibit?

9      MR. JARRARD:  Yes, Your Honor.  I don't intend

10  to make that an exhibit.

11      THE COURT:  Demonstrative of what?

12      MR. JARRARD:  Of the person I'm talking about.

13  The inmates involved in these four instances as listed in

14  the indictment.

15      THE COURT:  Well, that's evidence.  I mean, the

16  rule is well known, I think.  You know, evidence doesn't

17  go in during opening.  A lot of times lawyers agree that

18  you can display evidence during opening, but they don't

19  have to agree.

20      MR. JARRARD:  Okay, Your Honor.  If that's the

21  Court's ruling.

22      THE COURT:  If you know another basis for

23  putting in evidence during the opening that hasn't been

24  admitted I'll consider it.

25      MR. CHRISTIAN:  Actually, Your Honor, that's

1   the tip of the iceberg as far as the government's concerns

2   here.  But just to explain.  Franklin Jones was an inmate.

3   He assaulted an officer named Jason Davis.  It wasn't an

4   altercation.  He just attacked Jason Davis, blindsided

5   him, hit him with clippers, seriously injured Officer

6   Davis.

7        The government alleges that Franklin Jones was

8   then taken from the dorm, the housing unit in handcuffs to

9   the gym.  Inside the gym he was beaten in retaliation for

10  that prior incident.

11       But what Franklin Jones did to Officer Davis,

12  other than the fact of injuring him, was really of no

13  consequence to any element of the charges.  It's of no

14  consequence to any potential defense.  And the notion that

15  defense counsel will get to wave around bloody photos of

16  Officer Davis or blood on the floor from the dorm goes

17  straight to nullification.  It's more prejudicial than

18  probative.  It sheds no light whatsoever on whatever

19  happened in the gym.

20       As the Court recognized during the pretrial

21  hearing, if it, like the government says, in fact,

22  happened, these inmates were taken to another location in

23  handcuffs and beaten in retaliation, then whatever

24  happened, whatever happened in the dorm sheds no light on

25  that.  And so I'm concerned by the demonstratives because

1    it suggests to me that what the defense is going to do in

2    opening arguments is say, let's compare the officers'

3    injuries' with the inmates injuries and you tell me which

4    one should be charged?

5           MR. JARRARD:   Your Honor, may I first get

6    clarity.  Is it Mr. Christian's position that some of

7    these are appropriate demonstratives?

8           THE COURT:   No.  Now he's talking about the

9    substance of your argument.

10          MR. JARRARD:   I understand that, Your Honor.

11   That was my first question.  But --

12          THE COURT:   Not argument, opening.  Pardon me.

13          MR. JARRARD:   The government alleges that these

14   four instances are the overt acts of the conspiracy.  The

15   government tries to carve out that we can't talk about the

16   underlying assaults on the guards.  I don't think the

17   Court has ruled in pretrial that we cannot.  Moreover,

18   Your Honor, these are specific-intent conspiracies.

19          So the issue of what these guards were reacting

20   to at the time is directly relevant to our defense that

21   these gentlemen didn't have a specific intent to conspire

22   to do anything.  If they're reacting to these instances of

23   the four inmate-on-guard assaults, one, I don't think Your

24   Honor has ruled.  We can't talk about what transpired in

25   those assaults.  I presume Mr. Christian is saying that we

1    can't show any of the evidence that the government has

2    produced about the attacks of the guard -- I mean, the

3    inmates on the guards.  That guts our defense, my defense,

4    Your Honor, that I can't talk about the facts leading up

5    to -- even if we confine it to the instances in the

6    indictment, I can't talk about the facts leading up to

7    when the government says these gentlemen conspired to do

8    anything and what they were thinking at the time.

9            I think it's directly relevant that we talk

10   about the -- be allowed to talk about the four attacks

11   mentioned in the indictment and what happened just seconds

12   or minutes before the government says that some conspiracy

13   either existed or was formed.

14           I mean, the government wants to carve it up and

15   say we have to sanitize it down and all we can talk about

16   is the time when these inmates left the dorm until when

17   they went to the gymnasium.

18           I understand the government can take that

19   position, but our defense is directly contrary to that.

20   Our defense is what was happening.

21           Your Honor, you have ruled.  We can't talk about

22   prison conditions, I understand that.  But what was

23   happening in the four overt acts alleged in the indictment

24   from the time of the attack until whatever transpired

25   elsewhere outside of E dorm, all of that timeline is

1    relevant to our defense, I think all of our defense, and

2    certainly relevant to my defense, that there was no

3    conspiracy to do anything as it relates to these inmates

4    but to react to the circumstances these gentlemen were

5    facing.

6           MR. CHRISTIAN:   Your Honor, what we talked

7    about before was if these Defendants were asserting a

8    self-defense argument then that would be one thing.  They

9    haven't thus far.  All of their previous statements do not

10   assert self defense.  Their defense thus far has been we

11   weren't there.  We didn't do it.  It wasn't us.  So under

12   that defense it really doesn't matter what happened in the

13   dorm, whether an inmate had a weapon, whether an inmate

14   had seriously injured somebody or only moderately injured

15   somebody.  None of that matters if your defense is we

16   weren't there.

17          If it was self defense, the inmate was armed, we

18   knew he was dangerous because he had injured this guy who

19   was trying to run away and we had to go tackle him and

20   then maybe punched him a few too many times.  Sure, I

21   would concede that there's some relevancy there.  But not

22   here without a self-defense argument.

23          MR. JARRARD:   Your Honor, Mr. Christian can

24   type what he anticipates our defense to be all he wants.

25   Our defense will be set out -- well, my defense will be

1   set out in my opening statement.  And if our defense is

2   that to the conspiracy charge, if nothing else, that

3   members of the jury, you should not find my client and

4   these other gentlemen guilty of having a specific intent

5   to willfully violate the civil rights of Terrance Dean and

6   these other three inmates.  I submit to you we have to be

7   able to present the story about what happened from the

8   time of the inmate-on-guard attack up through the time

9   that the government has a theory about what transpired.

10           MS. GOMEZ:   Your Honor, also there is some

11  timestamp events that are very important to Mr. Lach's

12  defense because it proves that -- I'm not just talking

13  about just Mr. Lach.  There are some of us relying on the

14  videos from the incidents because it has impeachable

15  information for when people left, when people came in,

16  when people didn't do certain things.  So to say that we

17  can't use those videos will eviscerate our defense.

18           MR. PATE:   And Your Honor, just for Mr.

19  Griffin.  I mean, that's absolutely correct.  The incident

20  doesn't begin in the gym.  The incident begins in the

21  dorm.  That's when the code is called.  That's when the

22  video starts to run.  That's when the CERT officers

23  respond.  We have to put it into context with the jury as

24  to what's going on.  Why are all these people running into

25  the dorm?  Why is it as hectic as it is?

1     The government alleged these four incidents in

2     the indictment, those overt acts.  An inmate at MSP struck

3     an officer.  Well, that's not quite what happened.

4     There's a lot more to it than that.

5          And to ask the jury just to ignore everything

6     about the case up until they walked into the gym doesn't

7     allow any of these Defendants to present a defense.

8          MR. JARRARD:  And it certainly doesn't allow us

9     to put evidence in front of the jury about what was in

10    their minds at the time of the overt acts of the

11    conspiracy.

12         MR. CHRISTIAN:  But again, Your Honor, we're

13    not talking about whether this was an accident or not.

14    We're not talking about whether they punched one too many

15    times.  It's simply was that Defendant there or not.

16         And unless and until the defense established

17    some foundation that these underlying incidents -- in

18    particularly the Franklin Jones one.  I think there are

19    arguments to be made regarding Mario Westbrook, there are

20    arguments to be made regarding Terrance Dean.

21         With regard to Franklin Jones I don't think

22    they've established any foundation for the relevancy of

23    this information and why it's more probative than

24    prejudicial.

25         MR. JARRARD:  Your Honor, it's alleged to be

1    the first overt act of the conspiracy.

2          THE COURT:   What were you going to do with the

3    picture of this wound?

4          MR. JARRARD:   Your Honor, that is inmate Jason

5    Davis.  I'm sorry, Officer Jason Davis.

6          THE COURT:   And what were you going to do with

7    it?

8          MR. JARRARD:   Describe the assault on Officer

9    Davis.

10          THE COURT:   Why is it necessary for the jury to

11    see the picture of his wound?

12          MR. JARRARD:   Because --

13          THE COURT:   Is there a timestamp on here or

14    something like that, Ms. Gomez?

15          MS. GOMEZ:   Your Honor, there is a --

16          MR. JARRARD:   That was provided by the

17    government in discovery.

18          THE COURT:   No, I'm talking -- Ms. Gomez raises

19    an argument that I can understand which is that there

20    might be some timing issues that this evidence would shed

21    some light on.

22          MS. GOMEZ:   There are in the videos.

23          MR. JARRARD:   Well, Your Honor, my client

24    responded to -- Mr. Davis -- my client, we submit the

25    evidence will show, sat there with Officer Davis holding a

1    rag on him to keep him from bleeding to death while the

2    other things were happening at the time of the Franklin

3    Jones' incident.  That's part of our defense.

4         Part of our defense is that when the government

5    says the CERT team was removing Franklin Jones and

6    alleging beating him somewhere out of the E dorm, Chris

7    Hall is sitting there trying to save a man's life.

8         THE COURT:  And why is a picture necessary for

9    that?  The picture of the wound?

10        MR. JARRARD:  Because it's part of what he was

11   responding to, Your Honor.  If we're talking about --

12        THE COURT:  Why is a picture necessary for

13   that?  He said he was holding his head.  Why is the

14   picture of the wound necessary?

15        MR. JARRARD:  Well, Your Honor, I think you've

16   already told me I can't put that up.  It may become

17   relevant as the trial develops.

18        THE COURT:  Well, I just want to understand

19   your argument.  Tell me why you think the picture of the

20   officer's wound is relevant?

21        MR. JARRARD:  Because that is what my client --

22   at least I know my client was faced with when he went into

23   E dorm on the first alleged overt act of this conspiracy.

24        THE COURT:  Now --

25        MR. JARRARD:  I mean, Judge, the conspiracy is

1    a specific intent crime.  The jury has got to find that my

2    client specifically -- when he's reacting to that incident

3    and the other three instances, that he specifically

4    intended to violate the civil rights of these inmates.

5    What's happening, what leads up to -- and this is a seven

6    minute, two minute -- you know, what leads up to the

7    alleged assault on that inmate, I think, is relevant to

8    his state of mind.

9          And it's not just some sanitized version of

10   okay, he came into an assault on an officer.  I mean, this

11   man saw that -- that's what he was presented with when he

12   came in the dorm was that injury.  And he's reacting to

13   that.  I don't know of any other way to quantify it

14   but --

15         THE COURT:  Well, that's kind of where you left

16   it at the pretrial conference.  And the end result of that

17   argument necessarily is and hence it was understandable,

18   it was justifiable that they did what they did.

19         MR. JARRARD:  It may be, Your Honor.

20         THE COURT:  Mr. Jarrard, thank you.  You may

21   have a seat.  Now, this is not precisely the issue that we

22   talked about before in that it does involve the actual

23   assaults on guards that led to the overt acts.  I think

24   the Defendants are entitled to some latitude in setting

25   the scene for that.

1        I think it's a dangerous game.  If you're going

2  to ask this jury -- well, I think it's potentially a

3  dangerous game, I'll say that.  I'm not going to let it

4  get to the point where it becomes a dangerous game for the

5  Defendants.

6        I can't right now conceive of any reason why the

7  jury would need to see this.  Is it necessary?  Or would

8  it be relevant for there to be some testimony about what a

9  particular Defendant did as he came to the scene and saw

10  that another guard had been assaulted and how the events

11  unfolded from then?  Yes.  I think there is a need to get

12  into that.

13        The fact that Defendant would want to put in

14  this picture, based on what I know now, lends a lot of

15  credence to the government's concern.

16        So, I'm agreeing with you to a point.  I would

17  like to think that it's a point that we can work through

18  so that the relevant evidence is admissible without us

19  venturing into improper territory.

20        MS. GOMEZ:  Because, Judge, there are going to

21  be points in this case where the video, even though not

22  the greatest quality in the world, when certain people are

23  going out, when certain people are leaving, directly

24  contradicts some of the testimony of specifically the

25  cooperating witnesses.

 1          Even though the picture is nothing but the video

 2   with the timestamps, it's going to show some blood and

 3   some stuff like that.  But that is not the reason for it.

 4   It's to establish the whereabouts of the people and I

 5   think we should be allowed to use those.

 6          THE COURT:  I don't know enough about it yet to

 7   say, but with the points you make provides some reason why

 8   that might be relevant.

 9          Does that take care of things as far as openings

10   are concerned?

11          MR. CHRISTIAN:  I hope so, Your Honor.

12          THE COURT:  All right.  Let's bring our jury

13   in.

14   (JURORS ENTER COURTROOM)

15          THE COURT:  Welcome back, ladies and gentlemen.

16   In just a moment I'm going to have an oath administered to

17   you.  Let me just talk for a moment first.

18          Again, I want to tell you how much we appreciate

19   your being here and how necessary your service is.  We

20   know it's an inconvenience so I want to talk a little bit

21   about scheduling first.

22          Number one, even though we're getting started a

23   few minutes late, one thing that I commit to you and the

24   lawyers join me in this, is that when you're here at the

25   courthouse we want y'all in the jury box listening to

1    testimony or listening to the arguments or statements of

2    counsel as opposed to sitting back in the jury room while

3    we argue over things in here.

4         We can work early, we can work late to take care

5    of those things but sometimes things happen that we just

6    can't avoid talking about, things outside of your

7    presence.  But generally speaking, when y'all are here at

8    the courthouse I want you sitting in the courtroom sitting

9    in the jury box listening to testimony.  And we recognize

10   again how valuable your time is.

11        Now, about scheduling.  We've got a couple of

12   options here and I want y'all to talk about this and maybe

13   before you leave we'll see if we can make a decision.

14        Typically the court schedule is 9:00 o'clock to

15   roughly 5:00 o'clock with a midmorning break, a

16   midafternoon break and a lunch.  In trials that are going

17   to last a week or two or maybe longer there's an

18   alternative schedule that we sometimes use and we have

19   found that the jurors like this alternative schedule.  It

20   doesn't work for every juror and it doesn't work in every

21   case but it goes like this.  We would start the day at

22   8:00 o'clock and do a midmorning break of 20 minutes and

23   then we would take another break later in the day of

24   another 20 minutes and then we'd stop at 2:00 o'clock.

25   You'd be free to go at 2:00 o'clock and we'd have things

1  we need to work on so that we'll be ready for the next

2  day, but you're out of here by 2:00 o'clock.

3          We can't take a lengthy lunch break.  If we do

4  that, that defeats the purpose if we let you go for an

5  hour or an hour and fifteen minutes.  We also can't buy

6  you a full lunch.  But what we can do is bring in some

7  snacks and fruit and if you want to bring along a sandwich

8  or something like that we'll have drinks; we'll have some

9  snacks back there.  Maybe that second break, if we do that

10 8:00 to 2:00 day, you could eat a sandwich, eat some

11 crackers or whatever else, but we'd take just about 20

12 minutes so that we could get back in here.

13          What we find is if we're disciplined, if we keep

14 those breaks to 20 minutes we can do just as much work

15 from 8:00 to 2:00 as far as testimony is concerned as we

16 can from 9:00 to 5:00. But it frees up your afternoons at

17 least to some degree.  So that's an option.

18          When you go back to the jury room I'll let Teri

19 go back with you and you can maybe give us the benefit of

20 your thoughts about that.

21          You got to meet Teri already.  Tammy Fletcher is

22 our court reporter.  Her job, of course, is to take down

23 everything that is said.

24          Nicole Paschal is one of my law clerks and she's

25 assigned to this case so she'll be helping me throughout

1    the trial.

2         Those are the preliminaries I wanted to talk

3    about.  Ms. Hatcher, would you administer the oath please.

4         COURTROOM DEPUTY:  (JURORS REPEATING OATH) I do

5    solemnly swear that I shall well and truly try the issues

6    here and now joined in this indictment and a true verdict

7    make according to the law and the evidence, so help me

8    God.

9         THE COURT:  Thank you, Ms. Hatcher.  I invoke

10   the rule of sequestration.  So, if we have any non-party

11   witnesses or representatives in the courtroom they will

12   need to leave.  Do we have any?

13        MR. HOGUE:  Just one moment, Your Honor.

14        THE COURT:  What has just happened, ladies and

15   gentlemen, it's a routine thing.  At the beginning of a

16   trial the rule of sequestration is invoked.  That means

17   that unless a witness is testifying he or she can't stay

18   in the courtroom.   The parties, of course, can but the

19   witnesses, non-party witnesses are not allowed in the

20   courtroom until after they've testified.  I think you can

21   appreciate the reason for that.  We don't want witnesses

22   -- I'm not saying anybody would do anything wrong, but we

23   just want witnesses to testify based upon their own

24   knowledge and not be influenced in any way by having been

25   in the courtroom and heard what some other witnesses might

1    have said.  So, the rule of sequestration has been

2    invoked.

3           And now I need to give you some preliminary

4    instructions.  You have been empaneled to try the case of

5    the United States of America versus James Hinton,

6    Christopher Hall, Ronald Lach, Jr., Delton Rushin, Derrick

7    Wimbush and Tyler Griffin.

8           This is a criminal case as contrasted to a civil

9    case.  Criminal trials result when a person accused of a

10   crime in an indictment returned by the Grand Jury enters a

11   plea of not guilty, thereby denying all essential

12   allegations of the indictment.

13          The allegations of the indictment on the one

14   hand and the plea of not guilty on the other form the

15   issues which you must resolve, namely whether the

16   Defendants are, in fact, guilty of the crimes that they've

17   been charged with in the indictment.

18          Now, there are there basic things that you need

19   to remember about a criminal case.  First, as I said

20   earlier, the Defendants are presumed innocent until proven

21   guilty.  The indictment against the Defendants brought by

22   the government is just an accusation, nothing more than

23   that.  It is not proof of guilt or anything else.  The

24   Defendants start out with a clean slate.

25          Second, the burden of proof is on the government

1    at the beginning of the case and until the end of the

2    case.  The Defendants have no burden to prove their

3    innocence or to present any evidence or to testify.

4         Third, the government must prove the Defendants

5    guilty beyond a reasonable doubt.  And I'll give you

6    further instructions on that particular point later.

7         But bear in mind that the level of proof

8    required is high.

9         It will be your duty to ascertain the truth of

10   the case from a factual standpoint from the evidence and

11   only from the evidence presented.  The evidence consists

12   of two things; the testimony of witnesses who will take

13   the stand and testify under oath and exhibits, documents

14   and other things that I admit into evidence.

15        I caution you that what the lawyers say is not

16   evidence.  The inference and suggestions which the lawyers

17   make in their questions is not evidence.  Of course, if a

18   Defendant agrees with a question asked by a lawyer then

19   that is evidence; that is the witness's agreement with

20   something that a lawyer has posed in his question.

21        The opening statements that lawyers give, which

22   you'll hear in a moment, and their closing arguments which

23   they give at the conclusion of the trial, are not

24   evidence.  What I tell you is not evidence.  Again, the

25   evidence is from the witnesses and it's from the documents

1    and other things that I admit into evidence.

2         Some evidence proves a fact directly, such as

3    witnesses who can establish that it was raining because

4    they went outside and got wet.  That's direct evidence.

5    You got outside and you're wet; that's pretty good

6    evidence that it's raining.

7         But other evidence proves a fact indirectly,

8    such as a witness who did not personally see or experience

9    the rain, but he saw wet grass outside, and saw people

10   walking into the courthouse carrying wet umbrellas, for

11   example, this is indirect evidence.  Sometimes it's called

12   circumstantial evidence.  And it's simply evidence of a

13   chain of circumstances that can prove a fact.

14        Now, as far as the law is concerned it makes no

15   difference whether evidence is direct or indirect, direct

16   or circumstantial.  You may choose to believe or

17   disbelieve either kind of evidence and you should give

18   every piece of evidence whatever weight you think it

19   deserves.

20        Again, it will be my duty to determine what law

21   is applicable to this case and to instruct you on that

22   law.  At the end of the trial, after you've heard all the

23   evidence, I will give you detailed instructions on what

24   the law is that applies to this case.

25        After that you will take the law, as I have

1   explained it to you, and apply it to the facts of the case

2   as you find them to be.  And by this process the

3   application of law to fact and fact to law you will arrive

4   at a verdict.

5          The trial begins with the opening statements of

6   the attorneys.  In these opening statements the attorneys

7   will explain to you their contentions about the facts of

8   the case.  As I've said, these statements are not

9   evidence.  They are important and you should listen

10  carefully to the opening statements, but the statements

11  themselves are not evidence.

12         After the opening statements the government will

13  then call and question its witnesses and the government's

14  witnesses will be cross examined by defense counsel.

15         When the government has presented its evidence

16  then the Defendants may call witnesses and present other

17  evidence, if they wish, but the Defendants are under no

18  obligation to present any evidence and no unfavorable

19  inference shall be drawn against the Defendants if they do

20  not present evidence.

21         The entire burden of proving the guilt of the

22  Defendants is upon the government.  The Defendants are not

23  required to prove their innocence.

24         In order for your verdict to be fair you must

25  not be exposed to any other information about the case or

1    law or any of the issues involved in this trial during the

2    course of your jury duty.  This is a very important point

3    and I'm going to take some time to talk about what I mean

4    when I say that.

5          First, during the trial you must not discuss the

6    case in any manner among yourselves or with anybody else

7    and you must not permit anyone to attempt to discuss it

8    with you or in your presence.  I instruct you that should

9    you have any conversation or communication with the

10   lawyers -- you should not have any conversation or

11   communication with the lawyers or anyone else connected

12   with the case, other than court personnel.

13         In fact, when you pass a lawyer or maybe even a

14   party in the hallway they are not being rude when he or

15   she doesn't speak to you.  They just understand this rule

16   that they cannot have any communication with you.  So

17   understand that's the reason they're ignoring you.

18         Also, you must not try to get information from

19   any source other than what you see and hear in this

20   courtroom.  That means you can't speak to anybody else,

21   including your family and your friends.

22         You may not use any printed or electronic

23   sources to get information about this case or the issues

24   involved.  Of course, I'm talking about the internet, TV,

25   radio, reference books, magazines, whatever.  You cannot

1   go out and allow yourself to be exposed to any information

2   about this case.  That means you can't do any personal

3   investigation, including visiting any of the places that

4   might be involved in the case, talking to any possible

5   witnesses, creating your own demonstrations or

6   re-enactments of the events, which are the subject of the

7   case, googling or otherwise searching the internet to

8   gather information about the case or anyone involved in

9   the case, including the lawyers.

10          Now, I know that's natural these days.  We all

11   google to look up things all the time.  I understand I'm

12   asking you to do something that is probably fairly routine

13   for you to do but you just can't do it on anything related

14   to this case.

15          Similarly you can't allow anybody to try and

16   give information to you, by e-mail, text, tweet, blog,

17   chat, whatever the case may be.  You just cannot allow

18   yourself to be exposed to any information until after a

19   verdict has been returned.

20          I understand, again, that these place some

21   restrictions on you on things that you normally do.  I

22   hope you can understand the significance and importance of

23   these instructions though.

24          Our system of justice is based upon the idea

25   that the evidence comes into court and it gets tested.

1    The parties have the opportunity to test the evidence and

2    make sure that it's reliable and they do that by the

3    adversarial process.  They know what the evidence is.

4    They can try and discredit it; they can try and impeach

5    it.  They test it to make sure that it's reliable

6    evidence.

7         If you go off and google something to try and

8    get some information -- I say you, of course, I'm speaking

9    if someone were to go off and google and try and get

10   information, the lawyers aren't going to know about that.

11   They won't have an opportunity to test that information to

12   make sure it's reliable information.

13        It's just like I was talking about believing

14   everything you see and read or hear on TV.  We know

15   everything out there is not true.  But unless the lawyers

16   have an opportunity to test the evidence, it would be

17   highly improper for you to try and gather such evidence.

18        Now, any juror who violates these restrictions

19   jeopardizes the fairness of these proceedings.  And what

20   can happen if that happens?  A mistrial, which would

21   require the case to start over with a new jury.   As you

22   can imagine, a mistrial is a tremendous expense and

23   inconvenience to the parties, the courts and the

24   taxpayers.  If any juror is exposed to any outside

25   information or has any difficulty whatsoever in following

1    these instructions I need for you to notify me or let Teri

2    know or let the court personnel know immediately.

3          If you become aware that one of your fellow

4    jurors has done something that violates these instructions

5    you're obligated to report that to the Court as well.

6          If anyone tries to contact you about the case,

7    either directly or indirectly, or send you any information

8    about the case, report that as well.

9          These restrictions remain in effect throughout

10   the trial.  Once the trial is over then you can google,

11   tweet, blog, chat until your heart is content or not.  You

12   don't have to talk about your jury service, but if you do

13   want to talk about it once the trial is over, you're free

14   to do so.

15         I've said a lot, but it really just boils down

16   to a pretty simple thing:  It is your sworn duty, now that

17   you've taken the oath, to decide this case only on the

18   basis of the testimony and evidence presented during the

19   trial without any consideration of any other matters

20   whatsoever.

21         There may be some media coverage of this.  So if

22   you pick up the paper you need to -- well, just don't pick

23   up the paper is the best thing to do.  But certainly, if

24   you see something in the media that concerns this case

25   you've got to immediately turn it off, put it down, turn

1   away.  Don't let anybody talk to you about well, did you

2   see what was in the paper?

3          Now, I've already talked about this a little

4   bit.  During the trial it may be necessary for me to

5   confer with the lawyers from time to time out of your

6   hearing concerning questions of law or procedure that I

7   have to decide, that I have to rule on.  As I told you I

8   am going to minimize those conferences during your time.

9   The lawyers and I will work late or work early to deal

10  with those issues if at all possible, but sometimes we

11  have to do that and you may have to go back to the jury

12  room for a little bit or we may stand over here like we've

13  been doing earlier today to discuss those issues.

14         Understand that we'll only do that when

15  necessary and then by doing that, hopefully the trial will

16  run a little more smoothly.

17         You have your note pads.  You are free to take

18  notes.  You're free not to take notes.  That's entirely up

19  to you.  But your notes -- first you should not get so

20  caught up in note taking that you become distracted from

21  what's going on in the courtroom.

22         Also your notes should be used only as aids to

23  your memory and if your memory should later differ from

24  your notes you should rely upon your memory and not your

25  notes.

1        Again, if you do not take notes you should rely

2   upon your own independent recollection and memory as well

3   as to what the testimony was.

4        If you didn't take notes you should not be

5   unduly influenced by somebody else just because they took

6   notes.  Notes are not entitled to any greater weight than

7   the recollection or impression of each juror as to what

8   the testimony was.

9        Again, I will be giving you further instructions

10  at the conclusion of the trial.  But those preliminary

11  instructions, I hope, will give you some guidance.

12       At this point the government will present its

13  opening statement.  Mr. Christian?

14       MR. CHRISTIAN:  Thank you, Your Honor.  Good

15  afternoon.

16       A group of correctional officers stood in the

17  gym at Macon State Prison.  The officers, including four

18  of the Defendants, were members of a specialized unit

19  called the CERT team, the Correctional Emergency Response

20  Team.  Those officers were supervised by a deputy warden

21  who also is one of the Defendants here today.

22       The CERT officers had taken custody of an inmate

23  back in the housing unit.  An inmate had hit an officer

24  and CERT had done what it was supposed to do.  They had

25  responded to the housing unit and it had taken that inmate

1   into custody, handcuffed him behind his back and walked

2   him across the prison yard without any problem.

3        The CERT officers were supposed to take that

4   inmate to the medical unit to be checked to make sure he

5   didn't have any injuries before he was put in segregation

6   or solitary confinement.

7        The CERT officers took that inmate to the gym on

8   the way to medical.  The gym was an area at Macon State

9   Prison that wasn't covered by surveillance cameras.  No

10  staff members were assigned to the gym, so there would be

11  no video and no witnesses.  The CERT officers knew exactly

12  what they were going to do with that inmate when they got

13  to the gym.

14        When they walked in the gym with the inmate a

15  CERT officer stood and looked at him for a moment.  His

16  name was Terrance Dean.  The CERT officers looked at Dean

17  for a moment and then the senior CERT officer, Defendant

18  Ronald Lach, hollered, "What are you waiting for?  You

19  know what to do."  And with that CERT struck.  They

20  punched the inmate; they kicked the inmate.  You'll hear

21  there was a dog pile of officers on top of the inmate.

22  And they beat him until he was lying motionless on the

23  floor.

24        When they stopped, Inmate Dean was unresponsive.

25  The pupil in one of his eyes was blown and he had a

1    fist-sized hematoma coming out of his forehead.

2         The CERT officers dragged the inmate from the

3    gym, or at least some of the CERT officers dragged the

4    inmate from the gym, to the medical unit, the prison

5    infirmary.  The doctor and the nurses at the medical unit,

6    however, couldn't care for someone with injuries that

7    severe.  So they had him rushed by ambulance to a nearby

8    hospital.

9         The hospital staff they also, the nurses, the

10   doctor there, could not deal with somebody with that

11   severe of an injury so they had him taken to Atlanta to a

12   medical facility there.

13        Now, with the inmate in the hospital the CERT

14   officers knew there was going to be an investigation.  But

15   they weren't particularly worried because they had covered

16   up other beatings before and no doubt expected they could

17   cover up this one as well.

18        So the CERT officers got together and came up

19   with a cover story, a false explanation for how Dean had

20   been injured.  And the story that they agreed on was that

21   Inmate Dean in the gym he had snatched away.  He started

22   to run away from the officers and then he slipped and

23   fallen and hit his head.  That was the story they were

24   going to go with.  That was their cover story.

25        They had covered up other beatings before with

1    the assistance of their deputy warden.  And it might have

2    worked again.  CERT and the deputy warden might have

3    gotten away with yet another cover-up, yet another inmate

4    beating, except the youngest, the most junior, the least

5    experienced member of the CERT team, a man named Willie

6    Redden, sat down for an interview with the Georgia Bureau

7    of Investigation.  And Redden repeated the cover story and

8    he repeated the snatched and ran story, and then he

9    stopped and thought about his grandmother, the grandmother

10   who had raised him.  And Redden stopped in the interview

11   and said you know what, my grandmother raised me better

12   than this.  I'm going to tell you what happened in the

13   gym.  Redden admitted that he had beaten Terrance Dean.

14   Redden admitted that his fellow CERT officers had beaten

15   Terrance Dean.  Redden admitted that they had beaten

16   Terrance Dean to retaliate to get punishment for Dean for

17   hitting an officer back in the dorm.

18          Now, once Redden came forth the cover up started

19   to unravel.  First with Redden and then with another

20   officer and another officer and another officer.  You will

21   hear from those officers.  Their accounts of the beatings

22   may vary.  These are events that were sudden bursts of

23   violence that happened almost four years ago back in 2010.

24          But one thing they will tell you, each one of

25   them will tell you, is that CERT beat inmates to punish

1  them.  CERT beat inmates to retaliate from inmates who

2  acted up.

3          This case will be about that CERT practice, this

4  practice of beating people to punish them.  It will be

5  about the cover-up, the efforts to cover-up this unlawful

6  practice.

7          You will hear that CERT officers, at the

8  direction, the encouragement of their supervisors, would

9  punish inmates who hit officers by taking them to the gym

10  or to another location that wasn't covered by surveillance

11  cameras.

12          They were supposed to take the inmate from the

13  dorm, from the scene, to medical and then on to solitary

14  confinement.  But they would stop in the gym on the way

15  because the gym was the location that didn't have any

16  surveillance cameras.

17          You will hear that officers knew they weren't

18  allowed to punish inmates by beating them.  You will hear

19  that officers knew that inmates could be charged, inmates

20  could be punished by a judge, they could be punished

21  within the prison but not by beating them.  Officers knew

22  that.  But you will hear that's exactly what CERT was

23  doing back in 2010.

24          In 2010, in the fall of 2010 when officers

25  started on CERT they went and talked to their supervisors,

1    their sergeant, Defendant Christopher Hall, their senior

2    officer, Defendant Ronald Lach.  They would talk to those

3    officers and Defendant Lach and Defendant Hall would tell

4    them look, this is what happens, if an inmate hits an

5    officer the inmate is going to get beaten by officers.

6          Officers will tell you they knew from their

7    training, they knew from the policies at Macon State, they

8    knew from their common sense, in the United States people

9    could not be beaten to punish them, but they did it

10   anyway.  They did it to inmate after inmate after inmate.

11         You will hear that officers knew it was wrong to

12   beat up an inmate even when the inmate had attacked and

13   seriously injured an officer.  Officers knew that it

14   violated the oath they had sworn to uphold the

15   Constitution.  They knew that but with the direction and

16   encouragement of their supervisors they continued to do

17   it.

18         The officers also will tell you that when they

19   started on CERT in 2010 they met with the deputy warden,

20   one of the supervisors for CERT.  And the deputy warden

21   would tell them, look, things are going to be different on

22   CERT than when you were just a plain old correctional

23   officer.  And deputy warden now, Defendant Hinton, told

24   them, "What happens on CERT stays on CERT."  Officers will

25   tell you they did not know exactly, at first, what

1    Defendant Hinton wanted to keep secret but they would come

2    to learn that Defendant Hinton and the other senior CERT

3    officers expected them to cover up this practice of

4    beating inmates to punish them.  For this, the Defendants

5    have been charged with conspiracy.

6            Conspiracy is just a secret agreement.  Now to

7    understand how a secret agreement to go and commit a crime

8    works, you need to talk to somebody who is in the inside

9    of that secret agreement.  And you'll hear from officers

10   who were part of the conspiracy.  They will tell you how

11   this conspiracy worked, how the conspiracy achieved its

12   goals.

13           You will see there were two conspiracies, in

14   fact.  One conspiracy was a group of officers who

15   conspired to unlawfully beat inmates to punish them and

16   there was another conspiracy of officers who agreed to

17   cover-up this unlawful practice.

18           The indictment charges Defendants Christopher

19   Hall, Ronald Lach, Delton Rushin, Derrick Wimbush and

20   Tyler Griffin with that first conspiracy, the conspiracy

21   to beat inmates to punish them.

22           It charges all five of those Defendants -- well

23   it charges four of those five Defendants with beating a

24   specific inmate, a man named Terrance Dean.

25           Tyler Griffin isn't charged with beating

1    Terrance Dean.  You will see that Tyler Griffin, CERT

2    Officer Tyler Griffin, was not there for the beating of

3    Dean but he was involved in other assaults at Macon State

4    Prison.

5              The indictment charges all of the Defendants,

6    including Tyler Griffin, including Deputy Warden Hinton

7    with covering up this unlawful practice.

8              You will also see that officers are charged with

9    obstruction of justice offenses, for writing false

10   reports, for giving false and misleading statements to

11   investigators, and for corruptly persuading officers to

12   stick with the cover-up.

13             During this trial you will see exactly how this

14   cover-up worked.  First and foremost the CERT officers

15   made sure there would be no video evidence.  They made

16   sure to take the inmate to the gym or another location

17   where he wouldn't be covered by surveillance cameras.  The

18   gym was particularly commonplace, you will see, because

19   there is also no officer assigned to monitor the gym.  So

20   there would be no video evidence and no witnesses.

21             Then, even though CERT was supposed to use the

22   handheld video cameras, CERT was supposed to use those

23   cameras to follow the inmate all the way from the housing

24   unit to the medical unit and then to solitary confinement.

25   The whole thing was supposed to be videotaped by a CERT

1    officer with a handheld camera.

2        Well, you may see a video from the housing unit

3    and you may see video from the medical unit.  You will not

4    see any video in between.  CERT made sure that there would

5    be no video of that escort, no video of what happened in

6    the gym.  They would put down the cameras.  They would

7    hand the cameras to somebody else.  They would leave the

8    cameras turned off and then they would beat the inmate.

9    That was how the cover-up worked.  That's how they made

10   sure there wasn't going to be any video.

11       After beating up an inmate off camera the CERT

12   officers would then come back to their office, get

13   together and write the false reports to cover up what they

14   had just done to the inmate.

15       You will hear that officers talked about what

16   explanation, what excuse they could use, what story they

17   could make up to explain how this inmate suddenly had

18   injuries, how they could explain that the inmate left the

19   dorm, left the housing unit uninjured and arrived in

20   medical with injuries, and then in between time he was

21   only in the custody of CERT.

22       So they had to make up some story of how he had

23   been injured.  They would either make up a new story or

24   they would just leave out any mention of the force that

25   they used on the inmate.

1        Let me give you an example, Terrance Dean.  For

2   Terrance Dean he left the dorm with no injuries.  He

3   arrived in medical unresponsive with that fist-sized

4   hematoma coming out of his head.  So the officers got

5   together and the story they agreed on was that Dean had

6   snatched and ran, that he had slipped and fallen in the

7   gym.

8        The CERT officers, who have pleaded guilty, will

9   tell you that story was made up.  They will tell you the

10  senior CERT officers made up that story and they left the

11  junior guys to hold the bag for this accident, this

12  supposed accident that happened in the gym.

13       The CERT officers who will plead guilty will

14  tell you that story was a false one and that it was made

15  up.  But you won't have to rely just on the CERT officers

16  who have pleaded guilty.  You will also hear that some of

17  the Defendants have made admissions.  Some of the

18  Defendants have admitted that they were involved.  Some of

19  the Defendants have admitted that they lied to

20  investigators, that they wrote false witness statements.

21       Defendant Christopher Hall, for example, the

22  CERT sergeant, you'll see his initial statement, the one

23  he turned in at Macon State Prison.  Sergeant Hall's

24  initial story was he just walked from the housing unit

25  with the CERT team and Inmate Dean.  He walked from the

1    housing unit and when they got to the gym he turned around

2    and went back to the housing unit.  And that was Sergeant

3    Hall's first go round.  That was consistent with the cover

4    story.

5         And then Sergeant Hall sat down and talked with

6    the GBI, the Georgia Bureau of Investigation.  Sergeant

7    Hall gave them the cover story.  Sergeant Hall admitted

8    that yes, he was in the gym contrary to what he had

9    written in his statement.  Sergeant Hall admitted yes, he

10   had seen officers beat Terrance Dean.

11        You will hear from the GBI agent who interviewed

12   Sergeant Hall.  She will tell you what he said.  You'll

13   get to see some of her interview with Sergeant Hall.  You

14   will see portions of that interview because she videotaped

15   that interview, so you will see exactly what he said to

16   her.

17        Defendant Ronald Lach, that senior CERT team

18   officer, Defendant Ronald Lach also started off with the

19   cover story.  You will see his Macon State Prison witness

20   statement.  Defendant Lach's first story was he heard

21   somebody shout "Stop", so he looked over and saw Terrance

22   Dean fall down.  It's part of the slip-and-fall story to

23   explain Dean's injuries.  That was Lach's story.  But Lach

24   gave up on that story pretty quickly during his interview

25   with the GBI.  Lach admitted actually he was in the gym.

1  Lach admitted that he saw other officers beating an

2  inmate, and Lach admitted that he joined in that beating

3  by walking over and kicking Dean in the side repeatedly.

4         Lach's admissions didn't stop though with just

5  the beating.  Lach also admitted that afterwards officers

6  had gotten together and come up with a cover story.

7  Officers had gotten together and made up some story for

8  how Terrance Dean had been injured.  And Defendant Lach

9  admitted he actually had come up with the cover story,

10  that it was his idea.

11         You will see the handwritten confession that

12  Defendant Lach turned into the GBI agent who interviewed

13  him, and you will hear from the agent who interviewed

14  Defendant Lach.

15         There is also Defendant Delton Rushin, another

16  CERT team member.  You will see his Macon State Prison

17  witness statement.  Delton Rushin's first story was pretty

18  much identical to Sergeant Hall's.  He had walked from the

19  housing unit with the inmate and with the CERT team.  They

20  had gotten all the way to the gym and then Delton Rushin

21  said, "No, I headed back to the housing unit afterwards."

22  That was his story.  And Delton Rushin, during his

23  interview with the GBI, Delton Rushin said, "Well, maybe

24  officers might have possibly snatched on Dean a little

25  bit."  And Delton Rushin admitted that he was in the gym.

1    And Delton Rushin admitted that he may have possibly put

2    his hands on Dean, but he couldn't say for sure.

3              Once you have heard all of the Defendants'

4    admissions, once you have heard from the officers who have

5    pleaded guilty, once you have heard all the evidence, you

6    will see beyond a reasonable doubt that CERT officers in

7    2010 were beating people to punish them, and that

8    afterwards they were covering it up.  They were using the

9    power of their position, their uniform, their badge, their

10   authority, to cover up crimes that they were committing on

11   duty.

12             You'll see that the CERT officers were

13   responsible for the injuries that inmate Terrance Dean

14   suffered in 2010.  You will see that CERT officers beat

15   four inmates in a three-month period in 2010.

16             Once you have heard all that evidence there will

17   be but one verdict that is supported by the evidence and

18   that is that the Defendants are guilty as charged.  Thank

19   you.

20             THE COURT:   Mr. Wolfe?

21             MR. WOLFE:   Judge, may we approach for a

22   moment?

23   (BENCH CONFERENCE)

24             MR. WOLFE:   -- we argued to you this morning.

25   Mr. Christian just said that CERT beat inmates who acted

1    up.  They punished inmates who hit officers.  If it

2    happened they were beaten.  There was a practice of

3    beating inmates for punishment.  It was the practice and

4    policy of the CERT team to beat anybody who assaulted

5    staff or an officer.  They said officers.

6         If that's the case, Judge, then I think that it

7    opens the door now to us arguing to them that that's not

8    the case.  These are unique instances and, in fact, there

9    were other instances.  And I'll go with the timeframe, I'm

10   not going back from October through the December dates

11   where there were assaults on officers and it didn't

12   happen.  They opened the door.

13        MR. CHRISTIAN:  Absolutely, positively, 100

14   percent no way, Your Honor.  It's akin to saying that

15   because they didn't beat every single inmate at Macon

16   State Prison they didn't beat Terrance Dean.

17        It's akin to saying all of our prior good acts,

18   we didn't beat anybody in 2009.  We didn't have an

19   agreement in 2009, therefore, we couldn't have had an

20   agreement in 2010.

21        THE COURT:  What do you mean when you say these

22   were unique?

23        MR. WOLFE:  I'm saying, if it wasn't a

24   conspiracy and something occurred that prompted them to be

25   angry and to act the way they did and use excessive force,

1    that's one thing.  That doesn't exculpate them necessarily

2    from the overt acts and the specific substantive offenses.

3    But with regard to the conspiracy, the plan, the scheme to

4    do it to all inmates who acted up --

5            MR. PATE:   Inmate, after inmate, after inmate.

6            MR. CHRISTIAN:  Four inmates.

7            MR. WOLFE:   That's what we have.

8            MS. GOMEZ:   Have covered up other beatings

9    before.

10           MR. CHRISTIAN:   Four inmates.

11           MS. GOMEZ:   No.

12           MR. CHRISTIAN:   Yes.

13           MR. PATE:   Well, unlimited.  You said cover up

14   other beatings.

15           MR. CHRISTIAN:   There are other beatings,

16   absolutely.  Before Terrance Dean there were three other

17   beatings.

18           THE COURT:   So what was your point then?

19           MR. WOLFE:   My point would be -- well, I'm only

20   charged in a conspiracy.  My point would be that there

21   wasn't a conspiracy to do these things.  The fact that

22   these things happened, I can't contest -- but I wasn't

23   there.  But the bottom line was it wasn't a conspiracy,

24   everybody didn't get together and plan to do it every time

25   something like this happened.  There were unique

1   circumstances on these four instances based upon what

2   happened.  And part of it was the severity of the

3   circumstances with Davis with regard to Hinton and with

4   regard to the guard that Dean actually attacked.

5         MR. CHRISTIAN:   The guard that Dean attacked

6   got some redness in his face.  So, I don't think that was

7   the severity of those injuries prompted that one.

8         MS. GOMEZ:   Specifically as to his defense, had

9   covered up other beatings before with the assistance of

10   Deputy Warden Hinton, which were outside of the --

11         MR. WOLFE:   It's a conspiracy.

12         MR. CHRISTIAN:   No, they were not.  Franklin

13   Jones, Mario Westbrook all in 2010.  There was the overt

14   acts.  It's not a defense to the conspiracy charge to say

15   we didn't commit crimes that aren't mentioned in the

16   indictment.  If we prove what's in the indictment then

17   they are guilty.

18         MR. WOLFE:   That's my defense.

19         MR. PATE:   Judge, the charge of conspiracy is

20   to beat an inmate if an inmate beats a guard.  If there

21   were inmates who hit the guards who did not get beat then

22   that shows that there's not a conspiracy.  What the

23   conspiracy really is is that a conspiracy that Jones, a

24   conspiracy to get Miller, Westbrook and Dean, just those

25   four.

1          MR. CHRISTIAN:   That's what's charged in the

2     indictment.

3          MR. PATE:   Is that evidence to include that

4     there was --

5          MR. CHRISTIAN:   That's what's charged in the

6     indictment is they conspired to beat these four inmates to

7     punish them.

8          THE COURT:   So what is it, what's the point

9     that you want to make?

10          MR. WOLFE:   I want to make that if the

11     government is contending that there was a plan and a

12     conspiracy, as was just argued to them by Mr. Christian to

13     assault inmates as a routine practice who assault guards,

14     that's not true and it's not the case.

15          These assaults, this excessive use of force may

16     have occurred on the four instances that they are focusing

17     on, but there wasn't a conspiracy and it wasn't something

18     that was planned to be done the way the government

19     contends.

20          Please let me show you, the plan and purpose of

21     the indictment was to punish inmates for having previously

22     assaulted other MSP officers.  To achieve the object the

23     CERT members were to retaliate against inmates by

24     assaulting them.  First of all, this indictment and what

25     he just argued about hitting --

```
 1              THE COURT:   No, no --

 2              MR. WOLFE:   -- is my defense.

 3              THE COURT:   There's a break in your logic there

 4    though.  To the extent you're saying just because they

 5    didn't retaliate every time there was an assault on a

 6    guard, that there was no conspiracy.  The government has

 7    never alleged that every time there was an assault on a

 8    guard that there was a retaliatory beating.

 9              MR. WOLFE:   That's what he just said.  It was

10    the practice of --

11              THE COURT:   No.  He said it happened, it was a

12    practice --

13              MR. WOLFE:   He said policy also.

14              THE COURT:   Nobody -- I haven't heard any

15    contention that it happened every time.  So the logic --

16    now, the argument that there's no conspiracy, that these

17    were unique -- when I say dangerous ground, I think y'all

18    need to give the jury a little more credit than you might

19    be giving them.  That's y'all's call on that.

20              But to argue that -- perhaps you feel like your

21    client is in a different position because obviously he's

22    not charged in the beating conspiracy.

23              MR. WOLFE:   Right.

24              THE COURT:   But the argument is that were these

25    three unique and therefore they were justified?
```

1           MR. WOLFE:   No, no, no.  No one's arguing --

2  I'm not arguing --

3           THE COURT:   What's the uniqueness then?

4           MR. WOLFE:   They were separate individual

5  instances where excessive force was used on the inmates

6  but it wasn't a conspiracy.

7           THE COURT:   Well, then argue there was no

8  conspiracy.

9           MR. WOLFE:   I intend to.  But the --

10           THE COURT:   For start, say that.

11           MR. WOLFE:   I am going to say that, but I

12  wanted to demonstrate it by the evidence that happened on

13  days right around the time when these -- I've made my

14  argument.  It's my defense and I was just really --

15           MR. HOGUE:   Well, if you're not done then go

16  ahead.

17           MR. WOLFE:   I am done.  I have another issue.

18           MR. HOGUE:   Okay.  I want to take an exception

19  to the sidebars with the huddle where some of us, me up

20  until just this minute, we can't fit in here.  I couldn't

21  hear any of it.  I have the white noise right there.  I'm

22  trying to be involved.  I trust my co-defendant's counsel

23  to argue well for their clients, but I just don't know how

24  practical this is with this many lawyers.

25           THE COURT:   All right.  Then my ruling is the

1   same.  We'll stay late, as late as y'all want to stay, but

2   that's my point and everybody can hear, all right.

3        MR. HOGUE:   I don't want to punish anybody for

4   it.

5        THE COURT:   I'm not punishing anybody.  This is

6   exactly what we were trying to avoid.

7        MR. HOGUE:   I'm just saying I couldn't hear,

8   that's all.

9        THE COURT:   If you need to review any rulings

10  we'll do it when you're through.  Now, I've got lawyers

11  telling me they can't hear and we're arguing the same

12  thing time and time again.  Proceed with your opening in

13  accordance with the rulings I have made.

14  (BENCH CONFERENCE CONCLUDED)

15       THE COURT:   Mr. Wolfe?

16       MR. WOLFE:   Judge, I think Mr. Jarrard is going

17  to go first.

18       THE COURT:   That's fine.  But we are going to

19  need to figure out the order of things.  We typically

20  proceed in the order that the Defendants are listed.  We

21  will work that out later.  But if you want Mr. Jarrard to

22  go first, that's fine.

23       MR. JARRARD:   Good afternoon, members of the

24  jury, and thank you for being here.  I'm Brian Jarrard and

25  I represent Sergeant Chris Hall, who was a sergeant on the

1    CERT team at Macon State Prison in late 2010.

2         The evidence will show you that this case is not

3    about the conspiracy to violate inmates' rights.  It's

4    about these men responding to emergency situations and

5    then, thereafter, as is quite natural, discussing what

6    happened with the men who lived those emergency situations

7    with them.

8         The government, and you will see in its

9    indictment, alleges that on four separate occasions

10   excessive force was used on inmates at Macon State

11   Prison.

12        Franklin Jones, paragraph 6 of the indictment.

13   Mr. Jones was spending life in prison for murder. On

14   October 25th, 2010 Franklin Jones takes electric hair

15   clippers, puts them in a sock and beats viciously

16   Corrections Officer Jason Davis.

17        Paragraph 7 of the indictment says J.M., that's

18   referring to the inmate named Jabaris Miller.  Jabaris

19   Miller was sentenced to serve life in prison for murder.

20   Three days after Franklin Jones viciously attacks Officer

21   Davis on October 28th, 2010 Jabaris Miller viciously beats

22   Corrections Officer Sergeant Carlos Felton.

23        Paragraph 8 of the indictment says M.W.,

24   referring to Mario Demetrius Westbrook.  Mario Demetrius

25   Westbrook sentenced to serve life in prison for murder.

1   December 14th, 2010 Westbrook sucker punches that

2   gentleman right there, the Deputy Warden of Security,

3   James Hinton, comes at him from the side, pulls back as

4   hard as he can and sucker punches him.  Hits him so hard

5   and so violently it breaks his jaw and a tooth.  But that

6   was not enough for Mr. Westbrook.  You'll see as the

7   evidence plays out in this case Mr. Westbrook is going --

8   this gentleman is trying to defend himself.  Mr. Westbrook

9   reaches into his jumper and he pulls out a shank.  You

10  will see him try to pull it down, down, as he tries to

11  kill that man right over there.

12          Terrance Bryant Dean, paragraph 9 of the

13  indictment.  He is just listed as T.D. sentenced to serve

14  20 years in prison for multiple armed robberies.  Two days

15  after Westbrook's vicious attack on Deputy Warden of

16  Security Hinton, Terrance Dean comes up behind Officer

17  Stephen Walden and viciously attacks him.

18          I expect, members of the jury, you will have an

19  opportunity, through the government's case or through the

20  defense case to see these attacks.

21          In all of these instances you will see that the

22  other inmates stand around, cheer, taunt, and in most, if

23  not all of them, actively participate in keeping

24  assistance from coming to the guards being attacked.

25          In all of these instances something called a

1    code three is called.  A code three means an inmate is

2    attacking a guard.  A code three is a cry for help.  A

3    code three is an emergency call.  A code three is a call

4    for these men.

5            These men step into emergencies and they step

6    into the emergencies I just described to each of you.

7    These gentlemen were the Correctional Emergency Response

8    Team.  We give names and labels because they mean

9    something.  These gentlemen responded to emergencies.

10           This is the indictment against my client and

11   these other men.  I want to read to you a portion.  You'll

12   have the indictment and the judge will go through the law

13   with you.  After setting out, the government says in

14   paragraph 6 through 9, they use just a phrase "an inmate

15   struck an officer".  But you have just heard the four

16   instances that the government talks about.

17           And then the government says that there was a

18   conspiracy, an agreement to violate the law.  The

19   government says my client and these other men willfully

20   combined, conspired, and agreed with one another to

21   injure, oppress, threaten, and intimidate inmates

22   including Franklin Jones, Jabaris Miller, Mario Westbrook

23   and Terrance Dean.  In what way?  In the free exercise and

24   enjoyment of a right to be free from cruel and unusual

25   punishment.

1          Count Two is what we lawyers call the

2     substantive count.  Count Two is just where the government

3     says my client and others, again, willfully -- they say it

4     was willful -- deprived Terrance Dean of the right to be

5     free from cruel and unusual punishment.

6          Members of the jury, the evidence will show you

7     that these men were reacting to emergency conditions.

8     They were reacting to the emergencies I just described to

9     you.  And they never acted with a specific intent to

10    violate the rights of these attacking inmates.

11         Now, as Judge Treadwell told you, it's his job

12    to tell you the law.  But I'm confident at the end of this

13    trial when the Judge tells you the law he will make clear

14    to you that under the law, under our law, corrections

15    officers are allowed to use force as a good faith effort

16    to further legitimate law enforcement and institutional

17    purposes, such as restoring order and preventing harm to

18    themselves and others.

19         Now, the government, Mr. Christian, also says

20    that these men conspired to obstruct justice.  Members of

21    the jury, the evidence will show you that there was a lot

22    of talk and chatter after these instances.  There always

23    is.  There is always a lot of discussion when you've lived

24    through an emergency with other men about what happened,

25    what was perceived, how it happened.  That post attack

1    discussion happened in this case.  There was a lot of

2    discussion about what happened and there was a lot of

3    discussion about what happened with Terrance Dean.

4          Mr. Christian mentioned and you'll hear about

5    the two younger members of the CERT team and I suspect

6    you'll hear from them in the government's case in chief,

7    Redden and Douglass-Griffin.  These two members of CERT

8    have been convinced that they acted improperly and they

9    are now cooperating with the government in this case,

10   along with others.  You'll hear they'll say that this was

11   a conspiracy or that there was some effort to obstruct

12   justice.  But I'm confident when you've heard all that was

13   transpiring you'll know and understand that this was no

14   conspiracy, this was these men reacting to emergencies,

15   the emergencies I described to you.

16         In criminal cases, as the Judge alluded to at

17   the beginning, the government goes first and they go first

18   for a reason.  They have the burden of proof in this case

19   throughout.

20         I anticipate that we'll probably spend the next

21   week or so with the government bringing witnesses in to

22   convince you that inmate rights were violated.

23         Now, as I defend, as we defend these men, we get

24   the opportunity to cross examine the government's

25   witnesses.  We get to test what they saw, what they heard

1   and what they perceive as the events of late 2010 were

2   transpiring.

3          Please remember what Judge Treadwell said as we

4   began.  These men, they don't have to prove anything.

5   They are presumed innocent and that presumption of

6   innocence is with them now and it's with them throughout

7   this case.

8          The government at this table, they have to

9   prove to each of you every single element of their case

10  and they have to prove it beyond any reasonable doubt.

11         Members of the jury, I'm confident that when you

12  have heard the full story about what transpired in late

13  2010, after having heard both sides of the story, all of

14  us will get a chance to come back up and present what are

15  called closing arguments to you.

16         I'll tell you now what I'm going to tell you in

17  part then.  You are the judges of these men.  That is,

18  you're the only judges in this case that matter about what

19  happened.  And as the judges of these men, I'm confident,

20  however long this case takes, when we're done, that you

21  will, with absolute confidence, declare that my client,

22  Chris Hall, and the other men who responded to these

23  emergencies with him are not guilty.  Thank you.

24         THE COURT:  Mr. Fox, I gather you want to go

25  next?

1           MR. FOX:   I am, Your Honor.  I can almost

2    imagine listening for it above the noise.  Anticipating

3    it.  Fearing it.  Knowing that it is not if, but when, the

4    call will come.

5           At the Macon State Prison there are three

6    primary calls that one may hear.  First, is a code one.

7    And what that says is that there has been an

8    inmate-on-inmate altercation.

9           There is a code two.  Code two, the evidence

10   will show you, says that an inmate needs medical

11   attention.  I doubt you're going to hear about either of

12   those codes.

13          There is the code three.  Code three says that

14   there has been an inmate-on-guard attack.  And when that

15   call comes at the Macon State Prison everybody stops what

16   they are doing.  Everyone knows that if it is possible

17   they have to respond to that call.  And everyone knows

18   that they are to answer that call immediately. Because as

19   you will see from the evidence yourselves, when that call

20   comes, it brings with it violence.  It brings with it

21   injury.  And it brings with it chaos.

22          So when that call comes who will answer it?

23   You'll hear and you'll see that many do.  Many people from

24   the Macon State Prison, as they were able to, would

25   respond to a call three, a code three.  But principal

among those who would respond were the CERT team, the
Emergency Response Team.  That makes sense because a code
three is an emergency.

          And first among those was Mr. Delton Rushin.
Now, when the call came CERT had a variety of duties
before it.  First among those would be securing the
inmate.  They would then be required to transport that
inmate to another location in the prison.  If
circumstances required it they may have to return back to
the location of the incident, in this case the E dorm, and
return to help restore order to chaos.

          Now, the purpose of this trial, ladies and
gentlemen, the purpose of your presence here is to
determine what happened all those years ago at the Macon
State Prison in the late fall and winter of 2010 after
certain code threes were called and then what's happened
within the intervening years.

          Because, you see, you would not be here today,
Mr. Rushin would not be here today if we agreed with what
the government says happened so many years ago.  And
because the facts, because the evidence of what happened
is in conflict, it's in disorder, we don't agree about it,
because the facts are in chaos we need a jury to help put
it into some sense of order.  You are here to put order to
the chaos.

1          Now, there are 22 counts in this indictment and

2   eight of those charge Mr. Delton Rushin with the crimes.

3          He's charged in Count One.  You've heard a

4   little bit about it.  It's a conspiracy that alleges that

5   my client agreed and entered into an agreement to violate

6   the Eighth Amendment Rights of inmates.

7          He was also charged in Count Two.  It's a

8   substantive count that alleges he, himself, deprived

9   Terrance Dean, Inmate Terrance Dean of his Eight Amendment

10  rights in December of 2010.

11         And as to each of these, each is a specific

12  charge and that specific charge requires proof by the

13  government of that which it has charged, not some other

14  crime, but that which it has charged.  And the evidence

15  will not show you that Mr. Delton Rushin deprived Terrance

16  Dean of his Eighth Amendment rights.

17         The evidence will not show you that Mr. Rushin

18  entered into any such agreement to do so, that had he had

19  a secret agreement with the deprivation of rights as its

20  common purpose and its common objective.

21         And as you listen to all this evidence you will

22  hear many, many, many pieces of evidence, and that

23  includes evidence of the use of force.

24         Keep in mind that the question at the end of

25  this trial is, is this proof beyond a reasonable doubt?

1    Has the government removed, through its proof, any basis

2    for a reasonable doubt that Mr. Delton Rushin deprived

3    Terrance Dean of his Eighth Amendment rights or that he

4    entered into an agreement with others to do so.

5         The question is not going to be whether there

6    was ever the use of force.  The question, based on the

7    specific charges brought by the government, is whether or

8    not there was a deprivation of rights.  That's all.

9         Mr. Rushin is also charged in a conspiracy to

10   conceal information and certain overt acts related to

11   that.  He's alleged to have corruptly persuaded others to

12   provide false information, to have omitted from his

13   reports information the government believes should have

14   been included or included information which the government

15   contends was false.

16        And again, as to each of these charges, each of

17   these counts, it is a specific charge and it requires

18   proof by the government of that which they have charged

19   and nothing else.

20        And the evidence is not going to show you that

21   Mr. Delton Rushin entered into any agreement by which the

22   common purpose and the common goal was to conceal

23   information or obstruct justice.

24        So, as you hear all these pieces of information

25   in this trial, all this evidence presented to you by the

1    government and by the Defendants, keep in mind the

2    question at the end of this case, is this proof beyond a

3    reasonable doubt?  Has the proof submitted by the

4    government removed any reasonable doubt that Mr. Delton

5    Rushin entered into an agreement to conceal information or

6    to obstruct justice?

7            Because when the government charges a crime, a

8    very serious crime, they have to prove the crime that they

9    have charged.

10           Now, Judge Treadwell, he has spent some time

11   telling you about the principles of the law in some very

12   broad strokes.  And one of the first things that Judge

13   Treadwell instructed you on is that as Mr. Delton Rushin

14   sits before you today and in the days to come, he is

15   presumed to be innocent.  He stands before you as an

16   innocent man.  And that presumption of innocence, that

17   innocence is presumed by the law, it is the law, that's

18   where all of this begins.  And each of you, by taking the

19   solemn oath to be a juror in this case have agreed to

20   apply the law as it has been given to you.

21           As Mr. Delton sits here right now in front of

22   you he is an innocent man.

23           Mr. Rushin declared his innocence when he stood

24   before the Court and he entered a plea of not guilty

25   saying I am not guilty of that which the government has

1    charged me with.  And as I said before, when the

2    government makes a charge, that is the charge that they

3    have to prove.

4            For example, Count One, the alleged conspiracy

5    to violate the rights of inmates.  Count One does not

6    charge Delton Rushin with having used force on an inmate

7    before.  That's not the charge.  Whether or not Delton

8    Rushin has ever used force on an inmate is not the

9    question that is asked and put to you under Count One.

10           The question under Count One is not whether

11   Delton Rushin has ever used excessive force on an inmate.

12   That's not the charge.  Whether or not he has used

13   excessive force on an inmate that's not what Count One

14   asks.

15           Count One doesn't charge that Delton Rushin has

16   ever injured an inmate.  That's not what he's charged

17   with.  Count One charges that he entered into a conspiracy

18   to violate civil rights.  That is a charge and that is

19   what the government must prove to you.  They must prove

20   the specific charge, each of the specific charges and

21   nothing less.

22           So, throughout this case each of you must remain

23   vigilant in your observations and listen carefully to the

24   evidence presented to you and what's not presented to you.

25   Because ultimately you're going to have to ask yourself is

1    what I heard, what I saw, what I observed, is it clear?

2    Is it unclear?  Is it credible?  Does it lack credibility?

3    Is this proof beyond a reasonable doubt?  Because this is

4    your job, this is your duty, this is the oath that you

5    swore.

6          So when the call came, who answered?  Well, you

7    did.  You did.  Weeks and weeks ago y'all got a letter in

8    the mail from the court.  I'd imagine when you opened it

9    you saw that it was a notice of jury duty and it had a

10   questionnaire with a bunch of questions in it.  You were

11   probably a little nervous.  For most of you this is a new

12   thing.  And then in the weeks and days that followed you

13   have probably been a bit anxious.  You don't know what's

14   to be expected of you.  You don't know what to expect.

15         And then today came, you had to drive from your

16   homes to downtown Macon, park your car and get out and go

17   downstairs into this courthouse and go through security,

18   sit in this room with strangers, a lot of people you've

19   never met before.  And if you weren't nervous then, we all

20   started asking you questions, prying questions, and you

21   had to answer them publicly.

22         One thing you'll probably have noticed this

23   morning, though, when roll was taken that there were

24   people who weren't here.  Because when the call goes out

25   not everybody answers it.  It takes courage to answer it.

1    You guys have shown that courage simply by showing up.

2    You've shown that courage by taking your oath.  And I say

3    to you, if you have the courage to show up, to take your

4    oath, then you have the courage to discharge the task that

5    is before you.  Because the task before you is great.

6         At times it is going to seem daunting but I

7    promise you this, I am going to do everything I can to be

8    a good steward of your time and of your attention and to

9    try to keep this case moving along while doing everything

10   I can to represent my client to the best of my ability.

11        And I ask from you only this in exchange.

12   First, is that you withhold any judgments whatsoever until

13   you have heard all of the evidence.  And, two, when you

14   are seated in this jury box, as difficult as this will be,

15   you must put out of your mind all of those concerns you

16   have about your families, about your jobs and about your

17   personal obligations.  You have to focus on the task at

18   hand because it is your job ultimately to create order out

19   of chaos.

20        Now, at the end of this case I'm going to ask

21   you to return a verdict of not guilty on each of the eight

22   counts which have been brought against Mr. Delton Rushin.

23   And that is because the evidence that will be presented to

24   you will not have proven that which has been charged

25   against Mr. Delton Rushin in accordance with the law as it

1    will be given to you.

2         I thank you for your courage and for your time

3    this morning and your attention. I appreciate your

4    attention during this opening statement and I look forward

5    to speaking with each of you at closing.  Thank you.

6         THE COURT:   Mr. Wolfe?

7         MR. WOLFE:   Thank you, Judge.  Howdy folks.

8         I'm coming in the middle because I have a

9    different talk to have with you.  I represent James

10   Hinton.  James, stand up.  James is the Deputy Warden at

11   Macon State Prison in charge of security.  He is not a

12   guard.  He is not a CERT team member.  He's in charge of

13   all of the security at Macon State Prison.  And they have

14   to walk the perimeter; they have to walk the wood line

15   outside; they had to be careful of who's bringing in

16   contraband; they had to be careful as to who's coming to

17   visit; they have to monitor everything that's going on in

18   the prison.  And you might think to yourself, well, that's

19   what guards do.  But things are different on CERT.

20        Mr. Christian said that Mr. Hinton told the new

21   CERT officers that things were different on CERT.  And I

22   expect the evidence to be that he likely did say it and

23   that it's true.  I think you're going to hear that CERT is

24   a limited number of folks that, as these other gentlemen

25   have shared with you, are charged with the responsibility

1    of doing thing that are very, very dangerous.   There

2    aren't CERT teams at minimum security prisons.   There are

3    not CERT teams at some medium security prisons.   There are

4    CERT teams at what is called closed security prisons and

5    that is the type of prison that Macon State Prison is and

6    that's what James Hinton has the responsibility of

7    managing.

8           I think there are about 500 employees here at

9    Macon State Prison.   About 300 of them are staff that are

10   responsible for being guards and for going into the

11   locations where the inmates reside.

12          It's important to note that there were 1,729

13   inmates at Macon State Prison in December of 2010.   So the

14   odds with regard to protecting folks that are working

15   there, protecting the other guards and protecting some of

16   the inmates from some of the people that were at Macon

17   State Prison is a challenge, to say the least.

18          And let me tell you, that when a CERT team is

19   deployed during a given shift, generally at most prisons

20   there are five CERT team numbers, a sergeant and four

21   others.   At Macon State Prison there were eight because of

22   the nature of the folks that live there.

23          I think you'll hear in the evidence that the

24   people who reside at closed security prisons, the

25   offenders that live there fall into one or more of the

1    following categories; they are escape risks, they have

2    assault histories and they are deemed dangerous.  That is

3    the nature of the folks that live there and there are

4    1,729 of them.

5         Now, what makes CERT different?  What makes

6    things different on CERT?  The CERT team is not only

7    responsible for making sure people get from one place to

8    another, they are the people when there is trouble that

9    are tasked with extractions.  They have to go into cells

10   and extract violent inmates out.  They have to do daily,

11   what is called, shakedowns.  They shakedown the prison for

12   weapons like the shank that Mr. Fox and Mr. Jarrard told

13   you about that an inmate tried to use on Deputy Warden

14   Hinton after he had been hit and had his jaw broken when

15   he was in the most dangerous pod in the prison.  So that

16   is part of their job.  Things are different.  All the

17   guards don't have to do that.

18        And you want to know something else?  Guess who

19   else gets shaken down by the CERT team?  The guards.  The

20   guards get shaken down by the CERT team because who do you

21   think is most often responsible for bringing in

22   contraband, cell phones, drugs and getting them to the

23   inmates?  It's the guards.  So the CERT team is

24   responsible for searching them, searching their lockers

25   and shaking them down.  So what happens on CERT stays on

1    CERT.  I think Mr. Christian said that Mr. Hinton said

2    that to the people.  And it's true also because if you're

3    going to do a shakedown, if you're going to go into a

4    dangerous pod where the folks with this type of history

5    live and you're going to search those pods for weapons or

6    cell phones --

7         You heard about a fellow named Franklin Jones.

8    Franklin Jones got upset and had an altercation with one

9    of the guards.  It's going to be the subject -- just

10   because he found a cell phone and he took it.

11        So yeah, what happens on CERT stays on CERT

12   because if they were to know we were coming to do a

13   shakedown of either the inmates or the guards, the

14   shakedown wouldn't be successful and the contraband that

15   they were looking for would not be found.  So yeah, he

16   says those things, he said those things and he did those

17   things.  Because it's important to do those things.

18        Who is James Hinton?  James Hinton grew up here

19   in Montezuma.  He went to high school there.  He joined

20   the military when he got out of high school. He was

21   airborne.  He went to Desert Shield and Desert Storm and

22   came back.  And in 1993 joined the Department of

23   Corrections and became an inmate -- not an inmate --

24   became a guard, where?  A Correctional Officer.  At Macon

25   State Prison.  And over the 19 years he was there he rose

1    to sergeant, to lieutenant, and eventually to deputy

2    warden of security at the prison.  That's James Hinton.

3              Now, you heard Mr. Christian share with you what

4    Mr. Hinton is alleged to have done and what he expects the

5    evidence to be and I'm glad to know that.  Because when

6    you read this indictment Mr. Hinton is charged in one

7    count of this indictment and that's Count Three.  His name

8    appears in this indictment three times.  Once, in the

9    introduction where they tell you he was the assistant

10   warden.  That's what I expect the evidence is going to be.

11             Once, in Count Three where it says he's named as

12   a co-conspirator.  And the conspiracy is supposed to be,

13   and I think the evidence is going to be, that Mr. Hinton

14   conspired with some of these fellows to cover up the

15   assaults that had occurred.  But I haven't heard anything

16   and I haven't seen a word written in the indictment and I

17   don't expect that there will be any evidence that James

18   Hinton ever told them to write anything, that James Hinton

19   ever mislabeled or miswrote a report himself.

20             And with regard to the four instances set out in

21   the indictment, I think the evidence is going to be that

22   with regard to Franklin Jones, that Mr. Jones got into an

23   altercation with a guard, was taken to medical and did

24   appear to be injured.  And when Mr. Hinton went to talk to

25   him he didn't want to say anything.  I think the evidence

1    will be that he refused medical treatment.  I think the

2    evidence will be that he wouldn't do a grievance.  And I

3    think the evidence will be that he was transferred from

4    the prison on November 1st, the incident occurring on

5    October 25th.  So less than a week later he's gone and he

6    makes his grievance elsewhere.

7           However, did Mr. Hinton or anybody from -- I

8    think they said the staff -- the upper echelon try to

9    cover anything up?  No.

10          I think you'll see that with regard to the

11   Franklin Jones incident, which is the first incident that

12   is laid out in the indictment as a substantive offense

13   with regard to the beatings that allegedly occurred, with

14   regard to the Franklin Jones incident, the incident was

15   advised to the warden to be sent to Internal Affairs for

16   investigation.  So if anybody knew that anybody did

17   something wrong or if anybody expected or was expected to

18   cover something up you certainly wouldn't send it to

19   Internal Affairs.  But the evidence is going to be that

20   investigation of the Franklin Jones' assault went to

21   Internal Affairs.

22          And when I heard the Judge read the witness list

23   one name I didn't hear -- and I reckon the government is

24   not going to call them so I guess you won't hear -- but I

25   didn't hear any of the investigators for Internal Affairs

 1    named.  But they were notified and it was sent to them

 2    within days of the incident occurring.

 3         The next event that I think you're going to hear

 4    about has to do with a fellow named Miller.  Jabaris

 5    Miller.  Jabaris Miller got into an altercation with a

 6    guard in the cafeteria and they didn't take him to the

 7    gymnasium, which my understanding is where the conspiracy

 8    was.  But I'm not a part of that conspiracy.

 9         But at the end of the day, at the end of the day

10    he was brought to medical and when the incident was

11    investigated, James Hinton himself said that the guard in

12    the cafeteria used unnecessary force, and you're going to

13    see it in the evidence.  It's on the cover sheet of the

14    Miller incident.  It said that the guard force could have

15    been avoided.  So if the guard hadn't hit and gotten into

16    an altercation with Miller in the first place he never

17    would have gone up to ID where they say he was assaulted.

18         But at the end of the day that investigation was

19    for an excessive use of force, number one, and it was sent

20    to Internal Affairs also.  But the government contends

21    there was a cover up.  I think the evidence is going to be

22    that that's simply not the case.

23         Those two instances occurred in October, October

24    25 and October 28.  The next instance of problem was on

25    December 14th of 2010 when Mr. Hinton was in the most

1    dangerous pod in the prison taking it off of lockdown.

2    That's why he was there in the first place.  The prison

3    had been on lockdown for five days and he was letting them

4    know that we're going to be letting you off lockdown and

5    we're going to get back to normalcy.

6         And at one point while he was standing there,

7    Mr. Westbrook punched him in the jaw and broke it.  He

8    pulls out a shank and Deputy Warden Hinton had a camera.

9    The fellow tried to stab him.  He said to him, "Drop the

10   weapon and stop."  The inmate didn't.  He struck him and

11   then CERT and other guards came in, secured the guy and

12   took him away.

13        Mr. Hinton was in the hospital, before anything

14   occurred with regard to an investigation, with a broken

15   jaw.  And you're going to hear, the evidence is going to

16   be unequivocal, that as of December 14th of 2010, Mr.

17   Hinton was out, did not return to the prison except for

18   that night after having come back from the hospital, to

19   get his car with his mother and wife and went home and

20   didn't come back to the prison until February the 26th of

21   2011.

22        Now, as I've indicated to you, if you look at

23   the indictment, the indictment does not contend that Mr.

24   Hinton did anything specifically, nothing, not a word in

25   the indictment except overt act number 10 wherein the

1  government alleges that the only light that is shed on any

2  conduct that Mr. Hinton may have been involved with was

3  that on November 13th of 2012, twenty-two months after the

4  investigation began and twenty-three months after he left

5  the prison on December 14th, 2010 and not to return for

6  eight weeks, 10 weeks.  They say that Hinton appeared

7  before the grand jury and falsely denied having known in

8  2010 that CERT members had -- and then they used the word

9  assaulted inmates in the gym.  Hinton said he didn't know

10  that.

11          Jones, number one, October 24th, you're going to

12  hear, was assaulted in the gym or was injured in the gym

13  by the use of excessive force perhaps.  But Miller, the

14  second guy, wasn't.  Miller was at ID so he wasn't even in

15  the gym.  Hinton was the third guy and the fourth guy was

16  assaulted -- this fellow Dean that all of this is about,

17  you're going to hear, he was injured on December 16th

18  after Hinton had already been gone for two days.

19          But the word assaulted he didn't know.  He did

20  hear about the injuries and you'll hear from the grand

21  jury testimony that Mr. Hinton testified at the grand jury

22  and told them, yeah, the warden called me a couple of days

23  after the Dean incident occurred, which would have been on

24  the 17th or 18th, and I read it in the paper the next day

25  that there had been a commotion and an inmate had been

1    taken to the hospital.  But that's -- he said he knew

2    about that.  So he told them that he knew that something

3    had gone on there.  Yet they're saying that's the lie

4    twenty-three months later that prompted his involvement in

5    a cover-up.

6         I think you're also going to hear that this GBI

7    investigation that Mr. Christian was talking about.  It

8    began on January 5th of 2010 about two weeks after

9    Terrance Dean came in with the scalp hematoma.  And I'll

10   talk to you about that in a minute.  But that's the day

11   that allegedly the critical incident occurred.

12        The GBI investigation began on the 5th.  Redden

13   started blaming other people within three, four, six days

14   of that and other people may have joined in thereafter,

15   some of them not months and months and months later but --

16   but at the end of the day the GBI investigation began on

17   January 5th of 2010 and it ended in August of 2010 and Mr.

18   Hinton is not a part of that investigation it seems when

19   you read all the reports.

20        And the federal investigation you're going to

21   hear didn't begin until March of 2012, fifteen months

22   later.  And it was after that, after individuals had been

23   identified as those who had participated like Mr. Redden,

24   like Mr. McKenzie, like Mr. Bolden, all names that you're

25   going to hear, it was at that time that they begin to tell

1   on other folks and blame them.

2          Dean.  This fellow Dean was escorted to the gym.

3   And Mr. Redden, who the government has already shared with

4   you, told a lie at first and said the fellow broke and

5   ran. And then he came back and according to what the

6   government is going to try to introduced in evidence, Mr.

7   Redden said no, it wasn't me, it was those other guys and

8   I joined in too.  But I'm going to tell you something, in

9   trying to lie his way through, Mr. Redden establishes

10  clearly through his second statement what did happen.  He

11  indicated that he and Mr. Douglass-Griffin, who is another

12  guard that's cooperating to save his own hide because they

13  had been hard on the inmates, were escorting Mr. Dean

14  through the gym and Mr. Redden tells the GBI agent that's

15  interviewing him that we were walking, Douglass-Griffin

16  was on the left, I was on the right and I felt Dean tense

17  up.  And when he did, without anybody announcing anything

18  to anybody, without Mr. Lach being there and saying what's

19  going to happen, Mr. Redden, on his own says that, "I

20  stepped in front of him and took him down."  And don't

21  forget, ladies and gentlemen, that his hands were behind

22  his back and he landed squarely on the right side of his

23  head precisely where the most serious injuries occurred to

24  Mr. Dean.  Precisely where.

25          Redden caused the internal injuries in Mr.

1    Dean's skull.  Not any of these gentlemen.

2            The examination at medical indicated that there

3    were no injuries except for some abrasions on his face,

4    which could have occurred during the initial altercation

5    at the dorm where he assaulted an officer.  But in any

6    event he had no other injury, although there is

7    conversation and discussion that he was kicked and punched

8    and brutally beaten.

9            But I will tell you this, another cooperating

10   fellow, another guy that's come in here to testify to you

11   folks that the government is going to call, Mr. McKenzie,

12   clarifies and confirms what Redden said.  Because he will

13   tell you that after he walked up and ran his finger across

14   his face not because of any conspiracy, because he was

15   upset about the assault that Dean had just been engaged in

16   with regard to one of the guards in the dorm and he told

17   him don't ever mess with my guards and he said as he was

18   walking away Redden threw him to the ground.

19           But Redden is going to come in here and tell you

20   what his grandmother wants him to tell you and he's

21   getting a deal.  He's entering a plea.  He's getting

22   himself out of this thing.  So is Mr. Bolden, so is Mr.

23   McKenzie and so are all of these other fellows.  So don't

24   be confused.  Don't be confused.

25           With regard to the horrible injury that appeared

1    that Mr. Redden (sic) had sustained, it was called a scalp

2    hematoma.  When you have a scalp hematoma that means you

3    have a severe bruising but there is no laceration.  So

4    there's nowhere for the blood to escape to.  And you're

5    going to hear from the medical folks that the blood vessel

6    bleeds into the skin and it starts to grow into a knot.

7    Y'all have had knots before.  But the body -- when the

8    body tries to stop the bleeding it sends fluid to the area

9    and it fills the area up causing pressure to stop the

10   blood.  So yeah, it appeared as though he had a huge knot

11   on his forehead about the size of a softball or maybe

12   bigger then that.  But that wasn't the severe injury that

13   he sustained.  The severe injury he sustained was the

14   injury that was imposed upon him by Mr. Redden when he

15   slammed him to the ground helplessly.

16        But with regard to Mr. Hinton, he wasn't there.

17   He didn't help cover anything up.  He didn't order anybody

18   to cover anything up.  He trained these guys.  He advised

19   these guys, and he was the head of security and he was the

20   head of CERT.

21        And there are times in CERT, you're going to

22   hear, when different degrees of force are necessary and

23   these gentlemen are trained in that regard, all the way up

24   to the use of deadly force, when it's necessary.

25        And I submit to you, ladies and gentlemen, that

1    James Hinton did his job.  James Hinton did not conspire

2    with anything.  There's no allegation in the indictment he

3    conspired with anybody.  And there's certainly not going

4    to be any proof that he caused anybody to inappropriately

5    write a document or that he inappropriately wrote a

6    document.  And if, in fact, an investigation was delayed,

7    it was not as a result of Mr. Hinton because on the two

8    opportunities that he had, the two opportunities with

9    regard to Mr. Jones and with regard to Mr. Miller,

10   investigations were started immediately and an

11   identification of excessive force was pointed out and

12   looked into by the appropriate folks.

13            These guys have a dangerous job.  They do it and

14   they do it to save lives and to protect people at the

15   prison.  And the prisoners -- the prisoners get the

16   benefit of their work.

17            And if there weren't shanks and cell phones and

18   dope and assaults on inmates and guards in the prison

19   there wouldn't be a need for the CERT team.  But because

20   there was a need at this prison these fellows did a pretty

21   good job in light of all the circumstances.

22            And at the end of this trial I trust that you'll

23   agree and when you are asked to determine whether or not

24   they are guilty or not guilty of the allegations in the

25   indictment that you will say, they're not guilty.  Thank

1    you.

2              THE COURT:   Mr. Hogue?

3              MR. HOGUE:   Derrick Wimbush never laid a hand

4    on any one of the four inmates named in this indictment.

5    Not one of them.  Derrick Wimbush did not write or speak a

6    false word in reporting about any of the incidents that he

7    reported on.  And he openly reported on two of these four.

8              Derrick Wimbush never entered any secret

9    agreement, conspiracy with anyone else at Macon State

10   Prison to deprive these inmates of their civil rights or

11   to cover it up.

12             Now, you've heard probably over 200 names

13   already today.  The reading of the witness list, the roll

14   call and all the names we lawyers have been throwing

15   around.

16             I'm Franklin Hogue and Derrick Wimbush -- would

17   you stand Derrick.  That handsome man there is my client

18   and I'm privileged to represent him.

19             So I'll try not to add to many more names to the

20   load that you're already carrying.

21             Derrick, you will hear in this case, is a man of

22   good character, a man with a reputation for truth telling.

23             He became a CERT member when he joined Macon

24   State Prison after serving some time as a correctional

25   officer and guard first.  And the warden appointed him to

1    be in charge of physical training,  PT.

2            Now one of the things that they do in PT is they

3    exercise, they run, they do push-ups, they try to stay in

4    shape.  You saw him, he's in pretty good shape.

5            The warden appointed him because he also was

6    once a professional football player for the Jacksonville

7    Jaguars and was a standout college player at Fort Valley

8    State.  So he knew what to do on a playing field to keep

9    guards and new hires in shape.  And, this is important,

10   you'll hear in the evidence he did it nearly every single

11   day he worked at Macon State Prison.  In fact, he would

12   come in in the morning, get his papers to find out who was

13   to be in PT that day, either new hires or guards who were

14   continuing to stay in shape, and then he would leave the

15   prison and go to the field, where the track -- at the

16   Board of Education there in Macon County.  It's the place

17   where the buses, the school buses are parked.

18           And one of the witnesses we expect you'll hear

19   from is a pastor of his church who was a part-time school

20   bus driver and would stop and say hey to Derrick every day

21   coming in and going out where he parked his school bus

22   where Derrick was doing PT.

23           So he came home from his football career short.

24   It was, just a couple of years and went to work at the

25   prison.  And then, as you have heard, in the fall of 2010

1   these incidents occurred with these inmates whose names

2   have been given to you.  You'll see them again.  They're

3   in the midst of this 33-page indictment.  And I'm going to

4   talk to you just briefly about each one of them to tell

5   you the evidence you're going to hear about them and

6   Derrick Wimbush's role or not in them.

7            October 25, 2010 is the first of the four you'll

8   hear about alleged in the conspiracy as one of the four

9   incidents that Derrick Wimbush and others were involved

10  in.  It involved an inmate named Franklin Jones.  And the

11  day that Franklin Jones' incident occurred Derrick was, as

12  he often was nearly every day, at PT training.  When he

13  was finished he returned to the prison just as an

14  ambulance was leaving the prison that had Officer Jason

15  Davis in it.  He arrived after that attack, brutal attack,

16  on that officer occurred, saw him leaving in the ambulance

17  and was sent by his superiors to the medical wing where

18  Franklin Jones was, where protocol says he was supposed to

19  be taken and there he was.  And Derrick Wimbush was told

20  take over the camera duties, handheld camera, from Tyler

21  Griffin, he has other things we want him to do and so

22  that's what he did.  And Derrick Wimbush sat in medical,

23  filmed Franklin Jones for a handful of minutes and then

24  left and wrote a one sentence report that says, "I went to

25  medical and I filmed Franklin Jones", and that's exactly

     1    what happened and that was the extent of his involvement.

     2         October 28, three days later, Jabaris Miller.

     3    Once again, Derrick is at the track, the field, conducting

     4    physical training.  He did not see or participate or know

     5    about, at the time, anything involving Jabaris Miller.  He

     6    wrote no report about it.  He had nothing at all to do

     7    with it.

     8         Now, fast-forward, December 14, 2010.  This is

     9    the Mario Westbrook incident, the one where he broke

    10    Deputy Warden Hinton's jaw and pulled out a shank in an

    11    attempt to kill him.  On that incident, on that day,

    12    Derrick Wimbush was at home with his mother, with his

    13    stepfather, with his brother, in Macon County 45 minutes

    14    from the prison where he lived.  He got a page, "call

    15    Macon State Prison."  He called.  The prison said Deputy

    16    Warden Hinton has been attacked, come over to the prison.

    17    Because now it's CERT team.  It's time to come in.  This

    18    is an emergency.  We need to respond to it.  There are

    19    1,700 plus inmates in this place and one of them just

    20    attacked the deputy warden.  You don't know what's going

    21    to happen.  That situation is being controlled but there

    22    are all these other inmates in the place.  And so he's

    23    off-duty and told to come to the prison. He didn't even

    24    put on a uniform.  He got in his car and he went there.

    25    When he arrived Deputy Warden Hinton had already been

1    taken away in an ambulance and Westbrook had already been

2    transported off the prison grounds to be removed.  He

3    never saw the man.  Never wrote a report about it and had

4    nothing to do with it.

5         December 16, two days later, 2010, the Terrance

6    Dean incident.  Now you heard the government tell you they

7    expect the evidence to show that after Dean attacked

8    Officer Walden in the E dorm and he was escorted away,

9    taken to the gym where the government says the CERT team

10   beat him.  Then the government told you they expect the

11   evidence to show that the officers involved in that

12   beating then got together and came up with a story.  And

13   he said, Mr. Christian told you the story they came up

14   with was to write in your reports that Dean snatched and

15   ran and that's how he got his injuries when he ran and

16   fell in the gym.

17        Well Derrick Wimbush again was at PT training

18   that day.  When he was finished he returned to the prison.

19   He came through security, as they do.  He brings in what's

20   called a chit, a little round coin-like thing that has his

21   name on it.  He gives that to security and they give him

22   his keys, the prison keys for him to make his rounds to be

23   able to lock and unlock doors and gates and such.  He gets

24   them as he arrives.  Dean has already assaulted the guard

25   in the E dorm.  And Derrick then left to go toward E dorm

1    but he didn't get there.  They had already removed

2    Terrance Dean from E dorm.  He was coming through the

3    sally port being escorted by other CERT officers across

4    the big east yard.

5            Now here's something you need to know and the

6    evidence will show it.  Whenever guards are moving inmates

7    in a prison across an open space where there may be

8    dozens, scores or even hundreds of other inmates --

9    picture it.  You've got maybe two or three guards with an

10   inmate who is handcuffed, perhaps, being escorted across a

11   place where that inmate may have enemies.  There are

12   gangs, there are rival gangs.  If you've got a guy in

13   handcuffs and you've got a beef with that guy these guards

14   are in a dangerous situation.  So they have to have some

15   of their number scatter and clear the yard and keep

16   inmates at bay, lock doors behind the escorting guards so

17   inmates can't follow them into closed places and harm the

18   other inmate or a guard.  And that's what Derrick Wimbush

19   was doing that day.

20           When he got there and he got his keys and he

21   went to E dorm and Dean was being taken away by other

22   officers he moved in behind to start locking gates so he

23   could control the movement, control the situation.  That's

24   his job.

25           And so he moved his way towards the gym which

1    was the direction toward medical where they were taking

2    Dean.  And the officers had already taken Dean into the

3    gym, left the door open or unlocked.  Derrick comes

4    behind, comes in the gym and locks the door that leads out

5    to the east yard, and they've already cleared the gym.  So

6    he goes across the gym, goes out that door on the other

7    end and locks it and sees Dean being carried into the

8    medical unit.

9            Now, he infers from being carried, well an

10   inmate is either injured because he has resisted or as

11   more often happens inmates just say, well I'm not going

12   with you.  What are you going to do?  Well then they have

13   to just carry the guy.  So they'll get on either side of

14   him, two or three of them and just carry him.  So he

15   didn't know.  He saw Dean being carried into medical so he

16   locks the gym door.  He heads towards medical just as

17   Warden McLaughlin is coming toward medical himself.  And

18   he arrives at the medical unit and Derrick Wimbush goes in

19   there after the warden, Warden McLaughlin, the Warden of

20   the prison.

21           He's in medical.  He sees Dean in there.  Dean

22   is resisting, he's kicking.  And he just leaves at some

23   point.  His work is over.  He's locked gates and doors and

24   leaves.

25           And when he wrote his report, which he didn't

1    even actually have to do, but he had been summoned to come

2    in and lock and unlock and he was there when Dean was in

3    the room so he wrote one anyway.  He didn't get with

4    anybody else to come up with a story -- and this is most

5    critical for you to watch when you hear his report and his

6    statements about the Dean incident.  Because the

7    government says they had a secret agreement, they got

8    together and they fixed up what they were going to say

9    happened to Dean, snatched and ran.  There isn't anything

10   like that in Derrick Wimbush's report.  His report says

11   what I just told you.  It says, "I didn't see them in the

12   gym.  I didn't see anything happen in the gym.  I wasn't

13   there."

14        That's what I expect the evidence to show.  You

15   won't hear a single credible witness say to you with

16   unmistakable certainty and clarity that Derrick Wimbush

17   inflicted cruel and unusual punishment in violation of his

18   civil rights of a single inmate.

19        Instead, what you will hear in the evidence

20   because you've already heard it in the government's

21   opening statement, is a lot of plural group phrases like

22   they, them, CERT team, officers, guards.  You will not

23   hear a single credible witness say with unmistakable

24   certainty and clarity that Derrick Wimbush entered into a

25   secret agreement with others to violate those inmates

1    rights or to write false reports about them.

2           So as you listen to the evidence and you hear a

3    lot of names you'll hear a lot of they, them and them all

4    and guards and so on.  But I remind you the one important

5    name that I care about the most, that I will speak for

6    during this trial, is Derrick Wimbush.

7           So I ask you to listen with great care.  I see

8    you have notes.  And if anybody comes up here and takes

9    the stand and begins to say Derrick Wimbush did this or

10   Derrick Wimbush said that, it's false.  I will be up here

11   to speak for him and help you see that those witnesses, if

12   any, are not to be believed.

13           THE COURT:  Mr. Pate?

14           MR. PATE:  Thank you, Your Honor.  I promise I

15   am the last lawyer you have to listen to today.  I know

16   it's been an incredibly long day for y'all.  Y'all were

17   here early.  I saw y'all coming in and you've been very

18   attentive and we appreciate that.

19           I need to talk to y'all and I'm not going to go

20   over all of these incidents.  You've heard enough about

21   the inmates that were attacking the guards and what was

22   going on at the prison and what kind of place it is.  But

23   I have to talk to you a little bit about my client, Tyler

24   Griffin.

25           Tyler stand up.  Thank you.  It is going to be,

1    as y'all can probably already tell, very difficult to keep

2    all of these names together.  I mean, you've heard guards

3    that were mentioned by Mr. Christian.  You've heard six

4    guards mentioned before I stood up.  But it is incredibly

5    important that you do keep them straight.  Because I

6    anticipate at the end of this trial the Judge is going to

7    tell you not only do you have to weigh the evidence and

8    see if the government has proven their case beyond a

9    reasonable doubt, but you've got to do it for each person

10   individually.  Because the case against each person here

11   is not the same.

12          And I say that because I listened to Mr.

13   Christian and literally, as you'll hear through this case,

14   99 percent of what he says has absolutely nothing to do

15   with Tyler Griffin.

16          Tyler Griffin was not part of any conspiracy to

17   assault Terrance Dean.  Tyler Griffin was not on the CERT

18   team when that happened. Tyler Griffin was not even at the

19   prison when Mr. Dean's incident occurred.

20          Tyler Griffin, as you will hear, was on the CERT

21   team for a full two months.  From September of 2010 to

22   around the end of November 2010.  He was not on CERT or

23   even at the prison when this incident with Mario Westbrook

24   occurred.  He was not on CERT or even at the prison when

25   this incident with Terrance Dean occurred.  He was there

1    just enough time to witness the assault that y'all have

2    heard about of that inmate that attacked Officer Davis

3    with the barber clippers and beat him in the head four or

4    five times.  He saw that occur.

5           And then he saw the fistfight that y'all have

6    heard about from the inmate Jabaris Miller who jumped and

7    got into it with a guard in the chow hall.  He was around

8    for that.

9           And after those two incidents Tyler Griffin quit

10   CERT.  Tyler Griffin went home.  Tyler Griffin literally,

11   said I don't want the extra pay.  I want to go back to

12   being a regular CO, and that wish was granted.  They put

13   him back into a regular assignment and he was literally,

14   though, not at the prison for the last two incidents that

15   are listed in the indictment.

16          He requested, folks, an immediate transfer from

17   Macon State after he saw what he saw.  He requested that

18   transfer in December, the same month that these two

19   incidents you've heard about supposedly occurred with Mr.

20   Westbrook and Mr. Dean.

21          And he was transferred.  They eventually

22   approved it.  He was moved to a different prison.  He is

23   currently working, although suspended with pay until this

24   trial is over with, at Bleckley Probation Detention

25   Center.

1          He was nowhere around that place when the

2     Westbrook incident occurred or when this Dean incident

3     occurred.

4          Now, this entire case, this criminal

5     investigation as y'all have heard really began with this

6     GBI investigation.  They were asking folks about the

7     Terrance Dean incident.  And I expect you're going to hear

8     maybe even from the GBI agent, certainly from some of the

9     folks that that person questioned.  They never talked to

10     Tyler Griffin.  And they never talked to Tyler Griffin

11     because he had nothing to do with the Terrance Dean

12     incident.  He wasn't even at the prison.

13          About two years go by and the federal government

14     gets involved.  And the federal government is no longer

15     looking at that.  They want to go through all of the

16     records at Macon State.  And they go talk to Tyler Griffin

17     because Tyler Griffin, at that point, is the only person

18     who was on CERT either for that short amount of time that

19     hadn't been interviewed.

20          So they go talk to Tyler Griffin and he talks to

21     them.  He says "Yeah, absolutely, I'll tell y'all whatever

22     you want to know."

23          They asked him about this Franklin Jones

24     incident.  Again, the one with the barber clippers.  He

25     said, well I remember the incident.  I remember being

1  called to the code three.  I remember showing up.  This

2  officer was screaming in pain.  He literally was bleeding

3  there.  He remembers that, he recalls that.  And then he

4  told him what he did.  He was the new guy.  He had been

5  with the CERT team for a matter of weeks at this point.

6  And as everyone is rushing around he's trying to figure

7  out what am I supposed to do.  He doesn't have the camera.

8  And he goes to the control booth and somebody gives him

9  the camera.  He's got the camera.  It's apparently the

10  wrong camera.  The supervising officer sends him back to

11  the CERT office to get another camera.  He goes and does

12  it, yes, sir, double time.  By the time he gets back

13  Franklin Jones is already out of the gym, out of the dorm

14  and on his way into another building at the prison.  Tyler

15  Griffin runs, catches up with them and he's got his video

16  camera now and it's working and he videotapes the two

17  other CERT officers escorting Mr. Jones into medical.

18       Later he writes a statement, a handwritten

19  statement, one of these short handwritten statements.  I

20  expect y'all are going to see a lot of them, hear about

21  them.  Now, he's only been on CERT for a few weeks and he

22  hadn't written one before.  Some of the other officers

23  tell him the form that you need to use.  They discuss it.

24  You know, I, Officer Griffin, did X, Y and Z and they use

25  the lingo that they use.  He wrote it out.  And he said,

1    what you'll hear at this trial, that he did, he responded

2    to the code, he got the camera, he filmed the other

3    officers escorting Mr. Jones into medical.  He then stayed

4    with Mr. Jones in medical, continued filming it.

5    Eventually had to put shackles on him.  End of statement.

6           Everything that he wrote in that statement was

7    100 percent accurate.  You do not have to take my word for

8    it.  You don't even have to take Tyler's word for it

9    because, folks, you're going to see the video that he

10   took. And you'll see it kind of shaking as he is running

11   to catch up with the folks and then he gets it stabilized

12   and you know what you're going to see?  You're going to

13   see Franklin Jones with two CERT officers being escorted

14   into medical.

15          The government, however, is charging Mr. Griffin

16   with being part of this conspiracy to obstruct because

17   they say that handwritten statement is false.  I ask you

18   to pay careful attention again not just to what it says

19   but to what you'll see with your own eyes.  Because the

20   video is exactly the way that he described it.

21          Now, the FBI also asked him about this other

22   incident you've heard about, Jabaris Miller.  He didn't

23   recall that immediately.  Didn't remember the guy's name

24   but did recall an incident that occurred in the chow hall

25   -- in the cafeteria where this fight happened.  He did

```
 1    respond again.  Now remember, this is just three days

 2    after the first time.  He's still only been on CERT a few

 3    weeks.

 4           He gets there.  He's not in a position where

 5    they have to use force on Mr. Miller to keep him in

 6    control, but he does see it and he witnesses it.  And he

 7    tells the FBI, you know, that may have been a little much,

 8    but what do I know?  I just started here a few weeks ago.

 9    He was not in a position to get involved with the use of

10    force but he did witness it.

11           And folks, after seeing those two things Tyler

12    Griffin quit.  He resigned from CERT.  He went home and he

13    requested an immediate transfer.  He was never asked to

14    write a statement about the Miller incident because as far

15    as the prison folks were concerned he wasn't involved.

16           But as a result of that conduct over those two

17    months that you've heard about, he's now charged in two

18    counts of conspiracy and with making false statements to

19    obstruct a federal investigation.

20           You are going to hear a lot of conflicting

21    stories, I anticipate, during this trial.  You're going to

22    hear who hit who when, who said what to whom, who wrote

23    what where.  If y'all just keep focused on what the

24    charges are and you apply your own common sense to this

25    evidence to this case you're not going to have any problem
```

1    at all finding the truth.

2           Now, give these folks, give these nice folks

3    from Washington every opportunity in the world to lay out

4    their evidence.  They may call these inmates in, I don't

5    know.  You're going to hear from a number of witnesses.

6    Give them that opportunity.

7           But at the end of the day when you look at these

8    charges and if you look at this evidence it ain't going to

9    match up, certainly not for this man right there.  Thank

10   you.

11          THE COURT:   Ms. Gomez?

12          MS. GOMEZ:   Your Honor, as we've requested of

13   the Court, we're going to delay our opening until after

14   the government's case is over.

15          THE COURT:   That's fine.  Thank you.

16          Ladies and gentlemen, that concludes the opening

17   statements for the parties except for Ms. Gomez, and

18   you've just heard she's elected to defer her opening

19   statement.

20          It's a little after five so obviously it's time

21   for us to stop for the day.  In just a minute I'm going to

22   let you go back to the jury room.  Ms. Hatcher is going to

23   go with you to get your input on scheduling.  Specifically

24   what I talked about earlier, does the 8:00 to 2:00 sound

25   good or does the traditional 9:00 to 5:00 sound good.

1    Either way I'm going to need you to be in the jury room 10

2    or 15 minutes before the hour at any rate whenever we

3    start so that we can get started.

4          You will remember that I instructed you at some

5    length about how important it is that you not allow

6    yourselves to be exposed to any information about the case

7    outside of the courtroom.  Please remember those

8    instructions.  I'm going to bug you, as you will see,

9    every time you come back in the courtroom from an

10   overnight break or from a break I'll want to make sure

11   that nothing has happened that has led you or caused you

12   to disregard those instructions.  I think you understand

13   how important that is but we'll talk about it a good bit

14   during the course of the trial.  So we will remain seated

15   while you go to the jury room.  Thank you.

16   (JURORS EXIT COURTROOM)

17          THE COURT:   I do want the Defendants -- I don't

18   care what order you go in I just need to have some idea

19   about what order you want to go in so that I can call on

20   you as appropriate.

21          A general observation after hearing the opening

22   statements, I think that I'm satisfied with my rulings

23   based upon what I know so far.  There's just no way the

24   case can be tried in a vacuum where you can't hear at

25   least some of the circumstances relating to the four

1    assaults and specific other events.

2          At the same time, you know, the door is not open

3    to everything that happened in the prison.  So that's

4    where we are on that.  The government will be ready with

5    its first witness in the morning?

6          MR. CHRISTIAN:  Yes, Your Honor.

7          THE COURT:  Our IT people are checking to see

8    what we're going to do with regard to an additional

9    monitor for the jurors sitting over here.  Bear that in

10   mind, you've got two jurors sitting over here.  Don't

11   forget about them.  Anything from the prosecution before

12   we adjourn for the day?

13         MR. CHRISTIAN:  No, Your Honor.  Thank you.

14         THE COURT:  Anything from the defense?

15         MR. WOLFE:  No.  Thank you, Judge.

16         MR. FOX:  Your Honor, if I may, when are we

17   going to hear the jury's decision?

18         THE COURT:  I was hoping I would have heard by

19   now.  I thought there was a consensus among them just from

20   eyeballing them but I certainly could be wrong about that.

21   Why don't you go check Teri and see if they've made a

22   decision about that.

23         COURT SECURITY:  8:00 o'clock.

24         THE COURT:  They want to start at 8:00 o'clock?

25         COURT SECURITY:  Yes, sir.

1          THE COURT:   All right.   Then we need to be

2    ready to go by eight o'clock.   I will be here by about

3    7:30.   As I said, I would like to have them in the box by

4    8:00 o'clock.   We are adjourned until then.   Thank you

5    all.

6    (The proceedings for 6-9-2014 were thereby concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   CERTIFICATE OF OFFICIAL REPORTER

 2

 3          I, Tammy W. Fletcher, Federal Official Court

 4   Reporter, in and for the United States District Court for

 5   the Middle District of Georgia, do hereby certify that the

 6   foregoing is a true and correct transcript of the reported

 7   proceedings held in the above-entitled matter and that the

 8   transcript page format is in conformance with the

 9   regulations of the Judicial Conference of the United

10   States.

11

12                        Dated this 30th day of August, 2014.

13

14                   /S/ Tammy W. Fletcher

15                   TAMMY W. FLETCHER, CCR
                     FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25
```