```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF GEORGIA
 2                             MACON DIVISION
                        _____
 3
      THE UNITED STATES OF AMERICA,   :
 4                      PLAINTIFF   : Case No. 5:13-CR-32-MTT
      VS                             :
 5                                   :        June 10, 2014
                                     :
 6    JAMES HINTON, ET AL,           :      Macon, Georgia
                      DEFENDANTS. :
 7    _____
 8                             JURY TRIAL
                             Volume 2 of 10
 9
                 BEFORE THE HONORABLE MARC TREADWELL
10            UNITED STATES DISTRICT JUDGE, PRESIDING

11    APPEARANCES:
      FOR THE GOVERNMENT:        FORREST CHRISTIAN, AUSA
12                               TONA BOYD, AUSA
                                 UNITED STATES DEPT OF JUSTICE
13                               950 PENNSYLVANIA AVE, NW
                                 WASHINGTON, DC 20530
14    FOR THE DEFENDANTS:
      JAMES HINTON:              DAVID WOLFE
15                               101 MARIETTA ST. NW, STE 3325
                                 ATLANTA, GA 30303
16    CHRISTOPHER HALL:          BRIAN JARRARD
                                 230 THIRD STREET
17                               MACON, GA 31201
      RONALD LACH:               DEBRA GOMEZ
18                               P.O. BOX 13523
                                 MACON, GA 31208
19    DELTON RUSHIN:             JOHN FOX
                                 P. O. BOX 209
20                               MACON, GA 31202
      DERRICK WIMBUSH:           FRANKLIN HOGUE
21                               P. O. BOX 1795
                                 MACON, GA 31202
22    TYLER GRIFFIN:             PAGE PATE
                                 101 MARIETTA ST., STE 3300
23                               ATLANTA, GA 30303
      _____
24              TAMMY W. FLETCHER  USCR
                         P. O. BOX 539
25              MACON, GA 31202-0539
                       (478-752-3497)
```

```
                        I N D E X

                     LINDA HAMSLEY

DIRECT EXAMINATION
   BY MS. BOYD . . . . . . . . . . . . . . . .     5

CROSS EXAMINATION
   BY MR. WOLFE . . . . . . . . . . . . . . .     17
   BY MS. GOMEZ . . . . . . . . . . . . . . .     22

REDIRECT EXAMINATION
   BY MS. BOYD . . . . . . . . . . . . . . .      26

RECROSS EXAMINATION
   BY MR. WOLFE . . . . . . . . . . . . . . .     27

                    EMMETT MCKENZIE

DIRECT EXAMINATION
   BY MR. CHRISTIAN  . . . . . . . . . . . . .    28

CROSS EXAMINATION
   BY MR. JARRARD . . . . . . . . . . . . . .     73
   BY MR. FOX . . . . . . . . . . . . . . . .    120
   BY MR. WOLFE . . . . . . . . . . . . . . .    130
   BY MS. GOMEZ . . . . . . . . . . . . . . .    157
   BY MR. HOGUE . . . . . . . . . . . . . . .    164
   BY MR. PATE . . . . . . . . . . . . . . . .   182

REDIRECT EXAMINATION
   BY MR. CHRISTIAN  . . . . . . . . . . . . .   190

RECROSS EXAMINATION
   BY MR. JARRARD . . . . . . . . . . . . . .    200
   BY MR. WOLFE . . . . . . . . . . . . . . .    201

                     KERRY BOLDEN

DIRECT EXAMINATION
   BY MS. BOYD . . . . . . . . . . . . . . . .   209

JURORS EXCUSED  . . . . . . . . . . . . . . .    263
```

1        MR. JARRARD:  Today we are going to try to see

2   if this will work.

3        THE COURT:  We have one juror this morning who

4   has informed us that her daughter is giving birth.  It

5   seems like that's something that would have come up during

6   the course of the questionnaire, but it did not.  I don't

7   know any details other than that.  I don't see an

8   alternative other than to excuse her.  The juror is Wendy

9   Juanita Floyd.  Does anybody have any thoughts on that?

10        MR. CHRISTIAN:  Not for the government, Your

11   Honor.  Not much that can be done I suppose.

12        THE COURT:  No.  I don't -- maybe she is

13   premature, I don't know, but in any event it didn't come

14   up.  It's a surprise, I gather, to all of us, but if she's

15   with her daughter in the hospital, she is not going to be

16   with us.  So we will excuse Ms. Floyd.  Are we still

17   waiting on one juror?

18        SECURITY OFFICER:  Yes, sir.

19        THE COURT:  Mr. Christian, you can put your

20   first witness in the stand this morning.

21        MR. CHRISTIAN:  Okay.  Thank you, Your Honor.

22        THE COURT:  All right.  We're all present, and

23   I'm going to let Mr. Christian bring in his first witness,

24   and we can bring the jury in.

25        MR. WOLFE:  Judge, I just wanted to let you know

1   we're going to go in the same order today if that suits

2   you.

3            THE COURT:  Good.

4            MR. WOLFE:  Same order.  It would be Mr.

5   Jarrard, Mr. Fox and then Wolfe.

6    (JURORS ENTER COURTROOM)

7            THE COURT:  Okay.  Good morning, ladies and

8   gentlemen.  As I told you yesterday, I am going to begin

9   each morning by asking you this question:  Did anybody

10  have any difficulty with regard to the instructions that I

11  gave you yesterday about not allowing yourself to be

12  exposed to any information about the case?

13           Very good.  A bit of news.  You may have noticed

14  that there's only -- that there's one fewer of you today.

15  Ms. Floyd's daughter had a baby this morning.  That

16  obviously takes priority.  So we've excused Ms. Floyd so

17  that she can be with her daughter.  Apparently she was the

18  only one who was able to assist her with this.

19           All right.  The government's first witness is on

20  the stand.  Ms. Boyd, you may proceed.

21           COURTROOM DEPUTY:  Do you solemnly swear the

22  testimony you are about to give in the case shall be the

23  truth, the whole truth and nothing but the truth, so help

24  you God?

25           THE WITNESS:  I do.

1      COURTROOM CLERK:  Will you please state and
2  spell your name for the record.
3      THE WITNESS:  Yes, ma'am.  My name is Linda,
4  L-I-N-D-A (spelling), Hamsley H-A-M-S-L-E-Y (spelling).
5                LINDA HAMSLEY
6   Witness, having first been duly sworn, testified on
7                DIRECT EXAMINATION
8   BY MS. BOYD:
9  Q.    Good morning, Ms. Hamsley.
10  A.    Good morning.
11  Q.    Where do you work?
12  A.    I currently work at Southwest Georgia Primary Care
13  in Ellaville, Georgia.
14  Q.    What do you do there?
15  A.    I'm a family nurse practitioner, and I provide
16  primary care services for families, similar to a general
17  practitioner.
18  Q.    Did you work for the Flint River Hospital in
19  December, 2010?
20  A.    Yes.
21  Q.    What was your title then?
22  A.    Family nurse practitioner.  At the time I was
23  emergency room, emergency care provider.
24  Q.    Did you treat an inmate named Terrance Dean on
25  December 16th, 2010?

1    A.    Yes.

2    Q.    I want to ask you more about your treatment of Mr.

3    Dean, but first I'd like to ask you a few questions about

4    your experience.

5    A.    Yes, ma'am.

6    Q.    How long have you been a nurse practitioner?

7    A.    Eight years.

8    Q.    Prior to becoming a nurse practitioner, what type of

9    work did you do?

10   A.    I've been a registered nurse a total of 21 years, as

11   I'm still a registered nurse.  For the last eight years

12   I've been a nurse and nurse practitioner.

13   Q.    What training did you receive in order to be a nurse

14   practitioner?

15   A.    I received an Associate's degree in nursing and then

16   a Bachelor's degree and later went on to receive a

17   Master's degree in nursing.  And then took state boards

18   and became certified by the American Association of Nurse

19   Practitioners and another accrediting organization.

20   Q.    What were your duties in December 2010 as a nurse

21   practitioner at Flint River Hospital?

22   A.    I provided emergency -- primary emergency care

23   services similar to what a physician provides under the

24   supervision of a physician.

25   Q.    I want to turn your attention now to a patient named

1    Terrance Dean.  You said earlier that you treated him on

2    December 16th, 2010?

3    A.    Yes.

4    Q.    How did you come to treat Terrance Dean on

5    December 16th, 2010?

6    A.    He was brought to Flint River emergency room on that

7    day, and I was the provider on duty.

8    Q.    How had Mr. Dean been brought to you at Flint River

9    that day?  Do you know how he arrived?

10   A.    By ambulance, emergency medical services.

11   Q.    Where had Mr. Dean been brought from?

12   A.    Macon State Prison.

13   Q.    When Mr. Dean arrived in the emergency room was he

14   able to tell you what happened to him?

15   A.    No, ma'am.

16   Q.    When he arrived in the emergency room was he able to

17   walk or support himself on his own?

18   A.    No.

19   Q.    Based on your observations of Mr. Dean, what kind of

20   injury did he have?

21   A.    The most obvious injury was a head injury and with

22   his behavior it seemed to confirm that.

23   Q.    What visible injuries did Mr. Dean have that

24   indicated to you that he had a head injury?

25   A.    He had a large -- about fist size, my fist, about,

1   you know, a small female fist-sized hematoma on his

2   forehead, on his head.  That was the most obvious injury.

3   **Q.**   Could you please tell the jury what a hematoma is?

4   **A.**   Yes, ma'am.  It is a large bruise.

5   **Q.**   What other symptoms did Mr. Dean show that were

6   consistent with a head injury?

7   **A.**   He was not responsive in the way that you think of a

8   person speaking and answering questions appropriately.  He

9   had unequal pupils.  One pupil was larger than the other.

10  The other was, what we call, fixed and dilated which means

11  it was just -- it was just blown, big and didn't respond

12  to the light, and the other had a sluggish reaction.  He

13  was not able to answer questions.  He exhibited posturing

14  and when posturing -- if I might kind of show, it's where

15  the arms begin to -- at times he would flail his arms and

16  at other times his arms would posture inwards, and that is

17  a sign that the brain has been injured.

18  **Q.**   Now, I'm just going to describe now for the court

19  reporter what you just did with your arms.  So you drew

20  your arms in towards each other?

21  **A.**   Yes, ma'am.

22  **Q.**   And raised your shoulders?

23  **A.**   Right, yes, ma'am.

24  **Q.**   And is that how you saw Mr. Dean that day?

25  **A.**   At times, yes, ma'am.

1  Q.    What information did you have regarding how Mr. Dean
2  was injured when you treated him?
3  A.    That he was -- he was assaulted with an unknown
4  object was what we were told.
5  Q.    Based on what you saw that day, how would you
6  describe the seriousness or severity of the head injury
7  that Mr. Dean had?
8  A.    Because of the posturing -- usually with posturing,
9  and we also have a scale that's called the Glasgow Coma
10 Score, and what the maximum score you can have -- for
11 example, most people in this room would have a score of
12 15, and his score was a 5.  If the score is below 7 or 8
13 you become concerned about respiratory and cardiac arrest.
14 So his was 5, and that was very serious I would say.
15 Q.    What did you do to test or determine what Mr. Dean's
16 Glasgow Coma Score was?
17 A.    The Glasgow Coma Score gives a score from, I think
18 it's 1 to 5 on certain -- on three different areas of
19 neurological or brain function, and it tests -- the person
20 doing the exam tests eye response; they test verbal
21 response, like speaking, and they also look for motor
22 response.
23 Q.    Can you tell the jury what Mr. Dean's eye response
24 was that day?
25 A.    He -- as I mentioned his pupils were unequal.  One

1    was blown, the other was sluggish response to light.  When

2    the light shines in the pupil the pupils adjust according

3    -- if you walk in the sun, you know, your pupils get

4    smaller, but his were inconsistent with each other.

5    Q.    What about Mr. Dean's verbal response?

6    A.    There was no verbal response at all.  He was not

7    speaking or answering questions.

8    Q.    What about Mr. Dean's motor response?

9    A.    He was not able to cooperate.  He was not able to

10   follow commands or instructions at all.

11   Q.    Was the staff at Flint River Hospital able to fully

12   address Mr. Dean's injuries that day?

13   A.    No, ma'am.

14   Q.    What did you do in light of the severity of his

15   injuries?

16   A.    We stabilized the patient and -- well actually we do

17   our best to stabilize the patients for transport.  There

18   are times when you are not able to stabilize a patient,

19   but you have to get them out of -- it's a small rural

20   community hospital.  We don't have neurological services

21   there.  So we do our best to get them safe, when I say

22   stabilize, get them as safe as we can in order to transfer

23   them to a larger facility.

24        Normally they're transferred to either Macon -- the

25   Trauma, Level One Trauma Center here in Macon or Atlanta

1    Medical Center.

2         So in order to stabilize the patient we had to

3    intubate him.  As I said, with a Glasgow Coma Score below

4    eight and the posturing you become concerned about

5    respiratory arrest.  So he had to be intubated, which

6    means that a tube is inserted in his airway, and he's

7    placed on a ventilator to breathe for him.  Now, he was

8    breathing on his own, but as I mentioned with a coma score

9    that low you anticipate that the patient may stop

10   breathing, so you have to just -- that's one way to

11   stabilize them.  But we just have to get him ready to go

12   to a larger facility where they had neurotrauma services.

13   Q.    Did you record your observations of Mr. Dean and his

14   condition during the course of your treatment on December

15   16th, 2010?

16   A.    Yes, ma'am.

17   Q.    Do you regularly record your observations of

18   patients during treatment?

19   A.    Yes, ma'am.

20   Q.    Where do you normally record your patient

21   observations?

22   A.    We call it a T-sheet.  It's just an assessment form.

23   Q.    Do the notes that you take and the observations that

24   you record and your medical forms accurately reflect the

25   patient's condition?

1    A.    Yes, ma'am, as best as we can.

2    Q.    Are the medical records that you complete stored by

3    the hospital?

4    A.    Yes, ma'am.

5    Q.    And are those medical records kept in the ordinary

6    course of hospital business?

7    A.    Yes.

8          MS. BOYD:   Your Honor, may I approach the

9    witness?

10          THE COURT:   You may.

11   BY MS. BOYD:

12   Q.    Ms. Hamsley, I just handed you what had been marked

13   for identification as Government's Exhibit 1 and

14   Government's Exhibit 2.  First, I want to ask you some

15   questions about Government's Exhibit 1.  Do you know what

16   Government's Exhibit 1 is, Ms. Hamsley?

17   A.    Yes.

18   Q.    What is it?

19   A.    This is the assessment form for Terrance Dean that

20   was filled out on December 16th, 2010.

21   Q.    Who completed the form?

22   A.    I did.

23   Q.    How do you know that you completed that form?

24   A.    I recognize my handwriting, and I recognize the

25   information on the form.

1          MS. BOYD:  Your Honor, the government offers
2    Government's Exhibit 1 into evidence.
3          THE COURT:   Any objection?
4          MR. WOLFE:   No, sir.
5          THE COURT:   Hearing no objection from the
6    defense, it's admitted without objection.
7    BY MS. BOYD:
8    Q.    Okay.  I'm now going to point your attention, Ms.
9    Hamsley, to Government's Exhibit 2.  What is Government's
10   Exhibit 2?
11   A.    A physician's certification of medical necessity,
12   and this is for emergency or nonemergency transport.
13   Q.    Is that part of the medical record that you
14   completed for Mr. Terrance Dean?
15   A.    Yes.
16   Q.    Who filled that out?
17   A.    Esther Bailey, registered nurse.  Either the nurse
18   or the physician or the mid-level provider can fill this
19   out.
20   Q.    Okay.  Now, I ask you to turn to page two of
21   Government's Exhibit 2.  Who completed that portion?
22   A.    I did.  Yes, I see that.
23          MS. BOYD:  Your Honor, the Government offers
24   Government's Exhibit 2 into evidence.
25          THE COURT:   Any objection?  Hearing none it is

1  admitted without objection.

2          MS. BOYD:  Your Honor, may I publish

3  Government's Exhibit 1 to the jury?

4          THE COURT:   Yes.

5          MR. WOLFE:   Excuse me, Judge, if I may?

6          THE COURT:   Yes.

7          MR. WOLFE:   Before it's published, I have no

8  objection to it being admitted into evidence.  I don't

9  know if there is any HIPAA release information from Mr.

10 Dean authorizing it to be shared with the public.  She's

11 talked about what she did.  I just object in that regard.

12         THE COURT:   Well, it's been admitted without

13 objection, so it can be published to the jury.

14 BY MS. BOYD:

15 Q.   Okay, Ms. Hamsley, can you see the form on the

16 screen in front of you, and do you have it in front of you

17 as well there?

18 A.   Yes.

19 Q.   I want to draw your attention to some of the

20 handwritten notes that you made on the T sheet for Mr.

21 Dean.  You indicate that he had decorticate posturing?

22 A.   Yes.

23 Q.   Can you explain to the jury what decorticate

24 posturing is?

25 A.   As I mentioned before and showed -- decorticate

1    posturing is where the arms twist inward in a manner like

2    this.  There's decerebrate posturing and then decorticate

3    posturing, and it's a sign of a severe neurological

4    injury, or a brain injury.

5    Q.    Okay.  You also list on the form in your handwritten

6    notes that Mr. Dean was combative.  Can you explain that

7    to the jury?

8    A.    Yes.  At times, he was not purposely trying to

9    injure anyone.  None of his actions seemed purposeful but

10   he was flailing arms and kind of swatting in response to

11   pain.  At times he would, you know, just kind of push you

12   away or swat, and that was the initial assessment.   And

13   then we later, you know, just a few minutes later noticed

14   the posturing.

15            MS. BOYD:  Your Honor, the Government asks for

16   permission to publish Government's Exhibit 2 to the jury?

17            THE COURT:  You may.

18   BY MS. BOYD:

19   Q.    Okay, Ms. Hamsley, I'm going to ask you a question

20   about page two of Government's Exhibit 2.  What did you

21   note was Mr. Dean's diagnosis at the time of transfer?

22   A.    Closed head trauma with significant neuro deficit.

23   Q.    Can you explain to the jury what closed head trauma

24   is?

25   A.    Yes, ma'am.  Closed head trauma is where the head is

1    not cut open.  There's no laceration or cut or -- there

2    are no brains that are showing or nothing is coming out,

3    but it's where the skin is intact and the head is closed,

4    but there's an injury because of the swelling.  He had a

5    large area of swelling.  And with significant neuro

6    deficit, that means that his brain response, his ability

7    to talk and respond and -- we look at cranial nerves, you

8    know, where we would check the pupils and the patient's

9    ability to follow commands, and those were -- there was a

10   deficit there.  He was -- it was not functioning as it

11   should have.

12   Q.    Ms. Hamsley, have you treated other inmate patients

13   from Macon State Prison before?

14   A.    Yes.

15   Q.    Can you estimate about how many patients you would

16   say you have treated from Macon State Prison that are

17   inmates?

18   A.    I'm not certain, but I would say between, in

19   two-and-a-half years, between 30 to 50.

20   Q.    How would you compare those patients to Mr. Dean in

21   terms of the severity of injuries that you saw?

22   A.    Mr. Dean was the most severe that I had seen.

23          MS. BOYD:   Thank you, Your Honor.  No further

24   questions.

25          THE COURT:   Mr. Jarrard?

1          MR. JARRARD:  Your Honor, I don't have any

2     questions for Ms. Hamsley.

3          THE COURT:   Mr. Fox has none.  Mr. Wolfe?

4          MR. WOLFE:   Thank you.

5                    CROSS EXAMINATION

6     BY MR. WOLFE:

7     Q.    Good morning.  How are you, Ms. Hamsley?

8     A.    Fine, how are you?  Thank you.

9     Q.    I'm well, thank you.  My name is David Wolfe and I

10    represent Mr. Hinton over here.  I'm going to ask you a

11    few questions, okay?

12    A.    Sure.

13    Q.    My understanding is that you were working at the

14    hospital in your normal capacity on December 16th of 2010,

15    correct?

16    A.    Yes, sir.

17    Q.    And would it be fair for me to understand that you

18    were in the emergency part of the hospital?

19    A.    Yes, sir.

20    Q.    All right.  And that is part of what you're trained

21    to do, deal with things that come in, right?

22    A.    Right.

23    Q.    Now, when Mr. Dean was brought to the hospital, did

24    you get an alert from the ambulance or from anybody from

25    the prison or anything like that indicating to you what to

1    expect when Mr. Dean got there?

2    A.    I don't remember.

3    Q.    Okay.

4    A.    I know the -- typically -- I don't remember that day

5    if we had -- typically the EMS would call on the radio and

6    let us know what was coming.  Most of the time the nurse

7    answers the call on the radio, and then they call me on

8    the phone in my room.

9    Q.    That's fine.  But you don't have anything written in

10   the notes that you just alluded to which were included in

11   the State's Exhibits Numbers 1 and 2 which reflect that

12   you had prior specific information as to what you were in

13   store for?

14   A.    Right.

15   Q.    All right.  And when an inmate, or any person for

16   that matter, comes to the emergency room, I guess the

17   first thing that needs to be done is an assessment of what

18   you observe injury wise, correct?

19   A.    Yes, sir.

20   Q.    All right.  And the way I understand your testimony

21   this morning, when you observed Mr. Dean -- let me finish

22   the question -- there were no significant injuries except

23   for the woman's fist-sized hematoma on the right side of

24   his head, correct?

25   A.    Correct.

1  Q.    Now, my understanding from reading all the records

2  that what was on the side of his head was called a scalp

3  hematoma; is that correct?

4  A.    I think -- I don't know.  I don't have that, you

5  know -- that sounds right.

6  Q.    That's what it is though, correct?

7  A.    Yes, sir.

8  Q.    All right.  And my understanding is that with regard

9  to the scalp area, if in fact there were a laceration, it

10  bleeds quite profusely because there are many -- there are

11  more blood vessels there than in other aspects of the

12  body, correct?

13  A.    Yes, sir.

14  Q.    And the way I understand the scalp hematoma in this

15  instance was that there was a severe bruising to the right

16  side of his head, correct?

17  A.    Right.

18  Q.    And as a result, many blood vessels in the right

19  side of his head were burst and damaged and destroyed in

20  many respects?

21  A.    Correct, I'd say.

22  Q.    And when the blood starts to flow from those bursted

23  blood vessels it will start to pool, and it creates a lump

24  or a bump on the scalp, correct?

25  A.    Right, yes, sir.

1    Q.    And the body, the way I understand it, correct me if

2    I'm wrong, sends fluid to the area in order to try to

3    compress the blood vessels to stop the bleeding, right?

4    A.    Yes, sir, right, the acute inflammatory process.

5    Yes, sir.

6    Q.    Okay.  Cool.  And so as a result of the burst blood

7    vessels you have the hematoma which was most obvious to

8    you, right?

9    A.    Yes, sir.

10   Q.    Okay.  And the way I understand your testimony then,

11   after that, you started to do the other assessments that

12   come along with -- is it called a Glasgow Score?

13   A.    Yes, sir.

14   Q.    And -- I always get confused between subjective and

15   objective -- but is the Glasgow Score something you

16   calculate?

17   A.    It is, yes, sir.

18   Q.    Okay.  And while I'm not minimizing your expertise

19   and skills when it comes to three areas, the eyes, the

20   verbal, and the motor, you give an assessment of a 1 to 5

21   for each?

22   A.    Correct.

23   Q.    And then it's --

24   A.    And the nurse does too.  We --

25   Q.    I'm sorry.

1    A.    The nurse does as well.

2    Q.    Sure.  And then there's a calculation done and out

3    of 15 y'all's subjective calculation was that he was about

4    a 5 out of 15 which has him in the lower group?

5    A.    Yes, sir.

6    Q.    And -- now, I think you also said that in observing

7    the injury that it was consistent with being struck in the

8    head with an object, correct, or is that your testimony?

9    Was that your belief?

10   A.    It was consistent with a blow to the head or being

11   struck with an object, but we were also given -- and I

12   don't have who -- who said this, but the chief complaint

13   was hit on the head, unknown object.

14   Q.    Okay.  And you believed that the injury that you

15   observed and his manifestations were consistent with that,

16   correct?

17   A.    Correct, yes, sir.

18   Q.    And so would it be fair for me to assume that if it

19   was consistent with that, it would also be consistent with

20   somebody being, for example, lifted up and dropped on his

21   head, if his head struck a concrete floor?

22   A.    That's possible, yes, sir.

23   Q.    Or, even better, if somebody was thrown to the floor

24   with their hands behind their back and their head hit

25   first, it would be consistent with that also?

1    A.    Yes, sir.

2         MR. WOLFE:   Thanks for coming in today.

3         THE COURT:   Ms. Gomez?

4                    CROSS EXAMINATION

5    BY MS. GOMEZ:

6    Q.    Good morning, Nurse Hamsley.  My name is Debra Gomez

7    and I represent Mr. Lach, the gentlemen on the far right.

8    I have a few specific questions for you.  And you also

9    said that you conducted a physical assessment of Mr. Dean

10   from head to toe?

11   A.    Yes, ma'am.

12   Q.    Okay.  Would you please tell the members of the jury

13   what exactly that consists of, the assessment from head to

14   toe?

15   A.    Okay.  The very first things that we look at are

16   airway breathing circulation.  Those -- when we have an

17   emergent situation, just immediate -- immediately those

18   were intact.  The airway breathing circulation, those were

19   fine.  The next thing, when you have a suspicion of a head

20   injury which was pretty obvious with the hematoma to the

21   head, what you do is conduct a cranial nerve assessment.

22   And with the cranial -- cranial nerves are the

23   manifestation of how well the brain is working.  That

24   includes, as I mentioned before, pupil -- pupillary

25   reaction and the ocular movements.  We ask, you know, in a

1    normal cranial nerve exam you would say follow my finger

2    with your eyes and would have the patient puff their

3    cheeks and, you know, squeeze your hands to make sure that

4    everything is equal.  That is part of the cranial nerve

5    assessment.

6          And then, listen to, of course first -- next we

7    would assess the -- for crepitus in the neck to make sure

8    there's not a neck injury.  Of course look at the head,

9    you know, to see if any other injuries are on the head.

10   Q.    Well, you've describe the head injury already --

11   A.    Right. Okay.

12   Q.    -- but there was no neck injury?

13   A.    Right, I didn't see a neck injury.

14   Q.    Okay.  Take us from the neck down.

15   A.    Okay.  And then listen to the lung sounds.  You want

16   me to tell you what I found?  I mean, well, I guess I can

17   just look at my page.

18   Q.    Well, basically what I'm asking you to do is just

19   tell us in general what a head to toe assessment is?

20   A.    Okay.  Listen to lung sounds, heart sounds, of

21   course with suspected trauma you want to palpate or feel

22   the chest to see -- what you are feeling for is a crepitus

23   which is a crunching sound, if there could be any injury

24   to the ribs, cracked ribs.

25   Q.    If you could stop right there.

1   A.    Okay.

2   Q.    Okay.  As specific to Mr. Dean, your records do not

3   indicate there being any cracked ribs or any blunt force

4   trauma to his ribs; is that correct?

5   A.    That's correct, yes.

6   Q.    Okay.  Go ahead.

7   A.    And then abdomen, you assess the abdomen, listen to

8   -- with a stethoscope listen for any bowel sounds or lack

9   of bowel sounds.  You want to -- when I say palpate, I

10  mean press the abdomen and with trauma you are assessing

11  for a board-like -- sometimes if there's abdominal trauma

12  you'll feel a board-like -- I didn't feel anything like.

13  His abdomen was normal.

14  Q.    So let me stop you so we make sure we make that

15  plain.  As specifically as to Mr. Dean there was no

16  indication of blunt force trauma according to your medical

17  records?

18  A.    To the abdomen.

19  Q.    To the abdomen.

20  A.    Right, none.

21  Q.    Thank you.  Go ahead.

22  A.    Okay.  And then the pelvis as well, you would do a

23  pelvic tilt or push, and we just try to elicit a pain

24  response there, but I didn't see any trauma to the pelvis.

25  Q.    So I'll stop you again.  Specific to Mr. Dean there

1  was absolutely no trauma that you saw to the pelvis area

2  either?

3  **A.**    Correct.  And then you look at the extremities, you

4  know, arms, which is their arms and legs, fingers and

5  toes, hands and feet.  And there was nothing obvious

6  there.

7  **Q.**    No blunt force trauma to the extremities, meaning,

8  as you said, his hands, his feet that you could see?

9  **A.**    Right, yes, ma'am.

10  **Q.**    All right.  Do you also specifically check the back

11  of the person?

12  **A.**    We do.

13  **Q.**    Okay.  And can you tell us what you found

14  specifically as to Mr. Dean, if anything?

15  **A.**    It was unremarkable, no abnormalities.

16  **Q.**    When you do the back area of Mr. Dean's body, would

17  that also include you doing the side of his body also,

18  both sides?

19  **A.**    Yes, ma'am.

20  **Q.**    Okay.  And as to Mr. Dean you noted no blunt post

21  trauma in your records either -- to either his left side

22  or his right side; is that correct?

23  **A.**    That's correct.

24          MS. GOMEZ:   All right.  Thank you.

25          THE COURT:   Mr. Hogue?

1          MR. HOGUE:   No questions.

2          THE COURT:   Mr. Pate?

3          MR. PATE:   No questions.

4          THE COURT:   Thank you.  Any redirect?

5          MS. BOYD:   Briefly, Your Honor.

6                    REDIRECT EXAMINATION

7    BY MS. BOYD:

8    Q.    Hi, Ms. Hamsley.  I just want to follow up and ask

9    you a couple of questions.

10   A.    Yes, ma'am.

11   Q.    Mr. Wolfe asked you whether or not Mr. Dean's

12   injuries were consistent with different types of trauma.

13   Do you know, sitting here today, what happened to Mr.

14   Dean, how he came to the hospital in that condition?

15   A.    All -- I mean, all I know is that he was hit on the

16   head with an unknown object.  That was the -- that's all I

17   can really say from my records, is that he was hit on the

18   head with an unknown object.  But I do not know -- and if

19   I might say -- when patients are assaulted, if they come

20   from the home environment, we do have to call the -- we

21   have to ask questions, you know, who did this, for our own

22   safety because we don't want them to march into the

23   emergency room and injure us, and also because we have to

24   report that legally.  But with the prison we did not ask a

25   lot of questions about who might of, or how that might

1    have happened because, for one, we were safe.  We knew

2    that we were guarded from whoever might have done an

3    injury, and then -- but it was not handle -- we didn't

4    have to handle it legally.

5    **Q.**    Okay.  So it's fair to say that you don't know

6    exactly how Mr. Dean --

7    **A.**    I don't know exactly --

8    **Q.**    --was injured?

9    **A.**    -- but I do -- all I can say is that I documented

10   that he was hit on head with unknown object.

11   **Q.**    Okay.  You were asked by Ms. Gomez about your

12   assessment of Mr. Dean from head to toe.  What would you

13   say was the focus of your treatment of Mr. Dean that day?

14   Which part of his body?

15   **A.**    His head, most definitely.

16         MS. BOYD:  Thank you.  No further questions,

17   Your Honor.

18         THE COURT:  Thank you, Ms. Hamsley.  Mr. Wolfe?

19         MR. WOLFE:  Just briefly, Judge.

20               RECROSS EXAMINATION

21   BY MR. WOLFE:

22   **Q.**    But you do do a total assessment because you don't

23   want to miss anything even though the most apparent injury

24   was the hematoma to the head?

25   **A.**    Correct.

1           MR. WOLFE:  Thank you.

2           THE COURT:  Thank you, Ms. Hamsley.  You may

3    step down.  May this witness be excused?

4           MS. BOYD:  Yes, Your Honor.

5           MR. JARRARD:  Yes, Your Honor.

6           THE COURT:  All right.  You are excused.  Thank

7    you.  Mr. Christian, you may call your next witness.

8           MR. CHRISTIAN:  The Government calls Emmett

9    McKenzie.

10          DEPUTY CLERK:  Do you solemnly swear that the

11   testimony you are about to give in this case shall be the

12   truth, the whole truth, and nothing but the truth, so help

13   you God?

14          THE WITNESS:  I do.

15          COURTROOM DEPUTY:  Will you please state your

16   name and spell your name for the record.

17          THE WITNESS:  Emmett McKenzie, E-M-M-E-T-T

18   (spelling),  M-C-K-E-N-Z-I-E (spelling).

19                     **EMMETT MCKENZIE**

20    Witness, having first been duly sworn, testified on

21                    DIRECT EXAMINATION

22    BY MR. CHRISTIAN:

23   Q.   Good morning, Mr. McKenzie.

24   A.   Good morning.

25   Q.   Where are you from?

1    A.    Montezuma, Georgia.

2    Q.    Where are you working right now?

3    A.    I work as a water and waste water operator for the

4    City of Montezuma and I work as a part time associate for

5    Dollar General, Incorporated out of Oglethorpe.

6    Q.    Have you served as a correctional officer before?

7    A.    Yes, sir.

8    Q.    How long did you serve in corrections?

9    A.    Roughly about ten years.

10   Q.    What's the highest rank you reached in corrections?

11   A.    Lieutenant.

12   Q.    Did you serve at Macon State Prison?

13   A.    Yes, sir.

14   Q.    What was your highest rank at Macon State?

15   A.    Sergeant.

16   Q.    At Macon State did you ever serve on the

17   Correctional Emergency Response Team?

18   A.    Yes, sir.

19   Q.    Is that also called CERT?

20   A.    Yes, sir.

21   Q.    When did you serve on the CERT team?

22   A.    From 2007 to 2009.

23   Q.    What are some of CERT's duties generally?

24   A.    Investigations, search of contraband from inmates as

25   well as staff, weapons and just assisting with the daily

1    operations of the institution, filling in voids wherever

2    needed.

3    Q.    What type of uniform did CERT wear?

4    A.    Gray BTUs, black boots, black T-shirt, and a black

5    hat with the emblems of CERT on it.

6    Q.    Did anybody else at Macon State Prison, any other

7    officer, wear that kind of uniform?

8    A.    No, sir.

9    Q.    Who supervised CERT?

10   A.    CERT sergeant.

11   Q.    Who supervised the CERT sergeant?

12   A.    The deputy warden.

13   Q.    When did you serve at Macon State Prison?  What

14   years?

15   A.    From November 2002 to August 2012.

16   Q.    So you were working at Macon State Prison then on

17   December 16th, 2010?

18   A.    Yes, sir.

19   Q.    Were you on CERT at the time?

20   A.    No, sir.

21   Q.    What was your duty or your assignment on

22   December 16th, 2010?

23   A.    I was a shift supervisor.

24   Q.    Did you see an inmate named Terrance Dean on

25   December 16th, 2010?

1    A.    Yes, sir.

2    Q.    Where's the last place in Macon State Prison you saw

3    inmate Terrance Dean on December 16th, 2010?

4    A.    In the gym.

5    Q.    Who was Dean with when you saw him in the gym?

6    A.    The CERT team.

7    Q.    Did you see Terrance Dean again on December 16th,

8    2010?

9    A.    Yes, sir.

10   Q.    When did you see him next, where was he?

11   A.    At Flint River Community Hospital.

12   Q.    Was Dean injured when you saw him in the gym with

13   the CERT officers?

14   A.    No, sir.

15   Q.    Was Dean injured when you saw him at the hospital?

16   A.    Yes, sir.

17   Q.    Let's go back then to the start of your shift on

18   December 16th, 2010, and work up to you seeing Dean in the

19   hospital.  What was your rank on December 16, 2010?

20   A.    Sergeant.

21   Q.    Does that mean you're a supervisor?

22   A.    Yes, sir.

23   Q.    Who were you supervising?

24   A.    First shift, the first shift officers.

25   Q.    Did you respond to a code three on December 16th,

1    2010?

2    A.    Yes, sir.

3    Q.    What is a code three?

4    A.    That's when an inmate is assaulting an officer.

5    Q.    Where generally was the code three?

6    A.    In unit E-2.

7    Q.    What kind of unit is E-2?

8    A.    It's --

9    Q.    Is it a housing unit?

10   A.    Yes.  Yes, sir.

11   Q.    What did you find generally when you reached the

12   scene of the code three?

13   A.    Officers responded down there to the scene, a bunch

14   of inmates all over the building, staff members trying to

15   get the building locked down and trying to locate the

16   inmate that was -- had did the assault.

17   Q.    Did you see the officer who was involved in the code

18   three?

19   A.    Yes, sir.

20   Q.    What was the officer's name?

21   A.    Officer Walden.

22   Q.    What was your understanding of who had -- who had

23   been assaulted?

24   A.    It was my understanding that Officer Walden had been

25   assaulted.

1    Q.    And who was your understanding as to the person who

2    had assaulted Officer Walden?

3    A.    Inmate Dean.

4    Q.    When you -- did you see Terrance Dean in the dorm,

5    in the housing unit?

6    A.    Yes, sir.

7    Q.    Who was he with when you saw him?

8    A.    The CERT team, getting ready to leave out.

9    Q.    What was Inmate Dean doing when he was with the CERT

10    team?

11    A.    He was walking out.  He was basically talking.  He

12    was like, hmm, y'all ain't fixing to handcuff me in the

13    building or whatever.

14    Q.    Was he handcuffed when you saw him in the dorm?

15    A.    No, sir.

16    Q.    Was he standing?

17    A.    Yes, sir.

18    Q.    Was he standing on his own power?

19    A.    Yes, sir.

20    Q.    Did he appear to have any injuries, visible injuries

21    when you saw Terrance Dean in the housing unit?

22    A.    Not that I could tell.

23    Q.    Any apparent injuries to his head or face that you

24    saw?

25    A.    Not that I could see.

1   **Q.**   Did you see Officer Walden that morning, or that

2   day?

3   **A.**   Yes.

4   **Q.**   Did he appear to have any visible injuries when you

5   saw him?

6   **A.**   He was flustered in the face or what -- I guess from

7   the altercation but nothing other than that.

8   **Q.**   Did you ask him if he was okay?

9   **A.**   Yes.

10  **Q.**   How did he respond?

11  **A.**   He said he was all right.

12  **Q.**   What did you do from there, from the housing unit?

13  **A.**   Walked outside -- well, the instruction was given to

14  go get the pepper ball gun.  So at that time when we got

15  ready to walk outside we were all in the sally port and

16  the sally port door leading to the control room got

17  popped, I guess, by mistake or whatnot so I stepped in and

18  that's when I asked -- I closed the door, the CERT team

19  left out with the inmate and that's when I asked Officer

20  Walden was he okay or whatnot, and he said yes.  I told

21  them to escort him up to medical as soon as they get the

22  inmate across the yard.  At that --

23  **Q.**   Based -- let me stop you for a second.  Based on

24  your knowledge of Macon State policies and your

25  understanding from working at Macon State what was your

1    understanding of where CERT was going to take Inmate Dean?

2    A.    Across the yard, through the gym, into medical, and

3    then down to the lockdown unit.

4    Q.    As a former CERT member yourself, why was CERT

5    taking Inmate Dean to the hospital -- I mean to the

6    medical unit?

7    A.    You take him to the medical unit that way -- if for

8    instance an inmate gets down in the lockdown unit and says

9    something is wrong with them, we can already have verified

10   that we had him checked by medical to say that they were,

11   you know, okay, or in good physical condition when they

12   went down there or whatnot.

13   Q.    So the inmate has got to be checked by the medical

14   unit before he goes to the lockdown unit?

15   A.    Yes.

16   Q.    And that's to make sure that he doesn't have any

17   injury when he goes to the lockdown unit?

18   A.    Yes.

19   Q.    What is the lockdown unit?  Is that like solitary

20   confinement, segregated housing?

21   A.    Yes.

22   Q.    You said you saw Dean being escorted by CERT?

23   A.    Yes.

24   Q.    Where did you see Dean being escorted?  Where is the

25   first place you saw Dean being escorted by CERT outside

1  the dorm?

2  A.    Across the yard.

3  Q.    Now where do they go from -- where did CERT and Dean

4  go from the yard?

5  A.    To the gym.

6  Q.    As they approached the gym did you see anybody from

7  CERT with a handheld video camera recording the escort?

8  A.    They had them but the way they were holding them

9  kind of like iffy about the recording or what not.

10 Q.    I'm sorry, what's the last thing you said?

11 A.    I said the way they were holding them was kind of

12 iffy about whether they were recording it or not.

13 Q.    So you couldn't -- it didn't look to you like they

14 were recording it?

15 A.    No, not to me.

16 Q.    Now what's your understanding as a former CERT

17 officer yourself about what the CERT team was supposed to

18 do with those handheld video cameras as they were

19 escorting the inmate from the dorm to medical?

20 A.    Hmm, you were supposed to, hmm, video record

21 everything from -- from the point of the incident all the

22 way down to lockdown unit with the exception of when you

23 get to medical, if the inmate is being compliant you can

24 turn the cameras off, but if not, you're supposed to just

25 point them up to the sky because you're not suppose to

1    video tape the medical assistant or whatnot.

2    Q.    So your understanding as a former CERT officer is

3    that CERT was supposed to record the inmate all the way

4    from the dorm to medical, correct?

5    A.    (Nodding head).

6    Q.    And then record the inmate from medical to lockdown?

7    A.    Right.

8    Q.    But they weren't supposed to record the treatment

9    that he's receiving while he's in medical?

10   A.    No, that's some kind of confidentiality thing with

11   medical.

12   Q.    But you understand otherwise was that CERT was

13   supposed to use those handheld cameras to record

14   everything?

15   A.    Correct.

16   Q.    And it looked to you like that probably wasn't

17   happening?

18   A.    Right.

19   Q.    What did you do when you saw CERT go to the gym

20   door?

21   A.    At that time I was walking out of the E building.

22   Some inmates was on the sidewalk and I gave them some

23   instruction to go ahead and go back to their building or

24   whatnot, we had a situation going on.  And once they

25   started going back I went across the yard and as I was

1    going across the yard, Thomas ran past me to go toward

2    main control.  So that's when I saw some inmates over by

3    the kitchen and I went up there as well and gave them

4    instructions to come back down and that's when I went up

5    to the gym.

6    **Q.**    Did you go into the gym?

7    **A.**    Yes, sir.

8    **Q.**    Who was in the gym when you went into the gym?

9    **A.**    The CERT team.

10   **Q.**    What about Inmate Dean?

11   **A.**    Yes, sir.

12   **Q.**    Did you hear anyone from CERT say anything as you

13   walked into the gym?

14   **A.**    As I walked in -- got ready to walk into the gym I

15   heard somebody say, "We're about to handle this now."

16   **Q.**    Do you remember which CERT officer said, "We're able

17   to handle this now?"

18   **A.**    No, sir.

19   **Q.**    Let's talk then about what you saw of the CERT team

20   and Dean when you went into the gym.  Who specifically do

21   you remember seeing in the gym, which officers?

22   **A.**    Officer Douglass, Officer Bolden, Officer Redden,

23   Officer Lach, Officer Wimbush, and Officer Rushin.

24   **Q.**    Do you know those officers?

25   **A.**    Yes, sir.

1    Q.    Do you see any of those men here today?

2    A.    Yes, sir.

3    Q.    Can you identify the officers that you saw in the

4    gym and that you see here today?

5    A.    Yes, sir.

6    Q.    Can you point them out by where they're seated in

7    the courtroom and what they're wearing?

8    A.    Officer Rushin, a green shirt, plaid tie; Officer

9    Wimbush, white shirt; Officer Lach, beige shirt, on the

10   far end, right there.

11         MR. CHRISTIAN:  Your Honor, may the record

12   reflect that Mr. McKenzie has identified Defendants Lach,

13   Rushin, and Wimbush.

14         THE COURT:  It will reflect that.

15   BY MR. CHRISTIAN:

16   Q.    You mentioned there were other CERT officers in the

17   gym as well.  You said Douglass-Griffin?

18   A.    Yes.

19   Q.    And Willie Redden?

20   A.    Yes.

21   Q.    And who else?

22   A.    Officer Bolden.

23   Q.    Who was the supervisor for CERT at that time?

24   A.    Sergeant Hall.

25   Q.    Did you see Sergeant Hall in the gym at that moment?

1    **A.**    I don't remember seeing him.

2    **Q.**    Where were these officers, the CERT officers

3    relative to Dean when you saw them in the gym?

4    **A.**    Hmm, Douglass and Redden had Inmate Dean in the

5    inter -- not interview, but escort position, basically

6    with him standing with his hands behind his back

7    handcuffed and they had his -- their hands on his forearm

8    and the rest of the guys were standing off to the

9    right-hand side.

10   **Q.**    Was Dean handcuffed at the time?

11   **A.**    Yes.

12   **Q.**    Where were the cuffs, in the front or the back?

13   **A.**    In the rear.

14   **Q.**    What did you do at that point?

15   **A.**    At that point I walked up to Inmate Dean, got my

16   finger, put it in his face and told him don't you be

17   putting your hands on my staff -- across his face.

18   **Q.**    So you actually made contact with Dean's face?

19   **A.**    Yes, sir.

20   **Q.**    And you said you swiped it across his face?

21   **A.**    Yes, sir.

22   **Q.**    What did his head do when you swiped it across his

23   face?

24   **A.**    It turned a little bit like this.

25   **Q.**    Again, what did you say to him?

1    A.    Don't you be putting your hands on my staff.

2    Q.    What happened after that?

3    A.    After that Officer Redden threw Inmate Dean down and

4    punched him across the face.

5    Q.    What did you do after you saw a CERT officer punch

6    Dean?

7    A.    At that point I left.

8    Q.    Why did you leave?

9    A.    I didn't want any part of that.

10    Q.    You say part of that, what did you think was going

11    to happen to Inmate Dean at that point?

12    A.    More than likely be assaulted.

13    Q.    As a sergeant at Macon State Prison what were your

14    duties at that point?

15    A.    My duties were to stop that -- stop it.

16    Q.    Stop who?

17    A.    Stop Officer Redden.

18    Q.    Why didn't you stop what was going to happen?

19    A.    I just -- I guess I didn't want any part of it and

20    just wanted to get out of the area.

21    Q.    Based on your training as a correctional officer did

22    you think that officers were allowed to beat an inmate to

23    punish him?

24    A.    No.

25    Q.    What kind of punishment could an inmate receive for

1    hitting an officer at Macon State?

2    A.    Excuse me?

3    Q.    What kind of punishment could an inmate receive for

4    hitting an officer?  Could he be disciplined, the inmate?

5    A.    Uh -- I'm not understanding like the -- to my --

6    Q.    If an inmate hit an officer --

7    A.    Right.

8    Q.    -- what kind of punishment generally could the

9    inmate get?  You said officers weren't allowed to beat

10   him.  What kind of punishment could an inmate get?

11   A.    Oh, okay.  He can get institutional charges as well

12   as state and local charges put on him.

13   Q.    State and local criminal charges?

14   A.    Right.

15   Q.    After you saw the CERT officer hit Dean and you

16   walked away where did you go?

17   A.    Back down to E building.  I walked out across the

18   yard and as I was going across the yard some inmates were

19   coming, I guess from the kitchen or whatever, because at

20   that point they started locking the whole institution

21   down.  So there were some inmates out there in front of E

22   building with a couple of officers that they were trying

23   the pat search before they put them in the building, so I

24   assisted with that or whatnot and then I went back in E-2.

25   Q.    You mentioned a pepper ball gun earlier?

1    A.    Yes.

2    Q.    What is a pepper ball gun?

3    A.    It's like a -- it's a high -- it's like a paint ball

4    that shoots pepper powder in the ball form.

5    Q.    And you said you were looking for the pepper ball

6    gun?

7    A.    Sir?

8    Q.    You said you were looking for the pepper ball gun?

9    A.    I was initially going to get it but Thomas ran up

10   and got it.

11   Q.    Did you ultimately get the pepper ball gun yourself?

12   A.    Yes, sir.

13   Q.    Where did you get it?

14   A.    When I returned back to E-2.

15   Q.    And E-2 is the housing unit, right?

16   A.    Yes, sir.

17   Q.    That was the scene of the initial incident, right?

18   A.    Yes, sir.

19   Q.    When you returned to E-2 did you talk to anybody in

20   that dorm?

21   A.    It was a conversation with uh, myself, Mr. Blakley,

22   Mr. Bobbitt and Sergeant Hall.

23   Q.    Who is Sergeant Hall?

24   A.    He's the CERT sergeant.

25   Q.    Did you know Sergeant Hall?

1    A.    Yes.

2    Q.    And you said you had a conversation with him?

3    A.    Yes.

4    Q.    What was your conversation with Sergeant Hall, Don

5    Blakely and Mr. Bobbitt?

6    A.    Basically they were out there beating his butt, they

7    were out there whipping -- they were out there whipping

8    Inmate Dean's butt.

9    Q.    I'm sorry?

10   A.    They were out there whipping Inmate Dean's butt.

11   Q.    What was the response when you said to these

12   officers, including Sergeant Hall, they're out there

13   whipping Dean's butt?

14   A.    "Really.  You think."

15   Q.    Did anybody express any concern?

16   A.    No, sir.

17   Q.    Anybody do anything to try to stop it at that point?

18   A.    No, sir.

19   Q.    You mentioned Sergeant Hall being in that

20   conversation.  Do you see Sergeant Hall in the courtroom

21   today?

22   A.    Yes, sir.

23   Q.    Can you point him out by his location and/or his

24   apparel?

25   A.    Right there, gray shirt, no tie, eye glasses.

1          MR. CHRISTIAN:  Your Honor, may the record

2   reflect the Defendant -- the Defendant, Christopher Hall

3   has been identified by Mr. McKenzie.

4          THE COURT:  It will reflect that.

5   BY MR. CHRISTIAN:

6   Q.    Where did you go from the E-2 dorm, from this

7   conversation with Sergeant Hall?  Well, let me ask you

8   first before we leave that conversation.  What's Don

9   Blakely's position at Macon State, or what was it at that

10  time?

11  A.    Unit manager.

12  Q.    What's a unit manager?

13  A.    He basically oversees the housing units.

14  Q.    A supervisor?

15  A.    Yes, sir.

16  Q.    What about Mr. Bobbitt, what was his position or

17  what was his position at Macon State at the time?

18  A.    Unit manager.

19  Q.    And that's a supervisor again?

20  A.    Yes, sir.

21  Q.    So your conversation was with three supervisors at

22  Macon State when you told them they're whipping his butt?

23  A.    Correct.

24  Q.    Where did you go from the E-2 dorm?

25  A.    Hmm, up to main control.

1    Q.    Did you learn that an ambulance was on its way to

2    Macon State?

3    A.    Yes, sir.

4    Q.    Now you had said you saw Officer Walden after the

5    code three, right?

6    A.    Yes, sir.

7    Q.    And you said that Officer Walden looked flustered in

8    the face?

9    A.    Yes, sir.

10    Q.    Did he appear to need an ambulance when you saw him?

11    A.    No, sir.

12    Q.    Had you seen Terrance Dean when you left Dean in the

13    gym with the CERT officers?

14    A.    Yes, sir.

15    Q.    Did he appear to need an ambulance when you left him

16    with the CERT officers?

17    A.    Well, not at -- no, sir.

18    Q.    Did you go to the hospital that day, December 16th,

19    2010?

20    A.    Yes, sir.

21    Q.    Which hospital was it?

22    A.    Flint River Community Hospital.

23    Q.    Why did you go to the hospital?

24    A.    I had to go so that the CERT officers could be

25    relieved so they can come back and write their statements

1    about the incident.

2    **Q.**    So there were CERT officers at the hospital?

3    **A.**    Yes, sir.

4    **Q.**    And you were relieving them so they could come back

5    and write their statement?

6    **A.**    Yes.

7    **Q.**    What statement is that?

8    **A.**    I guess the statements about what they had done

9    during the incident or whatnot.

10   **Q.**    Which officers did you see at the hospital?

11   **A.**    It was Officer Douglass and Officer Bolden.

12   **Q.**    Did you talk to Officer Bolden at the hospital?

13   **A.**    Yes.

14   **Q.**    What did he say to you?

15   **A.**    I asked him was he all right -- was the inmate all

16   right, and he was like, yes, he's fine, he got what he

17   deserved.

18   **Q.**    What did you observe of Dean's condition at the

19   hospital when you saw him?

20   **A.**    Uh, he was just laying there, uh, unconscious with a

21   tube in his throat.

22   **Q.**    What was your reaction when you saw this change in

23   Dean's condition?

24   **A.**    My stomach dropped.

25   **Q.**    You said your stomach dropped?

1    A.    Yes.

2    Q.    Why did your stomach drop?

3    A.    That wasn't supposed to happen.

4          MR. WOLFE:  I'm sorry, I didn't hear it.

5          THE WITNESS:  That wasn't supposed to happen.

6    BY MR. CHRISTIAN:

7    Q.    Did you have any concerns for yourself at that

8    point?

9    A.    Yes.

10   Q.    What concerns did you have for yourself?

11   A.    Hmm, the overall fallout of everything, what might

12   possibly happen.

13   Q.    What do you mean by that?

14   A.    Uh, career wise, criminal wise, everything.

15   Q.    When you say career wise, what do you mean by career

16   wise for yourself?

17   A.    As far as me having to lose my job, something like

18   that.

19   Q.    What about criminal wise, you said?

20   A.    Yes.

21   Q.    What did you mean by that?

22   A.    Criminal wise, as far as this, period.  I mean,

23   court, the possibility of being locked up, everything.

24   Q.    So you thought you might end up here?

25   A.    Exactly.

1  Q.   When did you return next to Macon State?

2  A.   Uh, I returned back that night but that was just to

3  bring back my little stuff or whatever, and turn in the

4  weapons and van.

5  Q.   I'm going to show you -- if I may approach Your

6  Honor?

7          THE COURT:  You may.

8  BY MR. CHRISTIAN:

9  Q.   -- Government's Exhibit 4 and 4A.

10          MR. CHRISTIAN:   I'm showing to defense counsel.

11  (Pause).

12          THE COURT:  You can go ahead.

13  BY MR. CHRISTIAN:

14  Q.   Okay.  Mr. McKenzie, I'm showing you what has been

15  marked for identification as Government's Exhibits 4 and

16  4A.  Do you see those in front of you?

17  A.   Yes, sir.

18  Q.   What are Government's Exhibit 4 and 4A?

19  A.   They're my witness statements, the written and typed

20  copy.

21  Q.   How do you know that 4 and 4A are your witness

22  statements?

23  A.   Uh, these are the ones that, hmm, I wrote and signed

24  on.

25  Q.   What date did you -- what date did you complete

1    these witness statements?

2    A.    December 17th.

3    Q.    The 17th of what month and year?

4    A.    December.

5    Q.    And what incident were these two statements in

6    reference to?

7    A.    The incident out at unit E-2.

8    Q.    Out at E-2?

9    A.    Yes, sir.

10   Q.    Involving who, just to be clear?

11   A.    Inmate Dean.

12   Q.    Inmate Dean.  So it's for what happened in the

13   housing unit?

14   A.    Yes, sir.

15   Q.    With inmate Terrance Dean?

16   A.    Yes, sir.

17   Q.    You said that there's a written -- handwritten

18   statement and a typed statement?

19   A.    Yes, sir.

20   Q.    Can you explain why there's a handwritten version

21   and a typed version?

22   A.    Well, the written version is basically, hmm, done

23   basically like, it's your written version of what you

24   wrote down and put on your witness statement.  The typed

25   version is -- it looks more professional or whatnot so

1    they usually type -- type one up.  That way when they

2    submit it to Internal Affairs or wherever it has to go for

3    processing or whatnot, it looks better and it's legible.

4    Q.    Okay.  Did you get a chance to review your typed one

5    before you signed it?

6    A.    Yes.

7    Q.    Are those two statements identical, 4 and 4A?

8    A.    Pretty much, yes, sir.

9    Q.    Is there anything that's not identical on those two

10   statements?

11   A.    Not really.  They're pretty much what they're

12   supposed to be.

13          MR. CHRISTIAN:  Your Honor, I would move to

14   introduce Government's 4 and 4A and publish them for the

15   jury.

16          THE COURT:  Any objection?

17          MR. WOLFE:  No objection.

18          MR. FOX:   No objection, Your Honor.

19          MR. CHRISTIAN:  May I retrieve them, Your Honor?

20          THE COURT:  There being no objections, they are

21   admitted without objection, and yes, you may retrieve

22   them.

23   BY MR. CHRISTIAN:

24   Q.    All right, Mr. McKenzie, I'm showing you

25   Government's Exhibit 4 just so we can all follow along

1   here.  This is your witness statement, correct?

2   A.   Correct.

3   Q.   Can you read it to the jury?

4   A.   Okay.  At 1404 hours a code three, officer needs

5   assistance, was called.  I, Sergeant McKenzie, responded

6   to unit E-2 to assist with the situation.  I then left the

7   building to go get the pepper ball gun because the inmate

8   did not want to lockdown.  Officer Thomas retrieved the

9   pepper ball gun and I received it from him once I returned

10   to unit E-2 (reading).

11   Q.   And Mr. McKenzie, does your witness statement

12   mention that you swiped your finger across Mr. Dean's face

13   in the gym?

14   A.   No, sir.

15   Q.   Does it mention that you had seen a CERT officer

16   throw down and punch Inmate Dean in the gym?

17   A.   No, sir.

18   Q.   And does it mention that you expected that CERT was

19   going to beat up Terrance Dean in the gym?

20   A.   No, sir.

21   Q.   And was your witness statement here completely

22   accurate?

23   A.   No, sir.

24   Q.   Now before I get to why you wrote a statement that

25   wasn't completely accurate -- and just for the record,

1   here's 4A just so everybody can see.  Is this your

2   handwritten statement?

3   A.    Yes, sir.

4   Q.    Before we get to why you wrote that statement that

5   wasn't completely accurate, when did you write this

6   statement relative to when you had seen Dean in the

7   hospital.

8   A.    I wrote that statement on the 17th, the next day.

9   Q.    And who asked you to write a statement?

10  A.    Mr. Blakley.

11  Q.    Is that Unit Manager Blakely?

12  A.    Yes, sir.

13  Q.    Is that the same man you had the conversation with

14  where you said, "They're whipping his butt?"

15  A.    Yes, sir.

16  Q.    When you were writing this witness statement did you

17  have a conversation with Mr. Blakely?

18  A.    Yes, sir.

19  Q.    Where did he fit in your chain of command at Macon

20  State?

21  A.    He was the unit manager, he was right below the

22  deputy warden.

23  Q.    You said right below the deputy warden?

24  A.    Yes, sir.

25  Q.    What did Unit Manager Don Blakely say to you as you

1    were sitting down to write your witness statement?

2    A.    He was like, I told the guys to come over here and

3    let's review the video cause this thing is going to go

4    federal and when it do their ass is going to be in the

5    ringer.

6    Q.    When you say that Mr. Blakley said to you this thing

7    is going to go federal, what did that mean to you?

8    A.    I -- what did it mean to me?

9    Q.    Yes.

10   A.    It meant to me the thing's getting worse by the

11   second.

12   Q.    I'm sorry?

13   A.    It meant to me that things are getting worse by the

14   second.

15   Q.    Thing are getting worse by the second?

16   A.    Yes.

17   Q.    And by going federal what does that mean to you?

18   What does federal mean?

19   A.    That meant it's big.  That mean it's a big

20   situation.

21   Q.    And you said that Mr. Blakley asked them to come

22   down and look at the video.  What did that mean to you?

23   A.    Uh, I guess that, uh -- it meant to me I guess

24   they're just trying to put -- they were going to put

25   something together on their own or whatnot and go from

1    there.

2         MR. WOLFE:  I'm going to object to speculation

3    as to why Blakely had the other fellows come down and look

4    at the video.

5         THE COURT:  Mr. Christian?

6         MR. CHRISTIAN:  I just asked what it meant to

7    him, his understanding of what this conversation was

8    about as he sat down to write a witness statement that

9    he's already admitted was not completely accurate.  It's a

10   statement in furtherance, Your Honor.

11        THE COURT:  I'll sustain that objection.  I

12   think he was speculating.  If I understood what he said

13   correctly by what might have happened or might be in

14   somebody else's mind.  I might have misunderstood him.

15        MR. CHRISTIAN:  Well my question was:  What did

16   it mean to you when you got this information in terms of

17   what impact did it have on him?  It's the effect on the

18   listener, it's not what he thought other people were

19   doing.  It's this is what he thinks the conversation is

20   about and this is why he's writing his false statement.

21        THE COURT:  So the relevancy is to show why he

22   wrote the false statement?

23        MR. CHRISTIAN:  Absolutely, Your Honor.

24        THE COURT:  All right.  I'll overrule the

25   objection.

1    MR. CHRISTIAN:  Thank you, Your Honor.

2   BY MR. CHRISTIAN:

3   Q.    Now, what impact did that conversation with Mr.

4   Blakley have on what you put in your witness statement?

5   A.    I was like, I'm going to omit that little portion to

6   stay out of it.

7   Q.    What portion were you omitting after your

8   conversation with Mr. Blakely?

9   A.    The portion of me going to the gym and, uh, the

10  incident where, uh, I swiped my finger across Dean's face

11  and when I saw him get thrown to the ground and punched.

12  Q.    Did you talk to Mr. Blakley specifically about the

13  escort video, the handheld camera video from the escort?

14  A.    He said that, uh, he had been calling for the video

15  but they said they couldn't find it.

16  Q.    And that's the handheld video they said they

17  couldn't find?

18  A.    Correct.

19  Q.    And when you saw CERT in the gym with Dean, did you

20  see anybody video taping the incident as Dean was thrown

21  to the ground and punched?

22  A.    No, sir.

23  Q.    And again what was your understanding of what CERT

24  was supposed to be doing with the handheld cameras at that

25  moment?

1    A.    Video recording.

2    Q.    After your conversation with Mr. Blakley did you

3    turn in this witness statement?

4    A.    Yes.

5    Q.    I want to turn now -- I'll take down this exhibit.

6    I want to turn now to a different subject.  You met with

7    federal investigators for the first time on August 15th,

8    2012, right?

9    A.    Yes, sir.

10   Q.    That was for an interview with the FBI, right?

11   A.    Yes, sir.

12   Q.    At the beginning of that interview with the FBI, did

13   you admit that you had been in the gym with Terrance Dean?

14   A.    No, sir.

15   Q.    At the end of that interview you left, right?

16   A.    Yes, sir.

17   Q.    Had you told federal investigators when you left

18   what had happened to Dean in the gym?

19   A.    No, sir.

20   Q.    But then you came back a couple hours later that

21   same day, right?

22   A.    Yes, sir.

23   Q.    And you talked to federal investigators again?

24   A.    Yes, sir.

25   Q.    Did anybody make you come back?

1    A.    No, sir.

2    Q.    After you came back that day for the second

3    interview, on August 15th, did you testify the next day,

4    August 16th, under oath?

5    A.    Yes, sir.

6    Q.    And going in to testify that day did you understand

7    that you would not be charged for giving the FBI false

8    information the day before?

9    A.    Yes, sir.

10   Q.    But were you made any promises regarding any other

11   potential charges?

12   A.    No, sir.

13   Q.    Did you think you could be charged after you

14   testified under oath?

15   A.    Yes, sir.

16   Q.    What did you think would happen if you admitted what

17   you had done in the gym?

18   A.    What do I think would have happened if I admitted

19   what I done in the gym?

20   Q.    Yes.

21   A.    I mean, I think maybe I have some relief.

22   Q.    What did you decide to do about whether you were

23   going to testify or not?

24   A.    I decided to go ahead and testify.

25          MR. FOX:   Your Honor, I'm having a very

1    difficult time hearing.

2            THE COURT:  Speak up, Mr. McKenzie.

3            MR. CHRISTIAN:  If you could slide forward a

4    little bit Mr. McKenzie so we can hear you.

5    Q.    Had anybody --

6            THE COURT:  What was the last answer?

7    BY MR. CHRISTIAN:

8    Q.    What did you decide to do that day?

9    A.    I decided to testify.

10   Q.    Had anybody from the FBI, the Department of Justice

11   made you any promises at that point when you went in to

12   testify back in 2012?

13   A.    No, sir.

14   Q.    You had not pleaded guilty, right?

15   A.    No, sir.

16   Q.    Hadn't made any deals?

17   A.    No, sir.

18   Q.    Had you even retained an attorney?

19   A.    No, sir.

20   Q.    Did you ask for anything in exchange for your

21   testimony?

22   A.    No, sir.

23   Q.    After you testified under oath did you enter a

24   guilty plea in Federal court?

25   A.    Yes, sir.

1   **Q.**   What year did you plead guilty?

2   **A.**   2012.

3   **Q.**   What is your understanding of the offense that

4   you've pleaded guilty to?

5   **A.**   It's a violation of civil rights.

6   **Q.**   Have you signed a plea agreement with the United

7   States?

8   **A.**   Yes, sir.

9   **Q.**   Have you agreed to cooperate with the United States?

10  **A.**   Yes, sir.

11  **Q.**   What do you hope the prosecutors will do after you

12  testify?

13  **A.**   Hopefully speak in my favor.

14  **Q.**   And to your knowledge who will decide the sentence

15  you will receive?

16          MR. FOX:  Your Honor, I'm -- could we have him

17  repeat the answer.  We did not --

18          THE COURT:  I can't hear you.

19          MR. FOX:   I'm sorry, could you repeat the

20  answer.  I couldn't hear him.

21          THE COURT:  Okay.  Yes, Mr. McKenzie, if they

22  can't hear you, you need to speak up so --

23          THE WITNESS:  Okay.

24          MR. CHRISTIAN:  Can you speak up a little bit

25  louder.

1            THE WITESS:  Yes, sir.

2   BY MR. CHRISTIAN:

3   Q.    To your knowledge who's going to decide the sentence

4   that you will receive?

5   A.    The judge.

6   Q.    Now, you said that you pleaded guilty in 2012,

7   right?

8   A.    Yes, sir.

9   Q.    Before you pleaded guilty where were you working?

10  A.    Uh, Dooly State Prison.

11  Q.    And you had been working as a sergeant at Macon

12  State before, right?

13  A.    Yes, sir.

14  Q.    What rank were you going to be at Dooly?

15  A.    Lieutenant.

16  Q.    Is that a promotion from sergeant?

17  A.    Yes, sir.

18  Q.    What happened to that promotion?

19  A.    Gone.

20  Q.    Did you ultimately resign from Dooly?

21  A.    Yes, sir.

22  Q.    And now you have a felony conviction, right?

23  A.    Yes, sir.

24  Q.    So you went from a lieutenant at Dooly to now you're

25  a convicted felon because of this case?

1   **A.**      Yes, sir.

2   **Q.**      I want to turn now to a different subject, the

3   conversations that you had with Defendant Ronald Lach.

4   How do you know Ronald Lach?

5   **A.**      I served with him on the CERT team and hung out with

6   him a couple of times.

7   **Q.**      What was your relationship with Defendant Lach?

8   **A.**      We were pretty good friends.

9   **Q.**      You said you had socialized before?

10  **A.**      Yes.

11  **Q.**      You talked a lot about the force that he used on

12  other inmates?

13  **A.**      We talked about the Dean incident.

14  **Q.**      Okay.  How did this conversation come about first?

15  **A.**      We were at one of his friend's house and we was

16  outside just me and him, and we were just having a

17  conversation.

18  **Q.**      What did Lach tell you that he and other officers

19  would do to an inmate who hit an officer?

20  **A.**      He was like they were told to --

21          MS. GOMEZ:   Your Honor, I have to object.  May

22  we approach please?

23  (BENCH CONFERENCE).

24          MS. GOMEZ:   Your Honor, I just want to be

25  clear.  We've had a lot of discussions about us not being

1   allowed to go into previous incidences.  We've been told

2   repeatedly you have to stick specifically to what's in the

3   indictment.  And so he asked the question about other

4   inmates, what was -- he said you mean about Dean?  Mr.

5   Christian then went back to this issue about other

6   inmates.  So if you want to -- I think in turn this just

7   has to be limited to the four instances that have been

8   alleged in the indictment and not any of this outside

9   other stuff.  But he isn't -- we're not allowed to bring

10  in any other incidences.

11          THE COURT:  What I thought you were going to

12  say is that, of course, it does add him openness to the

13  door --

14          MS. GOMEZ:  Correct.

15          THE COURT:  -- which is what you've been

16  saying.

17          MS. GOMEZ:  Correct.  But what I'm saying is

18  that if he's going to do that --

19          THE COURT:  Now you're saying you don't want

20  him to open the door.

21          MS. GOMEZ:  No, no, no, Judge.  I'm saying if

22  he's going that way, if he does that, that's why I'm up

23  here saying if he does that he's opening the door and I

24  want to warn him before he does it.

25          THE COURT:  We don't have to have a bench

1    conference to decide that.

2            MS. GOMEZ:   Okay.

3            THE COURT:   If he wants to go somewhere with it

4    and then if it opens the door it opens the door.

5            MR. CHRISTIAN:   Just to be clear, Your Honor,

6    if he's talking about inmates that are referred to in the

7    indictment those are other inmates.  So, I don't think

8    that opens the door if he's talking about that kind of

9    incident.

10            THE COURT:   Well, we're speculating right now.

11    If he asks about incidences other than the four incidence

12    obviously that's going to open the door.

13            MS. GOMEZ:   Okay.

14            MR. CHRISTIAN:   And I'm not asking about --

15            THE COURT:   Subject to whatever the details

16    are.

17            MR. WOLFE:   Well, actually he just said he's

18    only spoke to Lach about Dean so I'd object --

19            MS. GOMEZ:   And then he asked the question

20    about --

21            MR. WOLFE:    I'm going to object to leading.

22            THE COURT:   We don't know what's going to

23    happen.

24    (BENCH CONFERENCE CONCLUDED)

25    BY MR. CHRISTIAN:

1    Q.    All right, Mr. McKenzie, I asked you about a

2    conversation you had with Defendant Lach?

3    A.    Right.

4    Q.    And you said that conversation was about the Dean

5    incident?

6    A.    Right.

7    Q.    What did Defendant Lach tell you about what had

8    happened to Dean in terms of why officers had used force

9    on Dean?

10   A.    Because, hmm, they were told that if an inmate were

11   to put their hands on an officer, they needed to take him

12   over to the gym and deal with him.

13   Q.    What was your understanding what deal with him

14   meant?

15   A.    Use force and assault him.

16   Q.    In that same conversation did you and Defendant Lach

17   talk about a state investigation into Dean's injuries?

18   A.    Yes.  And he was, like, they don't have anything

19   because, hmm, Dean can't remember anything.

20   Q.    I want to move now to other conversations that you

21   had about Terrance Dean.  Did you ever talk to Deputy

22   Warden James Hinton about the Dean incident?

23   A.    Once.

24   Q.    Did you know Deputy Warden James Hinton at the time

25   of this conversation?

1    A.    Yes.

2    Q.    How did you know him?

3    A.    He was a deputy warden over security.

4    Q.    One of your supervisors?

5    A.    Yes.

6    Q.    Do you see him in the courtroom today?

7    A.    Yes.

8    Q.    Can you identify him by his location and his

9    clothing?

10   A.    Right there --

11        MR. WOLFE:   Judge, we'll stipulate.  Stand up.

12   This is James Hinton.

13   A.    Blue shirt, plaid tie.

14        MR. CHRISTIAN:  Your Honor, may the record

15   reflect he's been identified?

16        THE COURT:  He has been identified as Defendant

17   Dean -- Hinton, pardon me.

18   BY MR. CHRISTIAN:

19   Q.    Now you said that Defendant Hinton was a supervisor

20   of yours at the time, right?

21   A.    Yes, sir.

22   Q.    Where was your conversation with Defendant Hinton?

23   A.    In his office.

24   Q.    At Macon State?

25   A.    Yes, sir.

1   Q.    What was his conversation -- what was his position

2   at the time of this conversation?

3   A.    Deputy warden of security.

4   Q.    When was this conversation relative to when

5   Mr. Hinton was out on medical leave?

6   A.    It was after he came back.

7   Q.    What did Defendant Hinton say to you about the Dean

8   incident?

9   A.    It was basically like, he don't know why those guys

10  did it, you know, they shouldn't have did that.  And, hmm,

11  that, hmm, if they would have came to him it wouldn't even

12  happened like that.  He would have taken care of it.

13  Q.    He would take care of it?

14  A.    Yes.

15  Q.    What did that mean to you, that conversation?

16  A.    I guess he was going to have it played down or

17  whatnot, like it wasn't that much of a big deal, I guess.

18  Q.    And at that point in time was your understanding

19  that the --

20       MR. WOLFE:  I'm going to object to leading.  He

21  can ask what his understanding was.

22       THE COURT:  Yes.  That was leading.  Rephrase

23  your question.

24       MR. CHRISTIAN:  I don't even know that I asked

25  the question, Your Honor.

1          THE COURT:  Well, I guess enough of it got out

2     that it was apparent that it was leading.

3          MR. CHRISTIAN:  Okay.

4     BY MR. CHRISTIAN:

5     **Q.**    At the time of this conversation what was the

6     status, if you knew, of the state criminal investigation?

7     **A.**    It was on going.

8     **Q.**    Okay.  So fair to say it was a big deal?

9     **A.**    Yes.

10    **Q.**    The last thing I want to talk about today is your

11    FBI interview.  You mentioned it earlier.  It happened on

12    August 15th of 2012 and we met for the first time about

13    9:00 o'clock that morning, right?

14    **A.**    Yes.

15    **Q.**    And you testified earlier at that initial interview

16    you did not admit that you went in the gym with Terrance

17    Dean and the CERT officers, right?

18    **A.**    Correct.

19    **Q.**    And then you said you came back a couple hours

20    later?

21    **A.**    Yes, sir.

22    **Q.**    Why did you come back?

23    **A.**    I just felt like that was the right thing to do.

24    **Q.**    How did you make that decision?

25    **A.**    Well, when I left the first time from the state

1   patrol office, hmm, I went to Creekwood Park in Perry and

2   I sat down, and I called my wife and, hmm, I told her what

3   was going on, and she just got -- she just said she

4   couldn't -- she just asked me was I serious and she just

5   started crying on the phone.  Then that's when she just

6   told me that she couldn't even talk to me right now and

7   she said she'll call me back.  So I sat there in the car

8   and I just prayed for a minute.  And then she called me

9   back shortly and she was, like, come get me.

10  Q.    Did you go get her?

11  A.    Yes, sir.

12  Q.    Where did you get her from?

13  A.    I drove down from Perry back down to Oglethorpe to

14  the prison.

15  Q.    Is that where she was working?

16  A.    Yes, sir.

17  Q.    What did you do when you got back to Macon State?

18  A.    Uh, I picked her up, and, uh she got in the car and

19  she was crying.

20        MR. WOLFE:  I'm going to object to the relevance

21  of any of this Judge.

22        MR. CHRISTIAN:  Your Honor, he's explaining why

23  he decided to come back and tell the FBI that he had been

24  in the gym with CERT.

25        THE COURT:  I overrule that objection.

1    BY MR. CHRISTIAN:

2    Q.    What happened after you picked your wife up from

3    Macon State?

4    A.    We were coming back and she was crying.  We were

5    coming toward Montezuma and stopped by the house and she

6    was like, Emmett, you gotta make this right, and I was

7    like, I know.  And then she went into the whole thing

8    about, I've always told you put --

9              MR. WOLFE:  I'm going to object to hearsay.

10             MR. CHRISTIAN:  Just to show the effect on the

11   listener, Your Honor.

12   BY MR. CHRISTIAN:

13   Q.    I'm sorry, what was your wife saying?

14             THE COURT:  I overrule that objection.  Speak up

15   Mr. McKenzie.

16   A.    She went to talking, saying that I've always told

17   you that you put this prison before me; you put this

18   prison before your kids; you put this prison before your

19   family and even your friends.  Every time they call, you

20   go out there.  It's always the prison and never us.

21   Q.    What did you decide to do after talking to her?

22   A.    To come on back and tell the truth.

23   Q.    Now, when you came back to talk to the FBI a couple

24   hours later, did you admit you'd been in the gym with CERT

25   and with Terrance Dean?

1    A.    Yes, sir.

2    Q.    Did you admit when you came back --

3          MR. WOLFE:  I am going to object to leading and

4    I would ask him that he testify as to what he said when he

5    came back.

6          MR. CHRISTIAN:  He's already --

7          THE COURT:  Did you cover this already?

8          MR. CHRISTIAN:  Yes, Your Honor.  I was just

9    trying to orient the witness before we move on to the

10   next subject.

11         THE COURT:  You're just trying to what?

12         MR. CHRISTIAN:  Orient the witness.

13         THE COURT:  All right, well orient him and move

14   on.

15         MR. CHRISTIAN:  Yes.

16   BY MR. CHRISTIAN:

17   Q.    When you came back the second time to talk to the

18   FBI did you tell the FBI then that you had been in the gym

19   with CERT and Terrance Dean?

20   A.    Yes.

21   Q.    Did you admit then when you came back the second

22   time that you had put your hands on Dean?

23   A.    No.

24   Q.    So that wasn't entirely truthful, right?

25   A.    No.

1    **Q.**    Now, when you came home from that second interview

2    who did you talk to?

3    **A.**    My wife.

4    **Q.**    What did you tell her?

5    **A.**    I told her what I had did and -- I told her what I

6    had said and what I didn't say.

7    **Q.**    What had you not said?

8    **A.**    About me finger swiping the inmate.

9    **Q.**    What was her reaction?

10            MR. WOLFE:  I'm going to object to relevance of

11   her reaction, Judge.

12            MR. CHRISTIAN:  This goes to show the effects on

13   listener Your Honor, we're going to move to his grand jury

14   testimony.

15            THE COURT:  I will admit it for that purpose.

16   BY MR. CHRISTIAN:

17   **Q.**    What was your wife's reaction when you told her you

18   had not been completely forthcoming with the FBI?

19   **A.**    She was like -- basically like, you need to make

20   this as right as possible.  You need to go in there and

21   let them know everything.

22   **Q.**    What did you do the next morning?

23   **A.**    I told you everything.

24   **Q.**    Thank you, Mr. McKenzie.

25            THE COURT:  Mr. Jarrard?

1       MR. JARRARD:  Your Honor, I need one minute to

2  get my laptop.

3       THE COURT:  Certainly.

4       MR. JARRARD  Thank you, Your Honor.

5                      CROSS EXAMINATION

6  BY MR. JARRARD:

7  **Q.**    Mr. McKenzie, we were having difficulty hearing you

8  so I would ask that you speak up, okay?

9  **A.**    All right.

10  **Q.**    My name is Brian Jarrard and I represent Sergeant

11  Hall.

12  **A.**    Okay.

13  **Q.**    Now, you met with the prosecution team, Mr.

14  Christian and Ms. Boyd, last Wednesday to prepare for

15  trial, correct?

16  **A.**    Yes.

17  **Q.**    And at that time did you review the videos from the

18  E dorm incident involving Terrance Dean and Officer

19  Walden?

20  **A.**    Yes, sir.

21  **Q.**    And from your review of those videos did they appear

22  to be true and accurate representations of what transpired

23  in E dorm that day?

24  **A.**    Yes, sir.

25       MR. JARRARD:  Ms. Hatcher, can we just turn on

```
 1    the witness's monitor?

 2     (Aside with courtroom deputy)

 3            MR. JARRARD:  I tried it this morning, Your

 4    Honor.  I'm sorry.  Give me just a minute to see if

 5    it'll --

 6    BY MR. JARRARD:

 7    Q.    Now, Mr. McKenzie, I'm going to try to maximize that

 8    in a minute.  That caused me a problem last time.  But

 9    does that appear to be the video from E -- or a video from

10    E dorm that you reviewed with the U.S. Attorney's Office

11    last week?

12    A.    We didn't review this portion.  We were in the

13    area -- around the time the incident actually happened

14    so --

15    Q.    I understand, Mr. McKenzie, but did the E dorm at

16    the time have various cameras?

17    A.    Yes, sir.

18    Q.    Stationed around the E dorm?

19    A.    Yes, sir.

20    Q.    And are you saying that you didn't review all of the

21    footage with the U.S. Attorney's Office?

22    A.    No, not the complete video.

23    Q.    Okay.  Now does this appear to you to be at least

24    camera five's view of E dorm on the date of the

25    Dean-on-Walden incident?
```

1    A.    Yes, sir.

2    Q.    Okay.  And you know, don't you, Mr. McKenzie, that

3    in the E dorm there are multiple cameras, that is multiple

4    views of what transpired that morning, correct?

5    A.    Yes, sir.

6    Q.    And you're saying that you haven't reviewed all of

7    that in preparation for trial?

8    A.    Not that entire -- the video in entirety.

9    Q.    But you do recognize this -- I'm going to try it one

10   more time.  We may have to leave it --

11          MR. JARRARD:  Judge, it's going to be easier for

12   everybody if it blows up and it did this morning.  But if

13   not I'll leave it small.

14   Q.    We're going to have to leave it that way, but you

15   can see it, can't you, Mr. McKenzie?

16   A.    Yes, sir.

17   Q.    And there are -- do you recall specifically which

18   camera angle you observed with the -- that you watched

19   with the U.S. Attorney's Office last week?

20   A.    Five and -- I forgot the other one.

21   Q.    Okay.  So five is the one we're looking at, right,

22   Mr. McKenzie?

23   A.    Yes, sir.

24   Q.    And this appears to be the video from E dorm,

25   doesn't it?

1    **A.**    Yes, sir.

2    **Q.**    And there are -- do you know how many other camera

3    angles there are on this video from E dorm that morning?

4    **A.**    No, sir.

5    **Q.**    Did the government show you all of those other

6    angles of the video?

7    **A.**    Sir?

8    **Q.**    Did the government show you the other angles of the

9    video?

10   **A.**    We only reviewed two.

11   **Q.**    And do you remember which angles those were?

12   **A.**    Five was one of them.  The other one I don't

13   remember.  It was the one from the, uh, front of the

14   building look toward the back.

15   **Q.**    All right.  And five is what we're looking at here,

16   right, Mr. McKenzie?

17   **A.**    Yes.

18          MR. JARRARD:  Your Honor, at this time I would

19   tender on behalf of Defendant Hall as Hall's Exhibit 1,

20   the video of camera five at least if not all of the Dean

21   videos.

22          MR. CHRISTIAN:  The government objects, Your

23   Honor.  May we approach?

24          THE COURT:  Yes.

25   (BENCH CONFERENCE)

1              MR. CHRISTIAN:  First, Your Honor, sort of a

2      clerical matter.  The videos' caption "Dean attack of

3      Walden" that's visible the way that he's playing the video

4      right now, so we object to that.  But more importantly, he

5      wants to play the whole Dean video and they haven't

6      established any foundation for the whole Dean video being

7      relevant.  I know Mr. Jarrard wants to try Terrance Dean

8      for assaulting Officer Walden but that's not the trial

9      we're here for today.  Mr. McKenzie wasn't even in the gym

10     during the assault.  He was in the dorm after that

11     assault.  He responded after the assault was over and Dean

12     was being escorted out.  So if he wants to show him the

13     part of Exhibit E while McKenzie is on there and being

14     escorted out, the government has no objection to him

15     showing that portion of it.  In terms of establishing the

16     relevance of what happened during the Dean assault you

17     can't see it.  You can see Mr. Dean following Mr. Walden

18     around.  You can actually see what's going on in the

19     assault.  It has absolutely no relevance.  It's purely

20     just prejudicial and inflammatory and offered essentially

21     for purposes of nullification.

22              Unless they intend to establish some foundation

23     for relevancy it's just inadmissible.

24              THE COURT:  Well, putting aside the broader

25     issue that we've talked about a lot, why is it necessary

1    for his testimony if he wasn't there?

2         MR. JARRARD:  He was there, Your Honor.  He's

3    there right after the incident and he is standing in the

4    dorm.  He places all of our clients or most of our clients

5    in the dorm at the particular times.  He testified to a

6    conversation he had with my client.  He testified to this

7    jury -- yes, I want to play from the beginning of the

8    video, which is just a few minutes, until the response

9    happens which shows CERT, it shows the Tact Squad, it

10   shows all of the COs responding.  But very shortly, very

11   briefly into the video it shows Mr. McKenzie and then it

12   shows -- he, I presume, will be able to say when Chris

13   Hall, as it relates to my client, when Chris Hall first

14   came in, when Terrance Dean was exited out and when Chris

15   Hall came back into the dorm and when these conversations

16   he's testified about allegedly happened.

17        It's very important for this jury to see -- I

18   mean, he identifies --

19        THE COURT:  But to do all that the jury doesn't

20   have to see the video.  I'm not ruling the video out.  But

21   to do what you want to do he can look at the video and do

22   everything you've just said.  The jury doesn't have to see

23   the video for him to be able to do that.  And then I will

24   have seen the video and we can decide.

25        MR. WOLFE:  He also says that when he goes into

1    the dorm and runs his hand across his face and threatens

2    the guy about what he did to his guards and promised him

3    to have done that.  And the government is arguing that

4    what happened before has no relevance to what went into

5    the gym and supports our defense that it does.

6         THE COURT:  All I'm saying is, everything

7    you've told me you wanted to do you can do with him

8    watching the video and the jury doesn't have to --

9         MR. JARRARD:  Well, I'm going to do the same

10   thing --

11        THE COURT:  Well --

12        MR. CHRISTIAN:  The government has no objection

13   to showing the video clips where Mr. McKenzie is on the

14   video.  That the government has no problem with.  Showing

15   the attack is just a nullification.  There's no purpose

16   for that.

17        MR. JARRARD:  Your Honor, that's not what's

18   been --

19        THE COURT:  You told me what you want to do.

20   You can do that without showing the video to the jury at

21   this time.  So, walk him through the video, set the things

22   you want it to set and then I will have had a chance to

23   see the video and I can decide if it's going to come in at

24   some other time.  But what you've told me you don't need a

25   jury to see it to do what you want it to do with this

1    video.

2              MR. JARRARD:  Your Honor, part of our defense is

3    that these gentlemen reacted --

4              THE COURT:  That's the way we're going to

5    proceed.

6              MR. JARRARD:  Well, let me ask you this, Your

7    Honor.  Because I'm going to have to play it in total to

8    him and the jury is going to be sitting there --

9              THE COURT:  That's fine.

10             MR. JARRARD:  -- and it's going to take, five,

11   ten, twelve minutes.

12             THE COURT:  That's fine.

13             MR. HOGUE:  Your Honor, Mr. Fox had to rush to

14   the restroom.  He said he would be right back.  He left

15   three minutes ago.

16             MR. CHRISTIAN:  Your Honor, while we're here,

17   just to clarify, Mr. Jarrard is not going to ask any

18   questions about what he sees in the video before he

19   actually arrives?  Does that make sense?  Before Mr.

20   McKenzie arrives?

21             THE COURT:  Yes.

22             MR. CHRISTIAN:  Okay.

23             THE COURT:  I mean, what could he establish

24   before he got there.

25             MR. JARRARD:  Yeah, I see what you're saying.

1    (BENCH CONFERENCE CONCLUDED)

2         THE COURT:  Ladies and gentlemen, the plan is

3    to take a morning break at 10:00 o'clock.  Is everybody

4    okay for a few more minutes?  Okay.  We'll go pretty close

5    to 10:00 unless we need to take a break before then.

6         MR. JARRARD:  Is it possible, Your Honor, for

7    just the witness, and based on the Court's direction, to

8    see this video?  If not, I'll bring my laptop up to him.

9         THE COURT:  It's up on your screen, right, Mr.

10   McKenzie?

11        MR. JARRARD:  And I think it's up -- is it up on

12   the jury's?  Okay.

13   BY MR. JARRARD:

14   Q.   Mr. McKenzie, before I have you watch the video I

15   want to ask you in December -- or in October, November,

16   and December of 2010 do you know where all there were

17   cameras at Macon State Prison?

18   A.   Do I know where --

19   Q.   Yeah.

20   A.   -- there were cameras?

21   Q.   On the whole facility, where were cameras?

22   A.   Front entry, all the housing units, the perimeter,

23   and that's it.

24   Q.   So it's your understanding then, Mr. McKenzie, in

25   October and December of 2010, were there cameras in the

1  big yard?

2  **A.**    No.

3  **Q.**    Isn't it true, Mr. McKenzie, that actually in 2010

4  the facility was just beginning to install cameras?

5  **A.**    I don't remember.

6  **Q.**    Do you recall whether the facility first installed

7  cameras in E dorm?

8  **A.**    No, sir.

9  **Q.**    You don't know one way or the other?  Is that your

10  testimony, whether the first cameras to be installed were

11  in the E dorm or not?

12  **A.**    I don't know.

13  **Q.**    Mr. McKenzie, I want to play for you this video of

14  camera five in E dorm.  Can you see it?

15  **A.**    Yes, sir.

16  **Q.**    Mr. McKenzie, this is going to take a few minutes

17  but I'll tell you I want you to note for yourself so you

18  can tell me when you come into E dorm, okay?

19  **A.**    Okay.

20  (VIDEO PLAYING AT THIS TIME)

21  BY MR. JARRARD:

22  **Q.**    I'm going to stop it just a minute, Mr. McKenzie.

23  On camera five at 2:04, do you see Inmate Dean right

24  behind --

25              MR. CHRISTIAN:  Objection, Your Honor.  We

1    haven't established that Mr. McKenzie has even entered the

2    facility yet.

3           THE COURT:  Well, let me see where this is

4    going.  You may proceed.

5    BY MR. JARRARD:

6    Q.    Mr. McKenzie, at 2:04 on camera five do you see in

7    the right hand portion of the screen Inmate Dean coming up

8    behind Officer Walden as Officer Walden heads to the back

9    door?

10          MR. CHRISTIAN:  Your Honor, this is -- I'm going

11   to object again.  This is specifically what we were

12   talking at.  My understanding was this is not where we

13   were headed.

14          MR. JARRARD:  Your Honor, I don't -- I'm trying

15   to set up the time line with Mr. McKenzie and I'm not

16   going to have him describe in detail the attack, but I am

17   asking that he put the time line in context for us, Your

18   Honor.

19          THE COURT:  I'll allow it for that purpose.

20   BY MR. JARRARD:

21   Q.    So Mr. McKenzie, again, if you look at camera five

22   at 2:04:02 do you see Inmate Dean approaching Officer

23   Walden from behind?

24   A.    Yes, sir.

25   Q.    2:04:05 Inmate Dean has begun to attack Officer

1    Walden, hadn't he?

2              MR. CHRISTIAN:  Your Honor, again --

3              THE COURT:  I'll allow it for this purpose.

4    BY MR. JARRARD:

5    **Q.**    Mr. McKenzie, is the answer to my question yes, at

6    2:04:05 Inmate Dean had begin -- had begun to attack

7    Officer Walden?

8    **A.**    Yes, sir.

9    **Q.**    Mr. McKenzie, I want to stop it there at 2:04:31 is

10   the Dean on Walden attack still going?

11   **A.**    Uh, as far as I can tell, yes.

12   **Q.**    Okay.  Are there any CERT team members in the dorm

13   yet?

14   **A.**    No, sir.

15   **Q.**    Okay.  But you would expect, Mr. McKenzie, that

16   about this time a code three is being called, right?

17   **A.**    Yes.

18   **Q.**    Okay.  I mean is it someone in the control room in

19   the dorm that's calling the code three?

20   **A.**    Excuse me, sir?

21   **Q.**    Who calls the code three?

22   **A.**    Whoever sees it.

23   **Q.**    Okay.  Whoever sees the inmate attacking the guard

24   is supposed to call a code three, right?

25   **A.**    Yes, sir.  It can even be the officer that's getting

1    attacked.

2    Q.    Okay.  So you expect that at 2:04:31 a code three is

3    being called, correct?

4    A.    I would -- guess I would have to have the audio to

5    know that for sure.

6    Q.    Now, Mr. McKenzie, at 2:04:44 there's some -- would

7    you agree with me that there's some regular COs that can

8    be seen running into the dorm?

9    A.    Yes, sir.

10   Q.    That's those gentlemen and ladies in blue?

11   A.    Yes, sir.

12   Q.    Mr. McKenzie, at 2:05:04 has a CERT member just

13   entered the dorm?

14   A.    Yes, sir.

15   Q.    Do you recognize that CERT member?

16   A.    Sergeant Hall.

17   Q.    It's your testimony, Mr. McKenzie, that the first

18   CERT member to enter E dorm is Sergeant Hall?

19   A.    Yes.

20   Q.    At 2:05:10 do you see one or two more CERT members

21   enter?

22   A.    Yes, sir.

23   Q.    Do you recognize from the video who those CERT

24   members are?

25   A.    One looks to be Officer Thomas, and the other one I

1    can't hardly tell.  In the video they're standing right

2    beside each other.

3    Q.    Mr. McKenzie, it's the CERT members who break up

4    this assault, isn't it?

5    A.    Sir?

6    Q.    It's the CERT members who break up Walden being

7    assaulted by Mr. Dean, isn't it?

8          MR. CHRISTIAN:  Objection, Your Honor.  He

9    hasn't identified that he's actually been present for any

10   of this and he's asked --

11         THE COURT:  Are you asking him if he knows?

12         MR. JARRARD:  Your Honor, he's identified three

13   of the CERT members who just entered the dorm.

14         THE COURT:  I assume your question is does he

15   know who broke up the fight?

16   BY MR. JARRARD:

17   Q.    Do you know who broke up the attack of Officer

18   Walden?

19   A.    No, sir.

20   Q.    Now at 2:05:32 on the video, Mr. McKenzie, is that

21   Terrance Dean being led out of the dorm?

22   A.    Yes, sir.

23   Q.    And Terrance Dean is not handcuffed, is he?

24   A.    No, sir.

25   Q.    Why is that?

1          MR. CHRISTIAN:  Objection, Your Honor.

2          THE COURT:  Well, he wasn't there but -- if

3   there's a procedural policy reason that he knows of --

4          MR. JARRARD:  I believe there is, Your Honor.

5          THE COURT:  Okay.  Now that, you can ask that

6   question.

7   BY MR. JARRARD:

8   Q.    Is there a reason, Mr. McKenzie, that Terrance Dean

9   is not handcuffed right after he's attacked an officer in

10  the dorm?

11  A.    The only thing I can think of is to avoid a

12  confrontation in front of the other inmates, where the

13  officer would be out numbered they would just wait until

14  he got him in the sally port to handcuff him.

15  Q.    That's not just what you think of.  That's from your

16  time on CERT, isn't it, Mr. McKenzie?

17  A.    Sir?

18  Q.    That's not just something that occurs to you today,

19  that's from your time on CERT.  You know why that happens.

20  A.    No.  My time on CERT, sir, we would lockdown the

21  building and isolate that one inmate.

22  Q.    Now if an inmate is cuffed in the midst of a dorm is

23  the inmate subject to being attacked by other inmates?

24  A.    Yes.

25  Q.    Okay.  And one role of the extracting officers is to

1    get that inmate out of that danger immediately, correct?

2    **A.**    Correct.

3    **Q.**    Because if you handcuff an inmate in a dorm with

4    other inmates who may have grudges against that inmate the

5    inmate is in danger, isn't he?

6    **A.**    Yes.

7    **Q.**    So it doesn't surprise you as you look at camera

8    five that Terrance Dean is not handcuffed as he walks out

9    of E dorm, does it?

10   **A.**    No.

11   **Q.**    2:05:36 has Terrance Dean just been handed over by

12   COs to two CERT members?

13   **A.**    Yes.

14   **Q.**    And who are those two CERT members?

15   **A.**    It's hard to tell on that video.

16   **Q.**    But from your other testimony you know that that is

17   Douglass-Griffin and Redden, don't you, Mr. McKenzie?

18   **A.**    No.

19   **Q.**    Who escorted -- who had each arm of Mr. Dean as he

20   was escorted away from E dorm?

21   **A.**    I don't remember.

22   **Q.**    Sergeant McKenzie, at 2:05:52, you see in this

23   bottom right-hand corner of the screen?

24   **A.**    Yes.

25   **Q.**    That's Sergeant Hall with his back to the camera,

1    isn't it?

2    A.    It's hard to tell on the video.

3    Q.    Okay.  Now you identified him when he came in, can

4    you not tell that's Sergeant Hall at 2:05:52?

5             MR. CHRISTIAN:  Objection, asked and answered.

6             THE COURT:  He just wants you to be sure.  But

7    can you identify him from that picture?

8             THE WITNESS:  Not from this still frame right

9    here, sir.

10   BY MR. JARRARD:

11   Q.    But as I play it do you think you can tell if that's

12   Sergeant Hall?

13   A.    I'll do my best.

14   Q.    All right.  Focus on it before I hit play.  That was

15   Sergeant Hall, wasn't it, Mr. McKenzie?

16   A.    It's still hard to tell.

17   Q.    Mr. McKenzie, at 2:06:25, can you tell what's

18   happening in E dorm, generally?

19   A.    They're attempting to try to lock the housing unit

20   down.

21   Q.    Why would you be trying to lock the unit down in

22   your experience?

23   A.    Because at this time the inmates are a little riled

24   up, so you want to just lock everything down until it gets

25   calmed down again.

1   Q.    Now, did you see that CERT member just run out at

2   2:06:49?

3   A.    Yes, sir.

4   Q.    Was that Sergeant Hall?

5   A.    Yes, sir.

6   Q.    So based on your prior review of the bottom right

7   hand corner and then just seeing that CERT member, that

8   was Sergeant Hall that we identified earlier, wasn't it?

9   A.    I can't say that about earlier, but I can say that

10  by right then that was Sergeant Hall.

11  Q.    You can certainly say at 2:06:52 that was Sergeant

12  Hall running out of E dorm, right?

13  A.    Yes, sir.

14  Q.    And Terrance Dean had already been escorted out of

15  E dorm with other CERT members, hadn't he?

16  A.    Yes, sir.

17  Q.    Now, Mr. McKenzie, you testified earlier that there

18  was begun a process to lockdown the dorm.  Now, at

19  2:07:28, it appears that the locking down of the dorm has

20  kind of fallen apart, hadn't it?

21  A.    Repeat the entire question again.

22  Q.    You testified earlier that it appeared to you

23  earlier in the video that the inmates had been sent to

24  their separate cells to be locked down, correct?

25  A.    They were given instruction, yes, sir.

1    Q.    But at 2:07:28 on the video inmates have started

2    coming back and milling around in dorm.  They're not going

3    to lockdown, are they?

4    A.    No, sir.

5          MR. CHRISTIAN:  Objection, Your Honor.  He

6    hasn't established that the witness knows what was going

7    on in the dorm and the video doesn't have audio.  Mr.

8    McKenzie wasn't there.

9          THE COURT:  Well, I'll allow him to answer that

10   question.  I overrule the objection.

11         MR. JARRARD:  Thank you, Your Honor.

12         THE COURT:  I'm not so sure what the answer was.

13         MR. JARRARD:  I think the answer was --

14         THE COURT:  I couldn't tell if he was agreeing

15   with you or not.  Ask your question again.

16   BY MR. JARRARD:

17   Q.    At 2:07:33, Mr. McKenzie, the inmates are not

18   continuing to go to lockdown, are they?

19   A.    No.

20   Q.    You see the inmates, for whatever reason, it appears

21   that they began to mill back in the common area of the

22   dorm?

23   A.    Yes.

24   (Pause).

25         THE COURT:  What time are we looking for next,

1    Mr. Jarrard?

2          MR. JARRARD:   2:12, Your Honor.

3    BY MR. JARRARD:

4    Q.   I want to ask, Mr. McKenzie, at 2:10:17, it appears

5    that there is some of the leadership of Macon State had

6    come in; is that fair?

7    A.   Yes, sir.

8    Q.   Who were those individuals?  Do you recognize -- who

9    were those individuals that you see at 2:10:17 seconds?

10   Who's the gentleman in the -- looks like a tan coat?

11   A.   Excuse me.

12   Q.   It looked like a gentleman came in in a tan coat.

13   Who was that?

14   A.   That was Mr. Bobbitt.

15   Q.   And who is the gentleman in jeans in a black -- the

16   white gentleman, black pull over and jeans?

17   A.   That's Mr. Blakely.

18   Q.   Now at 2:10:19 seconds, is that a CERT member shown

19   on the camera or is that you, Mr. McKenzie?

20   A.   That's a CERT member right there.

21   Q.   Okay.  And that's Kadarius Thomas who's gotten back

22   with a pepper ball gun?

23   A.   Yes, sir.

24   Q.   In your experience, Mr. McKenzie, what was Officer

25   Thomas doing coming back to the dorm with a pepper ball

1    gun?

2    **A.**    Say that again?

3    **Q.**    To your knowledge why was Officer Thomas back in the

4    dorm with a pepper ball gun?

5    **A.**    He was back there with a pepper ball gun

6    basically -- it's a use of -- show of force to get the

7    inmates to go ahead and lockdown, to try to get them to

8    lockdown a little quicker.

9    **Q.**    So at 2:10:39 we're back to trying to get the

10   inmates to lockdown; is that correct?

11   **A.**    I think they were trying to get them to lockdown the

12   entire time.

13   **Q.**    Okay.

14        THE COURT:  2:12 is your next point?

15        MR. JARRARD:  Yes, Your Honor.

16        THE COURT:  All right.  Let's take a break at

17   this time.  Ladies and gentlemen, we'll take our 20-minute

18   break.  We will remain seated while you go to the jury

19   room.

20    (JURORS EXIT COURTROOM)

21        THE COURT:  Counsel, I have got 9:59.  We'll

22   start at 10:20 a.m.

23   (RECESS)

24   (RECONVENED)

25        THE COURT:  You may continue, Mr. Jarrard.

1   BY MR. JARRARD:

2   Q.   All right, Mr. McKenzie, we're back at 2:11:03.  Is

3   your screen on up there?  Is your screen on?

4   A.   No, sir.

5         MR. JARRARD:  Ms. Hatcher, would you turn his on

6   for us?

7   BY MR. JARRARD:

8   Q.   Is that better, Mr. McKenzie?

9   A.   Yes, sir.

10  Q.   Can you see it?

11  A.   Yes, sir.

12  Q.   Okay.  2:11:03, correct?

13  A.   Yes, sir.

14  Q.   I'll give you a heads up, Mr. McKenzie, pay

15  particular attention to the next minute, okay?  Mr.

16  McKenzie, 2:12:16, that is Sergeant Hall, Officer Rushin

17  and you coming into E dorm, isn't it?

18  A.   Yes, sir.

19  Q.   Instead of playing for you the rest of that video,

20  after that you take the pepper ball gun from Mr. Thomas,

21  don't you?

22  A.   Yes.

23  Q.   Okay.  And Sergeant Hall is assisting -- the inmates

24  still haven't locked down, right?

25  A.   No.

1    Q.    And Sergeant Hall comes in and he's assisting

2    locking down E dorm at that point, isn't he?

3    A.    Yes.

4    Q.    You don't have to see the video to remember that, do

5    you, Mr. McKenzie?  Sergeant Hall came in and he was

6    assisting you.  You had the pepper ball gun.  Sergeant

7    Hall was helping lockdown the dorm, wasn't he?

8    A.    I mean, I don't know exactly what happened right

9    after the fact.  You could probably play the video so I

10   can see it.

11   Q.    I'm going to play just a few -- a small portion of

12   it for you, okay?

13   A.    Okay.

14   Q.    That's Sergeant Hall walking into the dorm, correct?

15   A.    Yes, sir.

16   Q.    And that's Sergeant Hall talking with --

17   A.    Mr. Blakely.

18   Q.    Mr. Blakely.  Who's he talking to there?

19   A.    Mr. Bobbitt.

20   Q.    And he's walking around.  Can you tell, is he --

21   what Sergeant Hall was doing at that point?

22   A.    Giving some sort of instruction.

23   Q.    Okay.  Sergeant Hall is walking around the dorm and

24   he's giving instructions to somebody, right?

25   A.    Yes.

1   Q.   Okay.  Mr. McKenzie, I want to back up and talk with

2   you the big picture about what was happening, okay?  Code

3   three goes out, right, on the date of the Dean on Walden

4   incident?

5   A.   Yes, sir.

6   Q.   Okay.  A code three means an officer is being

7   attacked by an inmate?

8   A.   Yes, sir.

9   Q.   Okay.  When the code three went out you were out on

10  the yard assisting with feed off.  Do you remember that?

11  A.   No, sir.  I was in the chow hall.

12  Q.   Okay.  You were in the chow hall assisting with feed

13  off?

14  A.   Yes, sir.

15  Q.   Chow hall is prison speak for the dining hall,

16  right?

17  A.   Yes, sir.

18  Q.   And feed off in prison speak is for getting the

19  inmates fed, right?

20  A.   Yes, sir.

21  Q.   But you were in the dining hall, and you were trying

22  to get the inmates fed?

23  A.   Yes, sir.

24  Q.   And there's a single dining hall at Macon State,

25  correct?

1    A.    No, sir.

2    Q.    Okay.  How many dining halls are there?

3    A.    Two.

4    Q.    Do they serve each side of the campus?

5    A.    Yes, sir.

6    Q.    But each dorm doesn't have its own dining hall,

7    right?

8    A.    No, sir.

9    Q.    Okay.  So the dorm -- I meaning the dining hall for

10   one side, you call the dorms one at a time, is that how

11   you do it?

12   A.    Yes, sir.

13   Q.    And you were assisting with that shifting around of

14   inmates, correct?

15   A.    Yes.

16   Q.    Mr. McKenzie, you were on CERT prior to 2010,

17   weren't you?

18   A.    Yes, sir.

19   Q.    And the CERT team by and large is always doing

20   something when they're on duty, aren't they?

21   A.    Yes, sir.

22   Q.    What I mean by that is the CERT team is not sitting

23   in some CERT office waiting on a code three to be called,

24   are they?

25   A.    No.

1   **Q.**   They're busy men that always have something going

2   on?

3   **A.**   Yes, sir.

4   **Q.**   Just like you when the code three goes out you were

5   assisting with feed off, right?

6   **A.**   Yes, sir.

7   **Q.**   And you would expect that the CERT members that were

8   on the campus, they were doing whatever their assigned

9   task was at the time, right?

10   **A.**   Yes, sir.

11   **Q.**   The code three goes out and you're expected to drop

12   what you're doing and get to the problem, aren't you?

13   **A.**   Yes, sir.

14   **Q.**   Okay.  Now when a code three goes out these inmates

15   don't automatically become compliant when the code three

16   gets called, do they?

17          MR. CHRISTIAN:  Objection, Your Honor.  I'm not

18   sure, is he talking about inmates over the history of time

19   or is he talking about inmates in a specific incident?

20          THE COURT:  Well, I think he's talking

21   generally.  I'll allow that question.

22          MR. CHRISTIAN:  But to be clear we're talking at

23   a timeframe that's years removed from the incidents at

24   issue here?

25          THE COURT:  I don't know that we are.

```
 1            MR. JARRARD:  No we're not.  We're talking at on

 2    the date of this incident.

 3            THE COURT:  Okay.

 4            MR. CHRISTIAN:  Which incident are we talking

 5    about?

 6            MR. JARRARD:  Terrance Dean, Mr. Christian.

 7            MR. CHRISTIAN:  Okay.

 8            THE COURT:  Well, rephrase the question because

 9    that would be a different question, I think.

10    BY MR. JARRARD:

11    Q.    I'm stepping you through the date of the Terrance

12    Dean incident, Mr. McKenzie.

13    A.    Okay.

14    Q.    You said you were in the dining hall assisting with

15    feed off?

16    A.    Okay.

17    Q.    Correct?

18    A.    Correct.

19    Q.    A code three gets called while you were in the

20    dining hall?

21    A.    Right.

22    Q.    You're supposed to drop what you're doing and go to

23    the code three?

24    A.    Okay.

25    Q.    Is that a yes?
```

1    A.    Yes, sir.

2    Q.    And you endeavor to do that, correct?

3    A.    Yes, sir.

4    Q.    I mean, a code three is an emergency?

5    A.    Yes, sir.

6    Q.    So if it's within your power, you're supposed to

7    stop what you're doing and get to the guard who is being

8    attacked?

9    A.    Yes, sir.

10   Q.    My question to you was however, all the things you

11   had going on, you don't expect that the inmates where you

12   are are automatically going to become compliant and do

13   everything they should based purely on the fact that a

14   code three got called?

15   A.    Are you talking about the inmates in the dining hall

16   or are you talking about the inmates in the building?

17   Q.    Wherever.  When you were responding to that code

18   three, not only are you trying to get to the incident you

19   are also trying to make sure that inmates on the walk are

20   doing what they're supposed to do.  You're trying to make

21   sure that inmates in the dining hall are doing what

22   they're supposed to do, correct?

23   A.    Well, unless you just see something out of ordinary,

24   your main focus is to get to the area where the officer is

25   in trouble on that code three.

1    **Q.**    Because it's an emergency situation, right?

2    **A.**    Right.

3    **Q.**    Now you get to the dorm and I think it was your

4    testimony earlier that Officer Walden was flustered; is

5    that right?

6    **A.**    Yes.

7    **Q.**    And you knew Officer Walden based on the nature of a

8    code three being called that he was the one most likely

9    who had been attacked?

10   **A.**    Yes, sir.  Cause the code was called down in his

11   building.

12   **Q.**    And your testimony earlier was when you get to the

13   dorm, Dean said, y'all ain't fixing to handcuff me in the

14   dorm?

15   **A.**    Yes, sir.

16   **Q.**    In your experience is that because of the danger to

17   a handcuffed inmate in the dorm?  Did that surprise you

18   when Dean said that?

19   **A.**    No, but it -- no, sir.

20           THE COURT:  No, it didn't surprise you?  There

21   were two questions there.  I'm just trying to figure out

22   which one he answered.

23           MR. JARRARD:  All right.  I'll break -- thank

24   you, Your Honor.

25   BY MR. JARRARD:

1   Q.   Did it surprise you?

2   A.   No, sir.  I mean he was agitated, so no, sir.

3   Q.   And the y'all was talking about whoever was coming

4   to remove him out of the situation, right?

5   A.   That was pretty much directed to all security staff.

6   Q.   Officer who?

7   A.   That was pretty much directed at all security staff.

8   Q.   Okay.  Do you understand that after he had attacked

9   Mr. Walden, Dean was walking out of the dorm and said,

10  "Y'all ain't fixing to do anything, you ain't fixing to

11  cuff me", and that was directed to the security staff,

12  right?

13  A.   Yes.

14  Q.   Then you head out -- you actually go to E dorm and

15  then you leave to go get the pepper ball gun, don't you?

16  A.   I started out to go get it, yes, sir.

17  Q.   And the pepper ball gun has, as its name implies,

18  pepper to help control the inmates, right?

19  A.   Say that question again.

20  Q.   The pepper ball gun has concentrated pepper

21  substance in it to help control unruly inmates, right?

22  A.   Yes, sir.

23  Q.   Okay.  That's why you went to get it?

24  A.   That's when I started --

25  Q.   You went to get it to help --

1    A.    I went to start -- I started out to go get it yes,

2    sir.

3    Q.    Okay.  But while you were on your way CERT member

4    Kadarius Thomas actually runs past you, waves you off, and

5    says I'm going to get the pepper ball gun, right?

6    A.    He didn't really wave me off.  He just run past me

7    and going toward main control so I already knew.  So, yes,

8    sir.

9    Q.    But when Thomas comes past you and he's gone to get

10   the pepper ball gun you divert what you're doing and you

11   go to a dorm, another dorm, right?

12   A.    No.

13   Q.    You go back to the kitchen?

14   A.    No, sir.  When I stepped out and when he ran past

15   me, I gave the inmate that was in front of E-2 direction

16   to go back toward that building which is over by D

17   building.  D --

18   Q.    Okay.  And based on your prior statements, that's

19   what I understood.  You told a group of inmates near you

20   at that time to do a certain thing, right?

21   A.    Yes, sir.

22   Q.    Okay, why did you tell them to go back to their

23   building?

24   A.    Go back to their building?  Why?

25   Q.    Yeah.

1   **A.**    Because we had an emergency situation and the -- in

2   the time we have an emergency situation, you want to make

3   sure you contain the situation therefore, so it won't

4   spread out throughout the rest of the institution.  So the

5   main thing to do is to gain inmate control by putting them

6   in a secure area.

7   **Q.**    And one reason is if you know that CERT is about to

8   be bringing an inmate across the yard you don't -- if you

9   can help it, you want inmates off the yard, right?

10  **A.**    Correct.

11  **Q.**    That's for the safety of the inmate who is being

12  escorted?

13  **A.**    Yes.

14  **Q.**    For the safety of the CERT officers who were

15  escorting the inmate?

16  **A.**    Yes.

17  **Q.**    And this is all happening very quickly, isn't it?

18  **A.**    Kind of, but the inmates are wanting to know what

19  was going on, this, that and the other, so I had answered

20  basically all of the questions.  The warden told me we

21  just got a major situation going on, I need for y'all to

22  go back to y'all's building.

23  **Q.**    But you expect them to get with it, right?  There's

24  an emergency code called, the inmates need to get where

25  you told them, right?

1    **A.**    Yes.

2    **Q.**    Now, at some point you see members of the CERT team

3    escorting Dean across the yard, don't you?

4    **A.**    Yes, sir.

5    **Q.**    And I think your testimony earlier was that you saw

6    that they had cameras, right?

7    **A.**    Yes.

8    **Q.**    But you couldn't tell if the cameras were on or not,

9    is that your testimony?

10    **A.**    Yes.

11    **Q.**    Explain to the jury what was it about how the

12    cameras were being carried that indicated to you that they

13    weren't on?

14    **A.**    If I remember they were carried in such a manner

15    like they was like almost like pointed down.

16    **Q.**    You mean they had them in their hand but they were

17    doing something with the inmate, so you didn't

18    have somebody?

19    **A.**    No.  The people who had the camera weren't holding

20    the inmate, they were walking behind him.

21    **Q.**    When you saw the CERT members on the yard with Dean

22    do you remember who had each of his arms?

23    **A.**    Sir?

24    **Q.**    When you saw the CERT members walking across the

25    yard with Dean do you remember which CERT member had each

1    arm?

2    A.    No, sir.

3    Q.    And let's talk about you in the gym with Mr. Dean.

4    You swipe your finger across Mr. Dean's face and then you

5    tell him not to mess with your officers and then you start

6    to walk out, correct?

7    A.    Yes.

8    Q.    And as you do that you presumably see out of the

9    corner of your eye Officer Redden throw Dean to the

10   ground?

11   A.    No, sir.

12   Q.    Mr. McKenzie, in your multiple interviews with the

13   prosecutors and the FBI in this case have you ever said

14   that my client was in the gym?

15   A.    No, sir.

16   Q.    Not a single time, have you?

17   A.    No, sir.

18          THE COURT:  You're talking at Mr. Hall?

19          MR. JARRARD:  Yes, Your Honor.  I'm just looking

20   at one thing.

21   BY MR. JARRARD:

22   Q.    So Mr. McKenzie, in all of the preparation you've

23   had for trial, you've had meetings with FBI agents?

24   A.    Yes, sir.

25   Q.    You've had meetings with Mr. Christian and Ms.

1   Boyd?

2   **A.**    Yes, sir.

3   **Q.**    Stand up, Chris.  You have never told any of these

4   people that this man right here, my client Chris Hall, was

5   ever in the gym with Terrance Dean, have you?

6   **A.**    No, sir.

7   **Q.**    Not once?

8   **A.**    No, sir.

9   **Q.**    That's Chris Hall?

10  **A.**    Yes, sir.

11  **Q.**    Do you know him?

12  **A.**    Yes, sir.

13  **Q.**    He wasn't in the gym as far as you know?

14  **A.**    Not that I remember.

15  **Q.**    Thank you, Chris.  Mr. McKenzie, you said you don't

16  remember Redden throw down Dean?

17  **A.**    No, I didn't say that.

18  **Q.**    Okay.  Did Redden throw Dean down in the gym?

19  **A.**    Yes.

20  **Q.**    And you remember that's what happened right after

21  you swiped your hand across Dean's face?

22  **A.**    Yes, sir.

23  **Q.**    And it was Redden, right?

24  **A.**    Yes, sir.

25  **Q.**    Once you walk out of that gym quite naturally you

1   had no idea what happened in the gym after you left, do

2   you?  From your observation?

3   A.    Repeat the question.

4   Q.    You didn't see anything that happened in the gym

5   after you swiped Dean's face and walked out, did you?

6   A.    And Redden threw -- uh -- threw him down and punched

7   him in the face.  After that when I walked out, no, I

8   didn't see anything else after that.

9   Q.    Okay.  All right.  You swiped his face, you see

10  Redden throw him to the ground, you walk out, correct?

11  A.    I see Redden throw him to the ground and punch him

12  in the face and then I walked out.

13  Q.    Okay.  You walk out and that's all you can testify

14  to about what happened in that gym, right?

15  A.    Yes.

16  Q.    And you leave the gym and you go back to E dorm,

17  right?

18  A.    I go back down there and on the way down there was

19  some officers down there trying to get some inmates to pat

20  search so they can put them back in the building because

21  we had began to lock the institution down so I assisted

22  with that, pat search of one or two inmates, or whatnot,

23  maybe three.  Once we got them escorted and put them in

24  their cells or whatnot, I went back in E-2.

25  Q.    So the answer to my question is yes, after you've

1    left the gym you've described a number of things you did,

2    but you went back to E dorm?

3    **A.**    Yes.

4    **Q.**    E-2?

5    **A.**    Yes.

6    **Q.**    Okay.  And we watched the video earlier at about

7    2:12 you, my client Mr. Hall, and Mr. Rushin walk into

8    E dorm, right?

9    **A.**    Yes.

10   **Q.**    Do you remember in the small portion of the video we

11   watched today, Mr. McKenzie, it was about 2:05 when Dean

12   is being escorted out of gym -- I mean out of the dorm?

13   **A.**    Yes, sir.

14   **Q.**    2:05, Dean's going out.  2:12 Hall, McKenzie, Rushin

15   are coming back in, right?

16   **A.**    Correct.

17   **Q.**    Now you testified earlier on direct examination with

18   Mr. Christian that you said certain things to MSP

19   supervisors when you were back in the E dorm, right?

20   **A.**    Yes, sir.

21   **Q.**    You testified that you said, they were up there

22   whipping his behind?

23   **A.**    Yes, sir.

24   **Q.**    Now, when you said they are up there whipping his

25   behind, my client Chris Hall is in E dorm with you, right?

1    A.    Yes.

2    Q.    Now, Mr. McKenzie, you said that Sergeant Hall

3    participated in this discussion when you said they're up

4    there whipping his behind?

5    A.    Yes.

6    Q.    Are you sure he participated in that discussion?

7    A.    I mean, he was standing by the -- I don't remember

8    who said what.  When I said what I said, I don't remember

9    who replied what, but he was standing there.

10   Q.    Do you remember testifying to the grand jury that

11   when this conversation was going on Sergeant Hall was

12   walking around the dorm trying to get everybody locked

13   down?

14   A.    Yes.

15   Q.    Mr. McKenzie, you're later at the hospital with

16   Bolden, aren't you?

17   A.    Could you repeat that question?

18   Q.    You were later at the hospital with Inmate Dean and

19   Officer Bolden, aren't you?

20   A.    Yes.

21   Q.    And Bolden tells you that Dean deserved what he got,

22   didn't he?

23   A.    Yes.

24   Q.    I want to talk to you a little bit about you

25   becoming a cooperator in this case.  The FBI contacted you

1    shortly before you had to come and talked to the federal

2    grand jury, didn't they?

3    **A.**     No.

4    **Q.**     Do you remember the FBI or Mr. Christian,

5    prosecutors reaching out to you the day before the grand

6    jury?

7    **A.**     No.  I received a -- a subpoena and instruction from

8    Ms. Cladd at the prison that I had to go and meet with

9    them that day.

10   **Q.**     And you didn't just show up cold to the grand jury.

11   The FBI or the prosecution talked to you in the days

12   leading up to the grand jury, didn't they?

13   **A.**     Repeat that question.  I can't hardly hear you.

14   **Q.**     The FBI or the prosecution or all of them they

15   talked to you in the days leading up to your testimony at

16   the grand jury, didn't they?

17   **A.**     Yes, they talked to me the day before.

18   **Q.**     And the day before you lied to the FBI, didn't you?

19   **A.**     Yes, sir.

20   **Q.**     And you knew immediately when you lied to the FBI

21   you were in hot water?

22   **A.**     Yes, sir.

23   **Q.**     Nobody had to explain to you that lying to the FBI

24   was serious for Emmett McKenzie, did they?

25   **A.**     No, sir.

1   Q.   So when you came to the grand jury Mr. Christian

2   said if you cooperate, you testify truthfully, we're not

3   going to hold that lying to the FBI against you, didn't

4   he?

5   A.   We talked about that the day before when I came back

6   the second time.

7   Q.   Right.  You talked about that if you did what was

8   expected of you you weren't going to be prosecuted for

9   lying that day to the FBI?

10   A.   If I did the right thing, yes.

11   Q.   Since that day, Mr. McKenzie, you've been

12   cooperating with the prosecution in this case, haven't

13   you?

14   A.   Yes.

15   Q.   You were subsequently indicted by the grand jury?

16   A.   Yes.

17   Q.   Were you indicted?

18   A.   Yes, sir.

19   Q.   Well, didn't you go in and plea to what's called an

20   information?  Do you remember that?

21   A.   I don't.

22   Q.   Do you remember coming in and saying that you would

23   plea to a document called an information as opposed to

24   your case having to go in front of the grand jury?

25   A.   I don't.  I mean, really, I'm unclear of what you're

1    talking about.

2    **Q.**    Mr. McKenzie, you know, you knew the day before your

3    grand jury testimony and you know today that whatever you

4    do to help the government is going to make things easier

5    on you, isn't it?

6    **A.**    I don't know that.  That decision ultimately lies

7    upon the judge, so I don't know.

8    **Q.**    That's what you're hoping happens, isn't it?

9    **A.**    I mean that's how the federal government works.

10    **Q.**    No, that's not my question, Mr. McKenzie.  That's

11    what Emmett McKenzie is hoping is going to happen, isn't

12    it?

13    **A.**    That -- what's the question?

14    **Q.**    Mr. McKenzie, you hope that if you do everything

15    expected of you by the government things are going to be

16    easier on you, don't you?

17    **A.**    I would hope so.

18    **Q.**    You hope that for yourself?

19    **A.**    Yes.

20    **Q.**    You hope that for your wife who you talked about

21    earlier?

22    **A.**    I mean, whatever happens to me is going to affect

23    her, so, it affects her, it affects my family, my friends,

24    everyone around me.

25    **Q.**    Yes, sir.  So the answer to my question is, yes,

1    sir, you hope that the government takes it easier on you

2    for your wife's sake, don't you?

3    A.    I mean, yes.

4    Q.    You hope that the government takes it easier on you

5    for all these friends of yours you're talking about, don't

6    you?

7    A.    I mean, yes.

8    Q.    Mr. McKenzie, you signed a written document called a

9    plea agreement with the government, didn't you?

10   A.    Yes.

11   Q.    And you went over that plea agreement line by line

12   with your lawyer, Mr. Cox, didn't you?

13   A.    Yes.

14   Q.    And Mr. Cox, a good lawyer, he explained to you what

15   that plea agreement was about, didn't he?

16   A.    Yes.

17   Q.    And that plea agreement even has a provision about

18   your cooperation that you hope to get credit for

19   cooperating?

20   A.    Yes.

21   Q.    You read that, didn't you?

22   A.    Yes.

23   Q.    You discussed it?

24   A.    Yes.

25   Q.    You thought about it?

1    A.    Yes.

2    Q.    So when you signed that plea agreement you're hoping

3    that you have credit, that things get easier on you,

4    you've done what the government has asked you to do, you

5    came in and met with them, you met with them last week,

6    didn't you?

7    A.    Yes.

8    Q.    Mr. McKenzie, you know that Mr. Christian and Ms.

9    Boyd, and the prosecution in this case, say that my client

10    conspired to violate the civil rights of inmates.  You

11    understand that's what we're here about, right?

12    A.    Yes.

13    Q.    To your knowledge Mr. McKenzie, my client

14    Christopher Hall never used force on Terrance Dean in the

15    gym, did he?

16    A.    I didn't see him do it.

17    Q.    So is the answer to my question, yes, to your

18    knowledge Chris Hall never used force on Terrance Dean in

19    the gym?

20    A.    No.  No, sir.

21    Q.    No, you don't have any knowledge of that, correct?

22          MR. CHRISTIAN:  Your Honor, he's answered the

23    question multiple times.

24          MR. JARRARD:  Well, he got a little --

25          THE COURT:  I think he's made it clear.  Yeah, I

1    understand the confusion you had there, but I think he's

2    made it clear that he can't say that Sergeant Hall beat

3    Mr. Dean.  Am I correct, Mr. McKenzie?

4              THE WITNESS:  Yes.

5    BY MR. JARRARD:

6    Q.    And at no point prior to today have you ever told

7    anybody involved in this investigation that he did, have

8    you?

9    A.    No, sir.

10   Q.    Mr. McKenzie, you never saw CERT hit an inmate

11   before the Terrance Dean incident, did you?

12   A.    No, sir.

13   Q.    Never?

14   A.    No, sir.

15   Q.    You're not disagreeing with me, you're saying no,

16   you never saw it, right?

17   A.    No, I never seen CERT just hit an inmate, no, sir.

18   Q.    Have you talked about with the government these

19   prior instances listed in the indictment?

20   A.    What prior instances?

21   Q.    Westbrook on Hinton, Jones on Davis, Miller on

22   Felton?

23   A.    I was only at work for one incident and that was the

24   Dean incident.

25   Q.    Okay.  And you have never discussed any allegations

1    that Chris Hall participated in hitting any inmates with

2    my client Chris Hall, have you?

3            MR. CHRISTIAN:  Objection, Your Honor.  Prior

4    bad acts, prior good acts.  I mean, this is squarely

5    within the motions we filed, Your Honor.  We wouldn't be

6    permitted to do it under 404(b).

7            MR. JARRARD:  Your Honor, I'm not asking about

8    other instances, I'm asking about the four instances

9    listed in the indictment.

10           THE COURT:  Then that, yes.

11   BY MR. JARRARD:

12   **Q.**    You've never discussed the Hall -- I mean, the Dean

13   on Walden incident with Chris Hall, have you?

14   **A.**    The only thing we talked about was --

15           MR. CHRISTIAN:  Your Honor.  Objection.  This is

16   getting into the Defendants's statements.  If he's going

17   to ask what Defendants have said to them, Defendants can't

18   get their own statements in that way.

19           THE COURT:  Well, but the question is whether or

20   not the witness had discussed with the government any

21   involvement by Sergeant Hall with the other beatings?  Is

22   that the question?

23           MR. CHRISTIAN:  That was the previous question.

24           MR. JARRARD:  No, Your Honor.  Let me try to

25   rephrase it.  I'll just withdraw that question if that's

1    the way it's perceived to be.

2    BY MR. JARRARD:

3    Q.    Mr. McKenzie, have you had any conversations with

4    Sergeant Hall about what happened to Dean or to Westbrook?

5    Just yes or no.  I'm not asking --

6    A.    No.

7         MR. JARRARD:  One minute, Your Honor.

8    BY MR. JARRARD:

9    Q.    Mr. McKenzie, do you remember telling me earlier

10   that you didn't remember, as you sit here today, who was

11   escorting Inmate Dean?

12        MR. CHRISTIAN:  When are we talking about the

13   escort, Your Honor?

14        THE COURT:  Pardon?

15        MR. CHRISTIAN:  What part of the escort are we

16   talking about?

17        THE COURT:  Yeah, what --

18        MR. JARRARD:  As he leaves the E dorm.

19   BY MR. JARRARD:

20   Q.    As he leaves the E dorm, he's being escorted across

21   the yard, you testified earlier, Mr. McKenzie, that you

22   don't recall who in CERT were escorting Inmate Dean.  That

23   was your testimony, right?

24   A.    Yes.

25   Q.    You knew when you met with the FBI on June 4th, just

1    last Wednesday who was escorting him, didn't you?

2    A.    No.

3    Q.    Did you tell the FBI last Wednesday Dean was being

4    escorted by Douglass-Griffin and Redden?

5    A.    No.  That's when he went with him when he was in the

6    gym.

7    Q.    All right.  So, when we're in the gym it's your

8    testimony to this jury that two CERT members escorting

9    Dean are Douglass-Griffin and Redden, right?

10   A.    No, because they weren't escorting him at that

11   point.  Escorting would have to mean that they were

12   moving.  They were just stationary right there.

13   Q.    Mr. McKenzie, do you remember talking to the

14   prosecution team last Wednesday?

15   A.    Yes.

16   Q.    Did you say Dean was being escorted by Darren

17   Douglass-Griffin and Willie Redden?

18          MR. CHRISTIAN:  Objection.  Asked and answered.

19          THE COURT:  Well, I don't know --

20          MR. JARRARD:  I don't think he has answered it,

21   Your Honor.

22          THE COURT:  Overruled.

23   BY MR. JARRARD:

24   Q.    Do I need to repeat myself, Mr. McKenzie?

25   A.    Yes.

1    Q.    Do you remember meeting with the prosecution team

2    last Wednesday?

3    A.    Yes.

4    Q.    Did you tell the prosecution team Dean was being

5    escorted by Darren Douglass-Griffin and Willie Redden?

6    A.    That statement was made, was made pertaining in the

7    gym.

8    Q.    Okay.  In the gym.  That was how we started just a

9    few moments ago?

10   A.    Yes.

11   Q.    In the gym you said Dean was being escorted by

12   Darren Douglass-Griffin and Willie Redden, didn't you, Mr.

13   McKenzie?

14   A.    Yes.

15        MR. JARRARD:  Nothing further, Your Honor.

16        THE COURT:  Mr. Fox?

17        MR. FOX:  Thank you, Your Honor.

18                      CROSS EXAMINATION

19   BY MR. FOX:

20   Q.    Good afternoon, Mr. McKenzie.  My name is John Fox.

21   A.    How you doing, sir.

22   Q.    I represent Mr. Delton Rushin.

23   A.    Okay.

24   Q.    Can you hear me okay?

25   A.    Sir?

1   Q.   Can you hear me okay?

2   A.   Yes, sir.

3   Q.   Okay.  If for any reason I ask you a question that

4   you don't understand or that you can't hear, please let me

5   know, all right?

6   A.   Okay, sir.

7   Q.   Okay.  Now you testified earlier for the government

8   that you were a CERT officer between 2007 and 2009,

9   correct?

10   A.   Yes, sir.

11   Q.   And it's also correct that during the time that you

12   were a CERT officer that you served with Mr. Delton

13   Rushin, correct?

14   A.   Yes, sir.

15   Q.   All right.  And I believe you had stated earlier

16   that during October, November, and December of 2010 that

17   there were cameras at the front entry of the Macon State

18   Prison, correct?

19   A.   Yes, sir.

20   Q.   Okay.  That there were cameras in some of the

21   housing pods such as an E dorm, correct?

22   A.   Yes, sir.

23   Q.   Okay.  Where else were cameras at the Macon State

24   Prison?  Just in that time frame.

25   A.   On the perimeter and I think all the other housing

1   units.  I can't remember exactly when they put the cameras

2   inside the prison.

3   Q.    Okay.  But it would be fair to say that the gym was

4   not the only location that didn't have a surveillance

5   camera, correct?

6   A.    Correct.

7   Q.    All right.  There were other locations that didn't

8   have cameras as well?

9   A.    Correct.

10  Q.    All right.  I'd like to take you back to August,

11  August 15th of 2012.

12  A.    Okay.

13  Q.    Do you recall meeting with the FBI that day,

14  correct?

15  A.    Yes.

16  Q.    And in your words you lied to them, you omitted some

17  information, correct?

18  A.    Yes.

19  Q.    And then when you left you drove to a park in Perry,

20  you stopped your car, correct?

21  A.    Yes.

22  Q.    You were probably pretty upset at that point in

23  time, is that a fair assessment?

24  A.    Yes, sir.

25  Q.    You were pretty worried about what was going to

1    happen to you, correct?

2    A.    Yes, sir.

3    Q.    You were worried about what your future would be,

4    correct?

5    A.    Yes, sir.

6    Q.    All right.  And there at that park did you see other

7    people, families, children playing?

8    A.    No, sir.

9    Q.    Okay.  You were the only one there?

10   A.    Yes, sir.

11   Q.    All right.  You picked up the phone and called your

12   wife, correct?

13   A.    Yes, sir.

14   Q.    All right.  And from what you've described

15   Ms. McKenzie wasn't too happy with what you told her, was

16   she?

17   A.    No, sir.

18   Q.    She was so upset she hung up the phone on you,

19   correct?

20   A.    No, sir.

21   Q.    Okay.  She didn't tell you I've got to get off the

22   phone?

23   A.    Yes.

24   Q.    Okay.  So she hung up the phone on you, correct?

25   You two were no longer talking at that point?

1    A.    Correct.

2    Q.    Okay.  And then what happened, did you just sit in

3    your car?

4    A.    I was standing outside my car.

5    Q.    Standing outside your car.  How long before

6    Ms. McKenzie called you back?

7    A.    Uh, in about five or 10 minutes, I'm guessing.

8    Q.    Five or 10 minutes.  And she was pretty upset when

9    she called you back, wasn't she?

10   A.    Yes.

11   Q.    All right.  Did it upset you to know that you had

12   done something that made your wife sad or made her cry?

13   A.    Yes, sir.

14   Q.    After that you went back and talked to the FBI,

15   correct?

16   A.    Yes, sir.

17   Q.    I think you said something to the effect of your

18   wife told you you need to make this right, you need to do

19   what's right, correct?

20   A.    Yes, sir.

21   Q.    All right.  And when you went back and talked to the

22   FBI the second time you didn't tell them everything, did

23   you?

24   A.    No, sir.

25   Q.    Okay.  In fact you went home that night and had to

1    tell your wife again that you left out information,

2    correct?

3    A.    Yes, sir.

4    Q.    All right.  And she was again pretty upset with you

5    at that point in time, fair to say?

6    A.    Yes, sir.

7    Q.    All right.  Was she more upset then than she was

8    earlier that afternoon?

9    A.    (Nodding head).

10   Q.    I'm sorry sir, the court reporter cannot pick up

11   head movements, if you're shaking your head --

12   A.    Repeat the question again.

13   Q.    August 15, 2012, when you got home that evening from

14   the second time you talked with the FBI --

15   A.    Uh-huh.

16   Q.    -- you told your wife that you hadn't told

17   everything yet again, was your wife more upset with you

18   then than she was earlier in the afternoon?

19   A.    It was still the same level.  She was pretty upset

20   from earlier, so, I mean --

21   Q.    And when you say pretty upset she was pretty upset?

22   A.    Yes, sir.  She was -- she had been crying.

23   Q.    Okay.  And she told you, I believe you told

24   Mr. Christian, something to the effect of you need to make

25   this right.  Sound fair?

1    A.    Yes, sir.

2    Q.    Okay.  So you went into the grand jury the next day

3    and you testified, correct?

4    A.    Yes, sir.

5    Q.    Okay.  And before that -- well first, you were given

6    a subpoena to show up at the grand jury, correct?

7    A.    Yes, sir.

8    Q.    Okay.  And when you showed up at the grand jury

9    voluntarily Mr. Christian told you he was going to tear up

10   that subpoena, correct?

11   A.    Yes, sir.

12   Q.    Okay.  And you also understood at that point in time

13   that if you testified to the grand jury, that you would

14   not be charged with having lied to the FBI the day prior,

15   correct?

16   A.    Yes, sir.

17   Q.    So it would be fair to say at that point in time you

18   knew that you had to be truthful, accurate, and complete

19   in what you told the grand jury, correct?

20   A.    Yes, sir.

21   Q.    And do you remember being questioned by

22   Mr. Christian at the grand jury about the Terrance Dean

23   incident?

24   A.    Yes, sir.

25   Q.    All right.  And do you remember your response when

1   asked how many or who the CERT members are who were in the

2   gym?

3   A.    Yes, sir.

4   Q.    Okay.  And is it correct your answer was, "Six, I

5   believe it was six?"

6   A.    Yes, sir.

7   Q.    And you would agree with me at that date back in

8   August you didn't name the name of any of those six

9   officers?

10  A.    No, sir.

11  Q.    Okay.  Do you remember meeting with the FBI in May

12  of this year, May 21, 2014?

13  A.    Yes, sir.

14  Q.    Okay.  And that was nearly two years after you had

15  appeared in front of the grand jury, correct?

16  A.    Yes, sir.

17  Q.    And at that time you gave the FBI the name of six

18  people that you believed were there, correct?

19  A.    Yes, sir.

20  Q.    All right.  It wasn't until almost two years later

21  that you recalled the names of the individuals, the six, I

22  believe, six who were there?

23  A.    No, sir.

24  Q.    Okay.  All right.  But the bottom line is you didn't

25  tell it to the grand jury that day, did you?

1    A.    No, sir.

2    Q.    All right.  You omitted that from your grand jury

3    testimony?

4    A.    I wasn't asked.

5    Q.    So sir, when you were in front of the grand jury you

6    knew you were there to be truthful, you knew you were

7    there to be complete and accurate, you didn't feel the

8    need to tell the grand jury the names of the six who were

9    there?

10   A.    I answered the questions that were given, sir.

11   Q.    All right.  So your testimony is you were only

12   answering what the government asked you?

13   A.    Yes, sir.

14   Q.    Okay.  You watched the video from the incident with

15   Terrance Dean earlier today, correct?

16   A.    Yes, sir.

17   Q.    Okay.  And your testimony was that as Officer Redden

18   threw Dean on the ground you walked out of the gym,

19   correct?

20   A.    After he punched him, yes, sir.

21   Q.    Okay.  After Redden punched Dean, correct?

22   A.    Yes, sir.

23   Q.    And you then went back to the E dorm, correct?

24   A.    Yes, sir.

25   Q.    Okay.  And at that E dorm you had conversations with

1    the supervisor, Blakely and those people, and that's when

2    you said, the moment you were in E dorm, Terrance Dean,

3    something's happening to Terrance Dean in the gym, right?

4    A.    Yes, sir.

5    Q.    When you walked in that dorm at 2:12 Delton Rushin

6    walked in right behind you, didn't he?

7    A.    Yes, sir.

8    Q.    Okay.  So while you're having this conversation with

9    your superiors, saying that whatever happened to Dean is

10   happening right now while I'm sitting here talking to you,

11   Delton Rushin was in the E dorm, wasn't he?

12   A.    Yes, sir.

13   Q.    All right.  You never saw Delton Rushin hit Terrance

14   Dean, did you?

15   A.    No, sir.

16   Q.    You've never seen Delton Rushin use any kind of

17   force on Terrance Dean, have you, sir?

18   A.    No, sir.

19   Q.    And you haven't had any conversations with Delton

20   Rushin about the Terrance Dean incident, have you, sir?

21   A.    No, sir.

22   Q.    All right.  Thank you, Mr. McKenzie.

23              THE COURT:  Mr. Wolfe?

24              MR. WOLFE:  Thank you, Judge.

25                        CROSS EXAMINATION

1    BY MR. WOLFE:

2    **Q.**    Good morning, Mr. McKenzie, how are you doing?

3    **A.**    Doing fine, sir.

4    **Q.**    Holding up?  I know it's been a long morning.

5    **A.**    It is, yes, it is.

6    **Q.**    I'm old so I don't hear very well, so if you'll

7    please speak into that microphone so that I can hear you

8    I'd appreciated it, all right?

9    **A.**    All right.

10   **Q.**    My understanding is that you're experienced in a

11   number of different roles as a Department of Corrections

12   corrections officer, correct?

13   **A.**    Yes, sir.

14   **Q.**    Okay.  And, in fact, you sort of worked your way up

15   the ranks a little bit.  Is that an accurate statement?

16   **A.**    Yes, sir.

17   **Q.**    Okay.  Did you begin as a corrections officer?

18   **A.**    Yes, sir.

19   **Q.**    And were you a C1?

20   **A.**    Yes, sir.  I began as --

21   **Q.**    Is that what they call it, C1?

22   **A.**    CO1.

23   **Q.**    There you go.  Corrections officer 1.  And you moved

24   up to a CO2, correct?

25   **A.**    Yes, sir.

1    Q.    And is my understanding correct that by stating that

2    you move up from a CO1 to a CO2 that a CO2 does different

3    things than a CO1?

4    A.    No.

5    Q.    All right.  Then what's the difference in a CO1 and

6    a CO2?  Experience?

7    A.    Experience and five percent pay.

8    Q.    Good.  All right. So things change, right?

9    A.    Yes.

10   Q.    And that's a big difference between a CO1 and a CO2.

11   Is it simply a pay increase that's the difference between

12   a CO2 and a sergeant?

13   A.    Uh --

14   Q.    Or are there other differences?

15   A.    Oh, there are other differences.

16   Q.    Like what?

17   A.    You're a supervisor.

18   Q.    And when you're a supervisor you don't do some of

19   the things that the CO1s and CO2s are doing regularly, you

20   manage them and make sure they're doing things correctly,

21   right?

22   A.    Yes, sir.

23   Q.    Okay.  And so while they're doing their duties you

24   have other responsibilities, correct?

25   A.    Yes, sir.

1   Q.   Reports, different things that a CO1 or 2 might not

2   have to do?

3   A.   Yes, sir.

4   Q.   All right.  And then I think you were kind enough to

5   share with Mr. Christian that when you went to Dooly State

6   Prison, they elevated you to a lieutenant, correct?

7   A.   Yes, sir.

8   Q.   All right.  And I reckon a lieutenant has different

9   responsibilities than a sergeant, right?

10   A.   Yes, sir.

11   Q.   And a lieutenant certainly has different

12   responsibilities than a CO1 and a CO2?

13   A.   Yes, sir.

14   Q.   But for the most part CO1s, 2s, sergeants and

15   lieutenants are guards, correct?

16   A.   Pretty much -- yes, sir.

17   Q.   Okay.  All right.  And is my understanding correct

18   that most of the CO1 and 2 responsibilities and the other

19   guards' duties take place inside the prison, within the

20   four walls of the perimeter?

21   A.   Well, it all depends on what you are assigned to.

22   If you are assigned to work inside the institution, yes,

23   but we also have -- at that time at Macon State you have

24   an officer who has to work -- drove vehicles on the

25   perimeter, as well as you had, uh, sergeants who did

1    transfers or whatnot outside.

2    Q.    All right.  So then there were times when different

3    guards did different things and depending upon your

4    assignment, you may have had different training and

5    different responsibilities, correct?

6    A.    Yes.

7    Q.    Now, my understanding is in December, November,

8    October of 2010 there were about 1,729 inmates at Macon

9    State Prison.  Would that be a fair estimate?

10   A.    Yeah -- yes, sir.

11   Q.    All right.  And having been at Macon State Prison

12   and Dooly State Prison, you know that different prisons

13   have different classifications, correct?

14   A.    Yes.

15   Q.    All right.  And there are minimum security prisons,

16   right?

17   A.    Yes.

18   Q.    Mediums?

19   A.    Yes.

20   Q.    And then there are close security prisons, right?

21   A.    Yes, sir.

22   Q.    Like Macon State?

23   A.    Yes, sir.

24   Q.    Which is the same as Jackson where they do the death

25   penalty and hold the death row inmates, right?

1    A.    Yes, sir.

2    Q.    So you know that there is a difference and what

3    institution you go to is determined by a classification

4    that inmate goes through when he first goes into the

5    system, right?

6    A.    Yes, sir.

7    Q.    All right.  And closed security prisons like Macon

8    State Prison house --

9          MR. CHRISTIAN:  I'm going to object, Your Honor.

10   It's irrelevant.

11         THE COURT:  Mr. Wolfe?

12         MR. WOLFE:  It goes to Mr. Hinton's role as

13   security, head of security at the prison.

14         THE COURT:  I will overrule that objection but

15   make your point quickly, which is simply that this is a

16   closed security prison?

17         MR. WOLFE:  Right.

18         THE COURT:  Okay.

19         MR. WOLFE:  All right.  Okay.

20   BY MR. WOLFE:

21   Q.    And long-term inmates go there, correct, to closed

22   security prisons?

23   A.    Yes, sir.

24   Q.    All right.  Now, within Macon State Prison and you

25   indicated you were on the CERT team and you've been a CO1,

1    2, and up the line, correct?

2    A.    Yes, sir.

3    Q.    There are several different dorms, correct?

4    A.    Yes, sir.

5    Q.    And E-1 dorm is the dorm that we've been talking

6    about, right, today with regard to at the very least the

7    Dean incident?

8    A.    No, sir.  Unit E-2.

9    Q.    E-2, excuse me.  Okay.  It was E.  And is my

10   understanding correct that part of the security plan at

11   Macon State Prison was to keep the -- a certain type of

12   inmate in the E-1 or -- I mean the E-2 dorm?

13           MR. CHRISTIAN:  Objection, relevance, Your

14   Honor.

15           THE COURT:  Mr. Wolfe?

16           MR. WOLFE:  It goes to security and the duties

17   of the CERT team and the duties of Mr. Hinton, and what he

18   might have said to different people at different times.

19           THE COURT:  I overrule the objection at this

20   time.  But it's a fairly simple point to make.  Let's make

21   it and move on.

22           THE WITNESS:  Could you repeat the question,

23   sir?

24           MR. WOLFE:  Sure.

25   BY MR. WOLFE:

1    Q.    Is my understanding correct that certain types of

2    inmates, gang members and those sorts of things, were kept

3    specifically in the E-2 dorm?

4            MR. CHRISTIAN:  I maintain my objection, Your

5    Honor, just for the record.  It's irrelevant.

6            THE COURT:  You can answer that question.

7    BY MR. WOLFE:

8    A.    THE WITNESS:  I don't remember if that was the dorm

9    or not.

10   Q.    Well, you don't remember that?

11   A.    No, sir.

12   Q.    All right.  Okay.  Well how about this.  You said

13   that you had been on the CERT team before, correct?

14   A.    Yes, sir.

15   Q.    And I just discussed with you some of the

16   differences between the corrections officers and their

17   responsibilities as you move up the line and you're

18   familiar with that, right?

19   A.    Yes, sir.

20   Q.    Well you're also familiar with the fact that things

21   are different on CERT also, from the duties of the other

22   guards?

23   A.    Yes, sir.

24   Q.    All right.  And there are cell extractions that is a

25   responsibility of CERT, correct?

1    A.    Yes, sir.

2    Q.    And tell the folks what a cell extraction is.

3    A.    That's basically when, uh -- not necessarily a CERT

4    officer, but any security staff member would put a team

5    together in which you would have a shield man --

6    Q.    What's a shield man?

7          MR. CHRISTIAN:  Your Honor, again I'm going to

8    object as to relevance.  He's just said this is any

9    officer's duties, it has nothing to do with CERT.

10         THE COURT:  Were you talking about CERT duties

11   and extraction?

12         THE WITNESS:  No.  A cell extraction can be any

13   security staff member.  It doesn't have to be a CERT

14   officer, it doesn't have to be a CO, it can be a sergeant

15   or a lieutenant that suits up and does it.

16         THE COURT:  I sustain that objection.

17         MR. WOLFE:  Okay.

18   BY MR. WOLFE:

19   Q.    Then cell extractions are managed by the security

20   people at the prison, though?  Would it be fair for me to

21   understand that?

22   A.    Yes, sir.

23   Q.    All right.  And what about shake downs of the guards

24   at Macon State Prison?  Are there shake downs of the

25   guards done by the CERT team?

1    **A.**    Yes, sir.

2    **Q.**    And that is a task that is unique to the CERT team,

3    correct?

4    **A.**    Yes, sir.

5    **Q.**    And part of the reasons that guards are shaken down

6    is in an attempt through security to prevent contraband

7    from coming into the institution, right?

8    **A.**    Yes, sir.

9    **Q.**    Drugs, correct?

10   **A.**    Yes, sir.

11   **Q.**    Cell phones, right?

12   **A.**    Yes, sir.

13   **Q.**    And drugs and cell phones are routinely found in the

14   institution, correct?

15   **A.**    Yes, sir.

16   **Q.**    And isn't shake downs of guards or even the shake

17   downs of the inmates necessary to discover weapons also?

18   **A.**    Yes, sir.

19   **Q.**    And weapons are routinely found in the prison,

20   correct?

21   **A.**    Yes, sir.

22   **Q.**    Shanks are a particular type of weapon which is

23   essentially a homemade knife, correct?

24          MR. CHRISTIAN:  Objection, Your Honor,

25   relevance.

1           THE COURT:  Well, the relevant point is, is the

2   statement upon which the government relies is the alleged

3   statement by Mr. Hinton that things are different for

4   CERT.  That allows Mr. Wolfe some latitude to develop

5   his -- the points he wants to make about that.  You are

6   beginning to stray a little bit, Mr. Wolfe.  Make your

7   point about how CERT was different.  We don't have to

8   elaborate and get into matters that are not relevant.

9   BY MR. WOLFE:

10  Q.    I asked you the questions with regard to the

11  searching and shaking down of guards because when a shake

12  down of the guards occurs, you're not supposed to tell the

13  guards before it happens that it is going to happen, are

14  you?

15  A.    No, sir, you're not.

16  Q.    That would defeat the purpose of shaking down the

17  guards, correct?

18  A.    Yes, sir.

19  Q.    So if you find out on CERT that a shake down is

20  going to occur, that should stay with CERT, right?

21  A.    Yes, sir.

22  Q.    Let me ask you some questions about your

23  participation in the conduct that occurred on

24  December 16th of 2010, okay?

25  A.    Yes, sir.

1  Q.    That was the day that the Dean incident occurred,
2  correct?
3  A.    Yes, sir.
4  Q.    And that was the day that you've testified you
5  engaged in certain conduct, right?
6  A.    Yes, sir.
7  Q.    All right.  And my understanding is that although
8  you had been a part of CERT up until 2009 you were no
9  longer a part of CERT, right?
10  A.    No, sir.
11  Q.    And you were a sergeant that was doing your own job,
12  right?
13  A.    Yes, sir.
14  Q.    And when you got the code three, you went to the
15  area where the incident had occurred and at the very least
16  you learned that somebody, an inmate, Dean, had put his
17  hands on staff, right?
18  A.    Yes, sir.
19  Q.    And there was an altercation, correct?
20  A.    Yes.
21  Q.    And you saw the video of the altercation.  I'm not
22  going to go into the details of it.  But you saw that
23  there was an assault with closed fists and those sorts of
24  things on the inmate, not on the -- pardon me -- on guard
25  Walden?

1    **A.**     Yes, sir.

2    **Q.**     All right.  Good enough.  So they extract Dean from

3    the location and my understanding is he was being escorted

4    to medical which is a responsibility that's part of the

5    transport, correct?

6    **A.**     Yes, sir.

7    **Q.**     Good deal.  All right.  And I understand that when

8    you got up to the gym, whenever it was that you got there,

9    you went in the gym, right?

10   **A.**     Yes, sir.

11   **Q.**     And although there might have been some confusion,

12   you saw Dean standing there with Redden and

13   Douglass-Griffin, correct?

14   **A.**     Yes, sir.

15   **Q.**     Standing there together.  And what type of position

16   did you say they were in?

17   **A.**     Escort position.

18   **Q.**     Escort position.  And when you came in the gym were

19   you then the superior supervising officer?

20   **A.**     Yes, sir.

21   **Q.**     Is that a yes?

22   **A.**     Yes.

23   **Q.**     And did you say anything or did anybody look to you

24   and stop to see if you had any direction for them?

25   **A.**     No, sir.

1   Q.   Okay.  Was there a plan for you to be there in the

2   gym?

3   A.   No, sir.

4   Q.   Did anybody invite you into the gym?

5   A.   No, sir.

6   Q.   Was that door open and unlocked -- I mean unlocked.

7   I don't mean open -- when you walked into the gym?

8   A.   It wasn't locked.

9   Q.   Okay.  And as you entered the gym you saw the guy

10  that you knew had assaulted Walden, correct?

11  A.   Yes, sir.

12  Q.   And at the risk of -- I don't mean to offend

13  anybody, you were pissed, you were hot because the inmate

14  had assaulted Walden down in E dorm, right?

15  A.   I was a little upset, yes, sir.

16  Q.   A little upset.  You were so upset that you walked

17  up to the inmate as he was being detained with his hands

18  cuffed behind his back and put your finger in his face and

19  says, keep your hands off of my guards, right?

20  A.   Something to that nature, yes, sir.

21  Q.   Something to that affect.  And then you put your

22  finger on his face and you swung your finger across,

23  right?

24  A.   I swiped my finger, yes, sir.

25  Q.   Swiped your finger and it turned his head, you

1    testified to a moment ago, correct?

2    A.    Yes, sir.

3    Q.    All right.  And that was a use of force that was

4    unnecessary, correct?

5    A.    No, sir.

6    Q.    It wasn't a use of force?

7    A.    No, sir.

8    Q.    What was it, a training mechanism?

9    A.    No, sir.

10    Q.    What was it?

11    A.    I don't know what they call it but it's not a use of

12    force.

13    Q.    Okay.  All right.  Well, it better not be a use of

14    force because you didn't fill out a use of force form for

15    that day, did you?

16    A.    No, sir.

17    Q.    Okay.  And you were angry that he put his hands on

18    your inmate, correct?  I mean on your guard, correct?

19    A.    I was a little upset.

20    Q.    Even though it had happened within a couple of

21    minutes prior to that, right?

22    A.    Yes, sir.

23    Q.    All right.  All right.  And then you turn to leave

24    the location, but when you walked in Dean had no malities

25    on him, you saw no injuries on him, did you?

1    **A.**    No, sir --

2    **Q.**    And you --

3    **A.**    -- that I could tell.

4    **Q.**    I'm sorry, I beg your pardon.

5    **A.**    No, sir, that I could tell.

6    **Q.**    Well, that you could tell?  You walked up close

7    enough to put your finger on his face, correct?

8    **A.**    Yes, sir.

9    **Q.**    All right.  All right, now, Redden is a junior

10   officer to you, isn't he?

11   **A.**    Yes, sir.

12   **Q.**    Douglass Davis is a junior officer to you, isn't he?

13   **A.**    Yes, sir.

14   **Q.**    And he -- they both just see you abuse Dean,

15   correct?

16   **A.**    No, sir.

17   **Q.**    They didn't see you abuse Dean?

18   **A.**    No, sir.  I didn't abuse him.

19   **Q.**    All right.  I'm sorry?

20   **A.**    I said, no, sir, I didn't abuse him.

21   **Q.**    Oh, okay.  Well, we still haven't figured out what

22   you call it what you did, though, right?

23   **A.**    Right.

24   **Q.**    All right.  But as you're leaving the gym you

25   observe Redden slam Dean to the ground, correct?

1    **A.**    Yes.

2    **Q.**    With his hands cuffed behind his back --

3    **A.**    Yes, sir.

4    **Q.**    Correct?

5    **A.**    Yes, sir.

6    **Q.**    And then he punches him, I believe you said, in the

7    face?

8    **A.**    Yes, sir.

9    **Q.**    And then you leave the location and it's your

10   responsibility because you observed the inmate, and you

11   had participated in the conduct surrounding the situation

12   in E dorm, to fill out a report, right?  You did a report,

13   a handwritten statement and a --

14   **A.**    Yes, sir.

15   **Q.**    And that handwritten statement was typewritten just

16   to go into the IA files, which is Internal Affairs,

17   correct?

18   **A.**    Yes, sir.

19   **Q.**    So you knew Internal Affairs was going to be

20   reviewing it, correct?

21   **A.**    Yes, sir.

22   **Q.**    And you wrote your statement, right?

23   **A.**    Yes, sir.

24   **Q.**    And you wrote that statement at 1404 which is 2:04

25   P.M. on December the 6th of 2010, right?

1    **A.**    Yes, sir.

2    **Q.**    And that was the first time that you lied with

3    regard to this case, correct?

4    **A.**    Well, I wrote that statement on that Friday on the

5    17th, but yes, sir.

6    **Q.**    Oh, beg your pardon.  The statement if you want to

7    look at it is dated -- it says witness statement date

8    12/16/2010.

9    **A.**    Yes, sir.

10   **Q.**    Is this wrong?  Is -- do you want to see the

11   exhibit?

12   **A.**    No, I'm looking at it.

13   **Q.**    Oh, okay.  You see the date at the top, correct?

14   **A.**    That's the date and the time that the incident

15   happened.

16   **Q.**    Okay.  Great.  So you had an entire day to think

17   about what you were going to put into your report before

18   you lied and left out what exactly you did, correct?

19   **A.**    Actually no, because I didn't know I was going to

20   have to write a statement until the next day.

21   **Q.**    Pardon me?

22   **A.**    I didn't know I was going to have to write a

23   statement until the next day.

24   **Q.**    Oh, okay.  Well you spoke with Blakely before you

25   wrote the statement, correct?

1   **A.**      Sir?

2   **Q.**      You spoke to Blakely before you wrote the statement,

3   correct?

4   **A.**      Yes, in his office.

5   **Q.**      Right.  But wherever you talked to him you talked to

6   him before you wrote the statement and if I'm not mistaken

7   he told you something to the effect that you better do it

8   right because this is -- there's going to be a federal

9   investigation of this.  Is that what he told you?  What

10  did he say about the feds, or the feds are going to get

11  involved?

12  **A.**      He said, I told the guys to come over and let's

13  review the video tape because it's going federal and when

14  it does their ass is going to be in the ringer.

15  **Q.**      Right.  Okay.  So if their ass was going to be in

16  the ringer yours would be too, right, because you

17  participated up in this gym, correct?

18  **A.**      Yes.  I was up there, yes, sir.

19  **Q.**      Uh-huh.  And knowing what Blakely had said and

20  fearing a federal investigation you went and wrote your

21  statement and intentionally left out your participation in

22  the altercation with Dean, right?

23  **A.**      Yes, sir.

24  **Q.**      All right.  And I think you said you did it cause

25  you didn't want to be involved, right?

1    A.    Yes, sir.

2    Q.    Okay.  But you were involved, weren't you?

3    A.    Yes, sir.

4    Q.    Now, my understanding is you went from Macon State

5    Prison to Dooly State Prison and you signed up there,

6    right?

7    A.    Yes, sir.

8    Q.    Okay.  And I guess you started as a sergeant there,

9    correct?

10   A.    No, sir.  I left Macon State as a sergeant and when

11   I got to Dooly I was -- that was my promotion.  They had a

12   lieutenant board in which I went up for and I made

13   lieutenant, so on August 16th when I started I was a

14   lieutenant at Dooly State Prison.

15   Q.    Oh, okay.  Good deal.  And when you went to Dooly

16   State Prison did you tell them that you had lied to the

17   Georgia Bureau of Investigation about your participation

18   in the Dean incident?

19          MR. CHRISTIAN:  Objection, Your Honor.  It's not

20   been established he was even interviewed by the Georgia

21   Bureau of Investigation.

22          THE COURT:  What?

23          MR. CHRISTIAN:  It's not been established that

24   he was even interviewed by the Georgia Bureau of

25   Investigation.  He's just accused him of lying to the

1    Georgia Bureau.

2              THE COURT:  Are you talking about the

3    statements.  The two statements he made?

4              MR. WOLFE:  Yes -- well not the two -- he's made

5    several statements.  But I'll rephrase the question.  I

6    understand.

7    BY MR. WOLFE:

8    Q.    Okay.  Did you ever speak to the Georgia Bureau of

9    Investigation with regard to your conduct on December 16th

10   of 2010?

11   A.    No, sir.

12   Q.    Aha.  Might that have been, do you think, because

13   you never said you were up there or participated?

14             MR. CHRISTIAN:  Objection, Your Honor.  He's

15   asking what GBI was doing in its investigation --

16             THE COURT:  I'll sustain that.

17             MR. WOLFE:  Okay.

18   BY MR. WOLFE:

19   Q.    All right.  But you knew that the Georgia Bureau of

20   Investigation, before you left Macon State Prison, began

21   an investigation into the Dean incident on January 5th of

22   2011, correct?

23   A.    Yes, sir.

24   Q.    Okay.  And you knew that they were interviewing

25   witnesses that were participants, correct?

1    A.    Yes, sir.

2    Q.    And you knew that certain of the other people like

3    Redden, for example, had already started telling on

4    everybody in his words, right?

5    A.    I didn't know who was saying what.

6    Q.    Oh, okay.  But you knew folks were saying stuff.

7    Did you ever go to the Georgia Bureau of Investigation and

8    say, hey, with regard to your investigation, I was there

9    and here's what I did?

10   A.    No, sir.

11   Q.    Okay.  All right.  All right.  Did you ever tell the

12   people at Dooly State Prison anything about your

13   participation in the Dean incident when you were applying

14   for your job there?

15   A.    No, sir.

16   Q.    And you've told the ladies and gentlemen of the jury

17   that you resigned from Dooly State Prison, correct?

18   A.    Yes.

19   Q.    But, in fact, the fact that were going to be

20   arrested and charged with Eighth Amendment violations, you

21   would have been fired from there anyway, correct?

22   A.    Yes, sir.  If I would have been arrested.

23   Q.    Right.  And if you knew about it do you believe they

24   would -- if they knew about it, when you applied for your

25   job, do you think they ever would have hired you?

1    A.    I can't answer that question.

2    Q.    All right.  All right.  Now, my understanding is

3    that at some point in August of 2012 is when you first --

4    is that when you first spoke with the FBI?

5    A.    Yes, sir.

6    Q.    Did -- hang on one second.  Had you ever made a

7    previous appointment to meet with the FBI and not gone?

8    A.    No, sir.

9    Q.    No.  Because they didn't know about you, right?

10   A.    I guess no, sir.

11   Q.    Okay.  But in August of 2012 you went and met with

12   them and that was the -- that was actually the second time

13   that you had to do anything affirmatively with regard to

14   your participation in the Dean incident, right?

15   A.    Yes, sir.

16   Q.    And so when you got the opportunity to come clean

17   and tell the truth, did you do that on your first visit

18   with the FBI?

19   A.    No, sir.

20   Q.    And, in fact, you lied to them again on that

21   occasion, right?

22   A.    Yes, sir.

23   Q.    Okay.  All right.  Now, leading up to August of

24   2012 -- is August 2012 the first time your wife found out

25   what you had done in the Dean incident?

1   A.    Yes, sir.

2   Q.    Did you tell her that you had lied in August?  In

3   August of 2012 when you went and met with the FBI and lied

4   to them, you went home and told her you had lied, right?

5   A.    Yes.

6   Q.    After sitting in the park and lamenting upon the

7   past 20 months, right?

8   A.    Yes.

9   Q.    All right.  Okay.  And she told you the story about

10  her and your kids and everything else and convinced you to

11  tell the truth, right?

12  A.    It was something I was going to do before she said

13  anything about it anyway after I had talked to her.

14  Q.    Okay.  Well, if it was something you were going to

15  do anyway why did you say just a few moments ago that that

16  was part of the reason that you did it?

17  A.    You asked me did she convince me.

18  Q.    Right.

19  A.    I mean, that was part of the reason.  That wasn't

20  the full --

21  Q.    Oh, okay.

22  A.    -- the full reason.

23  Q.    But you were going to do it anyway, right?

24  A.    After I had talked to her and I heard the pain in

25  her voice I knew that I wasn't going to drag her through

1    that.

2    Q.    Right.  So you go back and you talk to the FBI a

3    second time, right?

4    A.    Yes, sir.

5    Q.    And when you talk to them and tell them the truth,

6    do you tell them the entire truth?

7    A.    No, sir.

8    Q.    So you lied again.  That's the second time that you

9    lied to the Georgia -- I mean the Federal Bureau of

10   Investigation with regard to a federal investigation,

11   right?

12   A.    Yes, sir.

13   Q.    But on the third time, I guess after more

14   conversation, you go back and finally tell the truth,

15   right?

16   A.    Yes, sir.

17   Q.    All right.  Or at least you tell them what you think

18   they want to hear, correct?

19   A.    No, sir.  I tell them the truth.

20   Q.    Oh, okay.  All right.  How do we know when you're

21   telling the truth?

22          MR. CHRISTIAN:  Objection, Your Honor.

23          MR. WOLFE:   I'll withdraw the question.

24   BY MR. WOLFE:

25   Q.    Now, in exchange for your testimony at the grand

1    jury Mr. Christian tore up the subpoena, right?

2         MR. CHRISTIAN:  Objection, Your Honor.  It's

3    mischaracterizing the grand jury transcript.

4         MR. WOLFE:  I'm just asking him.  I don't

5    know -- I'm not talking about a transcript.

6         THE COURT:  It's only a question at this point.

7         MR. CHRISTIAN:  There has to be a good faith

8    basis for that question, Your Honor.

9         THE COURT:  Well, that's true.

10        MR. WOLFE:  I believed that Mr. Christian tore

11   up the subpoena.

12        MR. CHRISTIAN:  That is not what's in the

13   transcript, Your Honor, that I tore --

14        THE COURT:  Well, he says he believes it.  At

15   this point --

16        MR. CHRISTIAN:  In exchange for his testimony?

17   That's not what's in the transcript --

18        MR. WOLFE:  Okay.  I will rephrase the question.

19   I certainly don't want to -- I'm not focussing on the

20   transcript.

21   BY MR. WOLFE:

22   Q.    Do you remember Mr. Christian tearing up a subpoena

23   for any reason?

24   A.    Yes, sir.  He gave me the opportunity and told me

25   that I didn't even have to testify in front of the grand

1    jury if I didn't want to.

2    **Q.**    Okay.  All right.  But he tore up the subpoena, and

3    you agreed to testify, correct?

4    **A.**    Yes, sir.

5    **Q.**    And the way I understand the reason that you

6    testified is you decided to -- I think your term was -- do

7    the right thing, right?

8    **A.**    Yes, sir.

9    **Q.**    And at that time you knew what the government was

10    looking for you to say, correct?  About what you did and

11    what you saw?

12    **A.**    Yes, sir.

13    **Q.**    All right.  And you agreed to say what you did and

14    what you saw, right?

15    **A.**    Yes, sir.

16    **Q.**    In exchange for whatever your plea agreement gives

17    you in exchange for, whatever you have, Mr. Cox, the

18    lawyer for -- you know Mr. Cox, don't you?

19    **A.**    Yes, sir.

20    **Q.**    And in exchange for that you agree to testify,

21    right?

22    **A.**    Yes.

23    **Q.**    Here today?

24    **A.**    Yes.

25    **Q.**    All right.  Now, you indicated that the chain of

1    command -- I think you testified that there was a CERT

2    sergeant and then above the CERT sergeant was Deputy

3    Warden Hinton; is that correct?

4    A.    Yes.

5    Q.    Well, you know that above the CERT sergeant is the

6    unit manager, correct?

7    A.    No.

8    Q.    No?  How about Captain Davis?

9    A.    The CERT team is a lead group that falls directly up

10   under deputy warden and the warden here --

11   Q.    Oh, okay.  So on the reports and those sorts of

12   things with regard to people who signed off on the

13   statements you think Deputy Hinton Warden -- Deputy Warden

14   Hinton should have signed any documents in that regard?

15   A.    I'm not understanding your question.

16   Q.    All right.  Never mind.  I'll withdraw the question.

17   But you say that that's the chain of command, right?

18   A.    Correct.

19   Q.    Now, my understanding is that you actually went and

20   talked with Deputy Warden Hinton, correct?

21   A.    Yes.

22   Q.    And you went and talked with him about the Dean

23   incident, right?

24   A.    Not directly about the Dean incident.  It just came

25   up.

1    **Q.**    Oh, Dean just came up?

2    **A.**    Yes.

3    **Q.**    But your testimony on direct examination was that

4    there was a conversation about the Dean incident, right?

5    **A.**    Yes, sir.

6    **Q.**    Okay.  And this is what you testified to, that when

7    it came up Hinton said to you -- you weren't acting in an

8    undercover capacity, were you?  For any law enforcement

9    agency when you were talking with him, were you?

10   **A.**    No, sir.

11   **Q.**    Okay.  Hinton said, "I don't know why they did that,

12   right?"  That's what you just testified to?

13   **A.**    Yes, sir.

14   **Q.**    And then he said, "They shouldn't have done that,"

15   correct?

16   **A.**    Correct.

17   **Q.**    And then he said, "Maybe if I had been here it

18   wouldn't have happened," right?

19   **A.**    Repeat that again.

20   **Q.**    And then he said, "Maybe if I had been here it

21   wouldn't have happened", right?

22   **A.**    Something like that, yeah.

23   **Q.**    All right.  Thanks.

24              THE COURT:  Ms. Gomez?

25                        CROSS EXAMINATION

1    BY MS. GOMEZ:

2    Q.    Mr. McKenzie, good morning.  I represent Mr. Lach.

3    A.    Good morning.

4    Q.    Mr. McKenzie, this conversation that you claim that

5    you had with my client, Mr. Lach, actually took place at a

6    house party.  Do you remember that?

7    A.    Which one?  It was --

8    Q.    You said you had a conversation with Mr. Lach at a

9    social gathering?

10   A.    Yes.  Yes, ma'am.

11   Q.    Okay.  If you don't remember, that's fine.  I just

12   want your honest -- your answers to be honest so --

13   A.    Yeah, I remember.

14   Q.    All right.  On direct you testified about a

15   conversation you had with Mr. Lach at a social gathering?

16   A.    Yes.

17   Q.    All right.  That social gathering occurred at a

18   man's house named Carlos Watts?

19   A.    No.  That conversation that I testified to occurred

20   at one of his friend's house at Oglethorpe.

21   Q.    Which friend is that?

22   A.    I can't think of his name.  I know we was at a

23   house, it was a trailer or something like that outside on

24   Highway 49.

25   Q.    All right.  And that's the conversation where you

1    claim that Mr. Lach supposedly said that Mr. Dean -- he

2    wasn't worried about it because Mr. Dean wouldn't remember

3    anything.  Is that when you claim that conversation took

4    place?

5    A.    Yes, ma'am.

6    Q.    Okay.  Well then, let me ask you this.  During that

7    conversation did Mr. Lach tell you he didn't want to talk

8    to you?

9         MR. CHRISTIAN:  Objection, Your Honor.  You

10   can't put in the defendants's statements.

11        THE COURT:  Ms. Gomez?

12        MS. GOMEZ:  Your Honor, specifically as to this

13   conversation he's already testified to what my client said

14   to him, okay.  And during that conversation Mr. Lach, he

15   claims that Mr. Lach --

16        MR. CHRISTIAN:  Objection, Your Honor.  If we're

17   going to just have her read her client's statement into

18   the record --

19        THE COURT:  What's the reason why you think you

20   can admit your client's statement?

21        MS. GOMEZ:  Your Honor, the witness said what my

22   client had said to him about Mr. Dean.

23        THE COURT:  Right.

24        MS. GOMEZ:  Okay.  Excuse me?  Yes, I'm going to

25   state of mind about my client.  They're having this

1    conversation at -- there's two different conversations I

2    think I'm aware of.  So I'm trying to find out if it's

3    this one or some other one.

4              MR. CHRISTIAN:   Your Honor --

5              THE COURT:  You're not clear which of the two

6    conversations Mr. McKenzie was talking about --

7              MS. GOMEZ:  Your Honor, we were provided some

8    information --

9              THE COURT:  -- when he testified to the

10   statement --

11             MS. GOMEZ:  Yes, sir, yes Judge.  We were

12   provided some information that my client supposedly had a

13   conversation.  He testified to it on direct.  I'm trying

14   to figure out which one we were provided with information

15   about.

16             THE COURT:  Well, see if you can determine that

17   first without using your client's other statements.  For

18   example, were there two conversations?

19             MS. GOMEZ:  Yes, sir.

20   BY MS. GOMEZ:

21   Q.    Did you have more than one conversation with my

22   client about what occurred?

23   A.    Yes, sir -- I mean yes, ma'am, I'm sorry.

24   Q.    The one that you testified earlier to was that the

25   one you were talking about at Oglethorpe?

1    A.    Yes.

2    Q.    And that's the one when you -- can you tell us what

3    you claim Mr. Lach said because you testified to it on

4    direct?

5    A.    He was like, they were told that whenever an inmate

6    puts his hands on a staff member that they'll take them to

7    the gym and handle them.  And that Inmate Dean --

8    Q.    That's -- is that -- that's the Oglethorpe

9    conversation on direct?  You testified about Lach saying

10   that Dean could not remember anything.

11   A.    I was getting to that point.

12   Q.    Okay.  So now you're adding more.  Okay.  Go ahead?

13         MR. CHRISTIAN:  Objection, Your Honor.

14         THE COURT:  Yeah, no commentary.

15         MS. GOMEZ:  All right.

16   BY MS. GOMEZ:

17   A.    THE WITNESS:  And also that -- that, the state

18   didn't have anything because Dean couldn't remember

19   anything.

20   Q.    All right.  Where did that conversation take place

21   at the Oglethorpe residence?

22   A.    Outside.

23   Q.    On the front porch, correct?

24   A.    Backyard.

25   Q.    Do you remember telling Mr. Lach you had to do what

1    you had to do?

2    **A.**    That was at Carlos Watts' house, yes.

3    **Q.**    Okay.  Now when did the Carlos Watts' conversation

4    take place?

5    **A.**    That was after I had pled out.

6    **Q.**    Excuse me?

7    **A.**    That was after I pled out.  I don't remember exactly

8    when.

9    **Q.**    All right.  Do you remember when you pled out?

10   **A.**    Uh --

11   **Q.**    What year at least?

12   **A.**    2012.

13   **Q.**    First part of the year or second part of the year?

14   Meaning first part, first six months, or the back part of

15   the year, second six months?

16   **A.**    Second six months.

17   **Q.**    Okay.  So at some point in 2012, you remember having

18   a conversation with Mr. Lach at Carlos Watts' house?

19   **A.**    Yes.

20   **Q.**    And during that conversation is when you told him I

21   had to do what I have to do?

22   **A.**    Yes.

23   **Q.**    Isn't it true you also told him that you had to do

24   what you had to do because they said they were going to

25   get you for tax evasion or something else?

1    **A.**    No, ma'am.

2    **Q.**    You never said that?

3    **A.**    No, ma'am.

4    **Q.**    Now, Mr. McKenzie, the conversation that you had

5    with Mr. Lach is it not correct that conversation took

6    place on the front porch of Carlos Watt's house?

7    **A.**    No, ma'am.

8    **Q.**    Where did that conversation take place?

9    **A.**    Back porch.

10   **Q.**    All right.  On Oglethorpe, you said back yard?

11   **A.**    Correct back yard.

12   **Q.**    Okay.  And at Carlos Watts' house you were in the

13   back area again?

14   **A.**    Yes, ma'am, the back porch.

15   **Q.**    Who was present when the back porch conversation at

16   Carlos Watts' house took place?

17   **A.**    Just me and Lach.

18   **Q.**    You're sure about that?

19   **A.**    That's what I remember.

20   **Q.**    When you said that you witnessed Mr. Dean being

21   thrown to the ground, which officer again did that that

22   you saw?

23   **A.**    Officer Redden.

24   **Q.**    Okay.  Just tell us, you know, what did you hear?

25   Did you hear Mr. Dean's body hit the ground with a thud?

1   A.    It made a noise when he hit the ground.  I can't

2   remember exactly what the noise was, but, I mean, it made

3   a noise when it hit the ground.

4   Q.    Mr. Dean made a noise?  He made a noise verbally or

5   his body made a noise when it hit the ground?

6   A.    Body.

7   Q.    Okay.  Thank you.

8            THE COURT:  Mr. Hogue?

9                    CROSS EXAMINATION

10  BY MR. HOGUE:

11  Q.    Mr. McKenzie, I'm going to ask you just a few

12  questions.  I represent Derrick Wimbush.

13  A.    Yes, sir.

14  Q.    At the very end of your direct examination earlier

15  this morning when Mr. Christian was asking you questions,

16  you had covered your two meetings with the FBI on

17  August 15th, 2012, and you told the jury that you lied to

18  them the first time, left, talked to your wife, went back,

19  told them a little bit more, but then lied to them the

20  second time.  Do you remember that?

21  A.    Yes, sir.

22  Q.    Okay.  So, Mr. Christian asked you what happened

23  next and you talked to your wife and she told you you need

24  to make this as right as possible.  And then

25  Mr. Christian's last question today on direct was:  "What

1    did you do the next morning?"  And you answered, told the

2    jury -- the next day, when you met with the grand jury,

3    you told them everything, right?

4    A.    Yes, sir.

5    Q.    And when you came and testified to the grand jury it

6    was here in this very courthouse?

7    A.    Yes, sir.

8    Q.    A different room, upstairs and across the way,

9    right?

10   A.    I think so, sir.  I'm not sure.

11   Q.    All right.  But it was similar in this regard when

12   your testimony began that day somebody, perhaps the court

13   reporter or Mr. Christian, gave you the oath just like you

14   got this morning, right?

15   A.    Yes, sir.

16   Q.    And you took that oath and then you answered a bunch

17   of questions, right?

18   A.    Yes, sir.

19   Q.    And told the grand jury everything, right?

20   A.    Could you repeat that question, sir.

21   Q.    You told the grand jury everything?

22   A.    Yes, sir.

23   Q.    Now let me take you back -- we'll come back to what

24   you told them in a moment -- but let me take you back to

25   the day in December, December 16th, 2010, the Dean

1   incident.  When the code three went out, like when a code

2   three goes out any time, that's an emergency, right?

3   A.    Yes, sir.

4   Q.    And guards begin to move and they move fast to get

5   to their colleague, right?

6   A.    Yes, sir.

7   Q.    Who is in danger, perhaps even life threatening

8   danger, right?

9   A.    Yes, sir.

10  Q.    And so, is it fair to describe this situation, Mr.

11  McKenzie, when a code three goes out it's chaotic, people

12  are running to the scene, right?

13  A.    Yes, sir.

14  Q.    And like Mr. Wolfe pointed out to you there's

15  seventeen hundred plus inmates in this prison, Macon State

16  Prison, at that time, right?

17  A.    Yes, sir.

18  Q.    And we don't know yet and may never know how many

19  guards there are, but there's, what, on any given shift or

20  on that day, dozens of guards on duty?

21  A.    Thirty -- well, I mean, overall throughout the whole

22  institution?

23  Q.    Right.

24  A.    Oh I'm not sure.

25  Q.    A bunch?

1    **A.**    Yes.

2    **Q.**    You said 30, is 30 a guess, would there be more than

3    that?

4    **A.**    Well, I thought you were speaking just for the

5    shift.  The shift would usually be around about 42, 44, if

6    I'm not mistaken.

7    **Q.**    Okay.

8    **A.**    That's just for first shift.  That's not counting

9    split shift and --

10   **Q.**    Well, we're only talking about the one shift that's

11   on duty when the code three got called, right?

12   **A.**    Okay.

13   **Q.**    Right?

14   **A.**    Right.

15   **Q.**    So you're estimating, and that's good enough for our

16   purposes, around 40 or so guards?

17   **A.**    Yes, sir.

18   **Q.**    And that includes the CERT team members?

19   **A.**    No, sir.

20   **Q.**    So there's an additional six CERT team members or

21   seven?

22   **A.**    That's what I was telling you, the split shift, the

23   CERT team follows up on the split shift.

24   **Q.**    Okay.  So there might even be less than six CERT

25   team members?

1    A.    I'm not understanding what you asking.

2    Q.    Well, I'm just trying to find out roughly how many

3    guards are at the prison that day when the code three goes

4    out?

5    A.    I wouldn't have the answer to that.

6    Q.    All right.  Well, where did the 40 something come in

7    then?

8    A.    That's the number --

9    Q.    Was that an answer to that?

10   A.    That's the number of first shift staff that usually

11   take the men -- the housing units in the prison.

12   Q.    All right.  So whatever the number may be it's far

13   less than there are inmates, we can agree.  But let me

14   talk about the situation.  Code three is called out, it's

15   an emergency, it's dangerous and you know as a trained

16   officer and a former CERT team member it could get even

17   more dangerous if it's not quickly contained, right?

18   A.    Yes, sir.

19   Q.    And by contained that means getting to the scene of

20   the altercation or the assault on a guard as well as

21   looking out for all the inmates who are out and about at

22   the time the code three goes out, right?

23   A.    Yes, sir.

24   Q.    And so while there are guards who are running to the

25   scene of the danger, of their fallen colleague, that means

1   that there are inmates in the chow hall who have less

2   guards guarding them, right?  Because some of them have

3   left to go the danger?

4   A.    Yes, sir.

5   Q.    And inmates who are in the big yard, the east yard,

6   milling around doing whatever they're doing out there on

7   an afternoon, there are less guards guarding them because

8   many of them have rushed to the scene of the danger,

9   right?

10  A.    Yes, sir.

11  Q.    And even in the respective housing units around the

12  prison guards are leaving those housing unit to come to

13  the scene?

14  A.    Yes, sir.

15  Q.    Leaving fewer guards to guard those inmates, right?

16  A.    Yes, sir.

17  Q.    Which might increase the danger in all of those

18  areas, some guards need to stay back and watch those

19  inmates right?   I mean, you just don't leave the chow

20  hall completely unattended or do you?

21  A.    No, they don't.

22  Q.    Some guards stay back and guard the inmates, right?

23  A.    At least to clear it out.

24  Q.    At least to what?

25  A.    Clear it out.

1   **Q.**   Clear it out.  Contain it, get it under control, put

2   inmates in a safe place?

3   **A.**   Yes.

4   **Q.**   Like go back to your dorm rooms or your cells,

5   right?

6   **A.**   Yes.

7   **Q.**   All right.  Now, some officers then even CERT

8   officers will take up the task during this chaotic

9   emergency situation of clearing areas or getting

10   containment of inmates, right?

11   **A.**   During like a code three?

12   **Q.**   Right.

13   **A.**   Oh, CERT usually go, they go into that situation.

14   **Q.**   Well we saw, or you saw, the jury didn't, but you

15   watched some of that situation in the E dorm.  You didn't

16   see the entire CERT team in the E dorm, you saw two or

17   three of them?

18   **A.**   Correct.

19   **Q.**   And you couldn't identify who they were even looking

20   at the screen earlier today, right?

21   **A.**   No, sir.

22   **Q.**   Well, at any rate, you didn't see all of the CERT

23   team members in E dorm, correct?

24   **A.**   Sir?

25   **Q.**   You did not see all of the CERT team members in E

1   dorm, correct?

2   **A.**    No, sir.  On the footage I saw, no.

3   **Q.**    So if all the CERT team members are responding to

4   the code three by getting to their colleague who's under

5   assault, you didn't see all of them so some of them are

6   someplace else.  That follows, doesn't it?

7   **A.**    You didn't see all of them come in on the camera,

8   but if the inmate, the one that's being locked down, is

9   already being headed out the door, there is no need for

10  them to come in.

11  **Q.**    All right.  Well, it sounds like we're agreeing.

12  You didn't see them all come in E dorm because you saw

13  Dean being escorted out of E dorm by two of CERT team

14  members, right?

15  **A.**    Yes, sir.

16  **Q.**    Okay.  So you, being one of the guards in the midst

17  of this chaotic and dangerous situation, you know, after

18  it's all over, you might not remember every detail

19  accurately, that's fair to say, isn't it?  Like who did

20  what, what guards were where, that sort of thing?

21  **A.**    I think I remember pretty well.

22  **Q.**    You can remember it pretty well?

23  **A.**    Yes, sir.

24  **Q.**    All right.  Well, let's go to your grand jury

25  testimony then.  After the two lies to the FBI it was the

1  very next day that you came into this courthouse and

2  testified to the grand jury, right?

3  A.   Yes, sir.

4  Q.   That would have been on August the 16th of 2012,

5  roughly 20 months after the Dean incident?

6  A.   Correct.

7  Q.   And so now you're there testifying to the grand

8  jury, being questioned by the government lawyers and

9  you're doing it from memory, right?

10  A.   Yes.

11  Q.   You didn't have any notes with you, did you?

12  A.   No, sir.

13  Q.   You didn't have a video playing as you testified,

14  right?

15  A.   No, sir.

16  Q.   Now have you reviewed your grand jury testimony

17  lately?

18  A.   Yes.

19  Q.   How recently?

20  A.   This morning.

21  Q.   You read the whole thing this morning?

22  A.   Naw, I didn't read the whole thing.  I just went

23  through it.

24  Q.   Well, when is the last time you read the whole

25  thing?

1    A.    I've never read the whole thing.

2    Q.    Okay.  So you reviewed some parts of it, I guess, in

3    preparation for your testimony today?

4    A.    Yes.

5    Q.    You were asked to do that by the government lawyers,

6    or by your own lawyer?

7    A.    No, I was just given the opportunity to view it if I

8    wanted to.  If I didn't, I didn't have to.

9    Q.    Okay.  Let's see if we can agree on this part, Mr.

10   McKenzie.  When a person says, "I think", when you say it

11   or when you hear me say it or anyone else, when they say,

12   for example, I asked you who won Super Bowl X, do you

13   know?

14   A.    No, sir.

15   Q.    What if you said or you asked me and I said, "Well,

16   I think it was the Pittsburgh Steelers."  When I say, "I

17   think" you would agree with me that means, well, I'm not

18   sure; I'm not certain; I have a doubt about it.  Is that

19   what you would believe, I mean when I say, "I think" it

20   was the Steelers?

21   A.    Uh --

22   Q.    That's what it would mean to you if said --

23   A.    Rephrase your statement.  Rephrase your statement

24   again.

25   Q.    Okay.  If a person is having a conversation with you

1   and they say in response to a question you've asked them,

2   well, I think, and then they answer, do you agree with me

3   that the phrase, "I think", means I'm not really sure, I

4   have a little doubt, I'm going to give you the best answer

5   I can give you but I've got some uncertainty about it.

6   Does this make sense to you?  Is that what you understand

7   when we say, "I think?"

8   A.   Yes, sir.

9   Q.   Okay.  And when you say, "I think", that's what

10  you're doing, right?  You're saying, "I might be wrong,

11  I'm not sure, I'm giving you the best I've got".

12  A.   No, sir.

13  Q.   It means something different when you say it?  It

14  means what?  I'm sure?  I'm certain?

15  A.   When I say, "I think so" I'm saying that's my answer

16  for yes.

17  Q.   Okay.  All right.  Well, I'm going to -- you don't

18  have it up there with you, your grand jury testimony, do

19  you have that?  I'm going to approach and give you a copy

20  of it.  I've flagged a couple of places in it but I'll

21  take the two of them.  If you would, go to page eight.

22  That should be the first of the red flags in there.  Are

23  you there?

24  A.   Yes, sir.

25  Q.   Okay.  Let me get you oriented to what's going on on

1    page eight.  Okay.  It was Mr. Christian, you remember

2    him, he was the one asking you questions or was it Ms.

3    Boyd?

4    A.    It was Mr. Christian.

5    Q.    Okay.  And you see this is a transcript.  So the

6    lines are numbered and there's a Q that stands for

7    question and an A that stands for answer.  Are you with

8    me?

9    A.    Yes, sir.

10   Q.    So the Qs are the things Mr. Christian is saying and

11   the As, the answers are what you are saying.  Do you agree

12   with that?

13   A.    Yes, sir.  Yes, sir.

14   Q.    Line nine question:  Who from the CERT team did you

15   see escorting the inmate?  Now to get the context, you

16   know we're talking about Inmate Dean being escorted from E

17   dorm, right?

18   A.    Yes, sir.

19   Q.    And you understand the word who to mean the

20   identities of people, their names, right?

21   A.    Yes, sir.

22   Q.    Answer, on line 11:  I don't remember.  It looked

23   like the whole CERT team.  That was your answer?

24   A.    Yes, sir.

25   Q.    Okay.  And what you saw today we agreed with you

1    looked at it, the escorting out of E dorm was a couple of

2    CERT team members and there's more than two, right?

3    A.    Yes, sir.

4    Q.    All right.  Let's go to the next page, page nine and

5    let me get there with you.  Now on page nine near the top,

6    on line four, you've just described the escort, the

7    position they were holding Dean when they took him out,

8    hands on his forearms and they had him handcuffed from the

9    rear.  And then at line four Mr. Christian asks you,

10   "roughly how many officers did you see there in the gym

11   with Dean?"  And your answer was this, I'm going to read

12   it exactly, "six, I think it was six."  Did I read it

13   right?

14   A.    Yes, sir.

15   Q.    Did I say it right?

16   A.    Yes, sir.

17   Q.    Okay.  Nowhere else though in all of this testimony

18   at the grand jury did you name the six CERT team officers

19   you think were in the gym, did you?

20   A.    No, sir.

21   Q.    And you can review it -- okay, you have, all right.

22   Good.  Now, let me move onto another area.  During this

23   chaotic emergency --

24          THE COURT:  Mr. Hogue, at this point it's 12:00.

25   We need to take our second break.

1          MR. HOGUE:  May I say this, Your Honor?  This is

2     literally my last question.  I'm stop but it's like --

3          THE COURT:  No, no.  No, that's -- if you've got

4     one more question.

5          MR. HOGUE:  It's really just maybe one minute

6     and I'm done.

7          THE COURT:  All right.

8     BY MR. HOGUE:

9     Q.   So, I want to take you to the part where when this

10    chaotic dangerous situation is going on and there's

11    escorts taking the inmate across this big open yard, to

12    get from E dorm to medical you have to pass through

13    several doors or gates or both, right?

14    A.   Depending on which way you go.

15    Q.   Well, the way they went, that way, where you go

16    through the sally port -- the sally port is a sally port

17    because it has two doors and you lock the first one when

18    you're in it and then the second one gets unlocked so you

19    can go out.  So there's always one of the two doors

20    locked, right?

21    A.   Unless there's an emergency situation with that one

22    you can override it.

23    Q.   Okay.  And so in an emergency the escorts are doing

24    the unlocking of the doors or someone running in front of

25    them is unlocking doors for them?

1    A.    During this particular escort -- this incident?

2    Q.    Do you happen to know?

3    A.    No.  I'm asking, are you talking about during this

4    particular incident?

5    Q.    Or generally.  But if you know in this incident you

6    can answer that question.

7    A.    I don't know in this incident.  But generally if

8    someone's ahead they go ahead unlock the gate.  If not,

9    sometimes the person doing the escort has to unlock the

10   gate.

11   Q.    And the persons doing the escorting, of course,

12   they've got their hands full, they've got an inmate on

13   them, so they're relying on other officers to come behind

14   them and lock doors and lock gates to assist in containing

15   the inmates, right?

16   A.    Sometimes during -- depending on the severity of the

17   incident, sometimes that stuff gets overlooked.

18   Q.    Sometimes that, I'm sorry?

19   A.    It gets overlooked.

20   Q.    Overlooked.  But if it doesn't get overlooked and

21   there's somebody on their game, they're coming behind to

22   help contain inmates and locking doors escorting guards

23   have unlocked, right?

24   A.    Yes.

25   Q.    Because that's the safe secure thing to do, right?

1    A.    Yes.

2    Q.    All right.  And you can't remember today because of

3    the chaos and all that who's locking doors or who's

4    unlocking doors, do you?

5    A.    Going across the yard?

6    Q.    Right.

7    A.    No.

8              MR. HOGUE:   Now literally my last bit, Your

9    Honor.

10   BY MR. HOGUE:

11   Q.    When you said earlier today that when you entered

12   the gym after Dean had been taken into the gym, the door

13   was already unlocked, wasn't it?

14   A.    Yes.

15   Q.    And you were only in there a few seconds, long

16   enough to do the finger swiping thing and see Redden do

17   what he did and then you left, right?

18   A.    Yes, sir.

19   Q.    And when you left out the gym door it was still

20   unlocked, wasn't it?

21   A.    No, sir.

22   Q.    Well, that's what you said earlier today, you left

23   through the unlocked door.  Did I mishear that?

24   A.    I left through an unlocked door?

25   Q.    That's what you said.  You left the gym through the

1    same door you entered the gym, right?

2    A.    Right.  When I left out the door was locked -- I

3    mean unlocked.

4    Q.    It was unlocked?

5    A.    Right.

6    Q.    Right?  Okay.  So I was correct, I heard you

7    correct.  You entered the gym behind the escort with Dean

8    and when you entered the door was unlocked?

9    A.    Yes.

10   Q.    And then when you did the thing you described and

11   you left out that same door it was still unlocked, right?

12   A.    Yes.

13   Q.    Okay.  And you have no idea then who or how much

14   later somebody came from the yard to that gym door,

15   entered it and locked it or whether it even got locked.

16   You have no idea, do you?

17   A.    I locked that door on the way out.

18   Q.    You did?

19   A.    Yes.

20   Q.    Okay.  You can't say for sure because you said you

21   think there were six members in there and you never named

22   Wimbush to the grand jury --

23          THE COURT:  Now we're going long, Mr. Hogue.  Is

24   this your last question then?  If not we'll take a break

25   and then --

1         MR. HOGUE:  Well, I'll stop.

2         THE COURT:  -- you can finish.

3         MR. HOGUE:  I'll stop there then, Your Honor,

4    and I'll pick up later.

5         THE COURT:  All right, ladies and gentlemen, you

6    may go to the jury room.  And for those of who you bought

7    your lunches they should be there waiting for you.

8    (JURORS EXIT COURTROOM)

9         THE COURT:  All right.  I have got 12:05 p.m..

10   We'll reconvene at 12:30 p.m.

11   (RECESS)

12   (RECONVENED)

13        THE COURT:   Mr. Hogue you may proceed.

14   BY MR. HOGUE:

15   Q.   All right.  Mr. McKenzie, I really was at the very

16   end here.  So let's pick back up where we were.  So if you

17   left the gym through the door that was unlocked when you

18   got there, and then you locked it behind you, and that's

19   what you say you remember, right?

20   A.   Yes, sir.

21   Q.   Then, any other officer, even including a CERT team

22   member, even including Derrick Wimbush, but anyone who

23   wants to come into the gym after you've left has to have a

24   key to unlock the door, right?

25   A.   Yes, sir.

1    Q.    And then if they want that door locked when they

2    enter the gym, they have to turn right back around and

3    lock it, and then you can go across the gym and there's

4    another door, right?

5    A.    Yes, sir.

6    Q.    And if the escort team went out that door, with

7    Dean, and left it unlocked, then whatever officer got

8    through the gym would find that door unlocked, and when

9    going through it would want to lock it to contain security

10   and to contain the inmates?

11   A.    That would all depend on the person that was going

12   through that gate.

13   Q.    Got you.  All right.  Last question.  You have never

14   had any conversation with Derrick Wimbush about the use of

15   force against any inmate, including Dean and the others

16   named in this case, correct?

17   A.    No, sir.

18   Q.    That is correct?  You have not?

19   A.    Yes, it is.  Correct.

20          MR. HOGUE:  That's all I have.

21          THE COURT:   Mr. Pate?

22          MR. PATE:  Thank you, Your Honor.

23                    CROSS EXAMINATION

24   BY MR. PATE:

25   Q.    Mr. McKenzie, good afternoon.

1   **A.**   Good afternoon.

2   **Q.**   My name is Page Pate, and I represent Tyler Griffin.

3   Do you remember Tyler Griffin?

4   **A.**   Yes, sir.

5   **Q.**   Okay.  Earlier in your testimony you did, today,

6   name some individual CERT team members who were present in

7   the gym at the time of the Terrance Dean incident,

8   correct?

9   **A.**   Yes, sir.

10  **Q.**   Just to be clear, because we've heard a lot of names

11  today, Tyler Griffin was not in the gym at the time,

12  right?

13  **A.**   No, sir.

14  **Q.**   You did mention a name, Darren Douglass-Griffin, but

15  that's a different person, correct?

16  **A.**   Yes, sir.

17  **Q.**   Tyler Griffin was nowhere near the gym on that day

18  as far as you're aware?

19  **A.**   Yes, sir.

20  **Q.**   In fact, Tyler Griffin was not even on the CERT team

21  at the time of this incident where Mr. Dean attacked the

22  officer, correct?

23  **A.**   I don't remember him being on it, no, sir.

24  **Q.**   You never served on the CERT team with Tyler

25  Griffin, did you?

1    A.    No, sir.

2    Q.    Tyler Griffin was on the CERT team for a very short

3    period of time at the end of 2010, correct?

4    A.    I can't remember how long he was on the team.

5    Q.    And based on your recollection, as far as your

6    duties that day, and we're talking now December 16 of

7    2010, Tyler Griffin wasn't even at the prison at that

8    time, was he?

9    A.    I don't remember.

10         MR. PATE:  Your Honor, may I approach the

11   witness and show a document?

12         THE COURT:   You may.

13   BY MR. PATE:

14   Q.    Mr. McKenzie, I'm giving you a document that I've

15   marked as Griffin Exhibit Number 9, and I just want to ask

16   you to flip through those pages and tell me if you

17   recognize what that is?

18   A.    This is a daily staffing roster.

19   Q.    And what is a daily staffing roster?

20   A.    It's basically -- it basically is a roster that lets

21   you know where each of the individual officers are going

22   to be assigned and whatnot, as far as shift wise and what

23   their duties would be that day.

24   Q.    And you testified earlier that on this day, and

25   we're talking December 16, 2010, you were a shift

1    supervisor, correct?

2    A.    Yes, sir.

3    Q.    And so as part of your duties as a shift supervisor

4    you would review the staffing assignment, correct?

5    A.    Yes, sir.

6    Q.    And does this appear to be the staffing assignment

7    from December 16, 2010, at Macon State Prison?

8    A.    Yes, sir.

9          MR. PATE:  Your Honor, I would move for

10   admission at this point of Defendant Griffin's Exhibit

11   Number 9.

12         MR. CHRISTIAN:  No objection, Your Honor.

13         THE COURT:   It's admitted without objection.

14         MR. PATE:   And if I may retrieve the exhibit

15   and publish it to the jury?

16         THE COURT:   You may.

17   BY MR. PATE:

18   Q.    I'm going to take that back from you, but I'm going

19   to put it up on the screen so you can see it.

20   A.    Okay.

21   Q.    Can you see it, Mr. McKenzie?

22   A.    Yes, sir.

23   Q.    You had testified earlier during, I believe, Mr.

24   Hogue's questioning about a split shift versus a regular

25   shift, correct?

1  A.    Yes, sir.

2  Q.    And is it fair to say that the first couple of pages

3  of Defendant Griffin's Exhibit Number 9 indicates who from

4  the split shift was present at the prison?

5  A.    Yes, sir.

6  Q.    Okay.  And is it true that the CERT team members

7  were part of the split shift?

8  A.    Yes, sir.

9  Q.    All right.  And I'm going to turn -- that'll make

10  y'all dizzy.  I'll turn it and then put it down to show

11  you the second page, it magically appears.  Does that

12  appear to be a list of the CERT team officers from

13  December 16, 2010, at Macon State?

14  A.    Yes, sir.

15  Q.    Okay.  I do not see Tyler Griffin's name on there,

16  correct?

17  A.    Yes, sir.

18  Q.    Would that indicate to you that he was not a member

19  of the CERT team on December 16, 2010?

20  A.    Yes, sir.

21  Q.    Now, I do see down below, and I'm going to try this

22  and see if I can do it.  Well, almost.  Do you see what I

23  did there?

24  A.    You circled the annual leave hours.

25  Q.    All right.  If there was a CERT team member who was

1    not present that day, his name would appear under that

2    section, correct?

3    A.    Either there or either under the sick leave section

4    here, sir.

5    Q.    Okay.  But it would be on this page, right?

6    A.    Yes, sir.

7    Q.    Regardless of whether he was there or not, if he's

8    on the CERT team his name should be on this page?

9    A.    Yes.

10    Q.    And again and I'll zoom out so you can see the

11    entire page, or I'll give you the document if you wish.

12    And I see what you're saying.  There's sick leave down

13    there at the bottom, you see that?  The smaller I get,

14    though, the harder that's going to be.  Do you see sick

15    leave, sir?

16    A.    Yes, sir.

17    Q.    Okay.  And it's fair to say that Tyler Griffin's

18    name appears nowhere on the daily staffing assignment for

19    December 16, 2010, for the split shift CERT team?

20    A.    That's correct.

21    Q.    Okay.  I'm going to flip a couple of pages in this

22    exhibit.  Well, one more thing before I move on from the

23    CERT team.  We had talked a little bit about -- you had

24    mentioned that Darren Douglass-Griffin was present in the

25    gym on that day, and do you see the name Darren

1    Douglass-Griffin as listed under the CERT team?

2    A.    Darren Douglass.

3    Q.    And that's -- that's the same person, correct?

4    A.    Correct, yes, sir.

5    Q.    He goes by Darren Douglass or Darren

6    Douglass-Griffin?

7    A.    Yes, sir.

8    Q.    Okay.  And there's no relation, is there, between

9    the two of them?

10   A.    Not that I'm aware of.

11   Q.    Mr. Douglass-Griffin is African-American, right?

12   A.    Yes.

13   Q.    Okay.  And you know Tyler Griffin?

14   A.    Yes.

15   Q.    Let me go now to the next page of the document.  Can

16   you see that, sir?

17   A.    Yes, sir.

18   Q.    And I direct your attention to the upper left-hand

19   corner.  I'm getting worse instead of better.  All right.

20   You can probably see it without me marking all over it.

21   Do you see the upper left-hand corner where it says first

22   A key?

23   A.    Yes, sir.

24   Q.    And what does that designate?

25   A.    That's the shift.

1    Q.    That's the shift?

2    A.    First shift, A key.

3    Q.    Okay.  Would any of the CERT officers appear under

4    this shift list?

5    A.    No, sir.

6    Q.    Okay.  And let me move it up a little bit and direct

7    your attention down there at the bottom.  Do you see your

8    name?

9    A.    Yes, sir.

10   Q.    Okay.  I'm going to turn the page, still focused on

11   the first shift A key, and ask, under annual leave, if you

12   see Mr. Griffin's name?

13   A.    Yes, sir.

14   Q.    And would that indicate to you, again, as somebody

15   who has been at Macon State for many years as a shift

16   supervisor, that on this day, December 16 of 2010, Tyler

17   Griffin was not present at the prison?

18   A.    That is correct.

19   Q.    And moreover Tyler Griffin was not assigned to the

20   CERT team, but he was on a regular shift?

21   A.    Yes, sir.

22   Q.    As a regular corrections officer?

23   A.    Yes, sir.

24         MR. PATE:  That's all I have, Your Honor.

25         THE COURT:   Any redirect?

1            MR. CHRISTIAN:  Yes, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MR. CHRISTIAN:

4    Q.    Mr. McKenzie.

5    A.    Yes, sir.

6    Q.    You were asked about your grand jury testimony on

7    August 16th, 2012.  Do you remember those questions from

8    the defense attorneys?

9    A.    Yes, sir.

10   Q.    You were directed to a line where you said, "I think

11   that there were six CERT officers in the gym with Dean."

12   Do you remember that line?

13   A.    Yes, sir.

14   Q.    Who do you remember seeing in the gym with Inmate

15   Dean?

16   A.    Officer Lach, Officer Wimbush, Officer Rushin,

17   Officer Griffin, Officer Douglass. Hold on, excuse me.

18   Officer Lach, Officer Wimbush, Officer Redden, Officer

19   Bolden, Officer Douglass and Officer Rushin.

20   Q.    Okay.  How many officers is that?

21   A.    Six.

22   Q.    So you said I think there were six and you just

23   named the six officers you saw in the gym?

24   A.    Yes, sir.

25   Q.    Any doubt in your mind at all that Lach was in the

1    gym with Terrance Dean?

2    A.    No, sir.

3    Q.    Any doubt in your mind at all that Rushin was in the

4    gym with Terrance Dean?

5    A.    No, sir.

6    Q.    Any doubt in your mind that Wimbush was in the gym

7    with Terrance Dean?

8    A.    No, sir.

9    Q.    Can you say what Defendant Lach did after you left

10   the gym?

11   A.    No, sir.

12   Q.    Can you say what Defendant Rushin did after you left

13   the gym?

14   A.    No, sir.

15   Q.    Can you say what Defendant Wimbush did after you

16   left the gym?

17   A.    No, sir.

18   Q.    On cross examination you described yourself as a

19   little upset because you understood that Dean had hit one

20   of your officers.  Do you remember that?

21   A.    Yes, sir.

22   Q.    The fact that you were upset, did that allow you,

23   under Macon State policies, to use any kind of force on

24   Dean?

25   A.    No, sir.

1    Q.    If Dean hit an officer in the dorm, were you

2    allowed, under Macon State policies, to go and hit Dean

3    when he was handcuffed in the gym?

4    A.    No, sir.

5    Q.    Did you see any legitimate reason, under Macon State

6    policies, to use force on Dean in the gym?

7    A.    No, sir.

8    Q.    You were also asked by your grand jury testimony

9    where you said basically you didn't remember exactly who

10   from the CERT team had escorted Dean out of the housing

11   unit, out of the dorm.  Do you remember that question?

12   A.    Yes, sir.

13   Q.    You said it looked like the whole CERT team?

14   A.    Yes, sir.

15   Q.    Can you remind the jury what you go into when you

16   exit the housing unit?  Do you go into a sally port?

17   A.    Say that again, sir.

18   Q.    When you exit the housing unit, when you exit E-2,

19   do you go into a sally port?

20   A.    Yes, sir.

21   Q.    And you described that door inadvertently or

22   accidently opening, right?

23   A.    Yes, sir.

24   Q.    Who was in the sally port when you ended up in the

25   sally port?

1    A.    The CERT team and Inmate Dean.

2    Q.    Do you remember exactly which CERT officers were in

3    the sally port with you?

4    A.    All of them with the exception of Thomas that I can

5    remember.

6    Q.    Where did you guys go from the sally port?

7    A.    I went to the control room.  They went out across

8    the yard.

9    Q.    You watched -- and from the yard, where did they go

10   from the yard, just to be clear for folks who are taking

11   notes?

12   A.    To the gym, sir.

13   Q.    You watched part of a video from the dorm during

14   your cross examination by Mr. Hall's attorney.  Do you

15   remember watching part of the video?

16   A.    Yes, sir.

17   Q.    Did any of the defense attorneys show you any video

18   from the gym?

19   A.    No, sir.

20   Q.    Did any of the defense attorneys show you any video

21   of Dean as he was being escorted from the dorm to medical?

22   A.    No, sir.

23   Q.    Have you ever seen that video before?

24   A.    No, sir.

25   Q.    You just watched a portion of the video from the

1    dorm?

2    **A.**    Yes, sir.

3    **Q.**    In watching that portion of the video did you see

4    Inmate Dean walking on his own power?

5    **A.**    Yes, sir.

6    **Q.**    Did you see any visible injuries to Dean when he was

7    in the dorm?

8    **A.**    No, sir.

9    **Q.**    Did you see Inmate Dean resist the CERT officers in

10    the dorm?

11    **A.**    No, sir.

12    **Q.**    And you were following behind him, right?  You were

13    following behind Dean and the CERT officers as they went

14    out of the housing unit, right?

15    **A.**    Yes, sir.

16    **Q.**    You were also asked about the time that certain

17    events happened.  Do you remember those questions?

18    **A.**    Yes, sir.

19    **Q.**    I believe you said that you left and Dean left at

20    roughly 2:05.  Do you remember that question?

21    **A.**    Yes, sir.

22    **Q.**    And you said that Sergeant Hall ran out of the

23    housing unit at about 2:06, right?

24    **A.**    Yes, sir.

25    **Q.**    You also testified, for folks who are taking notes,

1    that at 2:12, about, you came back with Defendant Rushin

2    and Defendant Hall, right?

3    A.    Yes, sir.

4    Q.    You came back to the housing unit?

5    A.    Yes, sir.

6    Q.    Do you know what Defendant Hall did in that

7    six-minute block of time when he's seen running out of the

8    dorm until when he's seen walking back into the dorm?

9    A.    No, sir.

10   Q.    And you came back to the dorm with Defendant Rushin,

11   right?

12   A.    Yes, sir.

13   Q.    At 2:12?

14   A.    Yes, sir.

15   Q.    And you had seen Defendant Rushin in the gym with

16   Dean, right?

17   A.    Yes, sir.

18   Q.    And then you left the gym?

19   A.    Yes, sir.

20   Q.    And you said, I believe, on cross examination, you

21   were only in the gym for a matter of seconds?

22   A.    Yes, sir.

23   Q.    What did you do after you left the gym?

24   A.    I came down back in front of E-1, where they had

25   some inmates that they were getting ready to place back in

1    the cell because we were locking down the institution. I

2    assisted pat-searching those inmates and helped them get

3    them, you know, in the building.  And then that's when I

4    came back in E-2.

5    Q.    So in that time that you doing the pat searching of

6    the inmates in E-1, were you checking your watch to see

7    how long it was taking?

8    A.    No, sir.

9    Q.    You were focused on the pat down?

10   A.    Yes, sir.

11   Q.    Do you know what Defendant Rushin was doing while

12   you were patting down inmates in E-1?

13   A.    No, sir.

14   Q.    Do you know what Defendant Hall was doing while you

15   were patting down inmates in E-1?

16   A.    No, sir.

17   Q.    The six CERT officers, including Defendant Rushin,

18   that you saw in the gym with Dean, do you know what that

19   group was doing while you were patting down inmates in

20   E-1?

21   A.    No, sir.

22   Q.    Mr. Hall's attorney showed you a portion of the

23   video, right?  From the dorm?

24   A.    Yes, sir.

25   Q.    Do you recall at some point he stopped?

1    **A.**    Yes, sir.

2    **Q.**    What were you doing at the point that he stopped the

3    video?

4    **A.**    I think that's the part where I was getting a pepper

5    ball gun from Officer Thomas.

6    **Q.**    What did you do after you got the pepper ball gun

7    from Officer Thomas?

8    **A.**    I put it on and started walking around the dormitory

9    giving instructions until I ended up in the middle of the

10   dormitory.

11   **Q.**    Did you have a conversation with any supervisors

12   after that?

13   **A.**    Yes.

14   **Q.**    Which supervisors?

15   **A.**    Mr. Bobbitt and Mr. Blakely and Sergeant Hall were

16   present.

17   **Q.**    And that was in the dorm?

18   **A.**    Yes, sir.

19   **Q.**    And Mr. Hall's attorney didn't show you that clip of

20   the surveillance video, right?

21   **A.**    No, sir.

22   **Q.**    And can you remind the jury what you told those

23   supervisors?

24   **A.**    That they're out there whipping -- they're out there

25   whipping Dean's butt.

1    Q.    Now, you have said that you don't remember seeing
2    Sergeant Hall in the gym, right?
3    A.    Yes, sir.
4    Q.    Now, during the federal investigation has anybody
5    ever told you what to say?
6    A.    No, sir.
7    Q.    Has anybody ever told you to say that Sergeant Hall
8    was in the gym?
9    A.    No, sir.
10   Q.    And you were asked about what you hoped to get from
11   the prosecutors, right?
12   A.    Yes, sir.
13   Q.    You remember those questions?
14   A.    Yes, sir.
15   Q.    What's your understanding of whose going to control
16   what happens to you going forward?
17   A.    The judge, sir.
18   Q.    Now, with respect to Mr. Hall, you talked about your
19   testimony on August 16th, 2012 when you appeared before
20   the grand jury.  Did you receive a phone call from
21   Defendant Hall close in time to your grand jury
22   appearance?
23   A.    Yes, sir.
24   Q.    Was it common for you to receive calls from
25   Defendant Hall at that point in time?

1    **A.**    Not really.  No, sir.

2    **Q.**    Did you answer that call?

3          MR. JARRARD:  Your Honor, I object.  This

4    exceeds the scope of my cross examination.

5          THE COURT:  This is the first time this has

6    come up.  That's for sure.

7          MR. CHRISTIAN:  They've certainly indicated that

8    he was pressured to say certain things, and I was just

9    discussing that subject.  I can move on though.

10          THE COURT:  Well, if you think it's in response

11    to a point made on or attempted to be made on cross

12    examination, if you believe that in good faith, I'll let

13    you continue.

14          MR. CHRISTIAN:  I do, Your Honor.

15    BY MR. CHRISTIAN:

16    **Q.**    Did you answer that call from Mr. Hall?

17    **A.**    It was one answer, yes.

18    **Q.**    What did he say when he called?

19    **A.**    He was just basically saying that it was a civil

20    matter, and that the inmate and his family were just

21    trying to get some money.

22    **Q.**    You were also asked about a conversation you had

23    with Mr. Hinton.  Do you recall that question?

24    **A.**    Yes.

25    **Q.**    You were asked about a portion of what Mr. Hinton

1    said; is that correct?

2    A.    Yes.

3    Q.    Can you remind the grand jury the full conversation

4    you had with Mr. Hinton?

5    A.    He was like -- he don't know why they did it.  They

6    shouldn't have done it.  And that if he had been there and

7    they would have came to him, it wouldn't have happened

8    like that.  It wouldn't have been so bad or whatnot, and

9    that he would have handled it.

10   Q.    What was your understanding of that conversation?

11   A.    That it would have -- I guess he would had it played

12   down so it wouldn't have seemed so big of a deal or

13   whatnot.

14           MR. CHRISTIAN:  Thank you, Mr. McKenzie.

15           THE WITNESS:  Yes, sir.

16           MR. JARRARD:  May I recross, Your Honor?

17           THE COURT:   On that one point?

18           MR. JARRARD:  Yes, just what he just raised.

19           THE COURT:   You may.

20                      RECROSS EXAMINATION

21   BY MR. JARRARD:

22   Q.    Mr. McKenzie, you said my client called and said it

23   was a civil matter, right?

24   A.    Yes.

25   Q.    Mr. Dean did, in fact, make a civil complaint,

1  didn't he?

2  **A.**     Yes.

3  **Q.**     And you know what happened in that civil complaint,

4  don't you?

5          MR. CHRISTIAN:  Objection, Your Honor.

6          THE COURT:   All right.  Do you know?

7          THE WITNESS:  No, sir.

8          THE COURT:  He doesn't know.

9          MR. JARRARD:  Okay.

10  BY MR. JARRARD:

11  **Q.**     Do you know what the outcome of Mr. Dean's civil

12  complaint was, Mr. McKenzie?

13          MR. CHRISTIAN:  Objection.

14          THE COURT:   He just said no.  Is that what you

15  said?

16          THE WITNESS:  Yes, sir.

17          MR. JARRARD:  Nothing further, Your Honor.

18          THE COURT:   May he be excused?

19          MR. WOLFE:  May I ask on the point that he made

20  with regard to Mr. Hinton?

21          THE COURT:  Is this a new point?  Oh, yeah.  You

22  may ask about that.

23                  RECROSS EXAMINATION

24  BY MR. WOLFE:

25  **Q.**     You just testified that you understood what Mr.

1    Hinton had said to you to mean that if he had been there

2    things wouldn't have gone so bad.  What exactly did he

3    say?  What did you think he meant?

4    A.    What I thought that he meant was if that he would

5    have been here that the situation wouldn't have been as

6    big as it was.  As far as, I guess, how it was handled

7    after the fact.

8    Q.    Well, that is your thought.  What was it about what

9    he said that made you think that?  He couldn't have cured

10   the contusion, could he?

11   A.    No, sir.

12   Q.    He couldn't have cured the fact that his eyes were

13   fixed and dilated, could he?

14   A.    No, sir.

15   Q.    He couldn't have cured the fact that there was an

16   FBI investigation, could he?

17          MR. CHRISTIAN:  Objection, Your Honor.  He has

18   not laid the foundation that there was an FBI

19   investigation at the time the conversation took place.

20          THE COURT:  I don't think --

21          MR. WOLFE:  Well, he got involved as a result

22   of the FBI investigation.

23          THE COURT:  I think the timing may be a little

24   off.

25          MR. CHRISTIAN:  Yes.

1          THE COURT:  I think there's a point you're

2     making in there, but I think your timing is a little

3     off.

4          MR. CHRISTIAN:  The timing is off, Your Honor.

5     Thank you.

6          THE COURT:  Was the FBI involved at that

7     point?

8          MR. CHRISTIAN:  No, Your Honor.

9          THE COURT:  Yeah, I think that's the point.

10         MR. WOLFE:  Okay.

11    BY MR. WOLFE:

12    Q.   Could he have stopped the GBI investigation that

13    began on January the 5th of 2011?

14    A.   I can't answer that.  I don't know.

15    Q.   Well, I'm asking you to speculate about that -- hang

16    on -- just like you speculated as to what you thought Mr.

17    Hinton meant?

18         MR. CHRISTIAN:  It's -- objection, Your Honor.

19         THE COURT:  Well, he testified to that without

20    objection.  I don't know how on earth he can speculate as

21    to what the GBI was doing.

22         MR. CHRISTIAN:  Much less in regard to Mr.

23    Hinton's powers to control the GBI.

24         THE COURT:  I'll sustain that.

25         MR. WOLFE:  Well that's -- well.  When, in

1    fact, he testified, Judge, I think I did object and the

2    response by the government was that he's allowed to tell

3    what he was thinking at the time, meaning the witness.

4              MR. CHRISTIAN:  It's his understanding of the

5    conversation, what the person speaking to him meant.

6              THE COURT:  That's fine.  But you're talking

7    about his speculating as to what the FBI was --

8              MR. WOLFE:  Well, the FBI, the GBI, anybody.

9    BY MR. WOLFE:

10   Q.    All right.  So you can't speculate because you've

11   got no idea what other people were doing, correct?

12   A.    Correct.

13   Q.    And, in fact, you know that there's no way that Mr.

14   Hinton could have controlled anything as a result of the

15   injuries sustained by Mr. Dean, correct?

16             MR. CHRISTIAN:  Objection, Your Honor.

17             THE COURT:  I'll allow that question in view of

18   his testimony.

19             MR. CHRISTIAN:  Control anything, Your Honor?

20             THE COURT:  Well, yeah.  I mean, if he could

21   control anything.  I think that's opened up by his

22   testimony.

23   BY MR. WOLFE:

24   Q.    Correct?

25   A.    Repeat the question.

1          MR. WOLFE:   Could the court reporter read back

2     the question?

3          MR. CHRISTIAN:   If we could just get some

4     clarification on what anything means?  We're talking about

5     Internal Affairs, GBI, FBI, healing powers of sick people

6     I --

7          MR. WOLFE:  If Mr. McKenzie --

8          THE COURT:  Ask your question again.

9          REPORTER:  And, in fact, there's no way that Mr.

10    Hinton could have controlled anything as a result of the

11    injuries sustained by Mr. Dean, correct?

12         MR. WOLFE:  Did you hear that?

13         THE WITNESS:  No, sir, I didn't.

14    BY MR. WOLFE:

15    Q.   And, in fact, there was no way that Mr. Hinton could

16    have controlled anything with regard to the injuries Mr.

17    Dean sustained, correct?

18    A.   I don't know that.

19    Q.   You don't know that?

20    A.   No, sir.

21    Q.   So you have limited speculative ability?

22         MR. CHRISTIAN:  Objection, Your Honor.

23    Argumentative.

24         THE COURT:   Yeah, I'll sustain that.

25         MR. CHRISTIAN:  Thank you.

```
 1          THE COURT:   May this witness be excused?

 2          MR. CHRISTIAN:  Yes, Your Honor.

 3          THE COURT:  Mr. McKenzie, you are excused.

 4          MR. HOGUE:  Your Honor, could he just bring down

 5   that grand jury transcript for us.

 6          MR. JARRARD:   I can grab it, Your Honor.

 7          THE COURT:  Thank you, Mr. McKenzie.  You are

 8   excused.

 9          MR. CHRISTIAN:   Your Honor, may we approach

10   briefly just to approach one matter.  It should only take

11   a second.

12          THE COURT:   Okay.

13   (BENCH CONFERENCE)

14          MR. CHRISTIAN:  It's very clear Mr. Griffin is

15   seated with his back to the witness so to the extent that

16   these witnesses were going to identify Mr. Griffin, who he

17   is for the record, they will see the back of his head.  So

18   I don't know how they're supposed to -- they have a view

19   of the back of his head the whole time.

20          THE COURT:   Well, you know, if it's necessary I

21   guess we could say that all defendants look at the witness

22   or he could just turn around.

23          MR. CHRISTIAN:  I would just ask that he turn

24   around so that the witness can actually see his face.

25          MR. PATE:   If there's an issue --
```

1          MR. CHRISTIAN:   Unless you want to stipulate to

2    ID.

3          MR. PATE:   -- then say say can you identify him

4    and he can turn around.  I don't think that's really

5    identification in court.

6          THE COURT:   Well that's right, it's not.

7          MR. CHRISTIAN:  That why I say we address it

8    now before the witness comes in.  So if he's seated facing

9    the witness the witness has that opportunity to identify

10   him.

11         MR. PATE:  Ninety-nine times that wouldn't be

12   an issue but this particular witness in the last two

13   interviews couldn't name my client and apparently was

14   confused about who he was.  I don't know whether he's

15   going to identify him or not.

16         MR. CHRISTIAN:  All the more reason to see his

17   face and make sure we're identifying the correct witness.

18         MR. PATE:  Well, I don't know where else to put

19   him.  We don't have any space.

20         THE COURT:   He can turn his chair.

21         MR. PATE:   I'm fine doing that.

22         MS. GOMEZ:  Since we're here, Mr. Bolden, you

23   told us, is going to be next.

24         MR. CHRISTIAN:   Yes.

25         MS. GOMEZ:   There is a video of the escort that

1   Darren Douglass-Griffin and that Mr. Bolden is involved

2   in.

3            MR. CHRISTIAN:  Are you talking about with

4   Franklin Jones?

5            MS. GOMEZ:  Yes, Franklin Jones.  It has nothing

6   to do with an assault or attack so we are allowed to play

7   that.

8            MR. CHRISTIAN:  Yes.

9            MS. GOMEZ:  I just wanted to make sure we cover

10  it now so that's no issue.

11           MR. CHRISTIAN:  I mean, the one issue while

12  we're here, and this may be something worth discussion.

13  You know, there are portions of it that contain hearsay

14  statement and portions of it that contain statements by

15  Defendants so I'm not sure that the whole thing can be

16  played.  I think certainly portions of it, but I'm not

17  sure that the whole thing can be played.  If y'all are

18  putting in, for example --

19           THE COURT:  How long is he going to be on the

20  stand?

21           MR. CHRISTIAN:  Until we finish, I assume.

22           THE COURT:  Enough time to look at the video.

23           MS. GOMEZ:  We got it correct.  I just wanted

24  to say since we're here.  Thank you.

25  (BENCH CONFERENCE CONCLUDED)

```
 1          THE COURT:  Mr. Christian, you may call your
 2   next witness.
 3          MR. CHRISTIAN:  Your Honor, the United States
 4   calls Kerry Bolden.
 5          COURTROOM DEPUTY:  Do you solemnly swear the
 6   testimony you are about to give in the case shall be the
 7   truth, the whole truth and nothing but the truth, so help
 8   you God?
 9          THE WITNESS:   I do.
10          COURTROOM CLERK:  Will you please state and
11   spell your name for the record.
12          THE WITNESS:  Kerry Elonzo Bolden.  K-E-R-R-Y
13   E-L-O-N-Z-O  B-O-L-D-E-N (spelling).
14                        KERRY BOLDEN
15     Witness, having first been duly sworn, testified on
16                     DIRECT EXAMINATION
17   BY MS. BOYD:
18   Q.    Good afternoon, Mr. Bolden.
19   A.    Good afternoon.
20   Q.    Were you a member of the Correctional Emergency
21   Response Team at Macon State Prison from October 2010 to
22   December 2010?
23   A.    Yes, ma'am.
24   Q.    Is that team also called CERT or the CERT team?
25   A.    Yes.
```

1    Q.    Did you conspire or agree with members and

2    supervisors of the CERT team at Macon State to beat

3    inmates and cover it up afterwards?

4         MR. WOLFE:   That's a legal conclusion, Judge. I

5    object.  It's what the jury has been impaneled to decide.

6         MR. FOX:  Your Honor, I would join that

7    objection.

8         THE COURT:   Leading was the objection?

9         MR. WOLFE:   Yes.

10        THE COURT:   I sustained that objection.

11   BY MS. BOYD:

12   Q.    Did you plead guilty in relation to your involvement

13   with beatings of inmates at Macon State?

14   A.    Yes.

15   Q.    Are you prepared to tell the jury about what you did

16   and what you saw other CERT officers do?

17   A.    Yes.

18   Q.    I want to ask you questions about your involvement

19   but first I'm going to ask you about your background.

20   Have you ever served in the military?

21   A.    Yes, ma'am.

22   Q.    What branches?

23   A.    Marine Corps and the Army.

24   Q.    For how long?

25   A.    Twenty-four years.

1  Q.   What was your starting rank?

2  A.   Private.

3  Q.   What was the final rank that you held?

4  A.   E-7, Sergeant First Class.

5  Q.   Where were you last stationed during your military

6  service?

7  A.   Afghanistan.

8  Q.   When was that?

9  A.   2008, 2009.

10  Q.   Prior to your deployment in Afghanistan did you have

11  any other overseas deployments?

12  A.   Yes, ma'am.

13  Q.   Where were those?

14  A.   Iraq. I did Iraq 2005 and 2006. I did Yugoslavia in

15  2002.

16  Q.   You testified you were on CERT at Macon State

17  Prison.  When did you start work at Macon State?

18  A.   Around the time of 2007, August, 2007, if I'm

19  correct.  August, 2007.

20  Q.   What was your title or job rank when you started at

21  Macon State?

22  A.   CO1.

23  Q.   What were your duties as a CO1?

24  A.   Security.

25  Q.   Approximately when did you join the CERT team?

1   A.    October of 2010.

2   Q.    What is the primary duty of CERT at Macon State

3   Prison?

4   A.    The primary duty is security and we also had

5   secondary duties, cell extractions, removal of unruly

6   inmates and supervise.

7   Q.    When you say supervising is that supervising

8   inmates?

9   A.    Supervising inmates, yes.

10  Q.    What's a cell extraction, can you explain that to

11  the jury?

12  A.    Yes.  To remove violent inmates, a noncompliant

13  inmate.  That's where the CERT actually goes in and

14  removes the inmate, the ones that are violent.

15  Q.    Who was CERT's direct supervisor when you joined the

16  team?

17  A.    Deputy Warden Hinton.

18  Q.    Do you see the deputy warden here in court today?

19  A.    Yes.

20  Q.    Can you point him out and identify him by a piece of

21  clothing that he is wearing?

22  A.    Yes.  He has on a suit with glasses on sitting in

23  between two other officers.

24  Q.    And can you see what color his shirt is?

25  A.    I don't know what color it is.

1   Q.    And you say he is sitting in between two officers.

2   How close is he to the edge of the row there?

3   A.    He's the second guy in.

4   Q.    Who is next in the CERT team's chain of command?

5   A.    Sergeant Hall.

6   Q.    And do you see Sergeant Hall present in here today?

7   A.    Yes.

8   Q.    Can you point him out and identify him by a piece of

9   clothing that he is wearing?

10   A.    Yes.  He has on a black suit with glasses on sitting

11   on the end of the first row.

12         MS. BOYD:   And, Your Honor, I would like the

13   record to reflect that the witness has identified

14   Defendant Hinton and Defendant Hall.

15         THE COURT:   The record will reflect that.

16   BY MS. BOYD:

17   Q.    Now what was the command structure of the rest of

18   the CERT team?  Was there any rank or identification for

19   the individual members of the team?

20   A.    Yes, we had call signs.  We had X-1 which would be

21   Officer Lach.

22   Q.    And do you see X-1 or Officer Lach here today?

23   A.    Yes.

24   Q.    Can you point him out?

25   A.    Yes.

1   Q.    And identify him by a piece of clothing that he is

2   wearing?

3   A.    He has on a light color shirt sitting on the end of

4   the first row on the far end.

5   Q.    So you said he was X-1?

6   A.    Yes.

7   Q.    Who is next in the order?

8   A.    X-2 or Officer Rushin.

9   Q.    And do you see him here today?

10  A.    Yes.

11  Q.    Can you point him out and indicate who he is by an

12  article of clothing he's wearing?

13  A.    Yes.  He has on a light green shirt with glasses.

14  He's got a bald head and he is sitting the second guy in

15  from this end.

16  Q.    And who is next in the order?

17  A.    X-3, Officer Wimbush.

18  Q.    Do you see Officer Wimbush here today?

19  A.    Yes.

20  Q.    Can you point him out and identify who he is by an

21  article of clothing?

22  A.    Yes.  He has on a white color shirt sitting in

23  between -- sitting right next to Officer Rushin.

24  Q.    And who is next?

25  A.    X-4, Officer Thomas.

1    Q.    And who is after Officer Thomas?

2    A.    Officer Douglass, he was X-5.

3    Q.    Who was X-6?

4    A.    Myself. I was X-6.

5    Q.    Who was X-7?

6    A.    That was Officer Griffin.

7    Q.    Do you see him here today?

8    A.    Yes.

9    Q.    Can you point him out and identify him by a piece of

10   clothing that he is wearing?

11   A.    Yes.  He has on the black jacket with the blue

12   collar shirt sitting right there in the front.

13   Q.    And who was X-8?

14   A.    Officer Redden.

15          MS. BOYD:   Your Honor, I would like the record

16   to reflect that Mr. Bolden has a identified Defendant

17   Lach, Defendant Rushin, Defendant Wimbush, and Defendant

18   Griffin.

19          THE COURT:   The record will reflect that.

20   BY MS. BOYD:

21   Q.    I would like to turn to CERT's function at Macon

22   State.  Before you became a corrections officer what kind

23   of training did you receive to work at the prison?

24   A.    I was trained in Forsyth at the Academy.

25   Q.    Is that correctional officer training?

1   A.    Yes.

2   Q.    Now, you testified earlier that CERT was responsible

3   for cell extractions?

4   A.    Yes.

5   Q.    Was CERT called to a scene at the prison when an

6   inmate assaulted a guard?

7   A.    Not all the time.  But when that inmate got just --

8   I guess they couldn't get under control, the most violent

9   inmate, the most dangerous inmate, then CERT was called

10  out.

11  Q.    How would CERT be called to the scene?

12  A.    They would come over the radio and called for the

13  CERT sergeant and have him to bring his team to the

14  building.

15  Q.    Was there a particular code that would be called to

16  signify when an inmate assaults an officer?

17  A.    Yes, ma'am.

18  Q.    What's that code called?

19  A.    Code three.

20  Q.    Now what was CERT's role at a scene when an inmate

21  assaulted a guard?  When CERT is called to the scene what

22  was their role?

23  A.    To get control of the inmate and remove him from the

24  building.

25  Q.    Now under department policy how much force was CERT

1   allowed to use to get control of the inmate?

2   **A.**    It would be determine -- like what type of

3   aggression the inmate was showing toward the officer.

4   **Q.**    So the amount of force --

5   **A.**    The least amount of force necessary to gain positive

6   control of the inmate.

7   **Q.**    I'm sorry.  I just spoke over you for a second.  I'm

8   sorry.  You said the least amount of force necessary to

9   gain positive control of the inmate?

10   **A.**    Yes.

11   **Q.**    Now once an inmate was under positive control were

12   you allowed to use any further force on that inmate?

13   **A.**    No.

14   **Q.**    Why can't you use force on an inmate once they are

15   already under control?

16   **A.**    If he is in handcuffs he doesn't pose a threat.

17   **Q.**    And after the inmate is restrained and the inmate

18   doesn't pose a threat to officers anymore what was CERT

19   supposed to do?  Where were they supposed to take the

20   inmate?

21   **A.**    To medical.

22   **Q.**    Now during an inmate's escort to medical what is

23   CERT supposed to do to document that escort?

24   **A.**    It's supposed to be recorded on camera.

25   **Q.**    Why is CERT supposed to record the escort to medical

1    on camera?

2    **A.**    For security of the inmate and also the officers.

3    **Q.**    Now, why is CERT required to take the inmate to

4    medical?

5    **A.**    He has to be checked by medical personnel to make

6    sure that he didn't sustain any injuries during the cell

7    extraction.

8    **Q.**    Why is it important to make sure that the inmate

9    didn't sustain any injuries?

10   **A.**    It would be for the benefit of the officer and the

11   inmate in case there was an un-justice done.

12   **Q.**    Now, after you use force on an inmate what are you

13   required to do to document the force that you used?

14   **A.**    You have to write a statement.

15   **Q.**    And what about when you see someone use force on an

16   inmate, what are you supposed to do to document that?

17   **A.**    You should write a statement and you should report

18   it.

19   **Q.**    Why are you supposed to report that and write a

20   statement?

21   **A.**    Because it's -- it's bad conduct for an officer.

22   It's not legal to hit an inmate and if you witness it you

23   should report it to your supervisor.

24   **Q.**    So it's important for you to document when an

25   officer does something that is wrong or against their

1    training?

2    **A.**    Yes.

3    **Q.**    And if that's something that you see an officer do?

4    **A.**    Yes.

5    **Q.**    Now under prison policy are you allowed to leave

6    important details out of the reports when you see

7    something -- someone doing something to an inmate?

8    **A.**    No.

9    **Q.**    Now what about when you observe an inmate sustain an

10   injury, what responsibility do you have to document that

11   inmate's injury?

12   **A.**    You have a use of force paperwork that has to be

13   filled out.

14   **Q.**    So under department policy were you allowed to cover

15   up or hide whenever a use of force results in an injury to

16   an inmate?

17   **A.**    No.

18   **Q.**    Now, I want to turn your attention to conversations

19   that you had with CERT supervisors when you joined the

20   CERT team.  Now, did you have a conversation with the

21   supervisor of CERT to learn how CERT worked when you first

22   started?

23   **A.**    Yes.

24   **Q.**    And can you remind the jury when was it that you

25   first joined the CERT team?

1    A.    It was October of 2010.

2    Q.    So when you started on CERT in October of 2010 what

3    did your supervisor Defendant Hinton tell you about how

4    CERT worked?

5           MR. WOLFE:   Objection.   There has been no

6    testimony that Defendant Hinton told him anything.

7           THE COURT:   I guess you need to first ask if

8    Hinton told him anything.

9    BY MS. BOYD:

10   Q.    When you first joined the CERT team, Mr. Bolden, did

11   you have any conversations with Defendant Hinton?

12   A.    Yes.

13   Q.    What did Defendant Hinton tell you about how CERT

14   worked?

15   A.    He just said whatever happens on CERT stays on CERT.

16   Q.    When Defendant Hinton told you whatever happens on

17   CERT stays on CERT was there anyone else present for that

18   conversation?

19   A.    Yes.

20   Q.    Who else was there?

21   A.    Sergeant Hall.

22   Q.    Where did that conversation take place?

23   A.    In the deputy warden's office.

24   Q.    And that's Deputy Warden Hinton?

25   A.    Yes.

1    Q.    Again what was Sergeant Hall's position in relation
2    to CERT?
3    A.    He was the CERT supervisor.
4    Q.    So what did Defendant Hall or how did Defendant Hall
5    react when Defendant Hinton said, things that happen on
6    CERT stay on CERT?
7    A.    He didn't really react.
8    Q.    Now, what did it mean to you at the time when
9    Defendant Hinton said to you, things that happen with CERT
10   stay with CERT?
11   A.    I really didn't know what it meant.  I just knew
12   that CERT had a very important role at the prison.
13   Q.    Did you understand what Defendant Hinton wanted you
14   to keep secret?
15   A.    No.
16   Q.    Did you later learn what Defendant Hinton wanted you
17   to keep secret?
18   A.    Yes.
19   Q.    Okay.  What was it that you understood Defendant
20   Hinton wanted you to keep secret?
21         MR. WOLFE:   I'll object to speculation as to
22   what Hinton meant.
23         THE COURT:   I think there needs to be more
24   foundation like how did he learn this.
25         MS. BOYD:  Okay.

1    BY MS. BOYD:

2    **Q.**    So you said you later learned what Defendant Hinton

3    meant when he said things that happen with CERT stay with

4    CERT?

5    **A.**    Yes.

6    **Q.**    How did you learn what he meant?

7    **A.**    By the actions that were taken during some of the

8    working days when I was there.  It's like stuff that

9    happens as far as like doing the cell extractions, the

10   actions that was taken on violent inmates after they

11   assault an officer.

12   **Q.**    And what actions were taken on violent inmates after

13   they assaulted an officer?

14          MR. WOLFE:   I'm going to object and move to

15   strike that as no foundation for what Deputy Warden Hinton

16   meant.

17          MS. BOYD:  Your Honor, he is explaining how he

18   understood what Defendant Hinton meant.

19          THE COURT:   Well, yes, I know that's a question

20   but is this because of something that Mr. Hinton

21   subsequently did?  I mean, we have a conversation that

22   took place in October 2010 and at some point later he said

23   he came to have an understanding as to what Mr. Hinton

24   meant by that.  Is that because of something that he

25   learned from Mr. Hinton or is it because of something he

1    learned from somebody else or something else?

2         MS. BOYD:  Or practices that he saw taking place

3    at the prison.  If I can follow up and ask him some

4    questions about what exactly he meant when he said he saw

5    actions taken against violent inmates at the prison by

6    CERT.

7         THE COURT:  Well, I guess what I'm not quite

8    understanding is how the subsequent things that happened

9    that led him to have what he thought was an understanding

10   are related to Mr. Hinton.

11        MS. BOYD:  Okay.  Can I follow up about an

12   additional conversation with Mr. Hinton, Your Honor, and

13   then further lay the foundation?

14        THE COURT:  Yes.

15        MS. BOYD:  Okay.

16   BY MS. BOYD:

17   Q.   Was there ever a time when you had a conversation

18   with Defendant Hinton when he asked you to use force on an

19   inmate when it wasn't necessary?

20        MR. WOLFE:  I'm going to object to leading.

21        MS. BOYD:  I'm trying to orient the witness,

22   Your Honor.

23        MR. WOLFE:  The witness, if he needs

24   orientation, can share that.

25        THE COURT:  Well, I'll allow that question.

1    I'll overrule the objection.

2    BY MS. BOYD:

3    Q.    I'll ask you again, Mr. Bolden, did you ever have a

4    conversation with Defendant Hinton where he asked you to

5    use force on an inmate when it was not necessary in your

6    estimation?

7    A.    I didn't hear you.

8    Q.    Okay.  Did you ever have a conversation with

9    Defendant Hinton where he asked you to use force on an

10   inmate where it was not necessary?

11   A.    No.

12   Q.    Did you ever have a conversation with Defendant

13   Hinton about an inmate in the G building who wouldn't get

14   out of the shower?

15   A.    Yes.

16   Q.    Can you tell the jury about that conversation?

17   A.    Yes.  It was during when the prison had a shutdown

18   and there was an inmate in the shower -- prisoner in the

19   shower.  And at the time we was trying to get him out he

20   wouldn't come out.  And once he finally got out of the

21   shower the inmate referred to me as a derogatory name.

22   And later on when we were telling Mr. Hinton about it and

23   he just made the comment that you should have got him,

24   don't never let them call you out a name.  You should have

25   took care of him then.

1   Q.   Did Mr. Hinton say anything else to you about what

2   you should have done to the inmate?

3   A.   No.

4   Q.   What did you understand him to mean when he said you

5   should have got him, you should have taken care of him?

6            MR. WOLFE:   Same speculation we're trying to

7   establish a foundation for now, Judge.   I object.

8            THE COURT:   No, I think that's an appropriate

9   question.   She's asking him -- the problem with the

10  earlier question was he said he didn't have an

11  understanding as to what Mr. Hinton meant when he made the

12  alleged statement.   But later he came to have an

13  understanding and it was never clear to me how that

14  related to Mr. Hinton himself.

15           Now he is talking about a statement that Mr.

16  Hinton said to him in a particular context about a

17  particular thing and she is asking his immediate

18  impression after Mr. Hinton said that.   Right?

19           MS. BOYD:   That's correct.

20  BY MS. BOYD:

21  Q.   So what did you understand Mr. Hinton to mean when

22  he said, you should have got that inmate?

23  A.   I should have hit him.

24  Q.   And based on your assessment was there any reason to

25  use force on that inmate?

1   **A.**   No.

2   **Q.**   So after you had that conversation with Mr. Hinton

3   about using force on an inmate that you didn't think it

4   was necessary to use force, on what did you think he meant

5   in the earlier conversation that you referred to?

6          MR. WOLFE:   I'm going to object.  There is

7   still no foundation.  What happens on CERT stays on CERT

8   is the comment that we're talking about.

9          THE COURT:   Right.  I'm still not following.  I

10  understand the significance or I think I understand the

11  significance of the second statement about, allegedly,

12  made about the inmate, but how does that relate to an

13  impression that he subsequently formed as to what Mr.

14  Hinton meant when he said, what happens on CERT stays on

15  CERT?

16         MS. BOYD:   So, if I could now follow up and ask

17  Mr. Bolden when he understood what Defendant Hinton meant

18  that's what he was explaining before. So I think now there

19  has been further context provided for statements made by

20  Mr. Hinton and then what Mr. Bolden saw occurring what he

21  understood that to mean.

22         THE COURT:   You can ask him when.  I think

23  that's a question you need to ask.  When?

24         MS. BOYD:   Okay.

25  BY MS. BOYD:

1    **Q.**    So, Mr. Bolden, when did you understand what

2    Defendant Hinton meant when he said, what happens with

3    CERT stays with CERT?  When did you understand that?

4            MR. WOLFE:    Excuse me.  Object to the form of

5    the question.  It's not when did he understand what Mr.

6    Hinton meant, it's when did he form his opinion, if she's

7    going to be able to ask as to what Mr. Hinton meant.

8            MS. BOYD:   That's exactly --

9            THE COURT:   That's an appropriate -- I mean,

10   it's a foundation question.  She's first establishing when

11   he formed his understanding and the next they are going to

12   talk about how.

13           MR. WOLFE:   That's why I objected to the form

14   of the question.  It wasn't when did he develop his

15   understanding, it's when did you determine what Mr. Hinton

16   meant was what was asked and I don't think that's

17   appropriate.

18           THE COURT:   I'll overrule that.

19   BY MS. BOYD:

20   **Q.**    When did you understand what Mr. Hinton meant when

21   he said, what happens with CERT stays with CERT?

22   **A.**    When we had the first incident with Franklin Jones.

23           MR. WOLFE:   And I'll move to strike all the

24   other stuff that was attempted to be used as to establish

25   a foundation for understanding what he meant.

1          THE COURT:   Well, it doesn't appear that the

2     extraction questions had anything to do with the

3     understanding of what happens on CERT stays on CERT.  I'll

4     grant you that.

5          MR. WOLFE:   So I'll move to strike.

6          MS. BOYD:   But it is certainly a defendant's

7     statement, Your Honor, that is offered in furtherance of a

8     conspiracy.

9          THE COURT:   Yeah, it can be --

10          MR. WOLFE:   But he made the statement --

11          THE COURT:   -- relevant for other reasons.

12          MR. WOLFE:   He made the statement and the

13     statement is in and I'm not objecting to what Hinton said,

14     that's not my objection.  I move to strike the other

15     testimony.

16          THE COURT:   It's overruled.

17     BY MS. BOYD:

18     Q.    So you said you understood what Defendant Hinton

19     meant when he said what happens with CERT stays with CERT

20     after the incident with Franklin Jones.  Can you explain

21     how you knew what he meant based on that incident?

22     A.    Just with the incident that happened and what took

23     place and then the cover-up.

24          MR. WOLFE:   I object.  There's no foundation

25     there for what he meant based on that answer.

1          THE COURT:   Well, we don't know yet.  Can you

2     relate, if you can, something Mr. Hinton said or did or

3     that was involved with to the subsequent understanding

4     about the meaning of Mr. Hinton's words.

5          MS. BOYD:  Sir, the statement was, what happened

6     with CERT stays with CERT.  And I believe Mr. Bolden is

7     going to testify to an incident that happened with CERT

8     and then what happened afterward subsequently to keep that

9     incident with CERT, providing context for the statement

10    that Defendant Hinton made to him when he joined the CERT

11    team.

12         THE COURT:   Well, he has told us that he formed

13    his understanding after the incident with this inmate

14    Franklin Jones.  He hasn't told us how.

15         MS. BOYD:  Well, that's what I'm trying to get

16    to ask him.

17         THE COURT:   What I want to see is how that

18    subsequent understanding is related to something that Mr.

19    Hinton said or did or was involved with.

20         MS. BOYD:   So, Mr. Hinton makes the statement

21    when he joins CERT -- --

22         MR. WOLFE:   If we're going to discuss these

23    things I don't want it to be in the presence of the

24    witness so that the witness's testimony is not affected.

25         THE COURT:   Proceed.  Understand what I'm

1      looking for though.  I'm looking for a connection between

2      Mr. Hinton and his understanding of what he thinks Mr.

3      Hinton made, given he's told us initially that he didn't

4      have any understanding.

5              MS. BOYD:   Right.  So if I may inquire further?

6              THE COURT:   You may.

7      BY MS. BOYD:

8      Q.   So, what was it about the Franklin Jones incident

9      that led you to understand what Defendant Hinton meant to

10     you when he said things that happened with CERT stay with

11     CERT?

12             MR. WOLFE:   I'm going to object to the form of

13     the question.  It's not to understand to form his opinion

14     as to what Deputy Warden Hinton said.

15             MS. BOYD:  I assumed that was the same thing,

16     Your Honor, understanding, forming his own opinion.

17             MR. WOLFE:   They don't mean the same thing.

18     What he meant is not his opinion as to what he meant.

19             THE COURT:   Rephrase the question in the form

20     of an opinion.

21     BY MS. BOYD:

22     Q.   What was --

23             THE COURT:   Eliciting his opinion.

24             MS. BOYD:  I'm sorry.

25             THE COURT:   Speak of it in terms of opinion

1    rather than understanding.

2        MS. BOYD:  Okay.

3    BY MS. BOYD:

4    Q.    What was your opinion of what Defendant Hinton meant

5    when he said, things that happen with CERT stayed with

6    CERT?  How did the Franklin Jones incident contribute to

7    your opinion of what Defendant Hinton meant?

8    A.    Because when everything was over and said with and

9    done with and the statement that was wrote and everything

10   had happened it was just like normal routine, like all the

11   instructions came from the supervisor.

12        MR. WOLFE:  Objection, speculation as to where

13   the instruction came from unless he knows specifically and

14   personally.

15        THE COURT:  Overruled.  Move on.  Go ahead.

16   BY MS. BOYD:

17   Q.    And what was it that you said occurred with Inmate

18   Franklin Jones?

19   A.    When he was beaten in the gym by the CERT team and

20   all the statements.  And whenever it happened and when it

21   was over with the CERT Sergeant went to Deputy Warden

22   Hinton --

23        MR. WOLFE:  I'm going to object to something

24   that may have happened that he's not privy to and nobody

25   told him about.

1          THE COURT:   Overruled.

2     BY MS. BOYD:

3     Q.    Continue.

4     A.    He went to the Deputy Warden office -- he returned

5     from the Deputy Warden's office.  We was in the CERT

6     office and he said, y'all need to make sure y'all have all

7     your stuff in order.

8     Q.    And when you say make sure all your stuff was in

9     order, what did you understand him to mean?

10    A.    Make sure all the statements related to each other

11    so it wouldn't be no --

12    Q.    You said so it wouldn't be no --  So what wouldn't

13    it?

14    A.    So it wouldn't be like something wrong was did.

15    Q.    So just to make sure I'm understanding what you're

16    saying.  You said that Inmate Franklin Jones was beaten in

17    the gym?

18    A.    Yes.

19    Q.    Afterwords was it your understanding that --

20          MR. WOLFE:   Objection.  You keep relying on

21    facts not in evidence.  He never said Franklin Jones was

22    beaten in the gym.

23          THE COURT:   Is the objection the gym wasn't

24    mentioned?

25          MR. WOLFE:   No.  That Jones was beaten in the

1  gym.  It's not in evidence.  He hasn't testified to that.

2          THE COURT:   I thought he did.

3          MS. BOYD:   That's what he just said, Your

4  Honor.

5          MR. WOLFE:   Well he just--

6          THE COURT:   He said it.  You might can impeach

7  him.

8          MR. WOLFE:   No, the question asked it, he

9  didn't say it.  He said that they had beaten Inmate Jones

10  but they never said it was in the gym. The fact that it

11  was in the gym is not in evidence. The questions are

12  leading and she is adding information to the testimony.

13          THE COURT:   The question might have been

14  leading.  The jury will remember whether or not the word

15  gym got mentioned.  Go ahead.

16  BY MS. BOYD:

17  Q.    Mr. Bolden, was it your understanding that the

18  statements that you and other CERT members wrote after the

19  Franklin Jones beating were going to include the fact that

20  you and other CERT members had seen Franklin Jones being

21  beaten in the gym?

22  A.    Say it again.

23  Q.    Sure.  Was it your understanding that the reports

24  that CERT wrote after the Franklin Jones beating, was it

25  your understanding that those reports were going to

1    include the beating of Franklin Jones?

2    **A.**    Really, I don't understand the question.  Are you

3    asking me were we supposed to put it in the statement that

4    we did?

5    **Q.**    Yes?

6    **A.**    No.

7    **Q.**    And how did you know you weren't supposed to put

8    that in your statement?

9    **A.**    Because no one mentioned it.  It was never mentioned

10    in the statements.

11    **Q.**    And you mentioned that this contributed to your

12    opinion of what Defendant Hinton had said to you.  How did

13    that contribute to your opinion of what Defendant said to

14    you about things happening with CERT stay with CERT?

15    **A.**    Because all of this happened in the CERT office. No

16    one was allowed in the CERT office but the CERT team.

17    **Q.**    I want to turn your attention now to an inmate named

18    Terrance Dean.  Were you ever called to respond to a

19    situation regarding Inmate Terrance Dean?

20    **A.**    Yes.

21    **Q.**    How were you called to respond?

22    **A.**    Code three.

23    **Q.**    What did that mean when a code three was called for

24    Terrance Dean?

25    **A.**    That means that an inmate is assaulting an officer.

1    Q.    And where was the code called for Terrance Dean?

2    A.    In the E building.

3    Q.    And what is the E building?

4    A.    It's the dorm where the inmates were housed at.

5    Q.    Did other CERT team members respond to the dorm as

6    well?

7    A.    Yes.

8    Q.    You said that a code three indicates that an inmate

9    had assaulted an officer?

10   A.    Say that again.

11   Q.    You said earlier that a code three means an inmate

12   has assaulted an officer?

13   A.    Yes.

14   Q.    When you got to the dorm that day was the

15   altercation between Dean and the officer already over?

16   A.    Yes.

17   Q.    Who had custody of Inmate Dean when you saw him in

18   the dorm?

19   A.    Officer Rushin and Officer Thomas.

20   Q.    Was he already handcuffed when you saw him that day?

21   A.    Yes.

22   Q.    Now, were you part of the escort of Dean away from

23   the dorm?

24   A.    Yes.

25   Q.    Now, aside from you and Officer Rushin and Officer

1    Thomas who were the other CERT members that escorted Dean

2    away from the dorm that day?

3    A.    Officer Redden, Officer Douglass, Officer Wimbush

4    and Sergeant Hall.

5    Q.    Now, as CERT escorted Dean away from the dorm did he

6    have any visible injuries that you saw?

7    A.    No.

8    Q.    Were there any visible injuries to his head?

9    A.    No.

10   Q.    To his face?

11   A.    No.

12   Q.    Was he able to walk out of the dorm on his own?

13   A.    Yes.

14   Q.    Now according to prison policy where was Dean

15   supposed to be taken after CERT took him from the dorm?

16   A.    To medical.

17   Q.    Where was Dean taken after he was taken from the

18   dorm?

19   A.    To the gym.

20   Q.    Now earlier you said that escorts of inmates from

21   the dorm to medical are supposed to be filmed.  Did anyone

22   film Mr. Dean's escort from the dorm to the gym?

23   A.    I don't know.

24   Q.    Did you see anyone filming the escort?

25   A.    No.

1   Q.    Now to your knowledge was the gym a place at the
2   prison that was covered by cameras?
3   A.    I don't know.  I don't know.
4   Q.    Was the gym a place where officers were assigned to
5   a post?
6   A.    Yes, during recreation.
7   Q.    Was there anyone assigned there at the time that you
8   took Terrance Dean there?
9   A.    No.
10  Q.    Now, why was Mr. Dean being taken to the gym that
11  day?
12  A.    That's the way we just went.  We went through the
13  gym.  They said go through the gym and we go through the
14  gym.
15  Q.    What did you understand was going to happen to Mr.
16  Dean when you got to the gym?
17  A.    I understood once we got in the gym --
18  Q.    And what did you understand?
19  A.    That he was going to be beat.
20  Q.    Why was Mr. Dean going to be beaten in the gym that
21  day?
22  A.    Because he assaulted an officer.
23  Q.    Now, what were you taught in the training academy
24  about beating inmates when there's no reason to beat
25  them?

1   **A.**    It wasn't no excuse for it.  It wasn't tolerated in

2   the Department of Justice, Department of Corrections, I

3   mean.

4   **Q.**    Now when CERT took Dean into the gym was he still

5   handcuffed?

6   **A.**    Yes.

7   **Q.**    And when you got into the gym with the other CERT

8   officers can you describe who was with you?

9   **A.**    Myself, Officer Douglass, Officer Redden, Officer

10  Rushin, Officer Wimbush and Sergeant Hall.  Officer Thomas

11  was not with us.

12  **Q.**    Now when you got into the gym did anyone say

13  anything?

14  **A.**    Yes.

15  **Q.**    What did they say?

16  **A.**    We stopped and they said, "What are you waiting on?"

17  **Q.**    Who said, "What are you waiting on?"

18  **A.**    Officer Lach.

19  **Q.**    So Officer Lach was also in the gym with you, with

20  Mr. Dean?

21  **A.**    Yes.  Yes.

22  **Q.**    And when Officer Lach said, "What are you waiting

23  for?", how did the CERT team respond?

24  **A.**    By hitting Inmate Dean.

25  **Q.**    And at the time that CERT started hitting on Mr.

1   Dean was he still handcuffed?

2   **A.**   Yes.

3   **Q.**   Was he able to defend himself at all?

4   **A.**   No.

5   **Q.**   Based on your training and what you saw why was

6   force being used on Dean in the gym?

7   **A.**   I really don't know.

8   **Q.**   Was this the first time that you had been on an

9   escort where CERT had jumped on an inmate in the gym?

10   **A.**   No.

11   **Q.**   Now, you mentioned who was in the gym with you when

12   you -- when CERT started jumping on the inmate.  Who of

13   those officers were also using force on the inmate?

14   **A.**   I didn't hear the last part of that.

15   **Q.**   Who of the officers that you named were using force

16   on the inmate or participating in the beating of the

17   inmate?

18   **A.**   Every officer that was in there in the gym.

19   **Q.**   Did you use force on Dean in the gym?

20   **A.**   Yes, ma'am.

21   **Q.**   What kind of force did you use when you first struck

22   or hit the inmate?

23   **A.**   I struck him in the side with my elbow.

24   **Q.**   And what happened after you struck him in the side

25   with your elbow?

1 **A.** The other officers were hitting him and I got hit

2 and I turned him loose.

3 **Q.** Now when you struck Mr. Dean in the side with your

4 elbow was he standing at that point?

5 **A.** Yes.

6 **Q.** And after you struck him with your elbow was he

7 still standing?

8 **A.** Yes.

9 **Q.** And what happened after that?

10 **A.** I released him.

11 **Q.** And when you released him what happened?

12 **A.** He fell to the floor.

13 **Q.** And after Mr. Dean fell to the floor did you use

14 force on him?

15 **A.** Yes.

16 **Q.** What did you do?

17 **A.** I walked up to him and I slapped him in the face

18 about three or four times screaming at him.

19 **Q.** What were you screaming at Mr. Dean?

20 **A.** Get up.  Get your ass up and stop playing, get up.

21 **Q.** Did Mr. Dean ever get up?

22 **A.** No.

23 **Q.** Now previously when you met and spoke with us did

24 you admit that you had struck Dean while he was standing

25 but denied hitting him when he was on the ground?

1  **A.**     Yes, I denied it.

2  **Q.**     And previously did you say that it was chaos and you

3  couldn't say what happened to Dean when he was on the

4  ground?

5  **A.**     Yes.

6  **Q.**     When was it that you first admitted to us that you

7  used force on Dean when he was on the ground?

8  **A.**     It was yesterday morning.

9  **Q.**     And why did you admit that you hit Dean when he was

10 on the ground yesterday morning?

11 **A.**     Because I felt like it was just time for it to be

12 over with, you know.  I'm just ready for it to be over

13 with.  I've got a family and I'm tired.

14 **Q.**     Did you have any conversations with anyone before

15 you came in and told us that?

16 **A.**     No.

17 **Q.**     Was there anyone that helped you come to that

18 decision --

19 **A.**     Yes.

20 **Q.**     -- to tell us that you had struck him on the ground?

21 **A.**     Yes.

22 **Q.**     Who was it that helped you come to that decision?

23 **A.**     My sister-in-law.

24 **Q.**     Now when did CERT stop using force on Dean in the

25 gym?

1    A.    It was stopped when I -- after I got done slapping

2    him they was done.

3    Q.    Now before the use of force stopped in the gym can

4    you name the officers that you saw using force on Dean?

5    A.    I really don't know what exactly the officers did as

6    far as striking him.  I just know everyone was involved in

7    the beating.

8    Q.    Okay.  And when you say everyone was involved in the

9    beating --

10   A.    The CERT members.

11   Q.    Okay.  And which specific CERT members was that?

12   A.    Myself, Redden, Douglass, Rushin, Lach, Sergeant

13   Hall and Wimbush.

14   Q.    And you said earlier Mr. Dean didn't have any

15   visible injuries when he went into the gym?

16   A.    Not that I recall, no.

17   Q.    What, if any, injuries did he have when the beating

18   stopped?

19   A.    After the beating stopped I really couldn't tell.

20   Q.    Was there a time that you saw that Mr. Dean was

21   injured after CERT's use of force?

22   A.    Yes.

23   Q.    What injury did you see on Mr. Dean?

24   A.    After we began to pick him up he had a small knot on

25   his head.

1   **Q.**   Could Mr. Dean walk on his own out of the gym?

2   **A.**   No.

3   **Q.**   Based on the fact that he wasn't able to walk on his

4   own what did you think about the severity of his injuries

5   after the beating?

6   **A.**   I thought it was pretty bad.

7   **Q.**   What did Defendant Hall, Defendant Lach, Defendant

8   Rushin and Defendant Wimbush do after the beating?

9   **A.**   They exited the gym and they said they was going

10   back to the building.

11   **Q.**   Why did they leave the gym after the beating?

12   **A.**   Ma'am?

13   **Q.**   Why did they leave the gym after the beating?

14   **A.**   Why did they leave?

15   **Q.**   Yes.

16   **A.**   I really don't know.

17   **Q.**   What were you told to do after the beating?

18   **A.**   To take him to medical.

19   **Q.**   Who told you to take Dean to medical?

20   **A.**   Sergeant Hall.

21   **Q.**   Did anyone help you take him to medical?

22   **A.**   Yes.

23   **Q.**   Who was that that helped you take Dean to medical?

24   **A.**   Officer Douglass and Officer Redden.

25   **Q.**   Now, did you ever see Dean walking or talking again

1   after you carried him out of the gym?

2   A.   No.

3   Q.   Now, once you got into medical did any of those

4   other CERT officers who left the gym and went back to the

5   building ever come back to medical?

6   A.   Yes.

7   Q.   And did anyone from the CERT team comment on Dean's

8   condition in medical?

9   A.   No, not that I remember, no.

10  Q.   Did Defendant Hall make any comments in medical

11  about Dean?

12  A.   Not about Dean, no.

13  Q.   Did Defendant Hall make any comments at all in

14  medical that day that you recall?

15  A.   Yes.

16  Q.   What did he say?

17  A.   He said, "We're going to lose our jobs over this

18  one."

19  Q.   And did you, in fact, lose your job after the Dean

20  beating?

21  A.   Yes.

22  Q.   Have you plead guilty in association with your

23  involvement in the beating of Dean and other inmates?

24  A.   Yes, ma'am.

25  Q.   What did you plead guilty to?

1    **A.**    I plead guilty to the beating of an inmate and
2    making false reports.

3    **Q.**    And are those felonies or misdemeanors?

4    **A.**    Felonies.

5    **Q.**    Have you been sentenced yet?

6    **A.**    No.

7    **Q.**    Do you know what sentence you're going to get?

8    **A.**    No, ma'am.

9    **Q.**    Are you hoping for a lesser sentence because of your
10   cooperation in this case?

11   **A.**    Yes.

12   **Q.**    Has anyone promised you what sentence you're going
13   to get?

14   **A.**    No.

15   **Q.**    Has anyone promised you that you're, in fact, going
16   to get a lesser sentence?

17   **A.**    No.

18   **Q.**    What's your understanding about who will make the
19   decision about what your sentence is?

20   **A.**    The judge.

21   **Q.**    When Dean was taken to medical after the beating was
22   the prison staff able to fully address all of his
23   injuries?

24   **A.**    No.

25   **Q.**    Where was Dean taken?

1    **A.**    He was taken to an outside facility.

2    **Q.**    Earlier you said that your supervisor said that you

3    guys are going to lose your jobs about what happened to

4    Dean.  What did you or did you and other CERT members do

5    to take steps to try to stay out of trouble?

6    **A.**    Wrote false reports.

7    **Q.**    You wrote a false report about Dean you said.  When

8    did you write your report?

9    **A.**    After I returned back from the outside medical

10    facility.

11    **Q.**    Where did you write your report?

12    **A.**    In the CERT office.

13    **Q.**    Was there anyone else present when you wrote your

14    report?

15    **A.**    Yes.

16    **Q.**    Who else was present?

17    **A.**    Sergeant Hall, Officer Douglass, Officer Rushin

18    Officer Wimbush, Officer Lach and Officer Thomas.

19    **Q.**    What did your supervisor, Defendant Hall, say to you

20    about your written statement?

21    **A.**    He said get with these other guys and see what they

22    wrote on their statement so you can make your statement

23    match theirs.

24    **Q.**    And what did you think Defendant Hall meant when he

25    said make your statement match theirs?

1    A.    Just make it where seem like nothing out of the

2    ordinary happened.  It was like -- just make it where it

3    will go through and nothing will be said about it like no

4    un-justice was done.

5    Q.    So did your statement include anything about the

6    beating of Dean in the gym?

7    A.    No.

8    Q.    Was it your understanding that the other statements

9    were going include anything about Dean in the gym?

10   A.    No.

11        MS. BOYD:  Your Honor, may I approach the

12   witness?

13        THE COURT:   You may.

14   BY MS. BOYD:

15   Q.    I handed you what's been marked for identification

16   as Government's Exhibit 8.  Can you tell us what that is?

17   A.    It's a witness statement.

18   Q.    And is that your witness statement from the incident

19   with Terrance Dean?

20   A.    Yes, ma'am.

21   Q.    How do you know that that's your statement?

22   A.    My signature.

23        MS. BOYD:   And, Your Honor, the government

24   offers Government Exhibit 8 into evidence.

25        THE COURT:   Any objection?

1          MR. WOLFE:   No objection.

2          MR. FOX:  No objection.

3          THE COURT:   Hearing none it is admitted without

4    objection.

5          MS. BOYD:   May I publish it to the jury, Your

6    Honor?

7          THE COURT:   You may.

8    BY MS. BOYD:

9    Q.    What's the date of the incident.

10   A.    12-16-2010.

11   Q.    Can you please read your statement to the jury?

12   A.    Yes.  "I, Officer Bolden, met Officer Douglass and

13   Officer Redden on the west side walk where Inmate Dean

14   Tanner, number 1194267 appeared to be passed out. I,

15   Officer Bolden, assisted by carrying the legs of the

16   inmate to get him to medical."

17   Q.    So your statement did not include anything about the

18   force that you used on Dean in the gym?

19   A.    No.

20   Q.    Is that right?

21   A.    No.

22   Q.    Why not?

23   A.    Because we was instructed for our statement to match

24   the other CERT members statement so it wouldn't show no

25   signs that we beat the inmate.

1   Q.    Did any of the other CERT members statements that

2   you looked at include the fact that you and other CERT

3   members had used force on Dean in the gym?

4   A.    No.

5   Q.    Was anyone else with you when Defendant Hall told

6   you to make your statement match?

7          MR. WOLFE:   Judge, I'm going to object. I guess

8   it would be hearsay as to what was in the other witness

9   statements.  The best evidence would be the statements

10   themselves.

11          THE COURT:   Are those statements going to be

12   tendered?

13          MS. BOYD:   Yes, Your Honor.

14          THE COURT:   I'll overrule the objection.

15   BY MS. BOYD:

16   Q.    Was there anyone else with you when Defendant Hall

17   told you to make your statement match?

18   A.    Yes.

19   Q.    Who was with you?

20   A.    Officer Douglass.

21   Q.    How did Officer Douglass respond when Defendant Hall

22   told him to make the statement match?

23   A.    He was kind of hesitant because he was saying that

24   if we write this statement like this it's going to make it

25   seem like that we're not the only someone that had

1   anything to do with it.  And he didn't want to write it.

2   **Q.**    And how did Defendant Hall respond when Officer

3   Douglass didn't want to write his statement that way?

4   **A.**    The comment was made, "Just write the statement."

5   **Q.**    And when you wrote your statement who did you give

6   it to?

7   **A.**    Sergeant Hall.

8   **Q.**    And did Sergeant Hall review your statement?

9   **A.**    Yes.

10  **Q.**    Did Sergeant Hall ever give you your statement back

11  and tell you to put something in the statement about the

12  beating of Dean in the gym?

13  **A.**    No.

14  **Q.**    And was it your understanding that Sergeant Hall was

15  present for that beating?

16  **A.**    Yes.

17  **Q.**    And participated in that beating?

18  **A.**    Yes.

19  **Q.**    Now when an inmate is injured what part of the

20  Department of Correction investigates those injuries?

21  **A.**    I really don't know.

22  **Q.**    Is there a part of the Department of Corrections

23  that investigates inmate interviews?

24  **A.**    Internal Affairs.

25  **Q.**    Now, what directions did you get from supervisors or

1    other members of CERT about what to tell investigators

2    about how Dean was injured?

3            MR. WOLFE:   Object to the form of the question

4    with regard to that generalization if he was given

5    information.   It shouldn't be general like that.

6            THE COURT:   Make it specific.

7            MS. BOYD:   Okay.

8    BY MS. BOYD:

9    Q.    What direction did you receive about what to tell

10   investigators about how Dean got his injuries?

11   A.    Stick to the story.

12           THE COURT:   And from whom?

13   BY MS. BOYD:

14   Q.    Who told you that?

15   A.    Sergeant Hall.

16   Q.    Did anyone else tell you to do that?

17   A.    No.

18   Q.    Now what did it mean to you when Sergeant Hall said,

19   "Stick to your story when you talk to investigators."

20   A.    Stick to what you wrote on the statement.

21   Q.    And is what you wrote on your statement accurate?

22   A.    No.

23   Q.    About what happened to Terrance Dean?   Was your

24   statement accurate about what happened to Terrance Dean?

25   A.    No.

1   Q.    Were you interviewed by the Georgia Bureau of

2   Investigation?

3   A.    Yes.

4   Q.    When you met with the Georgia Bureau of

5   Investigation did you initially tell them how Dean got his

6   injuries?

7   A.    Yes.

8   Q.    What did you tell them?

9   A.    I told them force was used on him.

10  Q.    But when you first met with them did you initially

11  tell her about the force that CERT used on Inmate Dean?

12  A.    No.

13  Q.    Why not?

14  A.    I stuck to the story.

15  Q.    Now, in addition to the interview did you also give

16  GBI a handwritten statement?

17  A.    Yes.

18  Q.    And in your handwritten statement did you also stick

19  to the story?

20  A.    No. I can't remember the statement.

21        MS. BOYD:  If I could have the Court's

22  indulgence for a moment, Your Honor.

23        THE COURT:  Sure.  Let me ask a question while

24  you're doing that. The statement that is on the screen,

25  Exhibit 8, west side walk.  Where is that in relation to

1    the gym?

2            THE WITNESS:  The west side, you've got an east

3    and a west side in the prison.  The west side is coming

4    from the west side dormitories, where all the dormitories

5    are located on the west side.

6            THE COURT:  And where is the dormitory that Mr.

7    Dean was in?

8            THE WITNESS:  The east side, the E building.

9            THE COURT:  Thank you.

10           MS. BOYD:  I'm going to mark this, Your Honor,

11   as Government Exhibit 119.  May I approach, Your Honor?

12           THE COURT:  You may.  Does defense counsel know

13   what you're talking about?

14           MS. BOYD:  May I approach, Your Honor?

15           THE COURT:  You may.

16   BY MS. BOYD:

17   Q.   Mr. Bolden, I just handed you what's been marked as

18   Government's Exhibit 119 for identification purposes.

19   What is that?

20   A.   It's a statement that I wrote to the GBI officer.

21   Q.   And in your statement that you wrote to the GBI were

22   you truthful about how Dean got his injuries in that

23   statement?

24   A.   No.

25   Q.   Now, why did you provide the GBI with false

1    information about how Dean got his injuries?

2    A.    Because after that that's what she wanted to hear.

3    Q.    Now, Mr. Bolden, you testified earlier that Mr. Dean

4    was not the first inmate who assaulted an officer to be

5    taken to the gym; is that correct?

6    A.    Yes.

7    Q.    What was the first incident where you saw CERT use

8    force on an inmate to punish them for having assaulted an

9    officer?

10   A.    Inmate Franklin Jones.

11   Q.    Did you respond to a code three for inmate Franklin

12   Jones?

13   A.    Yes.

14   Q.    Where was that code for?

15   A.    That was in F building, on the east side of F

16   building.

17   Q.    And what is F Building at Macon State?

18   A.    It's the dorm.

19   Q.    What was the name of the officer who had been

20   assaulted?

21   A.    Officer Davis.

22   Q.    When you got to the scene of F building where was

23   Inmate Jones?

24   A.    Inmate Jones was outside on the ground.

25   Q.    And when you saw Inmate Jones outside of the dorm

1    and on the ground did he have any visible injuries?

2    **A.**    I don't remember.

3    **Q.**    Did you see any blood on Inmate Jones when you saw

4    him outside of the dorm?

5    **A.**    Yes.

6    **Q.**    Did he have any indivisible injuries to his face

7    that you saw?

8    **A.**    No.

9    **Q.**    Did he have any visible injuries to his head that

10   you saw?

11   **A.**    No, not that I can recall.

12   **Q.**    Were you part of Inmate Jones escort away from the

13   dorm?

14   **A.**    Yes.

15   **Q.**    Where did CERT take Jones once they left the dorm?

16   **A.**    To the gym.

17   **Q.**    Did you see anyone film the escort of Jones from the

18   dorm to the gym?

19   **A.**    I don't remember that part.

20   **Q.**    Was there anyone that you saw filming?

21   **A.**    No.  Not that I remember, no.

22   **Q.**    When CERT got to the gym with Jones did anyone say

23   anything?

24   **A.**    No.

25   **Q.**    Did anyone do anything when CERT got to the gym with

1    Jones?

2    **A.**    Yes.

3    **Q.**    What did they do?

4    **A.**    The CERT team started beating him.

5    **Q.**    Now was Jones still handcuffed when he was taken

6    into the gym?

7    **A.**    Yes.

8    **Q.**    Was he handcuffed when CERT started beating him?

9    **A.**    Yes.

10   **Q.**    What was your reaction when CERT started beating

11   Jones in the gym?

12   **A.**    I really didn't have a reaction.  It just happened

13   and I didn't really have no reaction.

14   **Q.**    Did you use any force on Jones in the gym that day?

15   **A.**    No.

16   **Q.**    Why not?

17   **A.**    It happened so fast.  I really didn't know what was

18   going on at first and it was over with.

19   **Q.**    Based on what you saw was there any justified reason

20   for using force on Jones in the gym that day?

21   **A.**    No.

22   **Q.**    Based on what you saw why was CERT using force on

23   Jones in the gym?

24   **A.**    There was no reason.

25   **Q.**    Who was in the gym when CERT was using force on

1    Jones?

2    **A.**    Myself, Officer Douglass, Officer Thomas, Officer

3    Wimbush, Officer Lach and Officer Rushin and Sergeant

4    Hall.

5    **Q.**    Who did you see use force on Jones in the gym?

6    **A.**    Everyone.  All the members of the CERT team.

7    **Q.**    Did you see anyone filming CERT using force on Jones

8    in the gym?

9    **A.**    No.

10           MS. BOYD:   Your Honor, may I approach?

11           THE COURT:   You may.

12   BY MS. BOYD:

13   **Q.**    Mr. Bolden, I've handed you what's been marked as

14   Government Exhibit 120 for identification purposes.  Do

15   you know what that is?

16   **A.**    Yes.

17   **Q.**    What is that?

18   **A.**    It's the staffing assignment.

19   **Q.**    What's the date of that staffing assignment?

20   **A.**    October 25th, 2010.

21   **Q.**    And whose listed on the staffing assignment for CERT

22   on Government 120?

23   **A.**    Sergeant Hall, Ronald Lach, Delton Rushin, Derrick

24   Wimbush, Kadarius Thomas, Darren Douglass, Kerry Bolden

25   and Tyler Griffin.

1    **Q.**    You mentioned that Tyler Griffin was listed on duty

2    that day?

3    **A.**    Yes.

4    **Q.**    Did he respond to the code three for Franklin Jones?

5    **A.**    Yes.

6    **Q.**    Was he part of the escort for Franklin Jones?

7    **A.**    Yes.

8    **Q.**    And when you got to the gym with Franklin Jones was

9    Tyler Griffin present?

10   **A.**    Yes.

11   **Q.**    What did you see Tyler Griffin do in the gym?

12   **A.**    I don't remember what he did but all the CERT

13   members that were in the gym used force on the inmate.

14   **Q.**    And when you say you don't remember what Tyler

15   Griffin did, are you certain that you saw him in the dorm?

16   I mean in the gym, I'm sorry.

17   **A.**    Yes, we was all in the gym.

18   **Q.**    Now, after CERT used force on Jones in the gym where

19   was he taken?

20   **A.**    To medical.

21   **Q.**    And were you part of the escort to the medical unit?

22   **A.**    Yes, ma'am.

23         MS. BOYD:  I'm going to ask Connie to pull up

24   Government Exhibit  10A.  Is it possible to pull that up

25   just for the witness, Your Honor, to identify.

1          THE COURT:   Is this on the Jones incident?

2          MS. BOYD:  Yes.  10A is the composite.

3     BY MS. BOYD:

4     Q.   Mr. Bolden, Government Exhibit 10A, what does that

5     image depict there?

6     A.   The inmate being escorted to medical by two CERT

7     officers.

8     Q.   And does that video fairly and accurately portray

9     the escort of the inmate into medical by the two CERT

10    officers?

11    A.   Yes.

12          MS. BOYD:  Your Honor, if I could ask to enter

13    that into evidence and publish it for the jury.

14          THE COURT:   You mean the still one?

15          MS. BOYD:   No.  I was actually going to play it

16    and have him narrate.

17          THE COURT:   Any objection?

18          MR. PATE:  Your Honor, at this point I'm not

19    sure if we're going to play the entire video that was

20    produced in discovery or just some excerpt of it.

21          MS. BOYD:  This is a clip from this portion.

22    The clip that is listed as Government Exhibit 10A.

23          MR. PATE:   Okay.  So we're not tendering the

24    entire video into evidence?

25          MS. BOYD:  That's right.

```
1           MR. PATE:  You're tendering part of the exhibit?

2           MS. BOYD:  That's right.

3           MR. PATE:  Judge, I think we ought to have the

4   entire video in evidence, whether they want to play it or

5   not.

6           THE COURT:  Well, we might.  But is there any

7   objection to this clip?  I understand you may contend

8   completeness.

9           MR. PATE:  Only on that basis.  I may want to

10  introduce the entire video.

11          THE COURT:  Okay.  And I will admit this clip

12  without objection; is that correct?

13          MR. WOLFE:  Yes, sir.  Should we all say when

14  we join, Judge?

15          THE COURT:  No.  On that I understand.  The

16  Defendants may contend that -- you're not included in

17  contending that other parts of this video may be necessary

18  as well.  You may proceed.

19          MS. BOYD:  Okay.  So is it okay to show it to

20  the jury now, Your Honor, then?

21          THE COURT:  Yes.

22  BY MS. BOYD:

23  Q.   Mr. Bolden, I'm going to ask you to watch the video

24  and I'm going to ask you some questions about it

25  afterward.  Okay.
```

1    (VIDEO PLAYING AT THIS TIME)

2    BY MS. BOYD:

3    **Q.**    Now, were you part of that escort that you just

4    watched?

5    **A.**    Yes.

6         MS. BOYD:  Connie, can you pull it back up and

7    pause it.

8    (VIDEO PLAYING AT THIS TIME)

9    BY MS. BOYD:

10   **Q.**    Where are you?

11   **A.**    On the left.

12   **Q.**    And if you touch your screen there you can circle

13   where you are?

14   **A.**    (Witness complies).

15   **Q.**    Okay.  That's you?

16   **A.**    Yes.

17   **Q.**    And who is the other officer with you?

18   **A.**    That's Officer Douglass.

19   **Q.**    And who is the inmate there in the middle?

20   **A.**    At this point I can't tell.

21         MS. BOYD:  Connie, can you continue playing the

22   video.

23    (VIDEO PLAYING AT THIS TIME)

24   BY MS. BOYD:

25   **Q.**    Who was the officer that was walking ahead of you?

1    **A.**    Here Sergeant Hall, CERT sergeant.

2    **Q.**    And where are you going at that point?

3    **A.**    To medical.

4            MS. BOYD:  Your Honor, if I may ask Connie to

5    pull up Government's Exhibit 10B.

6            THE COURT:   Does this still concern this?

7            MS. BOYD:   Yes, it's another clip from the --

8            THE COURT:   The only reason I'm asking is we're

9    right at 2:00 o'clock.  Do you have much more you're going

10   to do with this particular subject?

11           MS. BOYD:  Yes, Your Honor.  So maybe now is a

12   good time to stop.

13           THE COURT:   Okay.  Let's stop for the day.  I

14   promised you, ladies and gentlemen, that we would have you

15   out of here by 2:00 o'clock.  It's 2:01 by my watch.

16           In just a minute I will let you go to the jury

17   room to gather your things and Ms. Hatcher will check on

18   you just to make sure everything is okay.  We will see you

19   in the morning shortly before 8:00 o'clock.  We will keep

20   to the same schedule if at all possible.

21           Remember my instructions of how important it is

22   that you not allow yourselves to be exposed to any

23   information whatsoever about this case.  Again, everything

24   that you need to know to make an informed decision about

25   the case will be presented to you here in the jury room.

1          So don't do your own research and don't allow

2     anybody to try and talk with you about the case.  We will

3     see you in the morning.

4      (JURORS EXIT COURTROOM)

5          THE COURT:  Mr. Bolden, you can step down.  You

6     can wait outside.  As far as the Court is concerned you

7     are excused until in the morning.

8          One observation, I don't know that it changes

9     anything we're doing at the moment.  Having watched the

10    video that Mr. Jarrard was using during his cross

11    examination, I don't know why that's not admissible.  I

12    think there is information on the video that -- although

13    the witness testified to it, that it's still evidence of

14    certain events that the defense, at least Mr. Jarrard,

15    thinks is important.  But just as importantly, I didn't

16    see anything on there that was prejudicial, unfairly

17    prejudicial to anybody.  On the contrary I think there's a

18    risk the jury is going to assume there's something on

19    there that is not on there.

20         So, if it's not being tendered at this time I'm

21    sure we will return to the subject as the Defendants puts

22    up their case or maybe with some prosecution witnesses.

23    But that's my thoughts.

24         And as I said at the beginning of the trial,

25    with regard to the incidents that form the subject matter

1     of the indictment, I don't see how we can try it in quite

2     the vacuum that the government is suggesting that we

3     should.

4               MR. CHRISTIAN:   Can I just respond to that

5     briefly, Your Honor?

6               THE COURT:   You  may.

7               MR. CHRISTIAN:   To clarify, I certainly

8     understand there are circumstances, particularly parts of

9     the video for the Dean incident that are relevant and may

10    become relevant over the course of the trial.  I don't

11    deny that at all.

12              I think the same could probably be said for the

13    Mario Westbrook incident.  There are components of that

14    video from the dorm that could be relevant.

15              There could be components of, you know, witness

16    testimony from what happened in those two incidents.

17              For Franklin Jones where he blind-sided Officer

18    Davis, there was no force used on Jones in the dorm.  The

19    video of the officer just screaming in the background I

20    don't see how that's relevant and it's highly inflammatory

21    in contrast to the Dean video.

22              THE COURT:   Well, that may be.  I'm just

23    commenting about the video I saw from the Terrance Dean

24    incident.

25              MR. CHRISTIAN:   I still -- I guess my objection

1    to it at the time, with regard to Mr. McKenzie, was the

2    relevance of it with respect to Mr. McKenzie.  I certainly

3    concede it could be relevant with a subsequent witness,

4    but I don't think it was particularly relevant with Mr.

5    McKenzie when he came so late to the game.

6              THE COURT:  Well, but I think the defense was

7    able to legitimately use information on the video to get

8    testimony from Mr. McKenzie, that although he wasn't

9    there, he was able to corroborate and explain events.  And

10   I think that was an appropriate purpose for use of the

11   video.  I understand your objection.

12             MR. CHRISTIAN:  Okay.

13             THE COURT:  I'm just saying I hadn't seen it

14   now.  That particular video, nothing in it concerns me,

15   implicates the objections that the government has raised

16   generally about unrelated prison conditions.

17             MR. CHRISTIAN:  For that particular video for

18   Dean?

19             THE COURT:  Yes.  That's all I'm talking about.

20             MR. CHRISTIAN:  Okay.

21             MR. JARRARD:  There's a housekeeping matter I

22   have or I will provide to the Court that will help.  The

23   same issue is going to come up on the Westbrook videos.  I

24   have a copy of those.  I can either give you my copy now

25   or I can provide you a duplicate copy in the morning if

1      the Court wants to see it outside --

2              THE COURT:   Well, I think that's probably the

3      most expeditious way to proceed.  Ms. Gomez mentioned

4      another video that might come up with Mr. Bolden.

5              MS. GOMEZ:   Your Honor, it's the Franklin Jones

6      escort video.  That's what we labeled it and they started

7      to show portions of it.  Extremely important to our

8      defense because -- some of our contentions is it's very

9      important as to when Mr. Lach enters.  I know that they

10     have a concern about the audio, some statements being

11     made.  What I did was I have a -- if I may approach,

12     Judge?

13             MR. JARRARD:  And Your Honor, do you want the CD

14     of the Westbrook/Hinton?

15             THE COURT:   Yeah, that's the easiest --

16             MR. JARRARD:   I mean, if there's any question

17     on that -- just let the government get it.

18             MR. CHRISTIAN:   Have we gotten a copy of that?

19     Okay.  If we could get a copy if they're going to give it

20     to the Court.

21             THE COURT:   We'll get copies made.

22             MR. PATE:   And, Your Honor, I don't know at

23     this point if you're considering the admissibility of the

24     Jones clip but we have a different basis for its

25     admissibility as well, and I just want to be heard on

1    that.  Again, it's the video that Tyler actually took and

2    that's why.

3         MS. GOMEZ:  And, Your Honor, what I'll do is I

4    will e-mail to Ms. Hatcher the video of Franklin Jones's

5    video.  And here what I did, I'm going to show -- I've

6    showed the government already -- it's a synopsis of what

7    we did by a breakdown.  Because the player -- the numbers

8    were off at the bottom so we had to put it on another

9    player in order to follow this.  And this is something

10   that I was going to use during the questioning.

11        MR. CHRISTIAN:  And, Your Honor, if we could

12   just get a copy of that because we haven't gotten a copy

13   of it.  And not to make this more confusing to the Court

14   than is absolutely necessary, the government's issue with

15   the Jones video, which is relevant to the piece of paper

16   you're holding in your hand right there, is that unlike

17   the other videos, or most of the other videos, it actually

18   has audio.  So there are many different Defendants making

19   statements, there are unindicted co-conspirators making

20   statements, Franklin Jones makes statements.  He says at

21   one point the reason I'm hurting is because these guys are

22   beating me.

23        All those hearsay problems that make introducing

24   the entire video problematic.  So that's just an issue for

25   the Court.

1          THE COURT:   And Ms. Gomez, you contend that the

2     audio is admissible as well?

3          MS. GOMEZ:   Your Honor --

4          THE COURT:   And others may as well.

5          MS. GOMEZ:   Your Honor, I contend that there

6     are certain portions.  No, I'm fine if they want to play

7     the video completely sound free because what's important

8     to us is when my client enters.  But I did pull out some

9     of the audio to that to show you what's in there.  Because

10    I didn't know if you wanted to look at the whole thing.

11         THE COURT:   Okay.

12         MS. GOMEZ:   Because that wasn't intended to be

13    an exhibit to be introduced to the jury.  That was

14    something to help me along as I went through the video.

15    That's why I didn't give it to the government.

16         MR. CHRISTIAN:   And, Your Honor, in terms of

17    the clips that we want to play, there are clips where we

18    want to play where the Defendants make statements.

19    Whereas we raised in our previous motion, the government

20    can introduce the Defendants statements, but the

21    Defendants can't introduce their own statements.

22         So there are limited portions we intend to play

23    with audio, but other portions raise hearsay concerns.

24         THE COURT:   So the government has prepared

25    clips from the Jones escort video which includes audio and

1    it's being offered as admissions by the Defendants?

2           MR. CHRISTIAN:   Correct, Your Honor.

3           THE COURT:   And Ms. Gomez, did I hear that

4    you're primarily interested in the video as opposed to the

5    audio, which you wouldn't mind the audio?

6           MS. GOMEZ:   I'm fine with all of it Judge, but

7    I understand the hearsay objections.  What's more

8    important to me is the timing of when my client enters,

9    but you have to look at it for quite some time.  And I'm

10   going to say back to the Court's vacuum concern, I mean, I

11   can't speak for all the Defendants here, but from our

12   standpoint, the Lach standpoint, we would have no

13   objection holding the clip.

14          THE COURT:   What's the basis for the admission

15   of statements that are not admissions or admissible

16   pursuant to some other rule?

17          MR. PATE:   Judge, on behalf of Mr. Griffin,

18   we've also tendered that video and a clip of the video.  I

19   don't care about the audio.  I don't care about most of

20   the video.  I care about maybe the first three or four

21   minutes of the video with no audio.  That's just our

22   position on the record.

23          THE COURT:   And how are you -- are you going to

24   use the clip on cross examination?

25          MR. PATE:   It's this very clip that this

1    witness has testified to.  It does not matter for our

2    purposes.  The reason we would be introducing the video is

3    because -- and whether it can come in through this witness

4    through cross or another witness, that's the video Tyler

5    Griffin took.  And the allegation is he made a false

6    statement when he said I videotaped the inmate, Mr. Jones,

7    when he escorted him into medical.  And we just saw and,

8    in fact, heard the witness say this is the inmate being

9    escorted into medical.  So that's the purpose we would

10   offer it for.  I don't know yet which witness would be

11   most appropriate.

12          THE COURT:   Okay.  Well, has the government

13   seen your clip?

14          MR. PATE:   Yes.  I provided it to them last

15   week.

16          THE COURT:   Is there any objection to that

17   clip?

18          MR. CHRISTIAN:   I'll have to double check the

19   clip, Your Honor.

20          THE COURT:   He says he's not interested in the

21   audio.

22          MR. CHRISTIAN:   Yes.

23          MR. PATE:   The clip begins literally ten

24   seconds before what we saw and ends about two minutes

25   after it.

1          THE COURT:  It sounds like, and I'm not saying

2     you have to, but it sounds like that's something that

3     y'all can work out.

4          MR. CHRISTIAN:  Sure.

5          THE COURT:  And just tell me what your

6     agreement is?

7          MR. CHRISTIAN:  Sure.

8          THE COURT:  If not I'll take a look at it.  But

9     Ms. Gomez, are you going to get the video?

10         MS. GOMEZ:  Yes.  I didn't want to call him or

11    talk to him while you're still on the bench, Judge.

12         THE COURT:  Okay.  So I'm going to look at two

13    clips this afternoon or tonight.

14         MS. GOMEZ:  I need to tell you Judge, what I'm

15    sending you is not a clip.  It's the video, the entire --

16         THE COURT:  Yes, I understand.  And your intent

17    was to use the entire video?

18         MS. GOMEZ:  My intent was to use the entire

19    video, but I can use it because I understand their

20    concerns about other statements made other than the

21    Defendants here.  So we can do it completely silent or

22    completely however the Court sees fit.

23         THE COURT:  And doing it completely silent,

24    there are still objections that the government has to the

25    deal as a whole?

1      MR. CHRISTIAN:  No, Your Honor.  The

2   government's position is the government wants to play its

3   clips with audio because they contain segments we can get

4   in.  But statements otherwise that are made in there I

5   think can't come in.  So the government has no objection

6   to the video playing, but just without those statements.

7      THE COURT:  It sounds like you can use your

8   video and not your audio.

9      MS. GOMEZ:  Yes.

10      THE COURT:  If you want to get some of the

11   audio admitted then you need to get it to me in the form

12   for me to look at and with some basis for why the audio

13   would be admissible.

14      MS. GOMEZ:  Yes, Judge.

15      THE COURT:  And I will get a copy of this,

16   Teri, and I'll look at this.  So, right now my homework is

17   just Mr. Jarrard's.

18      MR. CHRISTIAN:  And to be clear with the disk,

19   Your Honor, I don't believe that we're yet at a point

20   where the defense has established a foundation for it to

21   be relevant and more probative than prejudicial.  They may

22   be there at some point, but I don't think we're there at

23   this moment.  Subject to cross tomorrow, of course.

24      THE COURT:  Right.  Okay, well at least I'll be

25   familiar with it.  I'm not going to rule on it until I

1   hear more about it but at least I will have seen the

2   video.  Anything else to do this afternoon for the

3   government?

4           MR. CHRISTIAN:   Not for the government.

5           THE COURT:   For any Defendant?

6           ATTORNEYS COLLECTIVELY:   No, sir.

7           THE COURT:   Thank you all, and thank you for

8   your cooperation with the schedule.  The jury is very

9   happy with that schedule, so we will do the same thing

10  tomorrow.

11  (The proceedings for 6-10-2014 were thereby concluded).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Tammy W. Fletcher, Federal Official Court

4    Reporter, in and for the United States District Court for

5    the Middle District of Georgia, do hereby certify that the

6    foregoing is a true and correct transcript of the reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United

10   States.

11

12                    Dated this 30th day of August, 2014.

13

14          /S/ Tammy W. Fletcher

15          TAMMY W. FLETCHER, CCR
            FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25