```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF GEORGIA
2                      MACON DIVISION

3        _____

     THE UNITED STATES OF AMERICA,   :
4                     PLAINTIFF   : Case No. 5:13-CR-32-MTT
     v.                            :
5                                  :        June 18, 2014
                                   :      Macon, Georgia
6    JAMES HINTON, ET AL,          :
                     DEFENDANTS. :
7    _____

8                    CRIMINAL JURY TRIAL
              Volume 8 of 10 (Afternoon Session)
9
          BEFORE THE HONORABLE MARC THOMAS TREADWELL
10           UNITED STATES DISTRICT JUDGE, PRESIDING

11   APPEARANCES:
     FOR THE GOVERNMENT:        FORREST CHRISTIAN, AUSA
12                              TONA BOYD, AUSA
                                UNITED STATES DEPT OF JUSTICE
13                              950 PENNSYLVANIA AVE, NW
                                WASHINGTON, DC 20530
14   FOR THE DEFENDANTS:
     JAMES HINTON:              DAVID WOLFE
15                              101 MARIETTA ST. NW, STE 3325
                                ATLANTA, GA 30303
16
     CHRISTOPHER HALL:          BRIAN JARRARD
17                              230 THIRD STREET
                                MACON, GA 31201
18
     RONALD LACH:               DEBRA GOMEZ
19                              P.O. BOX 13523
                                MACON, GA 31208
20
     DELTON RUSHIN:             JOHN FOX
21                              P. O. BOX 209
                                MACON, GA 31202
22
     DERRICK WIMBUSH:           FRANKLIN HOGUE
23                              P. O. BOX 1795
                                MACON, GA 31202
24
     TYLER GRIFFIN:             PAGE PATE
25                              101 MARIETTA ST., STE 3300
                                ATLANTA, GA 30303
```

1       INDEX TO PROCEEDINGS

2          June 18, 2014

3     Volume 8 of 10 (Afternoon Session)

4

CHRISTOPHER CALDWELL

5
        CROSS EXAMINATION BY MR. CHRISTIAN        23
6       CROSS EXAMINATION BY MR. WOLFE            42

7   SHURVON CLARK

8       DIRECT EXAMINATION BY MR. HOGUE           50
        CROSS EXAMINATION BY MR. CHRISTIAN        59
9       REDIRECT EXAMINATION BY MR. HOGUE         65

10  GREGORY MCLAUGHLIN

11      DIRECT EXAMINATION BY MR. HOGUE           67
        DIRECT EXAMINATION BY MR. PATE            81
12      CROSS EXAMINATION BY MR. CHRISTIAN        84

13  CHARGE CONFERENCE                             95

14  CERTIFICATE OF COURT REPORTER               122

15

16

17

18

19

20

21

22

23

24

25

1

**P R O C E E D I N G S**

2      June 18, 2014                          12:50 p.m.

3              **THE COURT:**  Mr. Christian, anything to report?

4              **MR. CHRISTIAN:**  No, Your Honor.  I did not have

5      an opportunity to talk to anybody at the break.  I

6      believe Mr. McLaughlin went to lunch.

7              **MR. HOGUE:**  He's back.  I just saw him outside.

8              **MR. CHRISTIAN:**  Okay.

9              **MR. HOGUE:**  I told him to come in because you

10     wanted to talk to him.  So he should be around here

11     somewhere.

12             **MR. CHRISTIAN:**  Your Honor, I mean, I think the

13     bottom line is I don't have any basis to dispute the

14     authenticity of the materials that the warden brought in.

15     I don't have any information to the contrary other than

16     having asked for them myself and not received them.  I

17     don't have any basis to establish that they are

18     in-authenticate.  So I concede they're authenticate.  I

19     concede they're admissible.  I guess the government would

20     just say that under the circumstances I don't think Mr.

21     McLaughlin needs to come and testify to that fact.  I

22     don't have any basis to challenge it.

23             **MS. GOMEZ:**  Your Honor, I hate to interrupt

24     briefly, but the witness who's supposed to come up next

25     just got a ticket and asked if he'd have time to go and

1    move his car real quick.

2              THE COURT:  All right.  You're talking about

3    Caldwell?

4              MS. GOMEZ:  Yes, Caldwell.  Is that okay,

5    Judge?

6              THE COURT:  He's needs to hurry, yes.  Were you

7    going to use either of these custodial witnesses for any

8    reason other?

9              MR. HOGUE:  Yes.  Just briefly, but I did plan

10   on having him explain a couple of the notations on the

11   time sheets, and he could answer a question about one of

12   those notations.

13             THE COURT:  Is he out there?

14             MR. HOGUE:  I'll check.  When I saw him he was

15   standing outside using the phone, and I told him to come

16   on in.  He's not on this hallway.  Do you want me to go

17   find him?

18             THE COURT:  All right.  Please, thank you.

19             MR. WOLFE:  Judge, so that there's -- so that

20   everything moves smoothly, I had an opportunity over the

21   break to read the rule of completeness and some other

22   cases with regard to hearsay and evidence, and based on

23   the Court's ruling, I just want you to know I'm not going

24   to read from the transcript as a part of my case.

25             THE COURT:  Okay.  I looked at Mr. Samuel's

1    book during the break, and I didn't look at the case, but

2    there was a case cited for the proposition that even

3    though something else in a defendant's statement is

4    exculpatory, if the prosecution didn't touch on that

5    subject and it introduced a portion of the statement, the

6    remainder is not admissible.  So, confirming in my mind

7    that the rule is confined to the document itself is what

8    is necessary based on the context of the document.

9         **MR. WOLFE:**  Well, actually the rule itself says

10   it can be other documents, other recordings, or other

11   information that in fairness should be admitted.  Rule

12   41?

13        **THE COURT:**  I didn't mean to open that up

14   again.

15        **MR. WOLFE:**  Okay.

16        **THE COURT:**  Just, what I read confirmed what my

17   ruling was to that.

18        **MR. FOX:**  Your Honor, just a brief housekeeping

19   matter.  I had a chance to review the stipulation

20   concerning the Wimbish alibi defense.  I just noticed in

21   the first sentence it reads that:  We're about to hear

22   from a witness who may say that Mr. Rushin was not at the

23   prison at the time.

24        **THE COURT:**  That's pretty significance.

25        **MR. FOX:**  Yeah, I mean, I'm fine if we have

1    witnesses who want to say Mr. Rushin wasn't there, but I

2    just I noticed and mention that perhaps in --

3              THE COURT:  Thank you.

4              MR. HOGUE:  I found him.

5              THE COURT:  Mr. McLaughlin?  Is that correct?

6              THE WITNESS:  Yes, sir.

7              THE COURT:  Sir, come on up and have a seat.

8              COURTROOM DEPUTY:  Do you solemnly swear that

9    the testimony you're about to give in this case shall be

10   the truth, the whole truth, and nothing but the truth, so

11   help you God?

12             THE WITNESS:  I do.

13             COURTROOM DEPUTY:  Thank you.  Will you please

14   state and spell your name for the record?

15             THE WITNESS:  Okay.  Gregory R. McLaughlin.

16   M-C-L-A-U-G-H-L-I-N.

17             THE COURT:  Mr. McLaughlin, I understand here

18   recently within the last day or two you've been involved

19   in gathering some documents relating to Mr. Wimbush; is

20   that correct?

21             THE WITNESS:  Not the last day or two, Your

22   Honor.  I just got this yesterday.  Yes, sir.

23             THE COURT:  Okay.  Tell me that your

24   involvement was.

25             THE WITNESS:  Well, all I did was when I got

1    the subpoena, on the second page of the subpoena it asked

2    me three questions.  It asked for some documentation and

3    one --

4              **THE COURT:**  Speak up a little.

5              **THE WITNESS:**  And one of them was the time

6    sheets, and so what I did, I gave it to my administrative

7    assistant who was Ms. Cladd, Veronda Cladd, and asked her

8    to locate the documentation for me.  And she went to the

9    personnel office and she retrieved the documentation.

10   She gave them to me along with a letter verifying that

11   she received them from the personnel office, and that's

12   it.  That's all I had to do with it.  So I have them in

13   pocket today.

14             **THE COURT:**  So the request came to you, you

15   turned it over to Ms. Clad?

16             **THE WITNESS:**  Yes, sir.

17             **THE COURT:**  And then she went to the people who

18   presumably had these documents and then at some point the

19   documents came to you?

20             **THE WITNESS:**  Yes, sir.

21             **THE COURT:**  And you've got them with you?

22             **THE WITNESS:**  Yes, sir.

23             **THE COURT:**  Can I see them?

24             **THE WITNESS:**  Yes, sir.

25             **THE COURT:**  The originals, I assume, are still

1    at the prison?

2            THE WITNESS:  Yes, sir.

3            THE COURT:  Let me show you my copy, a couple

4    of pages of these documents that I've just marked as

5    Court's One, and the second page of that shows some time

6    for Derrick Wimbush on December 14, 2010?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  And then there's a notation, a

9    parenthetical notation, that says "came back at 2000 to

10   2230."

11           THE WITNESS:  Yes, sir.

12           THE COURT:  Do you know how that came to be

13   there?

14           THE WITNESS:  Hmm, to come back at 2000 hours

15   and 2230 hours?

16           THE COURT:  Yes.

17           THE WITNESS:  No.  Now, this is the first time

18   I've seen this, but I'm looking at the dates, and on

19   those dates the only thing I can think of is that we, I'm

20   sure -- I don't know if there was something going on at

21   the institution or not, but I can't attest to that, Your

22   Honor.

23           THE COURT:  Is that, though, typically what

24   would be done if an employee came back?

25           THE WITNESS:  If he came back to work?

```
1              THE COURT:  Yes.
2              THE WITNESS:  Oh, yes, sir.  Because there's no
3     other way to do it other than go to the comment section,
4     yes.
5              THE COURT:  No way other than what?
6              THE WITNESS:  There's no other way to write it
7     on the time sheet other that the comment section because
8     it was on the same date, and if you notice on 12/14th and
9     the next day is 12/15th, so if I was to go back to work
10    tonight, then I would have to come out in the comment
11    section and do the same thing, yes, sir.  So that is
12    typical.
13             THE COURT:  So although you don't know
14    presumably -- well, maybe I shouldn't ask it that way.
15    In the normal course of things, who would put that
16    notation "came back at 2000 to 2230?"
17             THE WITNESS:  The officer, whomever time sheet
18    this was, and then the person that would testify to it is
19    his supervisor which his signature is at the bottom of it
20    saying that -- the supervisor's signature?  He's the only
21    person that can testify to this, this time sheet, and
22    whether or not Mr. Wimbush came back.
23             THE COURT:  Okay.  I'll give you your copy
24    back.
25             THE WITNESS:  Yes, sir.
```

1       **THE COURT:**  Thank you, Mr. McLaughlin.  Step

2  back outside, if you would, please, sir.

3       **THE WITNESS:**  I can go home?

4       **THE COURT:**  No, I can't let you do that yet.

5  All right, then.  I don't know of any other issues to

6  address now.  I sent you the cautionary -- or the

7  instruction I'm going to give.  Did you get that?

8       **MR. HOGUE:**  I did.  I have comments on it, but

9  I'd like to clarify another thing with Mr. McLaughlin if

10  I could.  As I understand it, the government is willing

11  to agree under Federal Rule of Evidence 901 that the

12  document is authentic, and I still need to get around the

13  803(6) hearsay exception, I presume, and I'm prepared to

14  do that unless that's also being conceded.  Otherwise

15  I'll be glad to establish that it is a business record

16  and get around 803.  And then I'll --

17       **THE COURT:**  Let me let -- Mr. Christian, is

18  that an issue?

19       **MR. CHRISTIAN:**  *(Shakes head).*

20       **THE COURT:**  That's not an issue.

21       **MR. HOGUE:**  That's not an issue?  Okay.  What

22  I'll do then is just identify them, tender them, and then

23  discuss as much as he knows, which the Court explored

24  some of the limitations of his knowledge just now, and

25  I'll do that for the jury as well.  And then the other

1    part would be the notation PT on those time sheets and

2    what that means.  Now, that's all that I have to say

3    about him.  If there's nothing more, I would like to

4    comment on this proposed limiting instruction.

5              **THE COURT:**  Yes.

6              **MR. HOGUE:**  Your Honor, I think it goes way too

7    far and gets into judicial comments on the evidence and

8    the weight of it.  I can get more detailed.  I've only

9    had a chance to read it just in the minutes before I went

10   to look for Mr. McLaughlin and briefly at my office when

11   I saw it on my cell phone.  But on my first reading it

12   just simply strikes me that it goes far beyond what's

13   necessary to let the jury know that I did not comply with

14   a rule of procedure.

15        For example, the sentence beginning here:  Beginning

16   in April of 2013 the government made 15 such requests to

17   Mr. Wimbush's lawyer.  I can only guess that the impact

18   of that on a jury would be, you know, I'm obstinate, I

19   didn't care.  I can't imagine what they'd make of that

20   when the fact is the rule says I have until 14 days

21   before trial.  And, you know, that's what I didn't meet.

22   The fact that I got requested in 15 cover letters that

23   had Rule 12.1 cited in it, really actually, truthfully

24   indicates that I didn't read their cover letters.  They

25   all came with a disc with thousands more pages of

1    evidence, and that's what I paid attention.  We all know

2    how it is.  They send one letter, they hit copy and send

3    another letter, make a few changes.  I didn't read the 14

4    successive letters after the first one.  So adding that

5    it was 15 requests, that says something that's inaccurate

6    and I think misleading to the jury.

7         And then despite these requests, the next sentence

8    says -- again, emphasizing that, you know, I'm blowing

9    them off, I don't care about the rules, I'm going to, you

10   know, cheat them.  I don't know what all.  But it just

11   reads that way to me -- Mr. Wimbush's lawyer did not

12   disclose that his witness would attempt to provide an

13   alibi testimony until after the start of the trial.

14   That's true.  And "the government knew about the witness

15   but did not know she was an alibi witness."  That's true.

16   Of course, they could establish that fact through cross

17   examination of her rather than having the Court establish

18   it as a fact.  It is true that this was unintentional.

19   You know, I guess it's okay to repeat that I didn't do it

20   until after the trial started.

21        Then, the next paragraph I think also gets into some

22   misleading and inaccurate commentary on the facts.  The

23   reason for the disclosure sentence is fine, and that is

24   the reason for the rule.  But it does go on in the next

25   two sentences to suggest that there are prison records or

1   other evidence that are not available now that could have

2   disproved the alibi witness perhaps.  That's the

3   intonation in those sentences.  The fact is, I wish I had

4   them.  I think they would show my client coming into the

5   prison on the time it says on this time sheet.  I happen

6   to believe him and his alibi witness.  And so this

7   assumes that it's not true, and the assumption should be

8   that the witness is testifying truthfully until

9   disproved.  So that sentence sort of makes the opposite

10  and incorrect presumption about the testimony of the

11  alibi witness.

12      I agree that you will comment on the -- tell the

13  jury the credibility and weight of evidence rules.  Your

14  then instructing them that they may consider the improper

15  failure of timely disclosure of this witness and the

16  impact of that late disclosure on the government's

17  ability to rebut her, again, shifts the burden to a

18  presumption that the witness is not testifying truthfully

19  after having taken an oath to do so, when, in fact, you

20  tell the jury, I presume, in closing -- I mean, in the

21  charge that "presume witnesses are testifying truthfully

22  unless they're impeached.

23      And if the government wants to impeach her, fine,

24  but it looks like the Court is telling the jury, you may

25  consider her to be impeached already because they didn't

1    get a chance to go out and disprove her.

2        So I don't want to lose my witness, but the cure

3    here seems perhaps worse than the disease I've created,

4    and I do take the full responsibility for that.  I know

5    I'm in this position because of my own fault, but I also

6    don't want to be further harmed by my own mistake, and

7    I'm happy to let the government cross examine her to

8    their heart's content about her credibility and so on,

9    but I think in reality it just goes too far.

10            **THE COURT:**  Mr. Christian?

11            **MR. CHRISTIAN:**  Well, Your Honor, I share Mr.

12   Hogue's dissatisfaction, but at the other end of the

13   spectrum, I think any good compromise probably leaves

14   everyone dissatisfied.  I'd like to see Ms. Clark

15   excluded.  I asked for her phone records yesterday, which

16   is the first time I got to talk to her about this issue.

17   I haven't gotten her phone records.  I didn't find her

18   creditable about the extent of her contact with Defendant

19   Wimbush.  I don't have any way to get phone records or

20   see what text messages she says that she got in

21   connection with this case or when she got that text

22   messages.

23       With respect to the notice requirements, I got

24   notice yesterday that these documents existed.  I asked

25   for them in 2012.  I'm not happy about that.  I certainly

1  would have changed the way the government presented its

2  case if I'd been given this material 14 days ago or 14

3  days before a trial started.  I've always been given that

4  opportunity.  And so I certainly still seek exclusion of

5  those materials, but I think the Court has crafted a

6  reasonable compromis even though I am dissatisfied with

7  it.

8       **THE COURT:**  All right.  I'm going to make a

9  couple of changes.

10       **MR. HOGUE:**  It does say Rushin instead of

11  Wimbush.

12       **MR. CHRISTIAN:**  That would be one change I

13  would ask for.

14       **THE COURT:**  Mr. Fox has already adopted that.

15       **MR. FOX:**  Yes, we can stipulate to that.

16  That'd be fine.

17       **THE COURT:**  I will change "15" to "many."  And

18  by the way, the 14-day requirement it's not just 14 days

19  before trial.  It's 14 days after the request, no later

20  than 14 days.

21       **MR. HOGUE:**  I misstated.  I remember there was

22  14 days in there somewhere.

23       **THE COURT:**  Instead of "despite these

24  requests," I'm going to say "however."  I will in the

25  last paragraph strike "improper."  And then the last two

1     lines will read "the government's ability to respond as

2     you consider the weight to be given to her testimony."

3     Is Mr. Caldwell back from moving his car?

4          **MS. GOMEZ:**  Yes, Judge, I stepped out, and he

5     is back.

6          **THE COURT:**  I'm sorry?  He is outside?

7          **MS. GOMEZ:**  Yes, Judge.  I stepped out, and he

8     is back.

9          **THE COURT:**  Okay.  Thank you.

10         **MR. CHRISTIAN:**  Your Honor, do you want to

11     address the stipulation regarding Franklin Jones?

12         **THE COURT:**  Has that been reached?

13         **MS. GOMEZ:**  Your Honor, we have -- I added one

14     bit, and we have reached that.  However, I know that

15     other counsel wanted to object to a portion of it.

16         **MR. JARRARD:**  I do, Your Honor, on behalf of

17     Mr. Hall.  I've reviewed the proposed stipulation.  I

18     would ask the Court to consider -- I'll wait til you have

19     a copy.  I would ask Your Honor to consider taking out

20     the word "repeatedly" in the first paragraph, second

21     line.  Do you see where I'm talking about?  "After he had

22     been punched in the face repeatedly?"

23         **MR. CHRISTIAN:**  The government agrees, Your

24     Honor, no objection.

25         **MR. JARRARD:**  All right, and then, Your Honor --

1            **THE COURT:**  Wait.  Just take it out completely?

2            **MR. JARRARD:**  Yes, sir.  Strike it.  The third

3    paragraph, I think the second sentence, it's got a typo,

4    one, but, Jones said that he had -- strike that "he" --

5    refused to meet previously because he had been -- I'd

6    suggest "advise," instead of "told" maybe.  But my real

7    concern is this.  It says "by a prison supervisor that he

8    should not meet with federal authorities."  I presume

9    that means a prison supervisor at his current facility.

10   However, I would suggest that it say "by an individual

11   with the Department of Corrections at the prison where he

12   was housed at the time."

13           **MR. CHRISTIAN:**  No objection, Your Honor.

14           **MR. JARRARD:**  Okay.

15           **THE COURT:**  All right.

16           **MS. BOYD:**  He had been advised?

17           **MR. JARRARD:**  I think "told."

18           **THE COURT:**  "Because he had been told by a

19   Department of Corrections official at the prison where he

20   was then housed."

21           **MR. JARRARD:**  Yes.

22           **THE COURT:**  Something to that effect?

23           **MR. JARRARD:**  Yes.  Yes, sir.  And then finally

24   I just think on the next paragraph it should say

25   "Franklin Jones also said."  Those are my only suggested

1      changes.

2              THE COURT:  All right.

3              MR. JARRARD:  Do you see that last one?

4              THE COURT:  Should say what?

5              MR. JARRARD:  "Franklin Jones also."  Just add

6      the word "also."

7              MR. CHRISTIAN:  No objection, Your Honor.

8              THE COURT:  When would you propose that this be

9      read to the jury?

10             MS. GOMEZ:  Judge, may I ask Ms. Boyd a

11     question?  Ms. Boyd, does the Court -- the copy you gave

12     to the Court have that other part?

13             MS. BOYD:  I'll email it to Teri.

14             MS. GOMEZ:  There was one additional thing I

15     wanted you to --

16             MR. JARRARD:  Judge, your copy does end with

17     the recitation of his conviction, right?

18             THE COURT:  "Franklin Jones has been convicted

19     of felony murder and is currently incarcerated in a

20     prison run by the Georgia Department of Corrections?"

21             MR. JARRARD:  Yes, sir.  Just making sure.

22             THE COURT:  Are the other defendants aware of

23     this latest edition?

24             MR. CHRISTIAN:  The edition, Your Honor, is

25     just that "on April 4th, 2012 Franklin Jones filed a

1    civil complaint in which Defendant Lach was not named as

2    a defendant."

3              **MS. GOMEZ:**  Yes, that was the only thing.

4              **MR. WOLFE:**  With regard to the other issues,

5    Judge, we conferred and Mr. Jarrard shared the

6    appropriate --

7              **THE COURT:**  So, it seems to me -- Mr. Hogue,

8    did you have something?

9              **MR. HOGUE:**  I did.  I just heard the edition

10   and the truth of the matter is he did not name Wimbush

11   either or Hall, so --

12             **MR. PATE:**  It's already into evidence who he

13   named.

14             **THE COURT:**  Yeah.

15   *(Counsel Aside)*

16             **MR. HOGUE:**  But putting that line in does

17   emphasize, one --

18             **MS. GOMEZ:**  Well, Your Honor, okay, I can take

19   Mr. Lach's name out, but chronology is what I'm concerned

20   about.  Can we add:  On April 4th Mr. Franklin Jones

21   filed a civil lawsuit?

22             **MR. JARRARD:**  Which is in evidence.

23             **THE COURT:**  Has that complaint been admitted?

24             **MR. JARRARD:**  It has not.

25             **MS. GOMEZ:**  It has not, Judge, and remember one

1    of the other witnesses could not remember the lawsuit.  I

2    wanted to just establish the date with Franklin Jones.

3    But taking out Lach out is fine, but can I have please

4    have the date in there of when he filed the lawsuit?

5              THE COURT:  Well, he probably couldn't tell you

6    the date himself.

7              MS. GOMEZ:  Yes, Judge --

8              THE COURT:  But the date can be established

9    from the court records.

10             MR. CHRISTIAN:  The government has no objection

11   to the date.

12             THE COURT:  That can be a separate stipulation.

13   It doesn't have to be in his statement.

14             MS. GOMEZ:  And, Judge, Mr. -- if he was going

15   to take the stand, he was going to be able to do that

16   because he filed his own lawsuit himself and has a file

17   stamped copy in his legal paperwork.

18             THE COURT:  But, still, I mean, if it's a court

19   record, there's no dispute, and that can be a separate

20   stipulation.  No reason to get into it in this statement.

21             MS. GOMEZ:  And how would the Court propose we

22   do both stipulations?

23             THE COURT:  What I would suggest is that I

24   would tell the jury that in Ms. Gomez's -- in her opening

25   statement she said that she would be bringing you the

 1   testimony of Inmate Franklin Jones.  Instead, Ms. Gomez

 2   and the government have reached a stipulation with regard

 3   to the relevant testimony that Mr. Jones would provide.

 4   And I'll allow Ms. Gomez to read that stipulation to you.

 5   And then I will say:  I advise you also that Mr. Jones

 6   filed his lawsuit which you heard about earlier on --

 7   what was the date?

 8            **MS. GOMEZ:**  April 4th, 2012.

 9            **THE COURT:**  Okay.

10            **MS. GOMEZ:**  Thank you, Judge.

11            **THE COURT:**  All right.  Let's bring our jury in

12   and Mr.  -- Mr. Pate?

13            **MR. PATE:**  Your Honor, I have one issue on the

14   witness, Mr. McLaughlin, and I intended to tender the

15   time records for Mr. Griffin.  I don't think there was an

16   issue as to authenticity of those records, but I just

17   wanted to make sure.

18            **MR. CHRISTIAN:**  Your Honor, actually the

19   government's position would just be that all of the

20   records that he has provided to the defense last night

21   should be introduced together for all four of the

22   defendants.

23            **THE COURT:**  Okay.

24            **MR. WOLFE:**  If Ms. Gomez doesn't, I intend to

25   ask him -- or Mr. Hogue -- whether or not he threw pepper

1    spray cans into a closed cell with inmates to torture

2    them, which was testified to by Mr. Redden, if I'm not

3    mistaken.

4         **MR. HOGUE:**  I don't intend to get into that

5    but --

6         **THE COURT:**  Are you talking about taking him on

7    direct?  Come in, Mr. Caldwell.  We can do that.

8         **MR. WOLFE:**  Just that one question.

9         **MR. CHRISTIAN:**  And with that one question,

10   Your Honor, to be clear, as the warden at that time, the

11   door is open to everything.

12        **MR. WOLFE:**  What does that mean, the door is

13   open to everything?  I'm asking whether he did it.

14        **THE COURT:**  I understand, but he's certainly is

15   going to be subject to cross examination.

16        **MR. WOLFE:**  As to whether or not he did it.

17   What other issues are there?

18        **THE COURT:**  Well, you also get into why he

19   wouldn't admit, as you saw with Mr. Bobbitt, which nobody

20   objected to that -- you know, there's some consequences.

21        **MR. WOLFE:**  Oh, I don't mind him saying:  And

22   if you admitted that, you'd be in trouble and you could

23   be prosecuted, and all that stuff.  I'm okay with that.

24        **THE COURT:**  Okay.  Let's bring them in.

25   *(Jury In)*

1    **THE COURT:**  I know we're 20 minutes late,

2    ladies and gentlemen, but I assure we've made a lot of

3    progress in terms of moving things along.  Mr. Christian,

4    you may conduct your cross examination.

5    **MR. CHRISTIAN:**  Thank you, Your Honor.

6    **CHRISTOPHER CALDWELL**

7    Witness, previously sworn, testified on

8    **CROSS EXAMINATION**

9    BY MR. CHRISTIAN:

10   **Q.**   Mr. Caldwell, you were a CERT officer at Macon

11   State Prison until last Friday?

12   **A.**   Yes, sir.

13   **Q.**   Let's start with something we agree on.  You agree

14   that you know just from common sense that officers can't

15   beat inmates to punish them?

16   **A.**   Yes.

17   **Q.**   You didn't have to go to the academy to know that

18   officers can't beat inmates to punish them?

19   **A.**   Yes.

20   **Q.**   You didn't have to have any special training to

21   know that officers can't beat inmates to punish them?

22   **A.**   Yes.

23   **Q.**   When you say yes, you needed special training or

24   no, you didn't need special training?

25   **A.**   You didn't need special training.  It's just common

1    sense.

2                **THE COURT:**  It's what?

3                **THE WITNESS:**  It's common sense.

4    **Q.    BY MR. CHRISTIAN:**  Let's talk about Franklin Jones.

5    You didn't see any injuries to him when you saw CERT take

6    him from the dorm on October 25th, 2010.

7    **A.**    I can't remember.  I can't remember that.

8    **Q.**    Do you remember testifying before the federal grand

9    jury on May 8, 2012?

10   **A.**    I can't recall.  I have to see something.

11   **Q.**    Sure.  I can provide you a copy of your grand jury

12   transcript.

13               **MR. CHRISTIAN:**  Your Honor, may I approach?

14               **THE COURT:**  You may.

15   **Q.    BY MR. CHRISTIAN:**  I believe this is Government

16   Exhibit Number 126 marked for identification.  Mr.

17   Caldwell, is that your grand jury transcript?

18   **A.**    Yes.

19   **Q.**    On page 28, line 15, were you asked:  Did Jones,

20   did Franklin Jones, the inmate, have any physical

21   injuries when CERT took him away?  Was your answer:  Not

22   to my knowledge?

23   **A.**    Let me check.  Give me a minute.

24   **Q.**    Do you see that on page 28, line 15?

25   **A.**    Line 15?  Yes, I see it.

1    **Q.**    That was your answer then, you didn't have any

2    knowledge of injuries to Franklin Jones?

3    **A.**    Yes, that's correct.

4    **Q.**    Let's move to Terrance Dean, on December 16th --

5          **MR. WOLFE:**  I'd object.  That wasn't his entire

6    answer.  Mr. Christian said "okay," and then he continued

7    his answer.

8          **MR. CHRISTIAN:**  The witness has answered the

9    question, Your Honor.  If Mr. Wolfe wants to do any

10   follow-up questions of his own, he's happy -- or welcomed

11   in my book to do it.

12         **THE COURT:**  I think that's correct.

13   **Q.**    **BY MR. CHRISTIAN:**  Let's move to December 16th,

14   2010, Inmate Terrance Dean.  Do you recall that incident?

15   **A.**    Yes.

16   **Q.**    You didn't see any injuries to Terrance Dean when

17   he left the gym, did you?

18   **A.**    When he left the gym?

19   **Q.**    I mean, the dorm, I'm sorry.

20   **A.**    From my -- I believe from the statement that I

21   wrote, after I pulled Mr. Dean off the inmate, if I'm not

22   mistaken, if I can recall, I seen a glimpse side of his

23   face -- I can't -- after I pulled him off the officer,

24   and I really couldn't tell if he had any injuries or not,

25   but I believe I also stated that if you got into an

1    altercation, that more than likely injuries would occur

2    so.

3    **Q.**    That's your testimony today?

4    **A.**    Yes, pretty much.

5    **Q.**    I'm going to show what's been marked for

6    identification as Government's Exhibit 127.

7              **MR. CHRISTIAN:**  May I approach, Your Honor?

8              **THE COURT:**  You may.

9    **Q.**    **BY MR. CHRISTIAN:**  Mr. Caldwell, what is

10   Government's Exhibit Number 127?

11   **A.**    This is a use of force supplement.

12   **Q.**    Who filled it out?

13   **A.**    Well, this is typed up, but --

14   **Q.**    Is that your name at the bottom?

15   **A.**    Yes, it is.

16   **Q.**    Did you sign this?

17   **A.**    That's not my handwriting.

18   **Q.**    Does it say Christopher Caldwell at the bottom of

19   this document?

20   **A.**    Yes, it is, but that's -- that's not my

21   handwriting.

22   **Q.**    You didn't write this?

23   **A.**    I probably did.

24   **Q.**    You probably --

25   **A.**    Yes, yes, yes.  Yes.

1    Q.    You did write it?

2    A.    Yes.

3          MR. CHRISTIAN:  Your Honor, I would move to

4    admit Government's Exhibit Number 127 and publish it to

5    the jury.

6          THE COURT:  Any objections?

7          MS. GOMEZ:  None.

8          THE COURT:  It's admitted without objection.

9          MR. CHRISTIAN:  Ms. Hatcher, can you tell me

10   how to take the blue box off there?  Very good.

11   Q.    BY MR. CHRISTIAN:  All right, Mr. Caldwell?

12   A.    Yes.

13   Q.    Government's Exhibit Number 127, you now know this

14   is your use or force supplement, right?

15   A.    Yes.

16   Q.    And it's for Terrance Dean, right?

17   A.    Yes.

18   Q.    And it's for December 16th?

19   A.    Yes.

20   Q.    You used force on Terrance Dean.

21   A.    No.

22   Q.    You wrote a use of force supplement.

23   A.    Well, if you call just removing him from the

24   officer, I just removed him, yes, but -- is that what you

25   say --

1    Q.    Mr. Caldwell --

2    A.    Yes.

3    Q.    -- did you use force on Mr. Dean?

4    A.    Yes.  If I wrote a use of force supplement that

5    means I used force on Mr. Dean.

6    Q.    And you agreed that this is your use of force

7    supplement, right?

8    A.    Yes.  But it's -- yes.

9    Q.    Okay.

10   A.    Yes.

11   Q.    And you did use force on him?

12   A.    I removed him from the officer, yes.

13   Q.    Right.

14   A.    If that's what you call force, yes.

15   Q.    I'm asking what you call force.  You wrote the use

16   of force supplement.

17   A.    But that's what you're saying, so if I -- yes, I'm

18   saying that I removed him from off the officer, so if

19   that what you call force, then, that's force.

20   Q.    It's not really what I call it, Mr. Caldwell, it's

21   what you say.

22   A.    Yes, it's a use of force supplement, so therefore,

23   yes.

24   Q.    Okay.  You didn't mention any injuries to Terrance

25   Dean in your use of force supplement, did you?

**A.**    No, because I also stated that I pulled him off of

the officer, and once I pulled him off of the officer, my

attention went straight back to the officer.  So I really

wasn't looking for any injuries.

**Q.**    My question was you didn't mention any injuries in

your use of force supplement, did you?

**A.**    No.

**Q.**    And you're supposed to note injuries if you see

injuries, correct?

**A.**    That's correct.

**Q.**    Okay.  And you didn't put any in your use of force

supplement.

**A.**    Yes, because I only seen -- I told you -- I only

stated to you what I seen at the time.  So at that time

if he had any injuries, I didn't see it at that time.  I

pulled him off of the officer and he was pushed into the

crowd.  So at that time my focus went back to the

officer, so I really couldn't tell you if I seen any

injuries or not.

**Q.**    I'm going to ask if you recall your interview with

the GBI agent, Terry Hunt?

**A.**    Yes, I do.

**Q.**    Do you remember that interview?  That was the one

you said you weren't happy about, right?

**A.**    Yes.

1   Q.   Did you tell the GBI agent you did not recall

2   seeing any visual injuries to the inmate or the inmate's

3   face?

4   A.   Could I see that?  Do you have --

5   Q.   I'm just asking if you recall saying that.

6   A.   I don't recall.  I can't recall if I said it or

7   not.

8   Q.   I'm going to ask you -- the next question I have

9   is:  When you testified in the federal grand jury, do you

10  remember being asked about your interview with Terry

11  Hunt?

12  A.   Yes.

13  Q.   I'm going direct your attention to page 24, line 8.

14  You were asked in the grand jury:  I'm going to ask you

15  if the GBI agent correctly reported what you said.

16  Officer Caldwell could not recall seeing any visual

17  injuries to the inmate or the inmate's face.  Do you see

18  on line 24 -- I mean, page 24, line 15, your answer was:

19  Yes, that was correct.  And you were asked then on page

20  25:  Is that all correct?  And you said "yes."

21       THE COURT:  Let him get to it now.

22  Q.   BY MR. CHRISTIAN:  Do you see on 24, page 24, line

23  8:  I'm going to ask you --

24  A.   Okay.  Line 8.  Okay.

25  Q.   24, line 8:  I'm going to ask you if the GBI agent

1    correctly reported what you said.  And you were asked on

2    line 24 -- on page 24, line 15:  Officer Caldwell could

3    not recall seeing any visual injuries to the inmate or

4    the inmate's face.

5    A.    Yes.

6    Q.    You said "yes."

7    A.    Yes.

8    Q.    So your testimony back in May of 2012 was the GBI

9    agent got it right?

10   A.    Yeah, for the most part, yes.

11   Q.    You said yes.

12   A.    Yes.

13   Q.    I asked you if that part was correct?

14   A.    Yes, yes.  Yes.

15   Q.    But today even if though you've acknowledged back

16   in 2012 the GBI agent got it right on the existence of

17   injuries --

18   A.    Yes.

19   Q.    -- today your testimony is you weren't happy about

20   that interview, right?

21   A.    Yes, I wasn't.

22   Q.    It didn't sit well with you.

23   A.    Yes.

24   Q.    It didn't sit well with you because you said he

25   didn't seem to believe you.

1    **A.**    Yes.

2    **Q.**    And you said that he wanted to hear a particular

3    story.

4    **A.**    Yes.

5    **Q.**    And you said he threatened you with prison if you

6    did not tell the truth, right?

7    **A.**    Yes, yes.

8    **Q.**    Did you lie to him?

9    **A.**    No, sir.

10    **Q.**    You told the truth?

11    **A.**    Yes.

12    **Q.**    So even though he said all this stuff you say he

13    said, you didn't change your story?

14    **A.**    No.

15    **Q.**    You still told him the truth?

16    **A.**    Yes.

17    **Q.**    When he told you the consequences for lying to him,

18    you told the truth?

19    **A.**    It -- yes, I told the truth.

20    **Q.**    And the truth was that you didn't see any injuries

21    to Terrance Dean?

22    **A.**    Yes.  Because I wasn't physically looking for any

23    injuries.  My only -- my main goal what to get that

24    inmate -- separate that inmate from the officer.  So

25    looking at injuries, I wasn't.

1  **Q.**    You said that Agent Hunt from the GBI -- and that's

2  the Georgia Bureau of Investigation --

3  **A.**    Yes.

4  **Q.**    -- wanted a specific story from you?

5  **A.**    Yes.

6  **Q.**    That was your testimony today, correct?

7  **A.**    Yes.

8  **Q.**    And I believe, and correct me if I'm wrong, but you

9  said that he wanted you to tell -- he wanted you to say

10  that you had seen the defendants, your fellow CERT

11  officers, you had seen them do it -- you had seen those

12  officers do something to Dean?

13         **MS. GOMEZ:**  Your Honor, I have to object.

14  That's a mischaracterization of the evidence.  He was not

15  a CERT officer at the time this occurred.  He became a

16  CERT officer after this CERT team left.

17         **THE COURT:**  Yeah, that part should be

18  clarified.

19         **MS. GOMEZ:**  Right.

20  **Q.**  **BY MR. CHRISTIAN:**  You were a CERT officer at the

21  time of your GBI interview, right, in 2011?

22  **A.**    2011.  Yes.

23  **Q.**    Okay.  That's all I was saying.

24  **A.**    Yes.

25  **Q.**    So you felt like he was telling you that you had to

1    implicate CERT officers at a time when you were a CERT

2    officer?

3    **A.**    Yes.

4    **Q.**    And that he wanted a specific story from you?

5    **A.**    Yes.

6    **Q.**    And the specific story he wanted -- and tell me if

7    I got it wrong -- was that he wanted you to say you had

8    seen officers doing something to Dean?

9    **A.**    Yes, pretty much.

10   **Q.**    That's what he said to you?

11   **A.**    Yes.

12   **Q.**    No doubt in your mind?

13   **A.**    Yes.

14   **Q.**    Did he actually say that to you?

15   **A.**    Yes.  Physically he -- he basically -- whatever I

16   was saying to him, it was as if he didn't show any

17   interest, as if what I was saying is -- okay, basically

18   what I was telling -- what I was saying to him, it didn't

19   sit right with him.  So, like I said in the last court

20   meeting I was here, he would oftentimes sit back and sit

21   up like when I had something to say, but when it wasn't

22   what he wanted to hear, he since didn't show any interest

23   to it so.

24   **Q.**    I want to be clear.  Did he actually tell you, I

25   want to hear these facts.  I want you to implicate CERT

1    officers?

2    **A.**    No, but that's how I felt at that time.

3    **Q.**    That's how you felt.

4    **A.**    Yes.

5    **Q.**    He never actually said that to you?

6    **A.**    No.

7    **Q.**    You just got that from him leaning forward?

8    **A.**    Yes.  His actions, the actions that he was showing.

9    **Q.**    So you --

10   **A.**    His actions showed that wasn't showing any

11   interest.  Basically, if I didn't say, like, I seen those

12   guys doing what they supposed to have did to that inmate,

13   he wasn't interested in my story.  So it didn't sit right

14   with me.  He came to the interview as to say that he

15   already knew what happened, and so what I said -- what I

16   had to say, it didn't matter.

17   **Q.**    I want to be very clear.  He didn't actually say

18   any of that to you, you just understood that from how he

19   moved his body movement?

20   **A.**    Yes.

21   **Q.**    So he never actually said that?

22   **A.**    No.

23   **Q.**    He just leaned forward at different times?

24   **A.**    No.  It was the actions that he showed.

25   **Q.**    Please tell me what the actions were --

1    **A.**    Okay.

2    **Q.**    -- so you can communicate that whole paragraph.

3    **A.**    Okay.  When you're speaking with someone and you

4    feel as though -- as if they are lying about everything

5    they're saying, you will look at them in a strange way as

6    to say he's lying about everything, when I was only

7    speaking of the truth, and my truth didn't sit well with

8    him.  He wanted for me to say that I had seen a group of

9    guys, the CERT team, use extra force -- or excessive

10   force on an inmate when I didn't.  So I don't know where

11   you're trying to go with it, but that's --

12   **Q.**    I just want to make sure I'm clear that he never

13   actually said any of that stuff you just told the ladies

14   and gentlemen of the jury that you understood him to say.

15   **A.**    Yes.

16   **Q.**    He just communicated that to you without the words?

17   **A.**    Yes.

18   **Q.**    And you managed to get all that just from the way

19   he was leaning back or leaning forward or making faces?

20   **A.**    Yes.  As to say that he didn't -- he wasn't

21   interested in what I had to say, so it was -- it was

22   nothing.

23   **Q.**    Now, you were asked that same question when you

24   testified in this same courtroom back on May 27th, 2014.

25   Do you remember being asked that question?

1    A.    Yes.

2          MR. CHRISTIAN:   Your Honor, may I approach with

3    what's been marked for identification as Government's

4    Exhibit 128?

5          THE COURT:   You may.

6    Q.    BY MR. CHRISTIAN:   Is that the testimony, the

7    transcript of your testimony from May 27th, 2014?

8    A.    Yes.

9    Q.    Any doubt in your mind about that?

10   A.    No.

11   Q.    Can I get you to turn to page 139.  Your testimony

12   today -- let me ask you this before you read this

13   section.  Your testimony today is that you understood

14   from Agent Hunt's actions --

15   A.    Yes.

16   Q.    -- that he wanted you to point the finger at CERT

17   officers for doing something to Terrance Dean?

18   A.    Yes.

19   Q.    On page 139 on line 15 you were asked:  And as best

20   you can, when he, referring to Agent Hunt, said that

21   comment to you about going to prison or jail twice, do

22   you remember what it was specifically in reference to?

23   Do you see where I am?

24   A.    Yes.

25   Q.    You said:  Me speaking about did I remember what

1   happened.  I got to removing the inmate from off the

2   officer, basically he asked me, like, did you get a good

3   visual of the inmate, and when I spoke to him, see, he

4   sat up at the time cause he felt like I was fixing to

5   give him some -- like I was fixing to say the inmate

6   didn't have bruises on him, but basically what I told

7   him, I said, any time anybody get in an altercation,

8   there's going to be some bruises somewhere.  So I didn't

9   know.  So the only thing I did was grab the inmate, and I

10  pushed him back, and I secured that officer.  So I

11  believe he wanted me to say, yeah, the inmate didn't have

12  nothing on him.  So he sat back at that time, like what I

13  was saying wasn't the truth.  So it was in that matter.

14  *(Reading.*

15  **A.**     Yes.

16  **Q.**     -- that manner?

17  **A.**     Yes.

18  **Q.**     Did I read that correctly?

19  **A.**     Yes, you did.

20  **Q.**     So your testimony just a couple weeks ago was that

21  what Agent Hunt wanted you to lie about was whether you

22  saw bruises on Dean or not, whether Dean was injured?

23  **A.**     Pretty much.

24  **Q.**     But your testimony today is that he wanted you to

25  implicate other officers?

1    A.    That's basically saying the same thing.

2    Q.    One's about an injured inmate, and one is about

3    pointing a finger at seeing officers do something to an

4    inmate.

5    A.    Basically what it is, if the inmate had injuries,

6    he wanted me to say, like, that those guys did that to

7    that inmate.  So basically that's what I was referring to

8    when I made the statement.

9    Q.    You didn't mention at that testimony on May 27th,

10   2014 that Agent Hunt, by virtue of the way he moved his

11   body, was trying to get you to point the finger at CERT

12   officers, did you?

13   A.    I don't recall.

14   Q.    You don't recall?

15   A.    No.

16   Q.    You weren't happy with the GBI interview, right?

17   A.    Yes.  I wasn't happy.

18   Q.    And you weren't happy because Agent Hunt made faces

19   at you?

20   A.    No.  Because he came down with the intention of

21   already knowing what happened, instead of trying to find

22   the truth, he somewhat -- he made it like he already knew

23   the truth, so basically whatever I was saying to him, it

24   didn't matter.  It was like I was telling him a lie the

25   whole time.

1   **Q.**    Did he say that to you, or is this, again, just the

2   way he's moving his body?

3   **A.**    Yes, basically.  And whatever I was saying to him,

4   he was, like, you basically lying.  He didn't verbally

5   say it, but that's -- those were the actions that he was

6   showing.

7   **Q.**    I don't suppose you could tell from the way I'm

8   moving my body what I'm trying to communicate to you

9   right now, can you?  All right, very good.  You knew

10  during the time of your GBI interview that other CERT

11  officers were being interviewed, right?

12  **A.**    I can't recall.  Only thing I knew, I was called up

13  and I went into this -- into the room with the GBI agent.

14  **Q.**    And you've talked about your unhappiness with the

15  GBI interview.  Were you unhappy at all with the way you

16  were treated during your FBI interview?

17  **A.**    Pretty much.  Only thing I did was just sit in the

18  FBI office, so it really wasn't much of a talk.

19  **Q.**    So do you have any complaints about the way you

20  were treated by the FBI?

21  **A.**    No.  The only thing I did was just sit there

22  basically, so it really wasn't much of a conversation.

23  **Q.**    My question was just, do you have any complaints?

24  **A.**    No.

25  **Q.**    Ultimately your friend and fellow CERT officer

1    Kadarious Thomas pleaded guilty, didn't he?

2    **A.**    Yes, from what I heard.

3    **Q.**    And you weren't happy about that, right?  He was a

4    good friend of yours.

5    **A.**    Yes, he's -- he was a good friend of mine.

6              **MR. CHRISTIAN:**  Nothing further.

7              **THE COURT:**  Any redirect?

8              **MS. GOMEZ:**  No, sir.

9              **THE COURT:**  Yes, sir?

10             **MR. WOLFE:**  May I ask some questions about his

11   testimony and about the questions that were asked?

12             **THE COURT:**  On cross or direct?

13             **MR. WOLFE:**  On cross.

14             **THE COURT:**  And how does that work?

15             **MR. WOLFE:**  How does that work --

16             **MR. CHRISTIAN:**  I don't understand, Your Honor.

17             **MR. WOLFE:**  Well, Mr. Christian elicited

18   erroneous information, and I wanted to clarify it for the

19   jury.

20             **MR. CHRISTIAN:**  I think that's an improper

21   characterization.  The witness was asked about his grand

22   jury transcript.  He looked at the transcript and he

23   answered the questions.  If there's something that needs

24   to be clarified, I'm happy to have the whole transcript

25   introduced, Your Honor.

1    **MR. WOLFE:**  I'm going to clarify the answer to

2    the one question that was given.

3         **THE COURT:**  All right.  In the interest of

4    that, ask him your one question.

**CROSS EXAMINATION**

6    BY MR. WOLFE:

7    **Q.**   Do you remember being asked with Mr. Christian's

8    initial question on page 28, line 15 -- are you there?

9    **A.**    Yes, I am.

10   **Q.**   The question was:  Okay, did Jones, did Franklin

11   Jones, the inmate, have any visible injuries when CERT

12   took him away?  Do you see that question?

13   **A.**    Yes.

14   **Q.**   Will you do me a favor and read from line -- to

15   yourself - line 7 --

16        **MR. CHRISTIAN:**  I'm going to object, Your

17   Honor, and we should approach.

18        **THE COURT:**  Bring that testimony up.

19   *(SIDEBAR)*

20        **THE COURT:**  What do you want him to read?

21        **MR. WOLFE:**  I think his entire answer goes

22   through page 29, line 8.  The answer to that very

23   question are given at 15.

24        **MR. CHRISTIAN:**  And this is on cross, correct?

25        **MR. WOLFE:**  It can be on direct.  It doesn't

1    matter.  I'll call him for direct.

2            **MR. CHRISTIAN:**  Direct is over.

3            **MR. WOLFE:**  I'll call him in rebuttal.  But

4    through line eight of the next page is when the answer

5    ends.

6            **THE COURT:**  Well, he says he was -- that Davis

7    was lying in his own puddle of blood.

8            **MR. CHRISTIAN:**  Judge, if you read to line

9    eight, he's answering, he said I was paying more --

10   essentially he's saying -- he says exactly what he's

11   saying there.  He says, okay, and the answer continues:

12   Again, not to my knowledge, okay, I really -- I really

13   couldn't tell you, but he was, you know, he was lying in

14   a puddle of blood.  Like he did -- Officer Davis is the

15   -- he was lying in a puddle of blood.  Like, who did it,

16   is the question that he rhetorically asked him, and his

17   answer of Franklin Jones -- Franklin Jones about the

18   time, sir, and then he goes, okay, I didn't really get a

19   chance to look at him like that, talking about --

20           **THE COURT:**  He's clearly talking -- he's

21   attributing the blood to the officer.  I'm not going to

22   allow that.

23           **MR. WOLFE:**  Can I ask you one other thing?

24   When he says, I really didn't get a chance to look at

25   him, he just follows up his original question:  But

1    sitting here today you have no memory that any injuries

2    to Franklin Jones when CERT took him away?  Not that I

3    recall *(reading)*.

4         **MR. CHRISTIAN:**  I believe that was his answer

5    on cross.

6         **THE COURT:**  That's the answer he gave.

7         **MR. WOLFE:**  He doesn't -- the entirety of his

8    answer says why he didn't recall.  He says "not to my

9    knowledge" and then explains why he doesn't recall, not

10   that the fellow didn't have injuries, which Mr. Christian

11   is trying to --

12        **MR. CHRISTIAN:**  He says I don't recall, and

13   that's all that was elicited.  Not to my knowledge and

14   not that I recall.

15        **MR. WOLFE:**  But he explains why.  The entirety

16   of his answer is included in the remaining lines.

17        **THE COURT:**  Well, at most -- I think this was

18   throughout his testimony anyway -- the relevant thing

19   would be:  I really didn't get a chance to look at him

20   like that.  But sitting here today you have no memory of

21   any injuries to Franklin Jones *(reading)*.  The blood's

22   got nothing to do with it.

23        **MR. WOLFE:**  We can take out the blood.

24   Precisely, he saying, I'm focusing on the blood.  I

25   wasn't focusing on Franklin Jones, but the entirety of

1   his answer goes to line 8 on the succeeding page.

2          THE COURT:  I'll give you this back.

3          *(BENCH CONFERENCE CONCLUDED)*

4          THE COURT:  Ladies and gentlemen, in

5   Mr. Caldwell's grand jury testimony, which you heard

6   excerpts from earlier, he also said this with regard to

7   the question of whether he saw any injuries on Franklin

8   Jones:  I really didn't get a chance to look at him like

9   that.  Then the question:  But sitting here today you

10  have no memory of any injuries to Franklin Jones when

11  CERT took him away.  Not that I recall.  *(Reading)*.

12         MR. WOLFE:  Thank you, Judge.  That's all I

13  have.

14         THE COURT:  All right, Ms. Gomez?

15         MS. GOMEZ:  Your Honor, I have nothing further

16  for Mr. Caldwell.  May he be excused?

17         THE COURT:  Thank you, Mr. Caldwell.  You may

18  step down and you are excused.

19         MS. GOMEZ:  Judge, next will be what we

20  discussed about the stipulation?

21         THE COURT:  Ladies and gentlemen, you may

22  recall Ms. Gomez's opening statements, that she said that

23  was going to call Inmate Franklin Jones.  And this is one

24  of the things we've been working on while you've been

25  back in the jury room.  She and the government have

1    agreed to stipulate, that is, to agree, with regard to

2    what some of his -- or what his testimony would be that

3    he would give you if he were here.  In other words,

4    they've agreed he would testify to certain facts and you

5    can take those facts as to what he would testify to.  And

6    Ms. Gomez is going to tell you what those facts are.

7            **MS. GOMEZ:**  Your Honor, do you want me to come

8    to the podium or from the lectern?

9            **THE COURT:**  Just -- yeah, go to the lectern so

10   the microphone will pick you up.

11           **MS. GOMEZ:**  Good afternoon.  On January 25th,

12   2011 Franklin Jones told IIU investigators that he had

13   been beaten in the gym by CERT officers and that after he

14   had been punched in the face, he had blacked out and

15   could not recall which officers had hit him.

16       On January 10, 2013, Franklin Jones refused to meet

17   with an FBI agent.  On March 14, 2013, Franklin Jones met

18   with an FBI agent.  Jones says that he had refused to

19   meet previously because he had been told by a Department

20   of Corrections official at the prison where he was housed

21   at the time that he should not meet with federal

22   authorities.

23       Franklin Jones told the FBI agent that he had been

24   beaten in the gym by CERT officers and that after he had

25   been punched in the face, he blacked out and did not

1    remember much else until he got to medical.

2        On June 18th, 2014, Franklin Jones also said that

3    Defendant Ronald Lach was not present for the incident in

4    the gym and that the first time he saw Lach that day was

5    in the medical when Lach read him his rights.  Jones next

6    saw Lach as he was led to segregation.

7        Franklin Jones has been convicted of felony murder

8    and is currently incarcerated in a prison run -- well, it

9    should be ran, I'm sorry -- ran by the Georgia Department

10   of Corrections *(reading)*.

11       **THE COURT:**  Thank you, Ms. Gomez.  I want to

12   advise you of one additional fact, ladies and gentlemen,

13   and that is that the lawsuit that Mr. Jones filed -- you

14   will recall some earlier testimony about a lawsuit he

15   filed -- was filed on April 4th, 2012.  All right.  Ms.

16   Gomez, anything further?

17       **MS. GOMEZ:**  No, sir, nothing further.

18       **THE COURT:**  Does that conclude your evidence?

19       **MS. GOMEZ:**  It does.

20       **THE COURT:**  All right.  I think, Mr. Hogue,

21   that brings us back to you -- Mr. Fox, was there anything

22   further?

23       **MR. FOX:**  Nothing further, Your Honor.

24       **THE COURT:**  Mr. Hogue?

25       **MR. HOGUE:**  I'll get my first witness, Your

1    Honor.

2            THE COURT:  Your first witness?

3            MR. HOGUE:  Shurvon Clark.

4            THE COURT:  That's the witness we discussed?

5            MR. HOGUE:  Right.

6            THE COURT:  Ask her to remain outside just for

7    a moment.  We'll call you in just a moment, ma'am.

8    Ladies and gentlemen, before this witness testifies I

9    need to give you a special instruction.

10           You are about to hear from an alibi witness, that

11   is, a witness who may say that Mr. Wimbush was not in the

12   prison at a time when the government says he was.  The

13   law requires a defendant to disclose to the government an

14   alibi witness when the government requests such

15   disclosure.  Here, beginning in April 2013, the

16   government made many such requests to Mr. Wimbush's

17   lawyer, however, Mr. Wimbush's lawyer did not disclose

18   that this witness would attempt to provide alibi

19   testimony until after the start of trial.

20           The government did know about this witness, but it

21   did not know that she was to be an alibi witness.  There

22   is no evidence that this failure to disclose was

23   intentional, but still, there was no disclosure until

24   after the trial started.

25           The reason for this disclosure requirement is to

1    give the government an opportunity to gather evidence to

2    counter the testimony of the alibi witness.  Here, the

3    government did not have the opportunity that it would

4    have had if Mr. Wimbush had complied with the law to

5    gather that evidence that there was such evidence.

6         Prison records and other evidence are not as

7    available to the government as they would have been had

8    Mr. Wimbush complied with this requirement of disclosure.

9         At the end of the trial, I will give you

10   instructions on how you judge the credibility and weight

11   of evidence.  In addition to that, I instruct you now

12   that you may consider the failure to timely disclose this

13   witness and the impact of that late disclosure on the

14   government's ability to respond as you consider the

15   weight to be given to this witness's testimony.

16        Mr. Hogue?

17            **COURTROOM DEPUTY:**  Do you solemnly swear that

18   the testimony you're about to give in this case shall be

19   the truth, the whole truth, and nothing but the truth, so

20   help you God?

21            **THE WITNESS:**  I do.

22            **COURTROOM DEPUTY:**  Will you please state and

23   spell your name for the record.

24            **THE WITNESS:**  Shurvon, S-H-U-R-V-O-N,

25   C-L-A-R-K.

1                          **SHURVON CLARK**

2        **Witness, having first been duly sworn, testified on**

3                        **DIRECT EXAMINATION**

4     **BY MR. HOGUE:**

5     **Q.**    Hello, Ms. Clark.  I see you're in uniform today.

6     What kind of uniform are you wearing?

7     **A.**    Correctional officer's.

8     **Q.**    And speak up for all the jury so they can hear you.

9     What kind?

10    **A.**    Correctional officer.

11    **Q.**    Where do you work?

12    **A.**    Macon State Prison.

13    **Q.**    What is your position there?

14    **A.**    ID clerk.

15    **Q.**    ID clerk?  And how long have you worked at Macon

16    State Prison?

17    **A.**    14 -- 14 years and 4 months.

18    **Q.**    And how long have you been the ID clerk?

19    **A.**    I think about, almost five years.

20    **Q.**    While you've been working there, did you come to

21    know Derrick Wimbush?

22    **A.**    Yes.

23    **Q.**    And do you remember how long ago you met him?

24    **A.**    Hmm, probably in '09.

25    **Q.**    2009?

1    **A.**    Yes.

2    **Q.**    Was he a CO-1 then or a CERT member, or do you

3    know?

4    **A.**    He was a CO-1.

5    **Q.**    And did you and Mr. Wimbush develop a friendship

6    that blossomed into a relationship?

7    **A.**    Yes.

8    **Q.**    And does that mean you two saw each other, dated,

9    and so on?

10   **A.**    Yes.

11   **Q.**    And when did that begin, if you can remember, and

12   when did it end, if you can remember?

13   **A.**    I think like in April of 2010.

14   **Q.**    Was when it began?

15   **A.**    It began in April of 2010.

16   **Q.**    And how long did you two see each other?

17   **A.**    Probably like, around July 2011.

18   **Q.**    All right.  About a year and a-half, a little less

19   than a year and a-half.  Do you remember ever meeting the

20   government lawyers who are seated here?

21   **A.**    Yes.

22   **Q.**    And do you remember about what month and year that

23   was?

24   **A.**    I know it was last year, but I don't remember what

25   month.

1    Q.    Do you remember the occasion upon which you met

2    them, why you were meeting them?

3    A.    Yes.

4    Q.    What was that about?

5    A.    Inmate Jabaris Miller.

6    Q.    And do you remember generally that that was about

7    what happened behind the ID office where you work, or do

8    you even remember what that was about?

9    A.    They asked me did I witness an assault on Jabaris

10   Miller behind ID.

11   Q.    Did you?

12   A.    No.

13   Q.    And you came and testified at the grand jury about

14   that?

15   A.    Yes.

16   Q.    Okay.  Now, let's fast forward to recent days.  How

17   did you first receive notice or a request to get involved

18   in this trial like you are today?  Do you remember how

19   and when that came about?

20   A.    Hmm, one day last week -- I'm not sure of the

21   day -- Derrick Wimbush texted me and asked me if it was

22   okay if his lawyer called and talked to me about --

23   called and talked to me.

24   Q.    And did his lawyer call and talk to you?

25   A.    Yes.  You called me that afternoon.

1  Q.    And do you know who you talked to on the phone?

2  A.    I remember the last name Hogue.  I don't remember

3  the first name -- your first name.

4  Q.    Do you know who I am?

5  A.    I know your last name, but not your first name.

6  Q.    You know I'm Derrick's lawyer?

7  A.    Yes.

8  Q.    Am I the one that talked to you on the phone last

9  week?

10  A.    Yes.

11  Q.    Now, between the time that you met with the grand

12  jury -- and, again, you said some time in 2013 that was

13  or '12?  I might have missed it.

14  A.    The grand jury?

15  Q.    Right.

16  A.    I think it was in 2013.

17  Q.    Last year.  Okay.  Between that time and last week

18  when we talked, had anybody else approached and talked to

19  you about this case?

20  A.    No.

21  Q.    Including Derrick Wimbush?

22  A.    No.

23  Q.    Now, do you know Derrick Wimbush's family?

24  A.    I know his mother, his brother, and his brother's

25  girlfriend.

1   Q.   Where does his mother work?

2   A.   At Macon State Prison.

3   Q.   Do you see her on occasion at work?

4   A.   Yes.  If I go purchase food.

5   Q.   She works in the food part of the prison?

6   A.   Uh-huh, for staff.

7   Q.   Have you seen her at the prison since you met with

8   the grand jury up until now?

9   A.   Yes.

10   Q.   Have you ever had any conversations with her about

11   this case?

12   A.   No.

13   Q.   Has anyone ever promised you anything of value to

14   get you to come here and testify today?

15   A.   No.

16   Q.   Has anyone threatened you in any way to get you to

17   come here and testify today?

18   A.   No.

19   Q.   In fact, are you here voluntarily?  You're not even

20   under subpoena, are you?

21   A.   No.

22   Q.   You're here because I asked you to come?

23   A.   -- me to come.  Yes.

24   Q.   Thank you.  Now, let's talk about a particular day

25   in 2010 toward the end of the year.  You know why you're

1    here.  You know what we're going to talk about now,

2    right?

3    **A.**    Yes.

4    **Q.**    Is there any day in late 2010 where something

5    happened at the prison that causes you to have a

6    particular memory about that day?  Was that too vague for

7    you?

8    **A.**    Yes.

9    **Q.**    All right.  I'm talking about anything you might

10   know about Deputy Warden Hinton.

11   **A.**    When he got assaulted?

12   **Q.**    Yes.

13   **A.**    Yes.

14   **Q.**    Okay.  Do you remember when that happened, not the

15   date.  We won't have to remember the exact date, but do

16   you remember -- unless you do.  Do you remember --

17   **A.**    I remember when it happened.  I don't remember the

18   date, but I remember it happening.

19   **Q.**    Did you know Deputy Warden Hinton?

20   **A.**    Yes.

21   **Q.**    Now, let's talk about where you were earlier that

22   day.  Had you been at work that day?

23   **A.**    Yes.

24   **Q.**    What are your work hours?

25   **A.**    I think back then it was 7:45 to 4:30.

1    Q.    That'd be a.m. to p.m.?

2    A.    A.m. to p.m.

3    Q.    And how did get to work typically, and specifically

4    how did you get to work that day, if you remember?

5    A.    I drove my car.

6    Q.    And were you dating Derrick Wimbush then?

7    A.    Yes.

8    Q.    Do you remember if Derrick Wimbush was at work that

9    day?

10   A.    Yes.

11   Q.    Do you remember leaving work that day?

12   A.    Yes.

13   Q.    And by what mode of transportation; whose car did

14   you leave work in?

15   A.    My car.

16   Q.    Were you by yourself?

17   A.    No.

18   Q.    Who was with you?

19   A.    Derrick.

20   Q.    What time did you get off?

21   A.    I think after -- it had to be after 4:30 when the

22   count cleared.

23   Q.    He rode with you?

24   A.    Yes.

25   Q.    Where did you two go?

1    **A.**    To his mother's house.

2    **Q.**    Where does his mother live?  Or where did she leave

3    live then.  She may still live in the same place.

4    **A.**    Maulk, Georgia?

5    **Q.**    Maulk, Georgia?

6    **A.**    Uh-huh.

7    **Q.**    About how far in minutes is that by driving from

8    the prison?

9    **A.**    About 45 minutes.

10   **Q.**    Did you go straight to the house?

11   **A.**    Yes.

12   **Q.**    Okay.  Okay.  What happened at the house that

13   evening that you remember as it relates to Deputy Warden

14   Hinton?

15   **A.**    I remember Derrick on the phone talking to someone

16   from the prison about Mr. Hinton being assaulted and he

17   needed to come back to the prison.

18   **Q.**    And after he got off the phone and you learned that

19   that's what it was about, what happened next?

20   **A.**    He left in my car going to the prison.

21   **Q.**    He borrowed your car?

22   **A.**    Yes.

23   **Q.**    Where did you stay?  Did you stay at his mother's

24   house?

25   **A.**    Uh-huh.  Yes.

1   Q.   And as far as you know he drove back to the prison?

2   A.   That night?

3   Q.   Right.

4   A.   Did I drive back?

5   Q.   Did he drive back?

6   A.   Yes.

7   Q.   Did he later on come back to his mother's house?

8   A.   Yes.

9   Q.   Were you still there?

10  A.   Yes.

11  Q.   And did he tell you anything about what had

12  happened at the prison?

13  A.   Not that I can recall.

14  Q.   Y'all didn't talk about it much?

15  A.   Probably --

16       MR. CHRISTIAN:  I'm going to object to the

17  extent he's trying to get in the defendant's statements,

18  Your Honor.

19       THE COURT:  Mr. Hogue?

20       MR. HOGUE:  Actual I expect her answer is, we

21  didn't talk about it, but --

22       THE COURT:  So far that would be the

23  implication.  Is that correct, ma'am, y'all didn't talk

24  about it?

25       THE WITNESS:  I can't recall.  I know he

1    probably mentioned that he got assaulted, but to what

2    extent we didn't go into detail.

3    **Q.    BY MR. HOGUE:**  All right.  Now, did you learn that

4    this involved an inmate named Mario Westbrook, or did you

5    know that?  The assault on --

6    **A.**    At the time?

7    **Q.**    The assault --

8    **A.**    I didn't know who the inmate was at the time.

9    **Q.**    Okay.  You later learned the name of that guy?

10   **A.**    Yes.

11   **Q.**    All right.  Now, Ms. Clark, are you here giving

12   this testimony truthfully?

13   **A.**    Yes.

14   **Q.**    Do you have a distinct and clear memory of that

15   night?

16   **A.**    Yes.

17            **MR. HOGUE:**  Your witness.

18            **THE COURT:**  Mr. Christian?

19            **MR. CHRISTIAN:**  Thank you, Your Honor.

20                    **CROSS EXAMINATION**

21   BY MR. CHRISTIAN:

22   **Q.**    Good afternoon, Ms. Clark.

23   **A.**    Good afternoon.

24   **Q.**    You work at Macon State Prison?

25   **A.**    Yes.

1    **Q.**    Currently?

2    **A.**    Uh-huh.

3    **Q.**    You work with Defendant Wimbush's mother?

4    **A.**    Yes.

5    **Q.**    A week or two ago your former boyfriend, Defendant

6    Wimbush, sent you a text message asking you to talk to

7    his defense attorney?

8    **A.**    Yes.

9    **Q.**    And that was before the start of this trial?

10   **A.**    The trial had already started.

11   **Q.**    The trial had already started when you got the

12   message?

13   **A.**    Uh-huh.  Yes.

14   **Q.**    So it was during the course of this trial you got

15   the message from the defendant?

16   **A.**    Yes.

17   **Q.**    And you were asked during an FBI interview to turn

18   over that text message, right?

19   **A.**    I didn't have it anymore.

20   **Q.**    Right.  You deleted it, you said?

21   **A.**    Yes.

22   **Q.**    You said yesterday that you deleted it?

23   **A.**    Yes.

24   **Q.**    You were asked to turn over your phone records,

25   correct?

1   A.   No.

2   Q.   Nobody asked you that during your FBI interview?

3   A.   No.

4   Q.   You haven't disclosed your phone records, have you?

5   A.   No.

6   Q.   You volunteered to be here today, right?

7   A.   Yes.

8   Q.   And today you say that Defendant Wimbush was with

9   you at the moment that Deputy Warden Hinton was

10  assaulted?

11  A.   Yes.

12  Q.   But you can't say exactly when he was with you,

13  right?  You don't know the specific minute that he was

14  with you?

15  A.   Not the exact time.

16  Q.   And you can't say the specific minute that he left?

17  A.   No.

18  Q.   You didn't write that down somewhere?

19  A.   No.

20  Q.   It didn't seem important to you at the time?

21  A.   No.

22  Q.   You talked to the FBI back in April of 2013, right?

23  A.   I don't remember which --

24  Q.   Do you remember testifying in the grand jury in

25  April of 2013?

1    **A.**    Yes.

2    **Q.**    That was about a year ago?  Roughly?

3    **A.**    Yes.

4    **Q.**    And that was in connection with a federal

5    investigation involving your former boyfriend, Defendant

6    Wimbush?

7    **A.**    It was what now?

8    **Q.**    In connection with a federal investigation

9    involving your former boyfriend, Defendant Wimbush?

10   **A.**    I'm not -- I'm not sure.

11   **Q.**    You were asked then back in April of 2013 about an

12   incident in which CERT officers had escorted an inmate

13   named Jabaris Miller and beaten him behind the ID

14   building.  Do you remember that?

15   **A.**    I remember that.

16   **Q.**    Okay.  Do you remember being asked about that

17   incident involving CERT officers?

18   **A.**    Yes.

19   **Q.**    And an allegation that they had beaten an inmate

20   behind the ID building?

21   **A.**    Yes.

22   **Q.**    And you understood at that time that your former

23   boyfriend, Defendant Wimbush, was on CERT?

24   **A.**    Yes.

25   **Q.**    So you understood that your former boyfriend was

1    implicated in this federal investigation?

2    **A.**    Yes.

3    **Q.**    And that's when you sat down and talked with the

4    FBI and appeared before the grand jury?

5    **A.**    Yes.

6    **Q.**    You denied seeing your boyfriend or any other CERT

7    officer beat Inmate Miller behind ID, right?

8    **A.**    Yes.

9    **Q.**    You said you didn't see it?

10   **A.**    I didn't.

11   **Q.**    But you did admit that you had seen CERT officers

12   take Inmate Miller through the ID building, right?

13   **A.**    Yes.

14   **Q.**    And you said when you saw the CERT officers take

15   Miller through ID he didn't have any injuries?

16   **A.**    I don't recall saying that.

17   **Q.**    So you don't recall saying that.  You think he

18   might have had injuries?

19   **A.**    Probably, cause he was just in an altercation.

20          **MR. CHRISTIAN:**  Your Honor, may I approach with

21   the grand jury testimony?

22          **THE COURT:**  You may.

23          **MR. CHRISTIAN:**  We're going to mark it for

24   identification.  It's 129, Your Honor.

25   **Q.**   **BY MR. CHRISTIAN:**  I'm going to direct your

1    attention to page six, the bottom of the page.  Do you

2    see where I am at the bottom of the page?  You were

3    asked:  When Inmate Miller was brought to ID, did he have

4    any visible injuries?  And your answer was:  I haven't

5    seen any of the injuries during the escort.  You were

6    asked on the next page:  Did you ever see Inmate Miller

7    bleeding as he was brought through ID out of the back?

8    And you said:  No.  Was that your testimony back in April

9    of 2013?

10   A.    Yes.

11   Q.    Today you think he had injuries, though, when CERT

12   brought him through?

13   A.    Do I think he had them?

14   Q.    Today.

15   A.    Repeat your question.

16   Q.    Is your testimony today that you believe that

17   Inmate Miller had injuries when you saw him with CERT?

18   A.    He could have.  I'm not sure -- I don't --

19   Q.    But back in April of 2013 --

20   A.    I don't remember seeing any.

21   Q.    Okay.  So was your testimony in April of 2013

22   accurate?

23   A.    Yes.

24   Q.    You said:  I haven't seen any injuries during the

25   escort.  Did you ever see him bleeding?  And you said:

1    No?

2    **A.**    No, I wasn't really paying attention.

3    **Q.**    That's your testimony today?

4    **A.**    Yes.

5    **Q.**    When you talked to the FBI back in 2013 during your

6    interview and during the grand jury appearance, did you

7    mention that your former boyfriend had been with you

8    during the Westbrook incident?

9    **A.**    No.

10             **MR. CHRISTIAN:**  Thank you, Your Honor.

11             **MR. HOGUE:**  A couple on redirect, Your Honor.

12                     **REDIRECT EXAMINATION**

13   **BY MR. HOGUE:**

14   **Q.**    Ms. Clark, when you were at the grand jury or even

15   in the FBI interview before then, did anyone from the

16   government even utter the name Mario Westbrook to you?

17   **A.**    No.

18   **Q.**    If they had and they told you he's the guy that

19   assaulted the Deputy Warden, would you have told them

20   what you've told this jury today?

21   **A.**    Yes.

22   **Q.**    All right.  And with respect to the time of day,

23   you remembered that it was after work that you and

24   Derrick drove home.  Where in the house were you?  Can

25   you remember that?

1    **A.**    In the kitchen.

2    **Q.**    Were you all eating dinner or supper, whichever you --

3          **MR. CHRISTIAN:**  Object to leading, Your Honor.

4          **THE COURT:**  Ask a non-leading.

5          **MR. HOGUE:**  Okay.

6    **Q.**    **BY MR. HOGUE:**  What were you doing in kitchen, if

7    you remember?

8    **A.**    If I recall, we were just sitting around the table.

9    **Q.**    Was it evening time or afternoon?

10   **A.**    It was after 4:30.  I'm not quite sure of the time.

11   **Q.**    Good enough.  After the work day.  I don't have

12   anything further.

13         **THE COURT:**  May this witness be excused?

14         **MR. CHRISTIAN:**  Yes, Your Honor.

15         **THE COURT:**  Thank you, Ms. Clark.  You are

16   excused.

17         **MR. CHRISTIAN:**  Your Honor, may I approach to

18   swap out the exhibit to give an unmarked-up copy of the

19   grand jury testimony, Government's 129?

20         **THE COURT:**  Yes.

21         **COURTROOM DEPUTY:**  Do you solemnly swear that

22   the testimony you're about to give in this case shall be

23   the truth, the whole truth, and nothing but the truth, so

24   help you God?

25         **THE WITNESS:**  Yes, ma'am.

1              **COURTROOM DEPUTY:**  Would you please state your

2    name for the record.

3              **THE WITNESS:**  Gregory McLaughlin.

4                    **GREGORY MCLAUGHLIN**

5     **Witness, having first been duly sworn, testified on**

6                    **DIRECT EXAMINATION**

7    BY MR. HOGUE:

8    **Q.**    Good afternoon, Warden McLaughlin.

9    **A.**    How you doing, sir.

10   **Q.**    Good.  Where are you a warden?

11   **A.**    Macon State Prison in Oglethorpe, Georgia.

12   **Q.**    How long have you been the warden there?

13   **A.**    July the 5th will be four years.

14   **Q.**    So July 5th, 2010 is when you started?

15   **A.**    Yes.

16   **Q.**    All right.  You're familiar with the case that

17   you're here about now, right?

18   **A.**    Well, you know, there are several cases.  So you

19   tell me which one you're talking about.

20   **Q.**    The one involving these men right here, including

21   my client, Derrick Wimbush?  You know why you're here?

22   **A.**    Oh, yeah, oh, yes.

23   **Q.**    All right.  Do you recall ever receiving a subpoena

24   or a request from the government made to you for records

25   that the prison keeps, if they do, regarding time sheets

1    on CERT members?  Do you ever remember that?  Not the

2    recent one from me, but earlier from anyone else?

3    **A.**    No.  The first subpoena I seen was yesterday.

4    **Q.**    Okay.  So you don't have any memory of any prior

5    subpoenas for records, like time sheets?

6    **A.**    No.  There was a subpoena that was sent to me that

7    said I was supposed to be here Monday and I really don't

8    know who it was from because my administrative assistant

9    handled it, but I understand that it wasn't served to me

10   personally so I didn't have to show up.

11   **Q.**    Okay.  After that one, did you get a subponea

12   personally served on you?

13   **A.**    Yesterday, yes, sir.

14   **Q.**    Yesterday?

15   **A.**    Yes, sir.

16   **Q.**    And that subpoena requested what, do you remember?

17   **A.**    Time sheets.  Yes, sir.

18   **Q.**    All right.  Did it request other stuff too?

19   **A.**    It did -- I have the piece of paper in my pocket.

20   Can I look at it?

21   **Q.**    You sure can.  Go ahead and look at it.

22   **A.**    All right.  Do you want me to read it?

23   **Q.**    What all did it request that you bring to court

24   today?

25   **A.**    Can I read it verbatim?

1    **Q.**    You may.

2    **A.**    All right.  Bring with you any document by whatever

3    name that reflects the entry and exit times of employees

4    through the main gate, through the administration

5    building, and into the prison, to include CERT members on

6    the following dates, October 25th, 2010, October 28th,

7    2010, December the 14th, 2010, and December the 16th,

8    2010.

9    **Q.**    Well, let's stop there.

10   **A.**    Yes, sir.

11   **Q.**    There's three of them, but let's take them one at a

12   time.  So what do you understand request number one to be

13   asking you to bring to court today?  Just to sum it up,

14   what it's looking for?

15   **A.**    Time sheets and anything --

16   **Q.**    No, no.  Number one, just number one.

17   **A.**    Number one.  Bring with you a document of whatever

18   the name reflects the entry and exit times of employees

19   through the main gate.

20   **Q.**    And do you have any of those?

21   **A.**    No.

22   **Q.**    Do you know why?

23   **A.**    Because we don't sign in at the front gate.

24   **Q.**    Oh, okay.  All right.  So go on to number two.

25   **A.**    October 20 --  number two.  Bring with you any time

1    sheets by whatever name that reflects the times when CERT

2    members sign in and out and indicating that they are on

3    duty for the following dates, October 25th, 2010;

4    October 28th, 2010; December 14th, 2010; and

5    December 16th, 2010.

6    **Q.**    Now, you were able to find those?

7    **A.**    My administrative secretary was, yes.

8    **Q.**    All right.  We're going to come back and talk about

9    those, but let's go ahead and wrap up number three first.

10   What does number three on the subpoena request that you

11   bring to court?

12   **A.**    Bring with you any video recording of parking lot,

13   entrance area, or administrative entrance area that would

14   show the arrival and departure of employees for the

15   following dates, October 25th, 2010; October 28th, 2010;

16   December 14th, 2010; and December 16th, 2010.

17   **Q.**    Did you bring any videos?

18   **A.**    No.  I don't have any videos.

19   **Q.**    And do you know why?

20   **A.**    Because we don't video the parking lot.

21   **Q.**    Okay.  All right, let's go back to number two then.

22   You say your assistant collected those time sheets for

23   you?

24   **A.**    Yes.

25   **Q.**    And did you bring them with you?

1    **A.**    Yes.

2    **Q.**    All right.  Do you have them in your pocket?

3    **A.**    Yes, sir.

4    **Q.**    Let me put an exhibit sticker on those.

5          **MR. CHRISTIAN:**  Mr. Hogue, do you want to use a

6    clean copy of what you e-mailed me last night?

7          **MR. HOGUE:**  Well, I'll use the ones he brought,

8    but I'm going to take the cover email off of it.

9          **MR. CHRISTIAN:**  Can I see what he brought then?

10         **MR. HOGUE:**  You can keep that.

11   **Q.**    **BY MR. HOGUE:**  All right.  I'm going to mark this

12   as Wimbush 11.  Warden McLaughlin, do you recognize what

13   those are, what you brought with you to court today?

14   **A.**    Yes, sir.

15   **Q.**    And what are they?

16   **A.**    They're copies of Officers Wimbush, Officers

17   Delton, and Officer Ronald Lach, and Officer Tyler

18   Griffin's time sheets.

19   **Q.**    Okay.  They're time sheets.  Are you familiar with

20   the use of time sheets in the prison for CERT members?

21   **A.**    Yes, sir.

22   **Q.**    And are CERT members on salary or hourly?

23   **A.**    Salary.

24   **Q.**    Salary?

25   **A.**    Yes, sir.

1    Q.    What's your understanding of why time sheets are

2    required therefore?

3    A.    Therefore this is how we get paid, and this is the

4    time that we enter, we have to account for the time that

5    we enter and exit the institution whenever we're there.

6    Q.    Okay.  Now, we'll get to what you're looking at and

7    show the jury in a minute, but is this a form that's

8    produced in the prison and it's got boxes that the

9    employee fills in?

10   A.    Yes, sir.

11   Q.    All right.  So, how -- what length of period is one

12   of those sheets for?  Is it an entire month?

13   A.    28 days.

14   Q.    28 days.  All right.  Go to the ones that relate to

15   Derrick Wimbush.

16   A.    Okay.

17   Q.    There should be two pages in there relating to him,

18   am I right?

19   A.    Yes, sir.

20   Q.    Okay.

21        MR. HOGUE:  And at this point, Your Honor, in

22   light of previous conversations we've had with the

23   government and the Court, I tender these into evidence so

24   I can publish them to the jury.

25        MR. CHRISTIAN:  No objection other than what we

1    discussed previously, Your Honor.

2         **THE COURT:**   Hearing no objection, other than

3    what we've talked about, they are admitted without

4    objection.

5    **Q.**   **BY MR. HOGUE:**   All right.   Warden McLaughlin, I

6    want to take you to the one on Derrick Wimbush for the

7    period 10/16/10 to 11/12/10.   Are you with me?

8    **A.**     Yes, sir.

9    **Q.**     You got that sheet?

10   **A.**     Yes, sir.

11   **Q.**     All right.   I've put -- well, let's go up to the

12   top first.   Do you see it's called split shift,

13   Department of Corrections, and I read the right period,

14   and this one is for Derrick Wimbush, right?

15   **A.**     Yes, sir.

16   **Q.**     And then because it doesn't fit, I'm going to move

17   it around here.   It's got the dates on the left and then

18   you can see various columns going all the way over to

19   comments, type of leave.   What's that column for, the

20   comments column?

21   **A.**     Oh, that's -- I use it for -- we use it for several

22   different things.   One, when we come back to work.   If we

23   leave the work during our regular hours or when we come

24   back to work, we use it for that.   We use it for any

25   special events that we have.   For instance, I use it

1    because like today I'm in court, so I put the time that I

2    came to court and then I go back in the comment slot and

3    I put that I attended federal court today on today's

4    date.

5    Q.    All right.  And you notice this has what appears to

6    be handwriting on it.  Do you have any personal knowledge

7    whose handwriting that is?

8    A.    No, sir.

9    Q.    Typically, though, who fills in a time sheet on a

10   particular employee?

11   A.    Each individual officer.

12   Q.    So would you infer that Derrick Wimbush is the

13   person who wrote on this timesheet?

14   A.    His signature is here, yes, sir.

15   Q.    And there's a signature of supervisor as well?

16   A.    Yes, sir.  Sergeant Hall.

17   Q.    At the bottom?

18   A.    Yes, sir.

19   Q.    What's the purpose of having a supervisor sign a

20   time sheet?

21   A.    So that he or she can verify that those -- this

22   individual actually worked those hours and he did what he

23   said he did.

24   Q.    All right.  All right, let's go to the first two of

25   the four dates we're going to talk about, 10/25/2010.

1    And what time did Derrick Wimbush indicate he started his

2    work day?

3    **A.**    Zero 630.

4    **Q.**    All right.  And what time did he end?

5    **A.**    It appears to be 1830.

6    **Q.**    And probably everybody knows military time, but

7    that would be what?

8    **A.**    6:30 in the evening.

9    **Q.**    And now, what -- what are those letters in the

10   comment section?

11   **A.**    PT?

12   **Q.**    What's PT stand for?

13   **A.**    Physical -- in our world, it's physical training.

14   **Q.**    Okay.  And what is physical training, what does

15   that tell you when you look at it on Derrick Wimbush's

16   time sheet?

17   **A.**    Well, probably I had some officers -- some

18   applicants to come in and apply for a job and he would go

19   out and he would run those officers or those applicants

20   for a PT test, and he's the one that actually does that

21   so.

22   **Q.**    Can everybody hear okay?

23   **A.**    Can they hear me?

24   **Q.**    Just speak up a little bit --

25   **A.**    Okay, I will.

1    **Q.**    -- if you would, Warden.  Were you familiar with

2    that assignment that Derrick Wimbush had, to conduct PT?

3    **A.**    Yes.

4    **Q.**    Were you the one that assigned him to do that among

5    others?

6    **A.**    No.

7    **Q.**    Was he doing that when you -- well, you became

8    warden in 2010.  Did he become the PT instructor at some

9    time during your tenure as a warden?

10   **A.**    That's a good question.  Someone was doing it.  I

11   don't know if it was him.  He might have been doing it

12   before I got there, but during my tenure, he was doing

13   it, yes.

14   **Q.**    And you're familiar with what the PT person does,

15   right?

16   **A.**    Yes.

17   **Q.**    And you said new hires.  Do current guards going to

18   PT training as well, or just new hires?

19   **A.**    The new hires go, and if you're on the tactile

20   squad, you have to do it also, but new hires mostly.

21   **Q.**    Now, are we talking about going to a place and

22   doing calisthenics, running, that sort of stuff?

23   **A.**    Yes.  We go to the Board of Education, which is

24   probably about two miles from the prison.

25   **Q.**    All right.  That was my next question.  So this is

1    conducted off prison grounds?

2    **A.**    Yes.

3    **Q.**    If you had to get in your car and drive back to the

4    prison from the place where you do PT and then get inside

5    the prison and come through the gate and all that,

6    approximately how long would that take?

7    **A.**    Well, it depends on how long the PT -- the training

8    takes because -- it depends.  I mean, it's depending on

9    how many applicants you got that day -- you have that

10    day.

11    **Q.**    Well, my question, though, is just the distance

12    from the BOE track where the training was conducted and

13    say you left and drove to the prison, then came through

14    the gate to get inside the prison to report for duty, if

15    you know, about how long would that take?

16    **A.**    There's a lot that that entail because it's

17    depending on how many people are in front of you because

18    we can only x-ray one person at a time.  We only let one

19    person go through the metal detector at a time.  So I

20    really can't put a time limit on that because it takes --

21    it's a pretty strenuous -- it's pretty strenuous to get

22    inside of the institution.

23    **Q.**    All right.  Do your CERT members, back in 2010, did

24    they carry pagers on them?

25    **A.**    2010, did they carry pagers.  Yes.

1  Q.    So if they were needed at the prison they could be

2  paged to come back to the prison if they were off prison

3  grounds?

4  A.    Yes, when it worked, yes.

5  Q.    When they worked, okay.

6  A.    Yes.

7  Q.    All right.  Well, let's go back.  Do you remember

8  typically when PT would start each day?

9  A.    Usually between -- we try to start at eight, but

10  sometimes it don't get started til about nine o'clock in

11  the morning.  It's depending on how many applicants we

12  got, it's depending on how long it takes those guys to

13  fill out the paperwork, so usually about nine o'clock.

14  Q.    Okay.  And do you know, would it last the same

15  amount of time every time, or would it vary on how many

16  people were in PT?

17  A.    It varies.

18  Q.    All right.  So is it fair to say then that "PT" in

19  that notation column would indicate that Derrick Wimbush

20  was at PT?  Assuming it's true, that if he put "PT," he's

21  at PT training at the BOE track?

22  A.    He's never lied to me.

23        MR. CHRISTIAN:  Objection, Your Honor.

24        THE COURT:  And the objection is?

25        MR. CHRISTIAN:  He's asking if he knows what

1    this notation means in terms of what actually happened

2    that day.  If he's got some basis for personal knowledge,

3    that's fine, but -- I mean, he can describe the documents

4    certainly.

5              **THE COURT:**  Right.  And he's told us what's on

6    the document.  I don't know that he can say much more

7    than that.  And he described generally what his

8    understanding of the activity would is.

9              **MR. HOGUE:**  All right.  I'll move on.

10   **Q.**   **BY MR. HOGUE:**  So go to 10/28/10, and what time

11   does it indicate that Derrick Wimbush reported for duty?

12   **A.**    Zero 630 to 1900, which is seven o'clock that

13   evening.

14   **Q.**    And does that column also have PT in it?

15   **A.**    Yes, sir.

16   **Q.**    All right.  Go to the next page for the next pay

17   period and look at the top and tell the jury what pay

18   period we're about to look at?

19   **A.**    12/11 -- December 11th, 2010, date ended January

20   1st, 2007 -- January 1st -- January the 7th, 2011, I'm

21   sorry.

22   **Q.**    Okay.  You can see on my copy on the monitor -- and

23   this is showing up everywhere, I presume, right?  Okay.

24   12/14/10, what time does it indicate Derrick Wimbush

25   started work that day?

1    **A.**    0730.

2    **Q.**    Were you at the prison when Deputy Warden Hinton

3    was assaulted by Mario Westbrook?

4    **A.**    Yes.

5    **Q.**    Do you remember the day that happened?

6    **A.**    12/14/2010.

7    **Q.**    Okay.  Let's go across.  It looks like he took a

8    meal start and end time and wrote that in, right, on

9    12/14/10?

10   **A.**    Yes, sir.

11   **Q.**    Okay.  And an end time is what?

12   **A.**    1630 which is 4:30.

13   **Q.**    4:30 p.m.?

14   **A.**    Yes, sir.

15   **Q.**    And let's go to the comments column.  Can you read

16   that?

17   **A.**    Come back -- came back at 2000 hours to 2230 hours

18   which was eight o'clock to 10:30 hours.

19   **Q.**    All right.  Thank you, sir.  Now, go down to

20   12/16/10, start time?

21   **A.**    0745.

22   **Q.**    And it has a meal time and an end time?

23   **A.**    1900 hours, which is seven o'clock.

24   **Q.**    And in the comments column, what does it indicate?

25   **A.**    PT.

1          **MR. HOGUE:**  Your witness.

2          **MR. PATE:**  Your Honor, I do have a few

3    questions on direct.

4          **THE COURT:**  All right.

5                    **DIRECT EXAMINATION**

6    BY MR. PATE:

7    **Q.**    Good afternoon, Mr. McLaughlin.

8    **A.**    How you doing, sir?

9    **Q.**    I'm doing well.  I represent Tyler Griffin.  Do you

10   remember Tyler?

11   **A.**    No, I really don't.

12   **Q.**    Okay.  All right.  Do you still have those

13   documents in front of you, the time sheets?

14   **A.**    Yes, sir.

15   **Q.**    I'm going to ask you a few questions about the time

16   sheets that have his name on it.  Can you turn to those?

17   I believe those are the last two pages.

18   **A.**    Yes, sir.  Okay.

19   **Q.**    I'll also do this so you can see it.

20   **A.**    That's too close.

21   **Q.**    The first page that deals with Mr. Griffin, does it

22   appear to be similar to the time sheets for other CERT

23   officers?

24   **A.**    The first sheets --

25   **Q.**    I guess my question is, there are two pages for

1    Mr. Griffin; is that correct?

2    A.    Yeah.  Okay, I'm on the first sheet now.  Yes, sir.

3    Q.    Okay.  Does the first sheet indicate that Mr.

4    Griffin is on the CERT team during this period of time?

5    Does it indicate at the top that it's a split shift time

6    sheet?

7    A.    Yes.  It indicates that it's a split shift time

8    sheet, but I'm trying to recall Griffin on the split

9    shift.  I just don't --

10   Q.    All right.  How about down at the bottom?  Does it

11   show who his supervisor was?

12   A.    Yeah, that appears to be -- it appears to be

13   Sergeant Hall.  That's what I was looking at, so, yes.

14   Q.    Okay.  And what would that indicate to you?

15   A.    That he was a part of the CERT team.

16   Q.    Okay.  What do the X's designate on these time

17   sheets?

18   A.    Days off.

19   Q.    Days off?

20   A.    Yes, sir.

21   Q.    Let me ask you to flip to that second page for Mr.

22   Griffin, if you will.

23   A.    Okay.

24   Q.    And let me first ask you, at the top of that page,

25   I see a different designation.  What designation is at

1    the top of the second sheet for Mr. Griffin?

2    **A.**    First shift AQ.

3    **Q.**    And what does that indicate to you?

4    **A.**    That he no longer works on split shift, that he now

5    works on a different shift.

6    **Q.**    Okay.  I also see quite a number of X's on this

7    sheet as well with no times.  What does that indicate to

8    you?

9    **A.**    That he did not start first shift at that

10   particular -- on those particular -- he did not work

11   first shift on those particular dates.

12   **Q.**    Okay.  Do you have any reason based on your

13   knowledge today or your review of these records as to

14   why?

15   **A.**    No.

16   **Q.**    Do you have any independent recollection as to why

17   Mr. Griffin went from the CERT team to a regular shift?

18   **A.**    No.

19           **MR. PATE:**  That's all I have, Your Honor.

20           **THE COURT:**  Any other direct?  All right, Mr.

21   Christian, you may cross.

22           **MR. CHRISTIAN:**  Thank you, Your Honor.

23   Mr. Pate, can I have a copy of that exhibit?

24           **MR. PATE:**  It's not the exhibit --

25           **MR. CHRISTIAN:**  It's not?  Is the exhibit still

1   up there?  Where's the copy Mr. Hogue was showing?

2         **MR. HOGUE:**  On the screen was mine, but he's

3   got the original.

4         **MR. PATE:**  I've just got two sheets.

5         **MR. CHRISTIAN:**  Okay.  That's the original

6   then?  May I approach, Your Honor?

7         **THE COURT:**  You may.

8                    **CROSS EXAMINATION**

9   **BY MR. CHRISTIAN:**

10  **Q.**   The version that you have here doesn't have the

11  highlights that Mr. Hogue was showing, correct?  You saw

12  the highlighted dates?

13  **A.**   I didn't have any highlight dates.

14  **Q.**   Okay.  So that was on Mr. Hogue's copy?

15  **A.**   I guess.

16  **Q.**   Okay.

17         **THE COURT:**  Mr. McLaughlin, do remember to

18  speak up.

19         **THE WITNESS:**  Yes, sir.

20  **Q.   BY MR. CHRISTIAN:**  The time sheets that are on

21  here, you mentioned they were signed by Chris Hall?

22  **A.**   Yes.

23  **Q.**   He was the CERT sergeant, the supervisor, right?

24  **A.**   Yes.

25  **Q.**   So in order to determine what time somebody was at

1    actually at work, a CERT officer, you would look at the

2    time sheet which would be signed by the officer and

3    signed by the CERT sergeant?

4    **A.**    Correct.

5    **Q.**    Any other way to verify what time those folks were

6    actually there?

7    **A.**    No.

8    **Q.**    So it's just those two guys sitting down and

9    writing down, this is the time that I was here?

10   **A.**    And that's what they do and then they send it to

11   personnel, right.

12   **Q.**    Right.  But no other verification other than that?

13   **A.**    Just those two individuals, yes.

14   **Q.**    No time clock, no time card?

15   **A.**    No, sir.

16   **Q.**    You said you didn't have knowledge of a government

17   request for these time sheets, these payroll sheets,

18   right?

19   **A.**    I did.

20   **Q.**    That was your answer?

21   **A.**    You're right.

22        **MR. CHRISTIAN:**  May I approach with

23   Government's 130, Your Honor?

24        **THE COURT:**  You may.

25   **Q.**    **BY MR. CHRISTIAN:**  Sir, do you know what

1    Government's 130 is?

2    **A.**    It appears to be a subpoena to testify before the

3    grand jury.

4    **Q.**    Who is the subpoena addressed to?

5    **A.**    Custodian of records, Macon State Prison.

6    **Q.**    What's the date of the subpoena?

7    **A.**    9/27/2012.

8    **Q.**    And if you could turn to page two, the fifth

9    paragraph, and tell us what was requested in 2012 from

10   Macon State Prison?

11   **A.**    The fifth paragraph?

12   **Q.**    Yes, sir.

13   **A.**    Any and all Macon State Prison payroll records for

14   employees serving on October 25th, 2010 and December the

15   14th, 2010, and December 16th, 2010 *(reading)*.

16   **Q.**    And are those the dates you just discussed with Mr.

17   Hogue?

18   **A.**    Yes.

19           **MR. CHRISTIAN:**  Your Honor, I would ask to

20   approach with Government's 48, 50, 51, 59 and 64.

21   *(Counsel Aside)*

22           **MR. CHRISTIAN:**  Your Honor, may I approach?

23           **THE COURT:**  You may.

24   **Q.**   **BY MR. CHRISTIAN:**  Have you had a chance to look at

25   those generally?  I'm going to take each one up in turn.

1    **A.**    Okay.  I'll wait on you then.

2    **Q.**    Okay.  Thank you.  Government's Exhibit Number 48,

3    who is that witness statement from?

4    **A.**    Delton Rushin.

5    **Q.**    What's date of that?

6    **A.**    10/25/2010.

7    **Q.**    What's the incident that it involves?  Or the

8    inmate?

9    **A.**    Franklin Jones.

10          **MR. CHRISTIAN:**  Your Honor, I would move to

11   admit Government's Exhibit 48.

12          **MR. FOX:**  That's fine.

13          **THE COURT:**  It's admitted without objection.

14   **Q.**   **BY MR. CHRISTIAN:**  Can you turn to number 50.

15   **A.**    Yes, sir.

16   **Q.**    Who is that witness statement from?

17   **A.**    Ronald Lach.

18   **Q.**    What is the date of that statement?

19   **A.**    1/25/2010.

20   **Q.**    What's it in reference to?  Is it 1/25 or 10/25?

21   **A.**    1/25/2010.

22   **Q.**    What's it in reference to?

23   **A.**    Franklin Jones.

24          **MR. CHRISTIAN:**  Your Honor, I would move to

25   introduce Government's Exhibit Number 50.

1        **MS. GOMEZ:**  No objection.

2        **THE COURT:**  It's admitted without objection.

3        **MR. CHRISTIAN:**  And since that document has a

4   date of 1/25, Your Honor, may I approach with 50-A?

5        **THE COURT:**  You may.

6   **Q.**   **BY MR. CHRISTIAN:**  Warden, what is 50-A?

7   **A.**   A witness statement.

8   **Q.**   Who's it from?

9   **A.**   Ronald Lach.

10  **Q.**   What's the date?

11  **A.**   10/25/2010.

12  **Q.**   Does it appear to be consistent with the one that

13  was dated 1/25/2010 that was typed?

14  **A.**   Verbatim.

15  **Q.**   Verbatim?

16  **A.**   Yes, sir.

17       **MR. CHRISTIAN:**  Your Honor, I would move to

18  introduce Government's Exhibit Number 50-A.

19       **MS. GOMEZ:**  No objection, Your Honor.

20       **THE COURT:**  It's admitted without objection.

21  **Q.**   **BY MR. CHRISTIAN:**  Warden, what is Government

22  Exhibit Number 51?

23  **A.**   Derrick Wimbush, witness statement.

24  **Q.**   What's the date?

25  **A.**   10/25/2010.

1    Q.    What incident is it in reference to?

2    A.    Franklin Jones.

3          MR. CHRISTIAN:  Your Honor, I would move to

4    introduce Government's Exhibit Number 51.

5          MR. HOGUE:  No objection.

6          THE COURT:  It's admitted without objection.

7    Q.    BY MR. CHRISTIAN:  Warden, what is number 59?

8    A.    Witness statement.

9    Q.    Who's it from?

10   A.    Christopher Hall.

11   Q.    What is the date?

12   A.    10/29/2010.

13   Q.    What is it in reference to?

14   A.    Carlos -- Sergeant Carlos Felton.  This is where he

15   escorted Sergeant Carlos Felton to medical for treatment

16   for injuries.

17         MR. CHRISTIAN:  Your Honor, I would move to

18   introduce Government's Exhibit Number 59.

19         MR. JARRARD:  No objection.

20         THE COURT:  It's admitted without objection.

21   Q.    BY MR. CHRISTIAN:  Number 64, Warden, last one?

22   A.    Witness statement.

23   Q.    Who's it from?

24   A.    Christopher Hall.

25   Q.    What is the date?

1    **A.**    12/15/2010.

2    **Q.**    What's it in reference to?

3    **A.**    Mario Westbrook and Deputy Warden James Hinton.

4           **MR. CHRISTIAN:**  Your Honor, I would move to

5    admit Government's Exhibit Number 64.

6           **MR. JARRARD:**  No objection.

7           **THE COURT:**  It's admitted without objection.

8           **MR. CHRISTIAN:**  Thank you, Warden.

9           **THE COURT:**  Any redirect?

10          **MR. HOGUE:**  No, Your Honor.

11          **THE COURT:**  Mr. Pate?

12          **MR. PATE:**  No, Your Honor.

13          **THE COURT:**  May this witness be excused?

14          **MR. HOGUE:**  He may, Your Honor.

15          **THE COURT:**  Thank you, Warden.  You are

16   excused.

17          **THE WITNESS:**  Thank you, sir.

18          **THE COURT:**  Mr. Hogue?

19          **MR. HOGUE:**  Warden McLaughlin, you don't have

20   the exhibit in your hand, do you?

21          **THE WITNESS:**  No, sir.

22          **MR. HOGUE:**  All right.  Good deal.

23          **THE COURT:**  Okay, yeah, don't run away with

24   anything that's got a yellow sticker on it.

25          **THE WITNESS:**  I gave it to him, Your Honor.

1      **MR. HOGUE:**  Your Honor, on behalf of Derrick

2    Wimbush, we rest.

3          **THE COURT:**  Thank you.  Mr. Pate?

4      **MR, PATE:**  Your Honor, I just have to tender

5    two documents we had previously provided to the

6    government.  Defendant's Exhibit Griffith 3 and Griffith

7    4 which are pages from his personnel file.

8          **MR. CHRISTIAN:**  No objection, Your Honor.

9          **THE COURT:**  They are admitted without

10    objection.

11          **MR. PATE:**  And with that, we rest.

12          **THE COURT:**  Mr. Wolfe, I believe you did not

13    have anything further at this point?

14          **MR. WOLFE:**  No.  Thank you, Judge.  We rest.

15          **THE COURT:**  Any further evidence from the

16    defense?  I appreciate y'all working out the order of

17    things.  All right.  Ladies and gentlemen, the defendants

18    have rested their case.  Does the government have

19    rebuttal?

20          **MR. CHRISTIAN:**  No, Your Honor.  The government

21    rests.

22          **THE COURT:**  Well, ladies and gentlemen, the

23    evidence is closed.  I told you we were doing our best to

24    move things expeditiously, and it's also close to 3

25    o'clock.  We've still got a lot more that we need to do.

1        I'm going to let you go to jury room, but I'm going

2    to ask you to hang around for just a few minutes, long

3    enough for me to discuss some scheduling issues with the

4    lawyers so that I can tell you when to be back tomorrow.

5        Remember my instructions overnight.  Do not allow

6    yourselves to come into contact with any information

7    whatsoever about the case.

8        And even though the parties have rested as far as

9    the evidence is concerned, you don't have the case yet.

10   You'll have to be charged as to the law and you'll have

11   to hear the closing arguments of the lawyers.  So it's

12   not time to start deliberating.  It's not time to start

13   talking about the case.  That will come soon enough.

14       All right.  You can go to the jury room and give us

15   just a few minutes to let you know about scheduling.

16   *(Jury Excused)*

17           **THE COURT:**  All right.  Everybody's had enough

18   time to look at the draft charge I sent around?  That was

19   a joke.

20           **MR. CHRISTIAN:**  Too late in the day for jokes.

21           **THE COURT:**  Obviously we've got a lot to talk

22   about -- well, we've got some to talk about as far as the

23   charges concerning.  What has been e-mailed to you is a

24   rough draft of where we are, not at all to suggest a

25   final draft.  I'm open to suggestions at this point about

1    how you want to try and schedule -- I want to have a

2    meaningful charge conference, obviously.  The

3    government's thoughts on that?

4         **MR. CHRISTIAN:**  I guess just an opportunity to

5    print it out, Your Honor.  Get a chance to read over it

6    one time, and then I'm happy to meet then.

7         **THE COURT:**  Any defendants' thoughts about it?

8    One option is to break for a while and come back and do

9    our charge conference, and then we can bring the jury

10   back in the morning and do closing, and move on.

11       And it is -- I know you've been here since early

12   this morning, but it's still just three o'clock.  I tend

13   to think that's probably the -- certainly that's the best

14   use of the jury's time for us to do the charge

15   conference, take about an hour break, do that, and

16   hopefully get it done.  Any objection to that?

17       **MR. CHRISTIAN:**  Not for the government.

18       **THE COURT:**  All right.  Then, Ms. Hatcher, tell

19   the jury to be back at eight o'clock in the morning, or

20   be ready to go by eight o'clock in the morning.

21       I believe that I have followed up only with Mr. Hall

22   with regard to testifying.  Am I correct about that?

23   Mr. Hinton, would you please stand, sir.  Do you recall

24   the discussion we had earlier about your right to testify

25   or not?

1      THE DEFENDANT:  Yes, Your Honor.

2      THE COURT:  Your attorney has announced that he

3  has rested his case, and, of course, you have not been

4  called to testify.  I assume that's your decision, that

5  you do not wish to testify?

6      THE DEFENDANT:  Yes, sir.

7      THE COURT:  Thank you, sir.  Mr. Lach, you as

8  well have seen that your attorney has rested.  You have

9  not testified.  Is that your decision that you do not

10  wish to testify?

11      THE DEFENDANT:  Yes, sir.

12      THE COURT:  Thank you, sir.  Mr. Rushin, your

13  attorney has announced that he has rested without calling

14  you as a witness.  Is that your decision, you do not wish

15  to testify?

16      THE DEFENDANT:  Yes, sir.

17      THE COURT:  Thank you, sir.  Mr. Wimbush, you

18  as well, now that your attorney has announced that he is

19  resting his case -- your case, is it your decision you do

20  not wish to testify?

21      THE DEFENDANT:  Yes, sir.

22      THE COURT:  Thank you, sir.  Mr. Griffin, would

23  you please stand?  Mr. Pate has rested his case on your

24  behalf.  You have not testified.  Is that your decision?

25      THE DEFENDANT:  Yes, Your Honor.

1          **THE COURT:**  You do not wish to testify?

2          **THE DEFENDANT:**  Yes, sir.

3          **THE COURT:**  Thank you, sir.  Other than the

4    charge conference, any other -- and we'll be back in an

5    hour.  But at the moment, any other business we need to

6    discuss?

7          **MR. CHRISTIAN:**  We have an issue with the

8    certified conviction for Terrance Dean.

9          **MR. JARRARD:**  Terrance Dean.  Your Honor, and I

10   sent the proposed redactions to the government.  I think

11   they need to respond.  They've been tendered, so I think

12   we can get that accomplished.

13         **THE COURT:**  Yeah, and hopefully there will be

14   no issue amongst y'all with regard to working that out.

15   Certainly at some point everybody has got to get together

16   with the evidence and make sure we've got that right and

17   the exhibits.  All right.  Let's reconvene at four

18   o'clock.

19   *(RECONVENED; ALL PARTIES PRESENT)*

20         **THE COURT:**  I would proposed that we first look

21   at the draft charge and then address what's not in the

22   draft charge among your requested charges.  Does anybody

23   see any problem with proceeding in that fashion?  All

24   right.  We're informal.  As long as the court reporter is

25   able to pick you up, you don't have to stand.  Your

1  clients are certainly welcome to stay, but that's

2  entirely up to you and your clients.

3       The preliminary charges pages one through seven.

4  Anybody have -- the character charge which is now at the

5  end will be moved to this section of the charge.  But any

6  issues about the preliminary charges on those pages?

7       Hearing none, at page eight, there's just a

8  general discussion what I call Introductions.

9       **MR. JARRARD:**  Your Honor?

10      **THE COURT:**  Yes, sir?

11      **MR. JARRARD:**  Count 2 -- on page eight where

12  the Court says:  Count 2 charges that Defendant Hall, et

13  cetera.  I think that should actually say though

14  specifically that they deprived Terrance Dean of his

15  constitution right.  Dean is the only inmate mentioned in

16  Count 2, not inmates.

17      **THE COURT:**  I think that's right.

18      **MR. FOX:**  In that vein, Your Honor, I believe

19  substantive offenses would become substantive --

20      **THE COURT:**  We still need to pick you up, Mr.

21  Fox.

22      **MR. FOX:**  Sorry about that.  I believe the

23  substantive offenses with regard to Count 2 would be

24  substantive offense.

25      **MR. CHRISTIAN:**  The government agrees Your

1    Honor.

2           **THE COURT:**  What is called a substantive

3    offense, specifically that they deprived --

4           **MR. JARRARD:**  -- Terrance Dean of his --

5           **THE COURT:**  -- Terrance Dean of his

6    constitutional right.

7           **MR. CHRISTIAN:**  And then the last sentence

8    should be also changed.

9           **THE COURT:**  Yeah, this substantive offense.

10   All right.  Page nine, "on or about" and "knowingly."

11   Any issues there?  Hearing none, page ten, multiple

12   defendants, multiple counts?  All right.

13          **MR. WOLFE:**  Excuse me, Judge, can I say one

14   thing?

15          **THE COURT:**  Yes, sir.

16          **MR. WOLFE:**  In that regard -- and it has

17   nothing to do with your charge.  But I presumed that the

18   charge would go out and with regard to the verdict form

19   it says, the United States of America versus James

20   Hinton, et al.?  I appreciate that everybody's name would

21   on the caption.  And I just mentioned it now because you

22   said multiple.

23          **THE COURT:**  Yes.  We really don't even need a

24   caption, but we'll either take out the caption or we'll

25   add every defendant.

1          **MR. WOLFE:**  Thank you.

2          **THE COURT:**  All right.  Beginning at page ten,

3    we get into Count 1.  Pages 10, 11, 12, and 13, the first

4    paragraph on 13, are just a recitation of the language of

5    the indictment.  Any issues there?  And then at page 13,

6    we quote the statute and then provide the elements of the

7    offense.  Any issues through there?

8          All right.  Beginning at the bottom of page 13 and

9    through at the middle of 15, there's elaboration of the

10   first element of the offense.  Any questions or comments,

11   criticism?  All right.

12         And then page 15, we address the second element of

13   Count 1, and that goes through the bottom of page 16.

14   This is not word for word for what anybody gave me.  I

15   kind of pushed it together.  I deleted some things that I

16   thought -- I think from the government's request to

17   charge that I just thought didn't need to be included.

18   But if I've left out anything essential, let me know.

19         **MR. CHRISTIAN:**  I'm sorry, Your Honor, what was

20   the last thing you said before that sentence?

21         **THE COURT:**  Well, there was a couple of

22   paragraphs, and I think that it was in this section.  I

23   left my marked up copy -- was this the one I took out?

24   It's was a paragraph "in other words."  Any time I see an

25   "in other words" in a charge, my antennae go up a little

1    bit.  I know I took out at an "in other words" paragraph.

2    It might not have been here.  All I'm saying is I don't

3    think this is word for word what anybody gave me.

4         **MR. CHRISTIAN:**  And this is still -- we're are

5    on the second element?

6         **THE COURT:**  We're on the second element.  And

7    then the third element begins at bottom of page 16, and

8    that continues to the bottom of page 18 where there's a

9    paragraph about the overt act, which, of course, are

10   treated different under Count 1 than they are under Count

11   3 for reasons I don't entirely understand, but that's the

12   way it is.

13       Now, I lean to perhaps being somewhat duplicative

14   with things like co-conspirators' conducts and statements,

15   and, unindicted, unnamed co-conspirators.  That will be

16   repeated in Count 3.  Is that right, Nicole?

17       **LAW CLERK:**  Yes, sir, I think so.

18       **THE COURT:**  Just for the sake of clarity I did

19   it that way, but if anybody sees a problem with that, let

20   me know when we get to Count 3.  So any questions through

21   page 20, the middle of page 20, which covers the charge

22   on Count 1?

23       Count 2, the discussion of that begins on page 20.

24   It gives the elements and then the discussion of the

25   elements, the first element, begins on page 22.  A minor

1    thing I noted the pattern charge says "under color of

2    state law."  Nobody requested that.  I don't see that it

3    is an issue.  We just say "under color of law," which was

4    what was in the requested charges.

5          The second element discussion begins on page 22.

6    There's some shaded language on page 23.  Was that Mr.

7    Jarrard's comment, or was that the government's comment?

8          **LAW CLERK:**  I'm not sure.  I know you had a

9    question about it.

10         **THE COURT:**  Well, look at that shaded language.

11         **MR. JARRARD:**  I'm pretty sure I didn't ask for

12   that to be included, if that's what you're asking, Judge.

13   So it must have been the government.

14         **THE COURT:**  I think my question was whether or

15   not it's necessary.  I see defendants shaking their

16   heads.

17         **MR. FOX:**  Your Honor, I believe in light of the

18   remaining language that you have in this that it would

19   not be.

20         **MR. JARRARD:**  Yeah, and I may have raised the

21   issue as I didn't think it ought to be included.

22         **THE COURT:**  Right.  Does the government have

23   any strong feelings if I take that language out?

24         **MR. CHRISTIAN:**  I think it should be included,

25   Your Honor.  And the questions about need for application

1    of force, I mean, I think that's directly on point.

2           **THE COURT:**  Well, it is, but we've got ample

3    instruction in several places of the charge about

4    appropriate use of force.  Was that in the pattern?

5           **LAW CLERK:**  It's not in the criminal.

6           **THE COURT:**  This language came from the civil

7    pattern charge.  The pattern charges aren't the best in

8    the world in the Eleventh Circuit on this area.  I've

9    just been put on that committee.  We haven't tackled this

10   yet.

11          **MR. CHRISTIAN:**  I've used it in other criminal

12   civil rights cases, but I believe it's appropriate here

13   particularly with respect to the need for the application

14   of force and the extent of the threat, if any, had been

15   posed.

16          **THE COURT:**  Well, I'll go back and look at that

17   some more.  I'm still thinking about that.

18          **MR. JARRARD:**  Your Honor, I do think if -- one,

19   I think it ought to be taken out, but if it's not, I

20   think it needs to be modified to not to refer to

21   Mr. Dean.  I mean, I think the factors could be set out

22   without the reference specifically to Mr. Dean.  I mean,

23   if the Court is just saying these are factors to

24   consider -- now, again, I start with I think it ought to

25   be stricken.

1          **THE COURT:**  Well --

2          **MR. JARRARD:**  For instance -- well, I didn't

3    want to interrupt you, Your Honor.  I can tell you what

4    my "for instance" is.

5          **THE COURT:**  Well, go ahead.

6          **MR. JARRARD:**  Again, I think it ought to come

7    out completely, but as a fallback, for instance, it

8    should say the extent of the injury inflicted upon the

9    individual, the extent of the threat, if any, the

10   individual posed.

11         **THE COURT:**  Well, I think that it's probably

12   appropriate to reference Mr. Dean.  I do think it needs

13   to say the extent of "any injury" inflicted upon

14   Mr. Dean.

15         **MR. CHRISTIAN:**  Your Honor, the language that's

16   included in the government's proposed instruction that's

17   adopted here, comes straight from *Whitley v. Albers*, a

18   Supreme Court case in 1986.  475 U.S. 312, at 320 to 21.

19         **THE COURT:**  And what was that case?

20         **MR. CHRISTIAN:**  *Whitley v* --

21         **THE COURT:**  No, I mean, criminal or civil?

22         **MR. CHRISTIAN:**  I don't recall off the top of

23   my head unfortunately.

24         **THE COURT:**  If it was *Whitley v. Albers*, it

25   wasn't a federal criminal prosecution.

1        **MR. CHRISTIAN:**  I don't think so.  Albers,

2    A-L-B-E-R-S.

3        **THE COURT:**  Okay.  Well, I'll take a look at

4    that.

5        **MR. CHRISTIAN:**  Thank you.

6        **THE COURT:**  All right.  And then the third

7    element is on page 24, and it goes through page 25, the

8    first two paragraphs.  Any comments, questions, or

9    criticisms about that?

10        All right.  Then the final element begins at page 25

11    and goes through the middle of page 26.  We will put a

12    heading there, by the way, for Count 3.  And, by the way,

13    sometimes I take the headings out, what I give the jury.

14    I've taken a lot of the headings out, but I've left some

15    in, and I've done that on purpose.  With a charge like

16    this, I think it would be better for them to have vanilla

17    headings, and we will put a heading at page 26 for Count 3.

18        **MR. CHRISTIAN:**  Your Honor, the only thing I

19    would say, at the bottom of page 25, the last sentence?

20        **THE COURT:**  All right.

21        **MR. CHRISTIAN:**  Bottom of page 25 onto the

22    first line of page 26.  It says:  The defendants' acts

23    are the direct, immediate, or sole cause of bodily

24    injury?

25        **THE COURT:**  Yeah.

1      **MR. CHRISTIAN:**   There's a Supreme Court case

2   Burrage, B-U-R-R-A-G-E.   I don't have the cite on me at

3   the moment, unfortunately, but I believe that under that

4   case, it would strike the words "direct" and "immediate."

5   So the sentence would be:   The defendants' acts were the

6   sole cause of bodily injury.

7           **THE COURT:**   All right.   Well, we can find that

8   case.

9           **MR. CHRISTIAN:**   And it's B-U-R-R-A-G-E, I

10   believe.

11           **THE COURT:**   I'm not sure why direct or

12   immediate -- I don't know what it adds.

13           **MR. CHRISTIAN:**   That's my --

14           **THE COURT:**   I see the point.

15           **MR. CHRISTIAN:**   That's my understanding of that

16   case, but I don't know the rationale behind striking or

17   including those two words.

18           **THE COURT:**   All right.   I'm sure we can find

19   that case.   I mean, is direct and immediate supposed to

20   suggest anything other than sole cause?   I guess that's

21   the question.   If it's not, then it's clearly

22   unnecessary.   If it is, then what is it?   We'll see if we

23   can run that down.

24       All right, Count 3, pages 26 through 30 simply

25   recites the pertinent portions of the indictment.

1          **MR. WOLFE:**  Judge?

2          **THE COURT:**  Yes, sir.

3          **MR. WOLFE:**  With regard to that, where it says

4     Count 3 of the indictment charges the defendants -- and

5     lists their names -- with a separate conspiracy to cover

6     up abuses.  Actually the indictment -- well, actually

7     1512(b)(3) doesn't include covering up.  1519 does

8     include covering up, but in the indictment where it says

9     what they did pursuant to the Code Sections with regard

10    to 1519 which would be paragraph B, it says:

11         Did knowingly make a false entry with the intent to

12    impede, obstruct, and influence the investigation and

13    proper administration of a matter within federal

14    jurisdiction.

15         Now simply -- I mean, cover up is an element of

16    1519, but they didn't charge it in paragraph B.  They

17    allude to it elsewhere in the language, but with regard

18    to the violation of 1519, obstruct is not there.  So I

19    don't think obstruction has been charged against these --

20    when I say obstruction, I mean cover up.  Cover up.

21    Please excuse me.

22         **THE COURT:**  Well, and you made that point in

23    your objections, and I'm certainly not wedded to this

24    language.  The full language gets explained, and I know

25    what I was looking for was a shorthand way to generally

1    describe the subject of this indictment.  I think that

2    point comes up maybe in another place as well.

3          **MR. JARRARD:**  Why not call it a conspiracy to

4    obstruct as the heading of the count?

5          **MR. CHRISTIAN:**  Your Honor, I think the

6    language tracks the plan and purpose of the conspiracy,

7    the first sentence in the plan and purpose of the

8    conspiracy section of the indictment on page seven?

9          **MR. WOLFE:**  Yeah, but where it says "as charged

10    in the remaining counts of the indictment and

11    incorporated hereof, A, to knowingly engage in misleading

12    conduct with the intent to hinder, delay, and prevent the

13    communication to a federal law enforcement," and that

14    sort of thing.  But that's 1512, which doesn't have a

15    cover-up component.  1519 does in the code section, but

16    it says with regard to 1519, "to knowingly falsify and

17    make a false entry in a document with the intent to

18    impede, obstruct, and influence the investigation," not

19    to cover it up, which is one of the elements of 1519.  So

20    therefore, I don't think they should be allowed to argue

21    that our conduct was to cover it up.

22          **MR. CHRISTIAN:**  That's what the plan and

23    purpose of the conspiracy is on page seven.

24          **MR. WOLFE:**  It's not what the charge is --

25          **MR. CHRISTIAN:**  That's part of the charge.

1      **MR. WOLFE:**  -- in regard to 1519.  They didn't

2  track that language.  In fact, they excluded it.

3          **THE COURT:**  Well, I mean, you're right, the

4  statute uses the word "covers up."  The indictment

5  alleges they made a "false entry," which the statute also

6  uses that word.  Legally does that make a difference,

7  Mr. Wolfe?  I mean, a false entry is a cover-up.

8          **MR. WOLFE:**  Yes.  My argument would be that if,

9  in fact, they're alleging you did something in particular

10  way and you're allowed to put every way in the

11  indictment, and then as long as you prove one

12  unanimously, that's fine.  But if you leave out the very

13  element that's in the code section in the indictment,

14  then that element is not in play.  If you're charged with

15  possessing and manufacturing and possessing with intent

16  to distribute drugs, that's great, but you can't convict

17  somebody of manufacturing if you didn't make that

18  allegation in the indictment even though you could allege

19  each different way.

20          **THE COURT:**  Mr. Christian?

21          **MR. CHRISTIAN:**  Your Honor, it's in the plan

22  and purpose of the conspiracy.  It specifically uses the

23  phrase "cover up" on page seven.  I understand the Court

24  is trying to find a shorthand way of explaining what this

25  count is.  I'm happy if the Court wants to go long form

1    to include the first sentence in the plan and purpose of

2    the conspiracy on page seven that talks about the plan

3    and purpose was to provide false and misleading

4    information about CERT members' assaults on inmates, it

5    identifies the inmates, and then it says "and would cover

6    up other information to ensure that officers involved in

7    the assaults would be shielded from liability *(reading)*.

8         **MR. WOLFE:**  Whether or not you have to include

9    a plan or purpose, whether or not you have to include the

10   overt act that they're convicted of, all that sort of

11   stuff is language that's in the count of the indictment,

12   but the specific language that says which elements of

13   Title 18, Section 1519 have been violated, "cover up" is

14   not alleged.  And I didn't draft it.  I'm just pointing

15   out it that it's not there so now they should not be able

16   to convict based upon it.

17        **THE COURT:**  Well, Mr. Wolfe, if you've got some

18   law that supports that argument, I'll take a look at it.

19        **MR. WOLFE:**  Okay.

20        **THE COURT:**  And I'll look at it as well.  And I

21   guess the point you're making is that the government when

22   it is indicting somebody under this statute has to pick

23   which one --

24        **MR. WOLFE:**  They actually don't.  They can

25   include all of them.

1    THE COURT:  Well, they could, but if they

2    don't -- if they don't include "cover up," but they

3    include "false entry," then they can't argue cover-up.

4    MR. JARRARD:  The question becomes what was the

5    false entry for, and that's fine, but they have not

6    alleged that we made false entries to cover up.  And, I

7    mean, it's -- the language is clear in the code section,

8    and it wasn't included in the indictment.

9    THE COURT:  Well, again, if you've got some law

10   on that, I'll take a look at it.  I don't know that I can

11   read the code section to impose --

12   MR. WOLFE:  It seems like a constructive

13   amendment, but I'll look into it and get you something.

14   MR. JARRARD:  I agree, Your Honor.  And I'll

15   pull the constructive amendment law.  I think that is a

16   constructive amendment.

17   THE COURT:  Well, subject to that, I happen to

18   think that in terms of a generic term to describe the

19   subject matter of Count 3 as used in that introductory

20   paragraph, "cover up" is as good as any.  The plan and

21   purpose does elaborate on that.  So I'll think about

22   that, but that doesn't cause me particular concern.

23   All right.  And then we are -- we covered the overt

24   acts through page 30, top of page 30.

25   MR. CHRISTIAN:  Paragraph seven on page 29,

1   Your Honor?  It's just a typographical error.  It refers

2   to Dean, and then, at one point it refers to him as

3   Inmate TD.

4          **THE COURT:**  The elements for -- at page 30?

5   Any issue there?  The elaboration on the first element of

6   page 31, I note this.  The shaded paragraph -- or, by the

7   way, "either spoken or unspoken" is highlighted because,

8   Mr. Jarrard, you raised an issue as to that.  I think

9   that's the law, but that's the reason that's highlighted.

10          **MR. JARRARD:**  Where at, Your Honor, I'm sorry?

11          **THE COURT:**  I'm at page 31.

12          **MR. JARRARD:**  I'm sorry.  No, I agree with you.

13   If I did, that was -- I don't know what that was about.

14          **THE COURT:**  Okay.  Now, the next paragraph as

15   far I can tell is certainly a correct statement.  It's

16   slightly different wording that was in Count 1.  I point

17   that out.  If anybody sees an issue there, let me know.

18       Then the second element begins at page 32.  And the

19   reason that we've got that "knowingly and willfully"

20   shaded there is only because we got that pattern charge

21   at the beginning on "knowingly," and apparently nobody

22   requested -- isn't "willfully" included in that pattern

23   charge as well?

24          **LAW CLERK:**  Willingly as to joining.  Knowingly

25   as to knowing --

```
1            THE COURT:  No, I mean the --
2            LAW CLERK:  The knowingly -- on or about
3      knowingly, willfully?
4            THE COURT:  Yeah.
5            LAW CLERK:  It's in brackets.  I mean, we can
6      add it.
7            THE COURT:  It's in the pattern?
8            LAW CLERK:  It's in the pattern in brackets.
9      It's optional.
10           THE COURT:  Any reason --
11           MR. JARRARD:  Which pattern, Your Honor?
12           THE COURT:  Well, if you look back at the
13     beginning, "on or about?"
14           MR. JARRARD:  Yes, sir, I see it, and
15     "knowingly."  I don't see "willfully" there.
16           THE COURT:  Right.  And isn't willfully
17     included in that?
18           LAW CLERK:  Yeah, it's probably the same -- -
19           THE COURT:  It's included in that pattern
20     charge.
21           MR. JARRARD:  We do want "willfully" there,
22     Your Honor, and I don't see it in the draft.  Is that --
23           MR. CHRISTIAN:  I think it should be just
24     "knowingly."
25           MR. JARRARD:  The conspiracy counts are
```

1    willfully.

2         **MR. CHRISTIAN:**  I think it's just "knowing

3    participation in the unlawful agreement."  "Knowingly

4    joined in the unlawful agreement."

5         **MR. JARRARD:**  As to Count 3, the conspiracy?

6    Your Honor, it should be knowingly and willfully as

7    listed on page 30 of the second element.

8         **MR. WOLFE:**  Page 33 also says that even a minor

9    person, if you can prove that he willfully joined.

10        **MR. JARRARD:**  But as I understand the law too,

11   conspiracy counts are specific intent counts which are,

12   in other words, willfully.

13        **MR. CHRISTIAN:**  I think the specific intent is

14   just knowing.  It's not accidental or inadvertent

15   participation.

16        **MR. JARRARD:**  I disagree, Your Honor, and I

17   think even the pattern instructions make clear that

18   specific intent is tantamount to willfully.

19        **THE COURT:**  Well, the reason we put the second

20   element shaded is that we noted it was slightly different

21   from the pattern.  What does the pattern say?

22        **MR. JARRARD:**  And in that regard, Your Honor,

23   I'll point out that Count 3 of the indictment alleges

24   willfully, as it must, willfully combined.

25        **THE COURT:**  I'm sorry?

1      **MR. JARRARD:**  Count 3 which we're talking about

2      in the indictment, as it should, alleges willfully

3      combined.  It's page six of the indictment.

4      **THE COURT:**  Let me see what the pattern says --

5      where does the "knowingly" come from?

6      **MR. JARRARD:**  It must come from the government.

7      The two conspiracy counts are willfully.  The other

8      substantive counts, I think, are all knowingly, but the

9      two conspiracy counts were willfully.

10      **MR. CHRISTIAN:**  It's included in the pattern,

11      Your Honor.

12      **THE COURT:**  Pardon?

13      **MR. CHRISTIAN:**  It's included in the pattern.

14      "Knew the unlawful purpose and willfully joined it."

15      **THE COURT:**  Well, that is different than what

16      was requested.  I think this came out of the government's

17      request to charge, which is the way it's stated as page

18      30.

19      **MR. JARRARD:**  And, Your Honor, I think I

20      included on behalf of Mr. Hall a specific intent charge,

21      which I didn't see incorporated in the draft.

22      **THE COURT:**  In answer to the first question,

23      yes, the pattern charge for "on or about, knowingly,

24      willfully" does include a definition of willfully.  But

25      what's the conspiracy element in the pattern charge --

1      the second element in the conspiracy pattern charge?

2            MR. CHRISTIAN:  Knew the unlawful purpose of

3      the plan and willfully joined it.

4            THE COURT:  Any reason why we shouldn't go with

5      the pattern?

6            MR. CHRISTIAN:  No, Your Honor.

7            THE COURT:  All right.  Then we will go with

8      the pattern charge on element two:  "The defendant knew

9      the unlawful purpose of the plan and willfully joined it."

10            MR. JARRARD:  In that regard, Your Honor, I

11      would say then on page 32 you have highlighted at the

12      bottom "you must first find that he?"  I think it should

13      say "knowingly and willfully joined."

14            THE COURT:  Mr. Christian, do you agree with

15      that?

16            MR. CHRISTIAN:  Yes, Your Honor.

17            THE COURT:  And it's at page 32, last

18      paragraph, "did knowingly and willfully."  Do you want to

19      include, then, the pattern charge on willfully back in

20      the preliminary charges?  We've got "knowingly," but

21      nobody requested "willfully" in that pattern.  Should we

22      put that in there now?

23            MR. CHRISTIAN:  I think that would be helpful,

24      Your Honor.

25            THE COURT:  We'll add that.  All right.  The

1    second element of Count 3 continues to page 34.  Any

2    issues there?  All right.  Third element begins on page

3    34 discussing overt acts.  I don't hear any issues there.

4    The fourth element begins at page 35.  Any issues there?

5        All right.  Unindicted, unnamed co-conspirators and

6    then we repeat that, but I tend to think that's better in

7    a lengthy charge like this.  Multiple objects of a

8    conspiracy at page 36.

9        All right.  And then we get into the remaining

10   counts.  First, Counts 4, 5, 6, 7, 8, and 9.  Pages 37

11   through 41 simply recite those counts.  Page 41, gives

12   the statute.  The elements are at page 42.  Any question,

13   comments, or criticisms on the charge for those counts?

14       All right.  Then page 45, the discussion of Counts

15   12, 13, 14, 16, 17, 18, 20, and 21 begins.  The counts are

16   recited at page 50, and here, the government does indeed

17   simply cite that portion of the statute about the false

18   entry.

19           **MR. CHRISTIAN:**  Your Honor, on page 51, a very

20   minor issue on the first element?  It just has the word

21   "handwritten" and the word "statement" capitalized?

22           **THE COURT:**  Yes.

23           **MR. CHRISTIAN:**  I would just ask that that be

24   put in lower case so the jurors are not looking for an

25   official GBI handwritten statement document.

1      **THE COURT:**  Prison witness statement or a

2  handwritten statement.

3      **MR. CHRISTIAN:**  The Macon State Prison witness

4  statement is, in fact, the title of that document, but

5  the GBI handwritten statement is just on a piece of

6  paper.

7      **THE COURT:**  Okay.  Yeah, I probably will, going

8  back to the general term in Count 3, come up with

9  something other than cover-up to describe that.  I'll

10  give some thought to that.

11      **MR. CHRISTIAN:**  And there's a typo also, I

12  believe, on page 52, the middle paragraph?  The sentence

13  that starts with "it is wholly for you to determine

14  whether the documents the defendant is charged with?"  I

15  think it should be document the defendant is charged

16  with.

17      **MR. JARRARD:**  Mr. Christian, where are you at?

18      **MR. CHRISTIAN:**  Page 52, the middle paragraph.

19  The one that starts:  The FBI is an agency of the United

20  States?  I just think it should be:  It is wholly for you

21  to determine whether the "document" rather than

22  "documents."

23      **THE COURT:**  Okay.  All right.  And, again, the

24  character evidence charge we'll move, duty to deliberate,

25  and the verdict form.  We'll talk about the verdict form

1    in a minute.  All right.  Have we covered the draft

2    charge and your comments about the draft charge?  Let's

3    talk --

4            **MR. JARRARD:**  Your Honor?

5            **THE COURT:**  Yes.

6            **MR. JARRARD:**  Is the Court going to be in a

7    position to send us that this evening?

8            **THE COURT:**  To do what?

9            **MR. JARRARD:**  The re-advised --

10           **THE COURT:**  Yes.  We'll go to work on that in a

11   little bit and send that out.  And let's talk about the

12   logistics of this.  Sometimes I give the jury a copy of

13   the charge in the jury box.  Sometimes I wait until they

14   get back there before they get a copy.  Of course, they

15   all want their own copy, which means we've got to have 12

16   copies.

17        So the logistics are that, you know, in the morning

18   I need to know that we've got the final charge.  Not that

19   wasting paper is the biggest thing we have to worry

20   about.  There is both paper and some effort involved in

21   printing out 12 copies, or they're going to be more than

22   that.  I'll wait til in the morning to do that, and we

23   can probably even do that while y'all are doing your

24   closing.  But I need to know in the morning if there's

25   anything that we need to change, beyond what we end up

1    discussing tonight.

2        Now, does anybody have any charge that was not given

3    that you wish to address?  Mr. Jarrard, I'll ask you

4    first.

5            **MR. JARRARD:**  No, Your Honor.

6            **THE COURT:**  Mr. Wolfe?

7            **MR. WOLFE:**  No, thank you, Judge.

8            **MR. FOX:**  No, thank you, Your Honor.

9            **THE COURT:**  Mr. Hogue?

10           **MR. JARRARD:**  None.

11           **THE COURT:**  Ms. Gomez?

12           **MS. GOMEZ:**  No, sir.

13           **THE COURT:**  Mr. Pate?

14           **MR. PATE:**  No, Your Honor.

15           **THE COURT:**  So, you know, I will give you --

16   obviously you'll have an opportunity to make your

17   objections to the charge, but I don't want to be

18   surprised about an objection that's made tomorrow that we

19   haven't talk about today, and I'm taking from -- subject

20   to your last review of the charge, I'm taking from our

21   discussion this afternoon that I've addressed the issues

22   that you think I need to address with regard to the

23   charge.

24           **MR. JARRARD:**  And I would anticipate Mr. Wolfe

25   and I will send some law on constructive amendment to you

1    just as soon as we leave.

2              **THE COURT:**  Okay.  Very good.  Anything else to

3    discuss with regard to the charge?  Closing arguments?

4    Time.  Mr. Christian, what does the government propose

5    for its closing?

6              **MR. CHRISTIAN:**  Maybe 75 minutes, Your Honor?

7              **THE COURT:**  All right.

8              **MR. CHRISTIAN:**  Hopefully not that long, but --

9              **THE COURT:**  Well, of course, the government is

10   everything and the defendants, while I'm not saying you

11   only talk about your clients, but --

12             **MR. CHRISTIAN:**  And that's the primary issue,

13   Your Honor, just the number of counts and the elements

14   for the different kinds of counts, just to recite those

15   for the jury is going to take some time.

16             **THE COURT:**  All right.  Any comments from the

17   defense about time?  At this -- I can't imagine that the

18   defendants, any defendant, wants to take nearly the time

19   that the government wants to take, but at the same time

20   I'm not going to restrict you.  Any defendant thinks that

21   counsel, he or she, will need more than 30 minutes, let

22   me know.  Is that fair?  Okay.  All right.  Any other

23   issues we need to discuss today then?

24             **MR. CHRISTIAN:**  Not for the government, Your

25   Honor.

1      **MR. FOX:**  Your Honor, I was going to say --

2   we're just talking about closings or all issues?

3      **THE COURT:**  No, any issue now.

4      **MR. FOX:**  In terms of the verdict form, I don't

5   have any objections per se, but I would just ask this.

6   My client is presumed to be innocent, that is, he's

7   presumed to be not guilty, and with that presumption in

8   mind, I would ask that the words "not guilty" appear

9   first in terms of elections and that the election for

10  guilty comes second.

11     **THE COURT:**  I don't have a problem with that.

12  Ms. Hatcher, you've got to type it up, so --

13  *(Aside to Clerk)*

14     **MR. FOX:**  And, Your Honor, I think the caption

15  on that would fall under Mr. Wolfe's concern about it

16  just being James Hinton, that if there was to be a

17  caption all the defendants would be on it.

18     **THE COURT:**  Yes, this has the complete -- what

19  I'm looking at has the complete caption.

20     **MR. FOX:**  Okay.

21     **MR. WOLFE:**  Judge, with regard to the

22  government's argument, I understand, is there -- is

23  government required to open and close?

24     **THE COURT:**  Yes.  A meaningful opening, a

25  substantive opening.  They don't have to close, but I'm

1    sure they'll want to close.

2             **MR. CHRISTIAN:**  It'll be much briefer, Your

3    Honor.

4             **THE COURT:**  You do have to open.  All right.

5    Anybody else that's thought of anything with regard to

6    the jury verdict form?

7             **MR. CHRISTIAN:**  Not for the government.

8             **THE COURT:**  All right, any other issues?  We

9    sent out the proposed redacted indictment.  Anybody spot

10   any issues there?

11            **MR. CHRISTIAN:**  Not for the government.

12            **THE COURT:**  All right.  Anything from the

13   defendants' counsel?

14            **MR. WOLFE:**  No, thank you.

15            **MR. JARRARD:**  No, sir.

16            **THE COURT:**  All right.  We'll get started then

17   at 8 o'clock in the morning.  Thank you all.

18            _____

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2          I, Sally L. Gray, Federal Official Court Reporter,

3    in and for the United States District Court for the

4    Middle District of Georgia, do hereby certify that

5    pursuant to Section 753, Title 28, United States Code

6    that the foregoing is a true and correct transcript of

7    the stenographically reported proceedings held in the

8    above-entitled matter and that the transcript page format

9    is in conformance with the regulations of the Judicial

10   Conference of the United States, dated this 10th day of

11   September, 2014.

12

13                    /S/ SALLY L. GRAY
                      SALLY L. GRAY, CCR, RPR
14                    FEDERAL OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25